## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| LUCID GROUP USA, INC.,<br><br>     *Plaintiff*,<br><br>     v.<br><br>MONIQUE JOHNSTON, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles; DANIEL AVITIA, in his official capacity as Executive Director of the Texas Department of Motor Vehicles; and CORRIE THOMPSON, in her official capacity as Director of the Enforcement Division of the Texas Department of Motor Vehicles,<br><br>     *Defendants*. | Case No. 1:22-cv-1116 |

## COMPLAINT

Plaintiff Lucid Group USA, Inc. (collectively, with its manufacturing affiliate, Lucid Motors USA, Inc., "Lucid") brings this civil action for declaratory and injunctive relief, alleging as follows:

### NATURE OF THE ACTION

1.    Lucid is an American company that develops, designs, and manufactures electric vehicles in the United States. Its mission is to inspire the adoption of sustainable energy by creating the most captivating electric vehicles, centered around the human experience. Its first vehicle, the Lucid Air, was launched in 2021 to widespread acclaim, including being recognized as MotorTrend's 2022 Car of the Year®. As a new entrant to the automotive market, Lucid recognized that the only feasible way to get its vehicles to consumers was by selling them directly—without a middleman. And it knew that the direct-sales model was the only way to stay true to its values of treating customers with respect and providing unsurpassed customer service, ruling out the kind of high-pressure, commission-driven sales tactics commonly associated with the traditional third-party-dealership model. Lucid's stores, which it calls "Studios," are different

from traditional dealerships: the focus is customer experience, not pushing cars off the lot. And customers have taken notice, praising Lucid's seamless approach to customer experience that extends from a customer's initial expression of interest through education, sales, and service.

2.      While many states have welcomed Lucid, the State of Texas has barred Lucid from obtaining a license to operate a dealership in the state. Its position is that a Texas law intended to protect traditional dealers against competition by the manufacturers whose vehicles they sell also prohibits manufacturers without independent dealers from operating their own dealerships. As applied to Lucid, this prohibition is irrational in the extreme: it hurts competition, reduces consumer choice, and drives up costs and inconvenience, with no countervailing benefit whatsoever. Texas law allows auto manufacturers like Lucid to lease and rent vehicles to Texans from within the state, sell previously leased or rented vehicles to Texans from within the state, and even sell new vehicles directly to Texans from out-of-state dealerships. The one thing that Lucid can't do is open a new-vehicle dealership within the State of Texas. And that makes no sense.

3.      Reducing competition only hurts Texas consumers. And forcing vehicle sales to take place outside of Texas borders makes it more difficult, or even impossible, for Texas regulators to protect Texas consumers. This prohibition is pure economic protectionism for the benefit of Texas's existing auto dealers. It puts their profits ahead of the interests of Texas consumers.

4.      Lucid brings this suit to vindicate its constitutional rights to be free from arbitrary government restrictions on its lawful business activities and to vindicate Texans' interest in enjoying the benefits of a competitive marketplace for vehicles. The State of Texas has no legitimate interest in blocking its citizens from purchasing vehicles at a Lucid-owned dealership. And it has no rational basis to distinguish between Lucid-owned dealerships and dealerships owned by independent dealers operating under franchise agreements with manufacturers. As applied to Lucid, Texas's direct-sales ban is unconstitutional. Accordingly, Lucid asks this Court to hold that Texas's application of the direct-sales ban to Lucid violates the U.S. Constitution's Due Process and Equal Protection Clauses, allow Lucid to compete on a level playing field for the

business of Texas consumers, and give Texas consumers the choice to patronize a Lucid dealership.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a) because Lucid's claims arise under the U.S. Constitution and 42 U.S.C. § 1983.

6.      Lucid's requests for declaratory and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*; the All Writs Act, 28 U.S.C. § 1651; Rules 57 and 65 of the Federal Rules of Civil Procedure; and the Court's inherent equitable powers.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b) and in this Division because one or more of the Defendants resides in this judicial District and Division and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial District and Division.

## PARTIES

8.      Plaintiff Lucid Group USA, Inc. is the sales entity that owns, operates, and controls Lucid retail locations in states that allow Lucid Group USA, Inc. to sell direct to consumers. Its corporate affiliate Lucid USA, Inc., is an American company that designs and manufactures electric vehicles, markets its vehicles, and provides parts, accessories, service, and support to owners of its vehicles. Both entities are headquartered in Newark, California, and both are wholly owned subsidiaries of Atieva, Inc.

9.      Defendant Monique Johnston is Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles and is responsible for administering and enforcing Texas law. She is a resident of Texas, resides in Austin, and is sued in her official capacity only.

10.     Defendant Daniel Avitia is Executive Director of the Texas Department of Motor Vehicles and is responsible for administering and enforcing Texas law. He is a resident of Texas, resides in Austin, and is sued in his official capacity only.

11.     Defendant Corrie Thompson is Director of the Enforcement Division of the Texas Department of Motor Vehicles and is responsible for enforcing Texas law. She is a resident of Texas, resides in Austin, and is sued in her official capacity only.

## FACTUAL ALLEGATIONS

### Lucid Designs, Manufactures, and Markets Award-Winning Electric Vehicles

12.     Lucid's parent company, Atieva, Inc., was founded in 2007 to advance the state of the art in electric-vehicle battery and powertrain technology. Through intensive research and development, it came to market with electric-vehicle components that simultaneously achieved high performance, efficiency, safety, and durability, and its technologies and components were featured in buses and racecars.

13.     In 2016, Lucid announced the development of its own all-electric, high-performance vehicle, the Lucid Air. In 2019, the company broke ground on a vehicle-manufacturing facility in Arizona. Commercial production of the Lucid Air began in 2021, and the first vehicles were delivered to consumers that year.

14.     The Lucid Air employs an advanced and efficient high-voltage electric-vehicle powertrain system. Relying on Lucid's in-house technologies, the Air Grand Touring is EPA-certified for up to 516 miles of range on a single charge, achieves up to 4.6 miles per kilowatt-hour of charge, can be charged to 300 miles of range in approximately 22 minutes, and continually receives new features and refinements through Lucid's over-the-air update system.

15.     Upon its launch, the Lucid Air met with immediate acclaim. It was named MotorTrend's 2022 Car of the Year®, "Best EV" at MotorWeek's Drivers' Choice Awards, "Luxury Green Car of the Year" by Green Car Journal, and "Best Car To Buy in 2022" by Green Car Reports. Customers have also raved over the Lucid Air's performance and quality, as well as Lucid's customer-focused buying experience.

16.     Customers have placed tens of thousands of reservations for the Lucid Air, and Lucid is in the process of expanding its manufacturing capacity to an estimated 90,000 cars per year, including its recently announced SUV model, which is expected to begin production in 2024.

17.     Lucid depends on the tight integration of research, development, production, and after-sale service and support to continuously improve the Air and its technologies.

**Lucid's Direct Sales and Service Model**

18.     Lucid's luxury customer experience likewise depends on its integration of sales and after-sale support and service. Lucid engages directly with customers at every step, from a customer's initial expression of interest through sale and after-sale support and service. Because Lucid is the developer and manufacturer of its vehicles, it has the knowledge and capabilities to rapidly respond to and act on consumer questions, concerns, and problems—even when that requires going straight to the product design and engineering teams. And Lucid uses the feedback that it receives from consumers to identify emerging issues and continually improve both its customer experience and its products. That tight and fast feedback loop, and the benefits it brings to Lucid's customers, would be impossible with third-party dealers interposed between Lucid and consumers.

19.     Lucid markets its vehicles directly to consumers through its website and a growing network of Lucid-owned Studios.

20.     Unlike legacy automakers, Lucid does not employ independent franchised dealers. Lucid is the only dealer of new Lucid vehicles. Lucid has no intention of ever entering into a franchise agreement with any independent dealer.

21.     While consumers are generally familiar with internal-combustion vehicles, many are unfamiliar with electric vehicles and harbor concerns about electric-vehicle range and charging, durability, and safety. Many consumers are also unfamiliar with Lucid and its technologies because it has only recently entered the market. Accordingly, a central part of Lucid's sales process is educating consumers about electric vehicles in general, Lucid's values and experience, its technologies, and its vehicles. Lucid's dealerships feature dedicated areas where consumers can experience vehicle options like colors, materials, and finishes; a virtual-reality system so that customers can experience their chosen options; and educational displays on Lucid's proprietary technologies.

22.    Lucid's direct-sales model allows it to provide a superior buying experience for consumers. Lucid's sales process differs from the traditional car-dealership experience. To begin with, Lucid sells its vehicles at uniform and transparent prices, no matter whether the customer places an order at a dealership or online. This eliminates the haggling over prices and hidden fees that lead consumers to distrust motor-vehicle dealers. Each Lucid Air is made-to-order, and customers can design their own vehicles online or at a dealership, choosing the performance level and customizing features like the body color, interior, and finishes. This allows customers to decide for themselves what options they want and see the prices, without being pushed into accepting add-ons that they do not want and may not need. There is no pressure and nothing to negotiate.

23.    To achieve its customer-first sales experience, Lucid has rejected the traditional incentive-structure for motor-vehicle sales. Traditional franchised dealerships profit from volume, receiving bonuses for high sales quantities. In turn, franchised dealerships' sales personnel are typically paid based on sales, giving them the incentive to pressure consumers, push profitable add-ons, and employ hardball tactics to close deals. Lucid rejects all of that. It sells directly, eliminating the dealer commissions and bonuses that drive the traditional high-volume, high-pressure franchised-dealer model. Its sales representatives are salaried. This gives them the right incentive to take the time necessary to educate customers, answer their questions, and provide a no-pressure sales experience that reflects Lucid's values of treating customers with respect and providing an unsurpassed customer experience.

24.    Upon placing an order, every Lucid customer is assigned and introduced to a Lucid employee known as a "Delivery Advisor" who serves as the point of contact between the customer and the team of Lucid employees responsible for the customer's vehicle. The Delivery Advisor answers customer questions, educates the customer about the vehicle, advises on and assists with preparations that may be necessary like arranging in-home charging, provides status updates, and then guides the customer on the delivery process. In this way, Lucid provides customers with personalized service that is tailored to their needs and responsive to their questions and concerns.

25.     Lucid provides support and service, including warranty service, to owners of its vehicles. Because Lucid's vehicles employ the company's proprietary advanced technologies, Lucid is best positioned to provide the full range of support and service for its vehicles. Moreover, providing support and service directly to consumers allows Lucid to quickly identify emerging issues, refine its customer support and service, and improve its products.

26.     The direct-sales model is what allows Lucid to provide its seamless and superior customer experience. Without a middleman standing between Lucid and its customers, Lucid can ensure that customers are treated with respect, and in line with Lucid's values, at all times. Unlike with the traditional franchised-dealer model, there is no diffusion of responsibility. Lucid is directly responsible for every contact that a customer has with the brand—its name and reputation are on the line in every customer interaction.

27.     Lucid has determined that the direct-sales model is the only viable way for it to bring its new vehicles to market. As a startup still building production capacity and consumer awareness, Lucid's sales at this time are limited and would not support a network of independent franchised dealers and the earnings, commissions, or other payments that franchised dealers would require to enter into business. In addition, Lucid's use of uniform and transparent prices would make it difficult for a franchised dealer to tack on its own markups because they would not be competitive with the prices published by Lucid and available from Lucid's out-of-state dealerships and on its website. For the same reason, a franchised dealer would have little or no ability to upsell consumers with add-ons. And because Lucid has only recently entered the market, few of its vehicles are on the road, limiting opportunities for a franchised dealer to sell used vehicles and provide parts and service—traditionally important sources of income for franchised dealers. Moreover, electric vehicles typically require less service and maintenance and fewer replacement parts than internal-combustion vehicles, further limiting a franchised dealer's earning opportunity. All of this would make it economically difficult, or even impossible, for independent, third-party dealers to justify the costs of building out, equipping, and operating Lucid dealerships. For an electric-vehicle startup like Lucid, establishing a network of independent franchised dealers is not

economically viable. And the independent-dealer model would break the tight feedback loop that Lucid relies on to continuously improve its customer experience, its vehicles, and ultimately its business.

## Lucid's Operations in Texas

28.     Texas residents have shown strong interest in the Lucid Air through vehicle reservations and orders, inquiries to Lucid, and visits to Lucid's website.

29.     Lucid operates a service and vehicle-delivery center in Houston, Texas, plans to open a Studio in Plano, Texas, in 2022, and plans to open additional Studios in Texas in the future.

30.     Texas residents can reserve a Lucid Air for purchase through Lucid's website or at a Lucid-owned out-of-state Studio licensed to sell directly to consumers. When the vehicle is ready to be manufactured, the purchase can be completed through one of Lucid's out-of-state licensed Studios. The customer will also arrange delivery of the vehicle, typically to a Lucid delivery center like the one in Houston or directly to the customer's home.

31.     Lucid performs service, including repair-work and warranty service, for its vehicles at its Houston service center.

## Texas's Direct-Sales Prohibition

32.     Texas law regulating new motor-vehicle sales is administered and enforced by the Texas Department of Motor Vehicles, in particular its Motor Vehicle Division.

33.     Texas law generally requires a license known as a "general distinguishing number" to sell motor vehicles from an established and permanent place of business within the state—i.e., a dealership. Tex. Transp. Code § 503.21. Without a general distinguishing number, it is unlawful for a person to engage in business as a motor-vehicle dealer. *Id*. General distinguishing numbers are issued by the Texas Department of Motor Vehicles. *Id*. §§ 503.029, 503.034.

34.     A separate statutory provision generally provides that motor-vehicle "manufacturer" may not: "own," "operate or control," or "act in the capacity of" (1) "a franchised dealer or dealership" for the same type of motor vehicles that it manufactures or (2) "a nonfranchised dealer." Tex. Occ. Code § 2301.476(c).

8

35.     When Texas enacted the initial version of this prohibition in 1999, there were no vehicle dealerships in the state owned or operated by direct-sales-only motor-vehicle manufacturers without independent dealers.

36.     The Motor Vehicle Division's position is that Tex. Occ. Code § 2301.476(c) generally prohibits any motor-vehicle manufacturer from owning, operating, controlling, or otherwise serving in the capacity of a new motor-vehicle dealer within the State of Texas, irrespective of whether the manufacturer has existing independent franchised dealers within Texas or anywhere. This prohibition, only as applied to manufacturers like Lucid that have no independent franchised dealers, is referred to herein as the "**Direct-Sales Prohibition**."

37.     In 2021, the Motor Vehicle Division informed Lucid that the Direct-Sales Prohibition prohibits Lucid from owning or operating a motor-vehicle dealership within the State of Texas.

38.     Texas law, however, allows motor-vehicle manufacturers like Lucid to undertake many activities commonly performed by new motor-vehicle dealerships. Specifically, such a manufacturer or manufacturer affiliate can:

a.     Lease and rent its vehicles from an established physical location within Texas;

b.     Sell previously leased or rented vehicles directly to consumers from an established physical location within Texas;

c.     Own and operate physical business locations within Texas, often referred to as "galleries," where consumers can see and learn about the manufacturer's models and take demonstration drives of the manufacturer's models;

d.     Sell new vehicles directly to Texas residents from out-of-state manufacturer-owned dealerships that consumers can then have delivered to them in Texas;

e.     Arrange financing for sales of the manufacturer's vehicles;

f.     Sell parts and accessories for the manufacturer's vehicles from an established physical location within Texas; and

g.      Provide repairs and service, including warranty service, for the manufacturer's vehicles from an established physical location within Texas.

39.     In short, Texas law allows vehicle manufacturers like Lucid to do everything that motor-vehicle dealers do—including selling motor vehicles to Texas consumers—with one single, narrow exception: selling new motor vehicles from an established and permanent physical location in the state.

40.     But for the Direct-Sales Prohibition, Lucid would seek to sell new Lucid vehicles to consumers from established and permanent physical locations in Texas.

## **The Prohibition Furthers No Legitimate State Interest**

41.     The Direct-Sales Prohibition limits competition in the Texas market for new motor vehicles, to the detriment of Texas consumers. It is pure economic protectionism and furthers no legitimate state interest. Indeed, it *frustrates* any governmental interests in advancing consumer welfare and protecting consumers from deceptive and unfair business practices.

42.     The Direct-Sales Prohibition does not advance any state interest in consumer protection. Whether a motor-vehicle dealership is owned or operated by a manufacturer versus a manufacturer's franchised dealer has no rational relationship to preventing unfair or deceptive business practices. Indeed, Texas law expressly authorizes manufacturers to own and operate dealerships in certain circumstances. *E.g.*, Tex. Occ. Code § 2301.476(d)–(e). Texas law further allows manufacturers to lease vehicles to consumers, which implicates consumer-protection interests no differently than vehicle sales. Moreover, the provisions of Texas law addressing unfair or deceptive practices apply to dealerships regardless of whether they are owned or operated by a manufacturer. That includes specific provisions relating to dealers and dealerships. Tex. Occ. Code §§ 2301.351 (prohibiting violation of rules and "false, deceptive, or misleading advertising relating to the sale or lease of motor vehicles"), 2301.651 (providing for denial or revocation of dealer licenses), 2301.801–805 (enforcement provisions). It also includes the state's laws generally prohibiting and punishing deceptive trade practices. Tex. Bus. & Com. Code §§ 17.12 (deceptive

advertising), 17.41–63 (Texas Deceptive Trade Practices-Consumer Protection Act); Tex. Penal Code § 32.42 (establishing criminal offense for "deceptive business practices").

43.     The Direct-Sales Prohibition frustrates the state's ability to protect consumers by forcing Texas residents to purchase vehicles from dealerships outside of the state's borders, where the state lacks the legal and practical ability to address deceptive or unfair practices. As previously alleged, the Direct-Sales Prohibition does not prevent manufacturers like Lucid from selling new vehicles to Texas consumers, but instead requires that such sales occur outside of Texas. Unlike in-state dealerships, motor-vehicle dealerships outside of Texas are not subject to licensure, monitoring, or supervision by Texas. Moreover, such out-of-state dealerships are not subject to Texas's regulatory jurisdiction and may not be susceptible to its enforcement jurisdiction. And, as a practical matter, it is more difficult for Texas to conduct investigation of and enforcement against out-of-state entities. By channeling vehicle sales through out-of-state dealerships, the Direct-Sales Prohibition undermines Texas's ability to detect, investigate, prevent, and punish any deceptive or otherwise unlawful practices respecting those out-of-state sales. In this way, the Direct-Sales Prohibition impedes Texas from protecting Texas consumers.

44.     The Direct-Sales Prohibition does not advance consumer welfare or prevent anticompetitive conduct. It does not increase competition or consumer choice. It does not reduce costs to consumers. To the contrary, the Direct-Sales Prohibition is a restraint of trade. It reduces competition by limiting access to the Texas market by manufacturers like Lucid that employ the direct-sales-only model. Increasing competition benefits consumers by giving them more choices, improving quality (including quality of service), and reducing prices; reducing competition, as the Direct-Sales Prohibition does, has the opposite effects and thereby undermines consumer welfare. Furthermore, the Direct-Sales Prohibition imposes additional expenses and inconveniences on consumers who purchase vehicles from manufacturers, by requiring those sales to take place out of state, away from where these consumers reside, and requiring that the risk of loss be transferred to the consumer out of state. And by requiring manufacturers to interpose an independent middleman between themselves and consumers, the Direct-Sales Prohibition drives up costs and

prices and undermines customer experience. The Direct-Sales Prohibition does not aid consumers; it injures them.

45.     The Direct-Sales Prohibition has no rational relationship to any state interest in protecting franchised dealers from competition or unfair practices by the manufacturers whose vehicles they market. Direct-sales-only manufacturers like Lucid have no independent franchised dealers, and so there is no competitive-power imbalance or manufacturer–franchisee relationship for the state to regulate.

46.     Moreover, Texas law recognizes that there is nothing inherently special about a franchise agreement and that such agreements are unnecessary, in and of themselves, to achieve any state interests. In certain market segments, Texas law does not require a dealer to enter into a franchise agreement with a manufacturer. Texas law expressly authorizes "nonfranchised dealers" to sell used motor vehicles and independent mobility motor vehicles. Tex. Occ. Code §§ 2301.002(25), 2301.255.

47.     The Direct-Sales Prohibition does not advance any state interest in public health and safety. Whether a motor-vehicle dealership is owned or operated by a manufacturer like Lucid versus a manufacturer's franchisee has no rational relationship to public health or safety. All Texas laws addressing public health or safety apply equally regardless of whether a dealership is owned or operated by such a manufacturer versus a manufacturer's franchised dealer.

48.     The Direct-Sales Prohibition is irrational on its face. Texas has no reason to channel vehicle sales to out-of-state dealerships, undermine its own consumer-protection interests, impose unnecessary costs and inconvenience on Texas consumers, and reduce competition in Texas's market for new motor vehicles. Nor does it have any reason to force Lucid to contract with independent franchised dealers to sell its vehicles—which, as alleged above, is not feasible for Lucid—when that requirement would only serve to increase prices and otherwise injure consumers. And it is illogical for Texas to prohibit direct-sales-only manufacturers like Lucid from selling new vehicles directly to consumers at a physical location in the state when Texas allows those same manufacturers to lease and rent vehicles, sell previously leased or rented vehicles,

service vehicles (including providing warranty service), and even sell new vehicles to Texans through out-of-state manufacturer-owned dealerships. Texas has no rational basis to distinguish between direct-sales-only manufacturers like Lucid and the independent franchised dealers that it permits to own and operate motor-vehicle dealerships. Texas has no rational basis to distinguish between direct-sales-only manufacturers like Lucid and the "nonfranchised dealers" that it permits to own and operate motor-vehicle dealerships. And it has no rational basis to distinguish between direct-sales-only manufacturers like Lucid that seek to sell directly to consumers from established physical locations in the state and manufacturers that it allows to lease and sell vehicles to Texas residents, including at established physical locations in the state.

49.     The anti-competitive, anti-consumer nature of direct-sales bans has been widely recognized. Federal Trade Commission officials have determined that state prohibitions on direct sales by motor-vehicle manufacturers reduce competition and harm consumers and that there is no rationale for applying such prohibitions to manufacturers like Lucid that have no independent franchised dealers.[1] The position of FTC's Directors of Bureaus of Economics and Competition and Office of Policy Planning is clear: "States should allow consumers to choose not only the cars they buy, but also how they buy them."[2] As is their rationale that blanket prohibitions like Texas's Direct-Sales Prohibition only injure consumers and have no offsetting justification:

> FTC staff supports the movement to allow for direct sales to consumers…. Blanket prohibitions on direct manufacturer sales to consumers are an anomaly within the larger economy. Most manufacturers and suppliers in other industries make decisions about how to design their distribution systems based on their own

---

[1] *See, e.g.*, FTC, Letter to Michigan Senator Darwin L. Booher, May 7, 2015, *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-regarding-michigan-senate-bill-268-which-would-create-limited-exception-current/150511michiganautocycle.pdf; FTC, Press Release, FTC Staff: Missouri and New Jersey Should Repeal Their Prohibitions on Direct-to-Consumer Auto Sales by Manufacturers, May 16, 2014, *available at* https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-staff-missouri-new-jersey-should-repeal-their-prohibitions-direct-consumer-auto-sales.

[2] FTC, Direct-to-consumer auto sales: It's not just about Tesla, May 11, 2015, *available at* https://www.ftc.gov/enforcement/competition-matters/2015/05/direct-consumer-auto-sales-its-not-just-about-tesla.

business considerations, responding to consumer demand. Many manufacturers choose some combination of direct sales and sales through independent retailers. Typically, no government intervention is needed to augment or alter these competitive dynamics—the market polices inefficient, unresponsive, or otherwise inadequate distribution practices on its own. If the government does intervene, it should adopt restrictions that are clearly linked to specific policy objectives that the legislature believes warrant deviation from the beneficial pressures of competition, and should be no broader than necessary to achieve those objectives.… Protecting dealers from abuses by manufacturers does not justify a blanket prohibition [that] extends to all vehicle manufacturers, even those…who have no interest in entering into a franchise agreement with any dealer.[3]

50.     Similarly, in a 2021 open letter, dozens of scholars in economics, competition policy, market regulation, industrial organization, and related fields called on state laws "prohibiting car companies from selling their cars directly to consumers" to "be amended to permit direct sales and service of electric vehicles."[4] Such laws, they found, have "a variety of negative consequences":

(1) slowing the market penetration of EVs; (2) correspondingly, maintaining a higher share of internal combustion vehicles on the roads, with negative environmental consequences; (3) interfering with manufacturers' freedom to experiment with new distribution models for new technologies and market conditions, thus reducing the competitiveness of the U.S. EV industry and advantaging foreign competitors; (4) interfering with consumers' freedom to decide how they will purchase cars; and (5) interfering with free and functioning markets to privilege economic special interests.[5]

"Prohibiting direct distribution of EVs," they explained, "is not supported by legitimate public policy objectives.…[T]he original concerns that animated the direct distribution prohibitions—protecting a franchisee from its own franchisor—do not apply to a company that is not using franchisees."[6] And "the argument that adding a mandatory layer of costs between the manufacturer

---

[3] *Id.*

[4] Open Letter by Academics in Favor of Direct EV Sales and Service, April 14, 2021, *available at* https://laweconcenter.org/wp-content/uploads/2021/04/Direct-Sales-Nationwide-Academics-Letter-4.14.pdf.

[5] *Id.*

[6] *Id.*

and the consumer will reduce consumer prices has no basis in economics. There is no credible consumer protection argument in favor of prohibiting direct distribution."[7]

51.     Another group of scholars in industrial organization, distribution, competition, intellectual property, innovation, and related fields reached the same conclusion in a 2014 letter addressing New Jersey's prohibition on direct sales by manufacturers without franchised dealers. They explained:

> There is no justification on any rational economic or public policy grounds for such a restraint of commerce. Rather, the upshot of the regulation is to reduce competition in New Jersey's automobile market for the benefit of its auto dealers and to the detriment of its consumers. It is protectionism for auto dealers, pure and simple.[8]

52.     The same is true of Texas's Direct-Sales Prohibition. It is "protectionism for auto dealers, pure and simple."

## CLAIMS FOR RELIEF

### Count I
### U.S. Const., Amend. XIV, Due Process Clause

53.     Plaintiff hereby incorporates the preceding allegations as if fully set forth herein.

54.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects every person's right to pursue legitimate business subject only to regulations that are rationally related to the advancement of a legitimate governmental interest.

55.     Economic protection of a particular industry like existing motor-vehicle dealers is not a legitimate governmental interest.

56.     Application of Texas's Direct-Sales Prohibition to Plaintiff is not rationally related to the advancement of any legitimate governmental interest.

57.     Accordingly, as applied, Texas's Direct-Sales Prohibition violates Plaintiff's rights under the Due Process Clause.

---

[7] *Id.*

[8] Letter to Governor Chris Christie from the International Center for Law & Economics, Mar. 26, 2014, *available at* https://law.wm.edu/documents/Tesla_letter.pdf.

58.     Unless Defendants are enjoined from this violation of Plaintiff's rights, Plaintiff will continue to suffer great and irreparable injury.

59.     An injunction would serve the public interest by increasing competition and consumer choice and eliminating the expense and burdens associated with the Direct-Sales Prohibition.

**Count II**
**U.S. Const., Amend. XIV, Equal Protection Clause**

60.     Plaintiff hereby incorporates the preceding allegations as if fully set forth herein.

61.     The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution protects every person's right to be free from arbitrary classifications by state government. It prohibits a state from treating one set of persons differently from others who are similarly situated when there is no rational basis for the differential treatment.

62.     Economic protection of a particular industry like existing motor-vehicle dealers is not a valid basis that justifies differential treatment.

63.     By prohibiting affiliates of manufacturers without independent franchised dealers like Plaintiff from owning or operating new motor-vehicle dealerships in Texas, Texas's Direct-Sales Prohibition arbitrarily distinguishes between classes that are similarly situated in all material respects, in three separate ways. First, Texas's Direct-Sales Prohibition arbitrarily distinguishes between (a) manufacturers without independent franchised dealers and their affiliates and (b) manufacturers' franchisees that Texas permits to own and operate motor-vehicle dealerships. Second, Texas's Direct-Sales Prohibition arbitrarily distinguishes between (a) manufacturers without independent franchised dealers and their affiliates and (b) "nonfranchised dealers" that Texas permits to own and operate motor-vehicle dealerships. Third, Texas's Direct-Sales Prohibition arbitrarily distinguishes between (a) manufacturers without independent franchised dealers and their affiliates and (b) manufacturers whom Texas law permits to lease or sell motor vehicles to Texas consumers.

64.     Accordingly, as applied, Texas's Direct-Sales Prohibition violates Plaintiff's rights under the Equal Protection Clause.

65.     Unless Defendants are enjoined from this violation of Plaintiff's rights, Plaintiff will continue to suffer great and irreparable injury.

66.     An injunction would serve the public interest by increasing competition and consumer choice and eliminating the expense and burdens associated with the Direct-Sales Prohibition.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A.     On an expedited basis, pursuant to Federal Rule of Civil Procedure 57, for entry of judgment declaring that Texas's Direct-Sales Prohibition is unconstitutional as applied to Plaintiff and a permanent injunction prohibiting Defendants from enforcing the Direct-Sales Prohibition against Plaintiff;

B.     For an award of attorney fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988;

C.     For such further legal and equitable relief as the Court may deem just and proper.

Dated: November 1, 2022                              Respectfully submitted,

*/s/ Billy M. Donley*
Billy M. Donley
Texas Bar No. 05977085
bdonley@bakerlaw.com
Rachel Palmer Hooper
Texas Bar No. 24039102
rhooper@bakerlaw.com
BAKER & HOSTETLER LLP
811 Main Street
Suite 1100
Houston, TX 77002
Telephone: (713) 751-1600
Fax: (713) 751-1717

Andrew M. Grossman*
agrossman@bakerlaw.com
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Suite 1100
Washington, D.C. 20036
(202) 816-1697
Fax: (202) 861-1783

*Attorneys for Plaintiff*

\* Motion for admission *pro hac vice* forthcoming