**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| LUCID GROUP USA, INC.,<br><br>    *Plaintiff*,<br><br>        v.<br><br>MONIQUE JOHNSTON, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles; DANIEL AVITIA, in his official capacity as Executive Director of the Texas Department of Motor Vehicles; and CORRIE THOMPSON, in her official capacity as Director of the Enforcement Division of the Texas Department of Motor Vehicles,<br><br>    *Defendants*. | Civil Action No. 1:22-cv-01116 |

**Plaintiff's Motion For Summary Judgment**

**<u>Table of Contents</u>**

Introduction ........................................................................................................................1

Background .........................................................................................................................2

    A.    Lucid Designs, Manufactures, and Markets Award-Winning Electric Vehicles .............2

    B.    Texas Permits Lucid To Sell Vehicles to Texans But Prohibits It from Owning or Operating a Dealership in the State ............................................................4

    C.    Texas's Direct-Sales Prohibition Hurts Texas Consumers ................................................6

Argument ............................................................................................................................7

    I.    The Direct-Sales Prohibition Violates Lucid's Due Process Rights ................................8

        A.    The Prohibition Irrationally Undermines the State's Interest in Consumer Welfare ...................................................................................................10

        B.    The Prohibition Irrationally Undermines the State's Interest in Consumer Protection ..............................................................................................11

        C.    The Prohibition Is Unrelated to Public Health or Safety .......................................13

        D.    The Prohibition Is Unrelated to the State's Interest in Preventing Manufacturers from Using Their Market Power to Disadvantage Their Independent Franchised Dealers ...............................................................14

        E.    Protecting Existing Dealers from Competition Is Not a Legitimate State Interest ...........................................................................................................15

    II.    The Direct-Sales Prohibition Violates Lucid's Equal Protection Rights ......................15

Conclusion ........................................................................................................................16

## Table of Authorities

**Cases**

*Aladdin's Castle, Inc. v. City of Mesquite,*
630 F.2d 1029 (5th Cir. 1980) ...........................................................................9

*Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty.,*
488 U.S. 336 (1989) ...........................................................................................9

*A.M. Capen's Co., Inc. v. Am. Trading and Prod. Corp.,*
202 F.3d 469 (1st Cir. 2000) ............................................................................13

*Brantley v. Kuntz,*
98 F. Supp. 3d 884 (W.D. Tex. 2015) ................................................................9

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.,*
476 U.S. 573 (1986) .........................................................................................13

*Casket Royale, Inc. v. State of Mississippi,*
124 F. Supp. 2d 434 (S.D. Miss. 2000) ..............................................................9

*Chappelle v. Greater Baton Rouge Airport Dist.,*
431 U.S. 159 (1977) ...........................................................................................9

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ...........................................................................................9

*Craigmiles v. Giles,*
312 F.3d 220 (5th Cir. 2002) ...........................................................................10

*Doe v. Plyler,*
628 F.2d 448 (5th Cir. 1980) .............................................................................9

*Ford Motor Co. v. Tex. Dep't of Transp.,*
264 F.3d 493 (2001) .........................................................................................14

*General Motors Corp. v. Romein,*
503 U.S. 181 (1992) ...........................................................................................8

*Georgia Pac., LLC v. Heavy Machines, Inc.,*
No. 07-cv-944, 2010 WL 2026670 (M.D. La. May 20, 2010) ...........................8

*Gibson v. Tex. Dep't of Ins.—Div. of Workers' Comp.,*
700 F.3d 227 (5th Cir. 2012) ...........................................................................15

*Harper v. Lindsay,*
616 F.2d 849 (5th Cir. 1980) .............................................................................9

*Harris Cty. v. CarMax Auto Superstores Inc.,*
177 F.3d 306 (5th Cir. 1999) .............................................................................8

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989)..................................................13

*Hooper v. Bernalillo Cty. Assessor*,
    472 U.S. 612 (1985)....................................................9

*Int'l Truck and Engine Corp. v. Bray*,
    372 F.3d 717 (5th Cir. 2004) ........................................14

*James v. Strange*,
    407 U.S. 128 (1972)....................................................9

*La. Seafood Mgmt. Council, Inc. v. Foster*,
    917 F. Supp. 439 (E.D. La. 1996)....................................9

*Lamar Outdoor Advertising, Inc. v. Mississippi State Tax Comm'n*,
    539 F. Supp. 817 (S.D. Miss. 1982)..................................9

*Lindsey v. Normet*,
    405 U.S. 56 (1972)......................................................9

*Marmon v. Mustang Aviation, Inc.*,
    430 S.W.2d 182 (Tex. 1968)..........................................13

*Mathews v. Lucas*,
    427 U.S. 495 (1976)....................................................8

*Mayer v. City of Chicago*,
    404 U.S. 189 (1971)....................................................9

*Merrifield v. Lockyer*,
    547 F.3d 978 (9th Cir. 2008) ........................................15

*Metro. Life Ins. Co. v. Ward*,
    470 U.S. 869 (1985)....................................................9

*Midwest Title Loans, Inc. v. Mills*,
    593 F.3d 660 (7th Cir. 2010) ........................................13

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
    439 U.S. 96 (1978)......................................................5

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992)........................................................15

*O'Donnell v. Harris Cty.*,
    892 F.3d 147 (5th Cir. 2018) ..........................................9

*Pedigo v. Austin Rumba, Inc.*,
    722 F. Supp. 2d 714 (W.D. Tex. 2010)..............................8

*Plyler v. Doe*,
    457 U.S. 202 (1982) ...........................................................................................9

*Quinn v. Millsap*,
    491 U.S. 95 (1989) .............................................................................................9

*Reliable Consultants, Inc. v. Earle*,
    517 F.3d 738 (5th Cir. 2008) ...........................................................................9

*Slaughter v. Dobbs*,
    No.20-CV-789, 2022 WL 135424 (N.D. Miss. 2022) ....................................9

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (2013) ........................................................1, 9, 10, 12, 15

*Thompson v. Gallagher*,
    489 F.2d 443 (5th Cir. 1973) ...........................................................................9

*Turner v. Fouche*,
    396 U.S. 346 (1970) ...........................................................................................9

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973) ...........................................................................................9

*Village of Willowbrook v. Olech*,
    528 U.S. 562 (2000) ...........................................................................................9

*Williams v. Vermont*,
    472 U.S. 14 (1985) .............................................................................................9

*W.P. Carey, Inc. v. Bigler*,
    No. 18-cv-585, 2019 WL 1382898 (S.D.N.Y. Mar. 27, 2019) .......................8

*Zobel v. Williams*,
    457 U.S. 55 (1982) .............................................................................................9

## Statutes and Regulations

Fed. R. Civ. P. 56 ..................................................................................................7

Fed. R. Civ. P. 56, 2009 Advisory Committee Note ...........................................8

Tex. Bus. & Com. Code § 17.12 ........................................................................12

Tex. Bus. & Com. Code § 17.41–63 ..................................................................12

Tex. Occ. Code §§ 2301.002 ........................................................................6, 12

Tex. Occ. Code § 2301.351 ...............................................................................12

Tex. Occ. Code § 2301.476 .........................................................................5, 6, 12, 14

Tex. Occ. Code § 2301.603 ......................................................................................6

Tex. Occ. Code § 2301.801–805 ...........................................................................12

Tex. Penal Code § 32.42 ........................................................................................12

Tex. Transp. Code § 503.21 .....................................................................................5

Tex. Transp. Code § 503.029 ...................................................................................5

Tex. Transp. Code § 503.034 ...................................................................................5

43 Tex. Admin. Code § 215.181 ..............................................................................6

43 Tex. Admin. Code ch. 215, subtitle F .................................................................5

49 U.S.C. 30111 ....................................................................................................14

**Other Authorities**

Daniel A. Crane, Tesla, Dealer Franchise Laws, and the Politics of Crony Capitalism,
    101 Iowa L. Rev. 573 (2016) ...........................................................................5

Tex. House Research Org., Revising the Texas Motor Vehicle Commission Code:
    Analysis of H.B. 3092 (1999) ..........................................................................5

**Introduction**

Plaintiff Lucid Group USA, Inc. (collectively, with its manufacturing affiliate Lucid Motors USA, Inc., "Lucid") hereby moves for summary judgment that Texas's prohibition on its selling motor vehicles through dealerships located in the state violates its rights under the Fourteenth Amendment's Due Process and Equal Protection Clauses. While many states have welcomed Lucid's company-owned and -operated dealerships, Texas has barred Lucid from opening a dealership in the state. Defendants' position is that a Texas law intended to protect independent franchised dealers against competition by the manufacturers whose vehicles they sell also prohibits manufacturers *without* independent dealers—that is, "direct-sales manufacturers"—from opening their own dealerships. As applied to direct-sales manufacturers like Lucid, this prohibition is irrational in the extreme: it undermines competition, reduces consumer choice, drives up costs, and inconveniences consumers, with no countervailing benefit whatsoever. Texas law allows direct-sales manufacturers like Lucid to lease and rent vehicles to Texans from within the state, sell previously leased or rented vehicles to Texans from within the state, provide warranty service within the state, and even sell new vehicles directly to Texans from out-of-state dealerships. The one thing that Lucid cannot do is open a dealership within Texas. And that makes no sense. Reducing competition only hurts Texas consumers. And forcing vehicle sales to take place outside of Texas borders makes it more difficult, or even impossible, for Texas regulators to protect Texas consumers. This prohibition is pure economic protectionism for the benefit of Texas's existing auto dealers, which are one of the most powerful interest groups in the state. The prohibition puts their profits ahead of the interests of Texas consumers and even those of the state itself.

Texas's prohibition is indistinguishable from Louisiana's ban on manufacturer-direct casket sales that the Fifth Circuit struck down in *St. Joseph Abbey v. Castille*, 712 F.3d 215 (2013). Both laws prohibited manufacturers from making in-state sales based solely on the fact that they weren't part of the state-protected club of dealers. Both laws were entirely divorced from any concern about public health, safety, or consumer protection; demonstrating as much, both laws permitted out-of-state sales to state residents of the same products subject to their prohibitions.

Both laws irrationally hurt consumers by restricting competition. And ultimately, both laws had no conceivable purpose besides protecting incumbent industry—franchised auto dealers and funeral homes, respectively—from competition by new market entrants. But, as the Fifth Circuit held, "mere economic protection of a particular industry" is not "a legitimate government purpose" that justifies otherwise arbitrary classification by the state. *Id*. at 222–23. If there is any difference between these two laws, it is that Texas's prohibition on manufacturer-direct auto sales is even more irrational: while both laws undermined state interests in consumer welfare, the record here demonstrates that the Texas law does so while allowing *the same manufacturer* to engage in *the same conduct it prohibits*, selling motor vehicles directly to consumers, so long as the vehicles have been previously leased or rented or the sales occur out of state.

Texas consumers deserve to enjoy the full benefits of a competitive market for motor vehicles. And Lucid has a right to bring its innovative electric vehicles and first-class customer experience to market in Texas and give franchised incumbent dealers a run for their money by competing on an even playing field for Texans' business. If Texas wishes to override consumer choice and pick for itself who gets to compete, it must do so according to some rational basis. But it has none. For that reason, its prohibition on direct-sales manufacturers owning or operating dealerships in the state is unconstitutional, and Lucid is entitled to summary judgment.

## Background

### A. Lucid Designs, Manufactures, and Markets Award-Winning Electric Vehicles

Lucid was founded in 2007 to advance the state of the art in electric-vehicle battery and powertrain technology. Ex. 3, Declaration of Zachary Edson ("Edson Decl."), ¶ 6. After a decade of success developing and manufacturing electric-vehicle components, Lucid announced its first electric vehicle, the Lucid Air, and it began vehicle deliveries in 2021. *Id*. ¶¶ 6–7. Employing Lucid's proprietary powertrain and battery technologies, the Air was recognized as setting a new standard for electric-vehicle performance. *Id*. ¶¶ 8–9.

Lucid employs an innovative, non-traditional sales model. Traditionally, new motor vehicles have been sold through middlemen, franchised dealers that are independent of the vehicle

manufacturer. *Id.* ¶ 17; Ex. 1, Declaration of Fiona Scott Morton ("Scott Morton Decl."), ¶ 15. The pathologies of that sales model are well-known: high-pressure sales tactics, price-haggling, hidden fees, and upselling. Edson Decl., ¶ 13; Scott Morton Decl., ¶ 15. Lucid set out to provide a different experience, one that exemplifies its values and fits its business. Edson Decl., ¶¶ 10–15. It needed a sales model that would emphasize education, both about electric vehicles in general and Lucid's advanced technologies and products in particular; that would provide transparency, particularly on prices and options; that would be responsive to consumer needs, questions, and concerns and could act on them, even when that required going straight to the product design and engineering teams; that would allow it to continuously improve its products and service in response to customer feedback; and that would, above all else, put its customers first. *Id.* To achieve these things, Lucid needed to take full responsibility for every contact that a customer has with its brand, from a customer's initial expression of interest through sale and after-sale support and service. *Id.* ¶ 15. And there was no way to do that through the traditional franchised-dealer model. *Id.*

Lucid also recognized early on that the franchised-dealer model was not a viable way to bring its electric vehicles to market. Edson Decl., ¶ 16. To justify the large upfront investment to build out dealerships, independent dealers depend on income from sources other than new-car sales, which account for just 12 percent of a traditional dealership's profits on average. *Id.*; Scott Morton Decl., ¶ 15. Much of the rest comes from service, parts sales, and used-car sales, all of which would be limited for many years because Lucid is a new manufacturer still building market share and has few existing vehicles on the road. Edson Decl. ¶ 16; Scott Morton Decl., ¶ 15. Another major source of income for traditional dealers is upselling—that is, pressing customers to buy accessories, features, and other add-ons to a new vehicle. Scott Morton Decl., ¶ 15. But Lucid's uniform and transparent pricing—which includes all customizations and features for its vehicles, which are made-to-order—eliminates that source of income, as well. *Id.*; Edson Decl., ¶¶ 21, 26. Lucid's uniform and transparent pricing also meant that independent dealers would not be able to compete on price; indeed, Lucid's uniform pricing would leave them with no margin to pay for dealership facilities. Scott Morton Decl., ¶ 16; Edson Decl., ¶ 16,

The only viable course was for Lucid to sell its vehicles directly to consumers. Scott Morton Decl., ¶ 16; Edson Decl., ¶¶ 16–17. It has no independent dealers. Edson Decl., ¶ 17. Instead, Lucid's vehicles are available for purchase through dealerships that Lucid owns and operates in states that allow direct sales. *Id.* By selling directly, Lucid has eliminated the middleman. *Id.* Its sales representatives are not paid on commission, giving them the right incentives to serve customers. *Id.* ¶ 19. And Lucid sells its vehicles at uniform and transparent prices, without any haggling or upselling. *Id.* ¶ 18. The result is a seamless and superior customer experience: without a middleman standing between Lucid and its customers, Lucid can ensure that customers are treated with the respect they deserve, and in line with Lucid's values, at every step of the way. *Id.* ¶ 20–25.

In short, Lucid depends on the direct-sales model to build its business from the ground up while providing unsurpassed customer service, uniform and transparent pricing, and the tight feedback loop that it uses to continuously improve its products and service. *Id.* ¶ 27.

### B. Texas Permits Lucid To Sell Vehicles to Texans But Prohibits It from Owning or Operating a Dealership in the State

Texas is one of the nation's largest markets for new motor vehicles, and therefore an important market for an up-and-coming manufacturer like Lucid. Edson Decl., ¶ 28. Lucid currently operates a facility in Houston where it provides warranty and repair service to Lucid owners, and it will soon open vehicle galleries in Plano and elsewhere in Texas. *Id.* ¶¶ 29–30. Consumers who visit those galleries will be able to learn about electric vehicles and Lucid's vehicles and technologies, view vehicle models, get answers to their questions about Lucid vehicles, and take demonstration drives. *Id.* What they will not be able to do at those facilities is purchase a new Lucid vehicle. *Id.* ¶ 31. To do that, they will have to place an order at an out-of-state Lucid-owned dealership, whether in person or over the internet, and have the vehicle delivered to them in Texas. *Id.* The reason for this is Defendants' position that Texas law prohibits Lucid, as a motor-vehicle manufacturer, from obtaining the license necessary to sell motor vehicles from a physical location in the state. *Id.* ¶¶ 31–32.

Texas law generally requires a license known as a "general distinguishing number" to sell motor vehicles from an established and permanent place of business within the state—i.e., a dealership. Tex. Transp. Code § 503.21. Without a general distinguishing number, it is unlawful for a person to engage in business as a motor-vehicle dealer. *Id.* General distinguishing numbers are issued by the Texas Department of Motor Vehicles. *Id.* §§ 503.029, 503.034.

Defendants' position that Lucid is ineligible to obtain a general distinguishing number is premised on a provision of Chapter 2301 of the Texas Occupations Code, which principally regulates the relationship between motor-vehicle manufacturers and their franchised dealers. As relevant here, Section 2301.476(c) generally provides that a motor-vehicle "manufacturer," which is defined to include any "affiliate[]" of a manufacturer, may not: "own," "operate or control," or "act in the capacity of" (1) "a franchised dealer or dealership" for the same type of motor vehicles that it manufactures or (2) "a nonfranchised dealer." Tex. Occ. Code § 2301.476(c). Although this provision was intended to prevent manufacturers from competing with their own franchised dealers,[1] Defendants have maintained, for approximately the past decade, that it also bars manufacturers without independent franchised dealers from owning, operating, or otherwise controlling motor-vehicle dealerships within Texas.[2] As applied to direct-sales-only manufacturers like Lucid, that prohibition is referred to herein as the "**Direct-Sales Prohibition**."

The Direct-Sales Prohibition is exceedingly narrow, limited to the sale of motor vehicles from an established physical location in Texas. Texas permits a direct-sales manufacturer like Lucid to: lease and rent its vehicles from an established physical location within Texas;[3] sell previously leased or rented vehicles directly to consumers from an established physical location within

---

[1] *See* Tex. House Research Org., Revising the Texas Motor Vehicle Commission Code: Analysis of H.B. 3092 (1999); *see generally New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 100–02 & n.7 (1978) (describing historical genesis of such laws); Ex. 2, Declaration of Andrew M. Grossman ("Grossman Decl."), Ex. B, at 2.

[2] *See* Daniel A. Crane, Tesla, Dealer Franchise Laws, and the Politics of Crony Capitalism, 101 Iowa L. Rev. 573, 584 (2016).

[3] *See generally* 43 Tex. Admin. Code ch. 215, subtitle F.

Texas;[4] own and operate physical business locations within Texas commonly known as "galleries" where consumers see and learn about the manufacturer's models and take demonstration drives of the manufacturer's models;[5] sell parts and accessories for the manufacturer's vehicles from an established physical location within Texas;[6] and provide repairs and service, including warranty service, for the manufacturer's vehicles from an established physical location within Texas.[7]

In short, Texas law allows direct-sales manufacturers like Lucid to do everything that traditional motor-vehicle dealerships do—including selling motor vehicles to Texas consumers—with one narrow but significant exception: completing sales of new or preowned motor vehicles from a physical location in the state.

### C.  Texas's Direct-Sales Prohibition Hurts Texas Consumers

Because of the Direct-Sales Prohibition, Texas consumers are unable to purchase new vehicles from direct-sales manufacturers at dealerships in the state. This injures Texans in a variety of ways. Scott Morton Decl., ¶ 2.

First, the Direct-Sales Prohibition undermines consumer choice by limiting Texans' ability to purchase vehicles that are only available from their manufacturers. *Id.* ¶¶ 2, 7, 19. While the new motor vehicles of traditional manufacturers that sell through franchised dealers are available for purchase at many dealerships in the state, direct-sales manufacturers' vehicles are available at no dealerships in Texas. Consumers who may be uncomfortable or unfamiliar with purchasing a vehicle over the internet or at an out-of-state dealership have no access to these vehicles. *Id.* ¶ 19. According to the Federal Trade Commission's senior economics, competition, and policy officials, "A fundamental principle of competition is that consumers—not regulation—should determine

---

[4] *E.g.*, 43 Tex. Admin. Code § 215.181.

[5] *See* Tex. Occ. Code §§ 2301.002(7), 2301.002(8) (defining "dealer" and "dealership"); *id.* § 2301.476(c) (prohibiting ownership, control of, or acting in the capacity of only a "dealer" or "dealership").

[6] *See supra* n.5.

[7] *See, e.g.*, Tex. Occ. Code § 2301.603(a).

what they buy and how they buy it." Grossman Decl., Ex. A. The prohibition denies Texas consumers that choice.

Second, the Direct-Sales Prohibition imposes unnecessary inconvenience and expense on Texans who do choose to purchase vehicles from direct-sales manufacturers through out-of-state dealerships. While these customers may visit a gallery to learn about a vehicle model and even take a demonstration drive, they cannot complete the sale there, in person, which many consumers prefer to do for its convenience. Edson Decl. ¶¶ 31. Instead, they must purchase the vehicle remotely in another state and then arrange for delivery of the vehicle to Texas. *Id*.

Third, the Direct-Sales Prohibition deprives Texas consumers of the full benefits of competition. Motor-vehicle manufacturers compete on price and quality, including the quality of their products and their service. Scott Morton Decl., ¶¶ 18–22, 26. By limiting market access, the Direct-Prohibition undermines competition and the benefits that it brings to Texas consumers. *Id*.

Fourth, by forcing manufacturers to sell their vehicles through independent dealers, the Direct-Sales Prohibition directly increases costs to consumers through a phenomenon that economics refer to as "double marginalization." *Id*. ¶ 23. Put simply, adding an additional company to the supply chain for vehicles also adds an additional level of markup. *Id*. ¶¶ 23–24. That, in turn, increases prices for consumers and reduces demand, both of which reduce consumer welfare. *Id*. ¶ 25.

The bottom line is one shared by dozens of the nation's leading economics and competition scholars, the Consumer Federation of America, Consumer Action, Consumers for Auto Reliability and Safety, and the American Antitrust Institute: "direct distribution bans are bad for consumers." Grossman Decl., Ex. B; *see also* Scott Morton Decl. ¶ 21.

<u>**Argument**</u>

Lucid is entitled to summary judgment. Courts must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And summary judgment is appropriate at this time because this case presents the legal question of the constitutionality of Texas's Direct-Sales

Prohibition as applied to Lucid, which implicates no reasonably disputed facts unavailable to Texas as the nonmovant. *See id*. 56(d). It is indisputable that Texas permits direct-sales manufacturers to lease and sell vehicles directly to Texans, that it prohibits them only from selling new or preowned vehicles through physical dealerships in the state, and that this prohibition reduces competition, limits consumer choice, and undermines Texas's ability to protect Texas consumers. It is further indisputable that application of that prohibition to manufacturers like Lucid that have no independent franchised dealers has nothing to do with regulating the relationship between manufacturers with independent dealers and those dealers. Application of this prohibition to Lucid is irrational and arbitrary, as is treating direct-sales manufacturers like Lucid differently than the other businesses that Texas allows to own and operate dealerships within the state. As a matter of law, Texas's prohibition is unconstitutional as applied to Lucid.[8]

## I.     The Direct-Sales Prohibition Violates Lucid's Due Process Rights

The Fourteenth Amendment's Due Process Clause protects the right to engage in lawful business activity free from arbitrary or irrational regulation. Accordingly, economic regulation must meet the "test of due process: a legitimate legislative purpose furthered by rational means." *General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) (quotation marks omitted). Although deferential, "the rational basis test 'is not a toothless one.'" *Harris Cty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 323 (5th Cir. 1999) (quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)). A state's rationale for an economic regulation "cannot be fantasy," and the state's "chosen

---

[8] Lucid seeks summary judgment at this time because there is no apparent rational basis for application of Texas's Direct-Sales Prohibition to a direct-sales-only manufacturer like Lucid, such that the Court may appropriately determine now that the Prohibition's application is unconstitutional. While "unconventional," day-one motions for summary judgment are permitted and should be granted when the plaintiff can show that the undisputed facts entitle it to judgment as a matter of law. *W.P. Carey, Inc. v. Bigler*, No. 18-cv-585, 2019 WL 1382898, at *4 (S.D.N.Y. Mar. 27, 2019) (granting plaintiff's day-one motion for summary judgment); *see also Pedigo v. Austin Rumba, Inc.*, 722 F. Supp. 2d 714, 719 (W.D. Tex. 2010) (explaining that the "'rule allows a party to move for summary judgment at any time, even as early as the commencement of the action'") (quoting Fed. R. Civ. P. 56, 2009 Advisory Committee Note); *Georgia Pac., LLC v. Heavy Machines, Inc.*, No. 07-cv-944, 2010 WL 2026670, at *2 (M.D. La. May 20, 2010) ("[T]he Court may grant summary judgment even before the defendant has filed an answer.").

means must rationally relate to the state interests it articulates." *St. Joseph Abbey*, 712 F.3d at 223. In turn, "plaintiffs may…negate a seemingly plausible basis for the law by adducing evidence of irrationality." *Id.* Applying rational-basis review, many decisions of the Supreme Court,[9] Fifth Circuit,[10] and district courts within the Fifth Circuit[11] have struck down economic regulations as violating the Due Process Clause or Equal Protection Clause.

No different than in *St. Joseph Abbey*, Texas has no rational basis to prohibit Lucid from owning or operating a motor-vehicle dealership in the state when Texas permits Lucid to lease and rent vehicles to Texans from within Texas, to sell previously leased and rented vehicles to Texans from within Texas, to sell new vehicles to Texans from out of state, to service its vehicles in Texas, and to operate galleries and offer demonstration drives in the state. This prohibition only hurts Texas consumers by restricting competition and consumer choice, and it only impairs Texas's ability to protect consumers by channeling vehicle sales through out-of-state dealerships not subject to Texas law and law enforcement. It has no relation to health or safety, nor any relation to manufacturer–dealer relations. This prohibition is pure economic protectionism for the benefit of

---

[9] *See, e.g.*, *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam); *Quinn v. Millsap*, 491 U.S. 95 (1989); *Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty.*, 488 U.S. 336 (1989); *Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612 (1985); *Williams v. Vermont*, 472 U.S. 14 (1985); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869 (1985); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Plyler v. Doe*, 457 U.S. 202 (1982); *Zobel v. Williams*, 457 U.S. 55 (1982); *Chappelle v. Greater Baton Rouge Airport Dist.*, 431 U.S. 159 (1977) (per curiam); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973); *James v. Strange*, 407 U.S. 128 (1972); *Lindsey v. Normet*, 405 U.S. 56 (1972); *Mayer v. City of Chicago*, 404 U.S. 189 (1971); *Turner v. Fouche*, 396 U.S. 346 (1970).

[10] *See, e.g.*, *St. Joseph Abbey*, 712 F.3d at 223; *O'Donnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008); *Harper v. Lindsay*, 616 F.2d 849, 855 (5th Cir. 1980); *Aladdin's Castle, Inc. v. City of Mesquite*, 630 F.2d 1029, 1039 (5th Cir. 1980); *Doe v. Plyler*, 628 F.2d 448, 458 (5th Cir. 1980); *Thompson v. Gallagher*, 489 F.2d 443, 448 (5th Cir. 1973).

[11] *See, e.g.*, *Slaughter v. Dobbs*, No.20-CV-789, 2022 WL 135424 (N.D. Miss. 2022); *Brantley v. Kuntz*, 98 F. Supp. 3d 884, 895 (W.D. Tex. 2015); *Casket Royale, Inc. v. State of Mississippi*, 124 F. Supp. 2d 434, 441 (S.D. Miss. 2000); *La. Seafood Mgmt. Council, Inc. v. Foster*, 917 F. Supp. 439, 446 (E.D. La. 1996); *Lamar Outdoor Advertising, Inc. v. Mississippi State Tax Comm'n*, 539 F. Supp. 817, 828, 831 (S.D. Miss. 1982).

existing motor-vehicles dealers, but economic protectionism is not a legitimate state interest under rational-basis review. *St. Joseph Abbey*, 712 F.3d at 222–23. So far as legitimate interests are concerned, the Direct-Sales Prohibition furthers none. It is, for that reason, unconstitutional as applied to Lucid.

## A. The Prohibition Irrationally Undermines the State's Interest in Consumer Welfare

It would be sheer fantasy for Texas to claim that prohibiting Lucid from owning and operating dealerships advances consumer welfare. "No sophisticated economic analysis is required to see the pretextual nature of [a] state's proffered explanations" that restricting access to a competitive market somehow aids consumers. *Craigmiles v. Giles*, 312 F.3d 220, 229 (5th Cir. 2002). It is undisputed, and indisputable, that Texas's Direct-Sales Prohibition reduces competition, reduces consumer choice, and imposes unnecessary expenses and burden on Texas consumers. If consumer welfare is the Direct-Sales Prohibition's aim, then it is an irrational measure because it undercuts that interest.

The Direct-Sales Prohibition is a purely protectionist measure that, as such, impairs competition and undermines the benefits of competition to consumers. It excludes direct-sales manufacturers from competing in Texas's market for dealership-sold motor vehicles. For consumers who choose to purchase vehicles from a local dealership, which is how most consumers purchase their vehicles, the vehicles sold by direct-sales manufacturers are entirely excluded from the market. In this way, it directly undermines consumer choice. Scott Morton Decl., ¶¶ 18–19, 22.

At the same time, it hurts all Texas consumers by denying them the full benefits of competition. Motor vehicle dealers compete on at least three dimensions: price, product quality, and service quality. *Id.* ¶¶ 19, 26. Economists have long understood that reducing competition, as the Direct-Sales Prohibition does, hurts consumers through higher prices and reduced quality. *Id.* ¶ 19. Without a Lucid dealership in range, dealers of competing brands face less pressure on price, quality, and customer service. Why would a traditional dealership feel compelled to match Lucid's virtual-reality technology for visualizing vehicle customizations, its transparent and uniform

pricing policy, and its no-pressure experience when the nearest Lucid dealership is hundreds of miles away in another state? The Direct-Sales Prohibition gives existing dealerships a pass on having to compete with Lucid's innovations, and consumers lose out.

And then there are the costs and burdens that it directly imposes on consumers. The Direct-Sales Prohibition denies consumers the convenience of purchasing vehicles from a local dealership. Even if they visit one of Lucid's "Studios" in Texas to learn about models or take a demonstration drive, they cannot simply complete the purchase then and there, but must contract with one of Lucid's out-of-state dealerships. Edson Decl., ¶ 31. And, because they are buying vehicles from outside of Texas, buyers have to endure the hassle and expense of purchasing vehicles from inconvenient far-away locations, often before they have even had a chance to see the model in person, and then having it delivered to them. While Lucid goes to great lengths to provide the smoothest possible buying experience, these unnecessary hurdles still impose burdens, inconveniences, and costs on customers.

The Direct-Sales Prohibition also injures the customers of manufacturers who choose to comply with it by contracting with independent franchised dealers in the state. While those dealers may own and operate Texas-located dealerships, adding them to supply chain inevitably drives up costs for consumers. Rather than purchase manufacturer-direct, with only one level of markup, sales through independent franchised dealers involve two levels of markup: one for the manufacturer and one for the dealer. This "double marginalization" raises prices paid by consumers and reduces demand, lowering consumer welfare. Scott Morton Decl., ¶¶ 23–25.

The Direct-Sales Prohibition is not related to any state interest in advancing consumer welfare. To the contrary, it irrationally undermines that interest.

### B. The Prohibition Irrationally Undermines the State's Interest in Consumer Protection

Likewise, there is no argument at all that the Direct-Sales Prohibition advances Texas's interest in consumer protection. As with consumer welfare, the prohibition irrationally undermines that interest.

The Direct-Sales Prohibition is not a consumer-protection statute. Its application is premised solely on a business's status as a manufacturer or manufacturer affiliate and does not take into account any factor even tangentially related to consumer protection, such as whether a given entity has previously defrauded consumers or engaged in other improper business practices. Put simply, whether a motor-vehicle dealership is owned or operated by a manufacturer versus a manufacturer's franchised dealer has no rational relationship to preventing unfair or deceptive business practices. Indeed, Texas law expressly authorizes manufacturers to own and operate dealerships in certain circumstances. *E.g.*, Tex. Occ. Code § 2301.476(d)–(e). And Texas law permits manufacturers to lease vehicles to consumers from within the state, which is a substitute to purchasing a vehicle;[12] to sell previously leased and rented vehicles from within the state; and to sell new vehicles to Texans from outside of the state. That Texas law permits these things—and even expressly authorizes manufacturers to own and operate in-state dealerships in certain circumstances—confirms that consumer protection is not at issue here.

Indeed, Texas has a variety of consumer-protection statutes that apply to dealerships regardless of whether they are owned or operated by a manufacturer. That includes specific provisions relating to dealers and dealerships. *E.g.*, Tex. Occ. Code §§ 2301.351 (prohibiting violation of rules and "false, deceptive, or misleading advertising relating to the sale or lease of motor vehicles"), 2301.651 (providing for denial or revocation of dealer licenses), 2301.801–805 (enforcement provisions). It also includes the state's laws generally prohibiting and punishing deceptive trade practices. Tex. Bus. & Com. Code §§ 17.12 (deceptive advertising), 17.41–63 (Texas Deceptive Trade Practices-Consumer Protection Act); Tex. Penal Code § 32.42 (establishing criminal offense for "deceptive business practices"). In sum, Texas law, aside from the Direct-Sales prohibition, "already polices inappropriate sales tactics by all sellers." *St. Joseph Abbey*, 712 F.3d at 225. And that, in turn "sheds much light on the disconnect between [any] post hoc hypothesis of consumer protection and the grant of an exclusive right of sale to [independent franchised

---

[12] *See* Tex. Occ. Code § 2301.002(34) (defining "vehicle lease" as "a transfer of the right to possess and use a motor vehicle for a term of more than 180 days in return for consideration").

dealers].” *Id*. at 226. Just as in *St. Joseph Abbey*, that “exclusive right of sale adds nothing to protect consumers.” *Id*.

In fact, the Direct-Sales Prohibition detracts from protecting consumers by forcing Texas residents to purchase vehicles from dealerships outside of the state’s borders, where the state lacks the legal and practical ability to address deceptive or unfair practices. Unlike in-state dealerships, motor-vehicle dealerships outside of Texas are not subject to licensure, monitoring, or supervision by Texas. *See generally Marmon v. Mustang Aviation, Inc*., 430 S.W.2d 182, 187 (Tex. 1968). Moreover, such out-of-state dealerships are not subject to Texas’s regulatory jurisdiction or its enforcement jurisdiction. *See Healy v. Beer Inst., Inc*., 491 U.S. 324, 336 (1989) (“[T]he Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State’s borders, whether or not the commerce has effects within the State.”) (quotation marks and alteration omitted); *Brown-Forman Distillers Corp. v. New York State Liquor Auth*., 476 U.S. 573, 582–83 (1986); *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 665 (7th Cir. 2010) (discussing authorities). Even if Texas could somehow overcome that seemingly insuperable hurdle to policing out-of-state sales, it would still face the daunting practical hurdle of conducting investigation and enforcement activities against out-of-state entities over out-of-state transactions. *See A.M. Capen’s Co., Inc. v. Am. Trading and Prod. Corp*., 202 F.3d 469, 473 (1st Cir. 2000).

By channeling vehicle sales through out-of-state dealerships, the Direct-Sales Prohibition undermines Texas’s ability to regulate dealerships selling vehicles to Texans and to detect, investigate, prevent, and punish any deceptive or otherwise unlawful practices respecting those out-of-state sales. In this way, the Direct-Sales Prohibition irrationally impedes Texas from protecting Texas consumers.

## C. The Prohibition Is Unrelated to Public Health or Safety

The Direct-Sales Prohibition has no relationship to public health or safety. It does not, after all, regulate the emissions or safety characteristics of vehicles, but only who may own and operate motor-vehicle dealerships in Texas. Motor vehicle safety standards are set by the federal National Highway Traffic Safety Administration, and they apply equally no matter whether a vehicle is sold

by a manufacturer or an independent dealer. *See generally* 49 U.S.C. 30111, *et seq*. And there is no conceivable basis for Texas to believe that the entities responsible for designing and manufacturing motor vehicles somehow know less about their operational and safety characteristics than independent dealers. Indeed, Texas law permits manufacturers to service vehicles, confirming that vehicle safety provides no basis for the prohibition.

### D. The Prohibition Is Unrelated to the State's Interest in Preventing Manufacturers from Using Their Market Power to Disadvantage Their Independent Franchised Dealers

The Direct-Sales Prohibition does not relate to any state interest in regulating the relationship between vehicle manufacturers and their independent dealers because direct-sales manufacturers like Lucid have no independent dealers. There is accordingly no competitive-power imbalance for the state to regulate. Scott Morton Decl., ¶ 22. While the Fifth Circuit has twice upheld Tex. Occ. Code § 2301.476(c) against facial challenges by manufacturers with independent franchised dealers, its reasoning in both cases depended on the proposition that the Texas Legislature could have reasonably sought to address the risk that "manufacturers could use their disproportionate market power to the disadvantage of dealers." *Int'l Truck and Engine Corp. v. Bray*, 372 F.3d 717, 728 (5th Cir. 2004) (discussing *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493 (2001)); *see also id.* at n.13 (explaining that the Legislature "heard expert testimony that manufacturers enjoyed a great deal of leverage over dealers and could use that leverage unfairly").[13] As applied to direct-sales manufacturers, however, there is no possibility of wielding market power or leverage to disadvantage dealers because there are no independent dealers in the mix. The previous facial challenges to this statute only highlight the lack of any rational basis for its application to direct-sales manufacturers.

---

[13] Neither decision considered a Due Process Clause claim of the sort brought here. *Ford* involved claims under the dormant aspect of the Commerce Clause and the Equal Protection Clause, as well as a procedural due process claim. 264 F.3d at 499, 510–11. *International Truck* involved a statutory claim and claim under the dormant aspect of the Commerce Clause. 372 F.3d at 720–21 & n.2.

### E. Protecting Existing Dealers from Competition Is Not a Legitimate State Interest

Controlling precedent forecloses any claim that the Direct-Sales Prohibition is supported by a state interest in favoring existing dealers over direct-sales manufacturers. The Fifth Circuit held in *St. Joseph Abbey* that "mere economic protection of a particular industry" is not a "legitimate governmental purpose" but properly "described as a naked transfer of wealth." 712 F.3d at 222–23. In other words, "'mere economic protectionism for the sake of economic protectionism is irrational with respect to determining if a classification survives rational basis review. Economic protectionism for its own sake, regardless of its relation to the common good, cannot be said to be in furtherance of a legitimate governmental interest.'" *Id.* at 222 n.38 (quoting *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008) (alterations omitted)).

## II. The Direct-Sales Prohibition Violates Lucid's Equal Protection Rights

The Fourteenth Amendment's Equal Protection clause forbids states from giving differential treatment to persons who are similarly situated unless the state has a rational basis for doing so. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *Gibson v. Tex. Dep't of Ins.—Div. of Workers' Comp.*, 700 F.3d 227, 238 (5th Cir. 2012). In other words, "similarly situated persons must be treated equally." *Merrifield*, 547 F.3d at 992. This inquiry parallels that under the Due Process Clause, requiring that a state's disparate treatment of similarly situated persons "rationally relate to the state interests it articulates." *St. Joseph Abbey*, 712 F.3d at 222–23 & n.38.

Texas has no rational basis to distinguish between, on the one hand, the franchised and nonfranchised dealers that it allows to own and operate dealerships and, on the other, the direct-sales manufacturers that it does not. These two classes are similarly situated in all material respects. They both sell vehicles to consumers and are subject to all the same rules and regulations respecting business practices, qualifications, consumer protection, health and safety, and so forth. They differ only in their political strength at the state level, and that is no rational basis for the state to restrain trade. For the same reason that the Direct-Sales Prohibition violates Lucid's Due Process

rights, its differential treatment of direct-sales manufacturers and existing dealers also violates Lucid's Equal Protection rights.

### <u>Conclusion</u>

The Court should grant summary judgment in favor of Plaintiff, declare that Texas's Direct-Sales Prohibition is unconstitutional as applied to Plaintiff, and enter a permanent injunction prohibiting Defendants from enforcing the Direct-Sales Prohibition against Plaintiff.

Dated: November 1, 2022

Respectfully submitted,

*/s/ Billy M. Donley*

Billy M. Donley
Texas Bar No. 05977085
bdonley@bakerlaw.com
Rachel Palmer Hooper
Texas Bar No. 24039102
rhooper@bakerlaw.com
BAKER & HOSTETLER LLP
811 Main Street
Suite 1100
Houston, TX 77002
Telephone: (713) 751-1600
Fax: (713) 751-1717

Andrew M. Grossman*
agrossman@bakerlaw.com
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Suite 1100
Washington, D.C. 20036
Telephone: (202) 816-1697
Fax: (202) 861-1783

*Attorneys for Plaintiff*

\* Motion for admission *pro hac vice* forthcoming

**<u>Certificate of Service</u>**

I certify that a true and correct copy of this document has been electronically filed with the Court on November 1, 2022, and will be served on the Defendants in accordance with Federal Rule of Civil Procedure 5.

*/s/ Billy M. Donley*
Billy M. Donley