**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| LUCID GROUP USA, INC.,<br><br>     *Plaintiff*,<br><br>        v.<br><br>MONIQUE JOHNSTON, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles; DANIEL AVITIA, in his official capacity as Executive Director of the Texas Department of Motor Vehicles; and CORRIE THOMPSON, in her official capacity as Director of the Enforcement Division of the Texas Department of Motor Vehicles,<br><br>     *Defendants*. | Civil Action No. 1:22-cv-01116 |

## APPENDIX TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

     Pursuant to Local Rule CV-7(c)(1), Plaintiff Lucid Group USA, Inc. submits this Appendix to its Motion for Summary Judgment, filed contemporaneously herewith.

## **<u>INDEX</u>**

Declaration of Fiona Scott Morton ...................................................................Exhibit 1

Declaration of Andrew M. Grossman ............................................................Exhibit 2

    Federal Trade Commission, *Direct-to-consumer auto sales: It's not just about Tesla* (May 11, 2015)........................................................................Exhibit A

    *Open Letter by Academics in Favor of Direct EV Sales and Service* (Apr. 14, 2021).......................................................................................Exhibit B

Declaration of Zachary Edson ........................................................................Exhibit 3

Dated: November 1, 2022                    Respectfully submitted,

                                           */s/ Billy M. Donley*
                                           Billy M. Donley
                                           Texas Bar No. 05977085
                                           bdonley@bakerlaw.com
                                           Rachel Palmer Hooper
                                           Texas Bar No. 24039102
                                           rhooper@bakerlaw.com
                                           BAKER & HOSTETLER LLP
                                           811 Main Street
                                           Suite 1100
                                           Houston, TX 77002
                                           Telephone: (713) 751-1600
                                           Fax: (713) 751-1717

                                           Andrew M. Grossman*
                                           agrossman@bakerlaw.com
                                           BAKER & HOSTETLER LLP
                                           1050 Connecticut Ave., N.W.
                                           Suite 1100
                                           Washington, D.C. 20036
                                           (202) 816-1697
                                           Fax: (202) 861-1783

                                           *Attorneys for Plaintiff*

* Motion for admission *pro hac vice* forthcoming

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been electronically filed with the Court on November 1, 2022, and will be served on the Defendants in accordance with Federal Rule of Civil Procedure 5.

*/s/ Billy M. Donley*
Billy M. Donley

# EXHIBIT 1

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| LUCID GROUP USA, INC., | |
| *Plaintiff*, | |
| v. | |
| MONIQUE JOHNSON, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles; DANIEL AVITIA, in his official capacity as Acting Executive Director of the Texas Department of Motor Vehicles; and CORRIE THOMPSON, in her official capacity as Director of the Enforcement Division of the Texas Department of Motor Vehicles, | Civil Action No. 1:22-cv-01116 |
| *Defendants*. | |

**<u>Declaration of Professor Fiona Scott Morton</u>**

**TABLE OF CONTENTS**

<u>Page</u>

I.     INTRODUCTION ........................................................................................... 1

II.    QUALIFICATIONS ....................................................................................... 1

III.   LUCID'S DIRECT SALES AND SERVICE MODEL ................................... 3

IV.    AN INDEPENDENT LUCID DEALER WOULD NOT BE ECONOMICALLY
       VIABLE ......................................................................................................... 4

V.     ECONOMIC HARM RESULTING FROM PROHIBITING LUCID'S DIRECT
       SALES MODEL ............................................................................................. 5

       1.    Barring Lucid from Selling Direct to Consumers in Texas Harms
             Consumers by Reducing Consumer Choice ............................................. 6

       2.    Barring Lucid from Selling Direct to Consumers in Texas Harms
             Consumers by Introducing the Risk of Double Marginalization ............... 7

VI.    CONCLUSION ............................................................................................... 9

## I.    **INTRODUCTION**

1.      I have been retained by Lucid Group USA, Inc. ("Lucid") in connection with its lawsuit against the Texas Department of Motor Vehicles.  Lucid has asked me to prepare this brief report to explain the economic harm that results from Texas's ban on direct sales of automobiles by their manufacturers.

2.      As I explain in the main body of this report, an independent Lucid dealer would not be economically viable.  Thus, requiring Lucid to sell its vehicles through an independent dealer effectively bars Lucid from selling in Texas.  More generally, Texas's direct sales ban stifles competition, harms consumers, and creates an artificial barrier to the entry of new companies and technologies into the automobile market.  Allowing Lucid to own and operate sales studios in Texas and to sell directly to Texas consumers would increase consumer choice and eliminate the risk of higher prices from double marginalization.

## II.   **QUALIFICATIONS**

3.      I am the Theodore Nierenberg Professor of Economics at the Yale University School of Management, where I teach courses in the area of competitive strategy and conduct research into empirical industrial organization.  I am also a Visiting Professor at the University of Edinburgh, a Senior Consultant at Charles River Associates, and a Research Associate at the National Bureau of Economic Research.  I hold a Bachelor's degree in Economics from Yale and a Ph.D. in Economics from the Massachusetts Institute of Technology.

4.      I have been a professor at Yale since 1999, during which time I have been the Senior Associate Dean for Faculty Development.  Before becoming a professor at Yale, I was an Assistant Professor of Economics and Strategy at the University of Chicago's Graduate School of Business.  Before that, I was an Assistant Professor of Strategic Management at Stanford University's Graduate School of Business.

5.      From 2011 to 2012, I held the position of Deputy Assistant Attorney General for Economic Analysis in the Antitrust Division of the US Department of Justice.  In this role, I

supervised the economists in the Antitrust Division analyzing the cases that came before the Division.  In many of these cases, the economists at the Division developed and assessed evidence of whether an organization's behavior was pro- or anti-competitive in light of the net impact of the behavior on consumers in terms of price, innovation, or quality.

6.      I teach two courses at the Yale School of Management:  Competitive Strategy, and Advanced Competition Economics and Policy.  Competitive Strategy is an MBA elective course covering theories of how firms compete, including competition with respect to price, quantity, entry and exit into the market, research and development, and product differentiation. Advanced Competition Economics and Policy focuses on antitrust concepts.

7.      I have published dozens of articles in peer-reviewed journals.  I also have served in an editing role on various academic economics journals, and I referee for a number of journals, including the *Review of Economic Studies*, the *Quarterly Journal of Economics*, the *RAND Journal of Economics*, the *Journal of Industrial Economics*, and the *Journal of Law and Economics*.  I am also a member of the American Economic Association.

8.      My research is in the field of empirical industrial organization, which is the application of empirical methods to the field of industrial organization.  The field of industrial organization examines the structure of firms and markets, including competitive markets and monopolies.  My work focuses on empirical studies of competition among companies and firms, including in areas such as pricing and entry.

9.      I have researched and published peer-reviewed articles about the automotive industry, including on price negotiation in US auto retailing, state franchising laws related to dealer terminations, internet auto retailing and transactions, price discrimination against women and minorities at dealerships, and inventory fluctuations at dealerships.  Several of these papers received recognition in the profession, including the Green Award from the *Journal of Marketing Research* for the paper on internet auto retailing and transactions.

10.      I have testified as a qualified expert about the auto dealer franchise system, including the economics of the auto dealer franchise system.  **Attachment 1** is a copy of my curriculum vitae.

11.      To prepare this report, I have reviewed my prior research on retail sales and the dealership model in the automotive industry,[1] as well as academic articles and publicly available information concerning Lucid, its retail strategy, and the economics of automobile distribution.

12.      Lucid has retained me at an hourly rate of $1,200 per hour.  My compensation is not contingent in any way on the outcome of this matter.

## III.    LUCID'S DIRECT SALES AND SERVICE MODEL

13.      Lucid is a new and innovative US manufacturer of all-electric automobiles.  Its Lucid Air sedans have EPA-rated ranges of up to 520 miles, up to 1,111 horsepower, and charging speeds of up to 300 miles in 20 minutes.[2]  The 4.6 miles/kWh efficiency of its Lucid Air Grand Touring sedan is unprecedented, reducing both its manufacturing costs and total ownership costs for its customers.[3]  *MotorTrend* has named Lucid Air its 2022 Car of the Year.[4] Lucid's cars are being built in its new plant in Arizona, currently configured for a capacity of 34,000 units per year.[5]

14.      Lucid has adopted a direct sales and service model to sell its new and innovative vehicles.  Cars are sold at a fixed, uniform price that depends only on the configuration of options and accessories chosen by the customer.  Sales are either online or at Lucid "studios,"

---

[1] For example, Fiona Scott Morton, Florian Zettelmeyer, and Jorge Silva-Risso, "Internet Car Retailing," *The Journal of Industrial Economics* 49, no. 4 (2001): 501-519; Francine Lafontaine and Fiona Scott Morton, "State Franchise Laws, Dealer Terminations, and the Auto Crisis," *Journal of Economic Perspectives*, 24, no. 3 (2010): 233-250 and online appendix, available at http://www.e-jep.org; Fiona Scott Morton and Ann McDermott, "Retail Auto Sales: Tesla v. State Vehicle Franchise Laws (2017)," in John E. Kwoka, Jr. and Lawrence J. White (eds.), *The Antitrust Revolution, Economics, Competition, and Policy (7th Edition)*.  New York: Oxford University Press (2018).

[2] Lucid Website, "Air," available at https://www.lucidmotors.com/air.

[3] Lucid Group, Inc., Second Quarter 2022 Earnings Release, August 3, 2022 ["Lucid Q2 2022 Report"], p. 26, available at https://ir.lucidmotors.com/static-files/8bdec76d-808a-4a7b-bacf-0853ae53d6ee.

[4] MotorTrend Press Release, "The Lucid Air Is the 2022 MotorTrend Car of the Year," November 15, 2021, available at https://www.motortrend.com/news/lucid-air-2022-car-of-the-year/.

[5] Lucid Q2 2022 Report, p. 8.

staffed by Lucid employees.  As of June 30, 2022, Lucid has 29 studios and service centers in operation worldwide, with more expected to follow.[6]  All sales of Lucid automobiles are direct from the manufacturer – there are no independent dealerships selling Lucid's cars.  Because Texas bars direct sales of new vehicles by auto manufacturers, Lucid is not permitted to sell its innovative cars in Texas.[7]

## IV.    AN INDEPENDENT LUCID DEALER WOULD NOT BE ECONOMICALLY VIABLE

15.    An independent dealership would not be economically viable under Lucid's direct sales and service model.  Under the independent dealership model, the dealer has a contract with a vehicle manufacturer.  The dealer buys vehicles from the manufacturer and maintains an inventory of vehicles on its lot.  The dealer maintains a showroom and sales staff to sell new vehicles, and offers service and repairs, including warranty and non-warranty repairs for vehicles produced by the manufacturer and non-warranty service work for vehicles produced by other manufacturers.  Typically, commissions or volume-based bonuses are important for compensation of the sales team.[8]  The staff is also incentivized through commissions to sell "add-ons" such as additional features, service contracts, and warranties.  Prices for new vehicles and "add-ons" are usually negotiable, with the dealer attempting to obtain the highest price possible.  The average traditional dealership derives just 12% of its profits from the sale of new vehicles.[9]  Vehicle service, financing, and used car sales are more important sources of profits for an independent dealer.[10]

---

[6] Lucid Q2 2022 Report, p. 5; Lucid Website, "Studios & Service Centers," available at https://www.lucidmotors.com/locations/.

[7] Lucid currently operates a service center in Houston.

[8] Edmunds, "Where Does the Car Dealer Make Money?," June 13, 2019, available at https://www.edmunds.com/car-buying/where-does-the-car-dealer-make-money.html.

[9] New car sales, net of profits from F&I, generated 12% of an average dealership's gross margin in 2016-2020. National Automobile Dealers Association, "Dealership Financial Profiles," available at https://www.nada.org/dealershipfinancialprofile/.

[10] National Automobile Dealers Association, "Dealership Financial Profiles," available at https://www.nada.org/dealershipfinancialprofile/.

16.     Based on Lucid's product and scale, Lucid's sales and service model makes sense for its business, while the independent dealership model does not.  The hypothetical independent Lucid dealer would need to compete with Lucid's fixed and uniform retail prices, available online and in its studios, leaving it no margin with which to fund its buildings and inventory. Two significant sources of income for traditional dealers – service and parts and used vehicle sales – would not be available or would be greatly reduced for a hypothetical independent dealer selling Lucid cars.  Lucid's service and parts revenue will be quite limited due to the relatively small scale of sales, Lucid's plans to provide service through non-traditional channels (over-the-air or with mobile service vehicles), and electric vehicles' lower maintenance requirements.[11]  In addition, the pool of available Lucid used vehicles will be exceedingly small for years to come. Moreover, because the product (as well as the company) is new and novel, selling Lucid's all-electric vehicles will require different selling behavior, different sales skills, and a different environment than are required for motor vehicle sales generally.  Again, this would require Lucid-specific investments by a dealer.  In brief, the hypothetical independent Lucid dealer would be expected to earn zero margin on new car sales in perpetuity while bearing significant fixed costs, leading to financial losses.  For these reasons, the independent dealer sales model is not viable for Lucid's vehicles.

## V.     ECONOMIC HARM RESULTING FROM PROHIBITING LUCID'S DIRECT SALES MODEL

17.     This section explains how Texas's prohibition on direct sales by auto manufacturers protects incumbent manufacturers and dealers at the expense of competition and consumers.  It shows that authorizing Lucid to open and operate sales studios in Texas would benefit consumers by increasing consumer choice and eliminating the risk of double marginalization.

---

[11] EVs do not require oil changes, spark plug replacements, or timing belt replacements, among other routine maintenance tasks.  A recent study estimated maintenance costs per mile for EVs are 41% less than those for comparable gas-powered vehicles.  Energy Systems Division, Argonne National Laboratory, "Comprehensive Total Cost of Ownership, Quantification for Vehicles with Direct Size Classes and Powertrains," April 2021, pp. 82-85, available at https://publications.anl.gov/anlpubs/2021/05/167399.pdf.

1.    **Barring Lucid from Selling Direct to Consumers in Texas Harms Consumers by Reducing Consumer Choice**

18.    Lucid's direct sales model, including uniform prices and a low-pressure and relaxed environment in which consumers can shop for a car, is rare in the auto industry. This alternative model is good for the consumer because it creates more choices, and some consumers may prefer the new model over traditional car buying. If consumers like this retail experience, and the retail experience is one factor that drives Lucid's sales, this will put competitive pressure on traditional dealers. Competing dealers will want to improve their own buying experience in order to retain consumers, and all consumers will benefit from the resulting competition.

19.    If Lucid is not permitted to sell its vehicles in Texas, Texans will be denied ready access to Lucid's new vehicles. Potential Lucid buyers might not hear of Lucid cars or obtain purchase information. Consumers in Texas would thereby be denied choices in their car buying. Dealers of competing automakers would have fewer incentives to compete on the basis of lower prices or superior customer service.

20.    It is important to emphasize that there is no risk of harm to competition from Lucid's direct sales model. If Lucid's direct-sales model or its vehicles are not desired by consumers or if consumers judge Lucid's car prices to be too high, Lucid's cars will not be purchased. This is standard and expected in a competitive market.

21.    The two government agencies tasked with enforcing US competition laws, the Federal Trade Commission ("FTC") and the US Department of Justice, support the conclusion that bans on direct sales by vehicle manufacturers harm competition and consumers.[12] In multiple submissions to state legislatures, the FTC has explained that giving automakers the freedom to choose the sales model that makes the most sense for them, and letting the market determine whether they succeed or fail, is in the best interest of consumers and competition.[13]

---

[12] Joint Letter of the Antitrust Division of the U.S. Department of Justice and the Federal Trade Commission on Franchised Dealer Requirements to Sell and Service Motor Vehicles and Nebraska Legislative Bill 51, March 14, 2019, available at https://www.justice.gov/atr/page/file/1146236/download.

[13] "Our principal point is this: absent some legitimate public purpose, consumers would be better served if the choice of distribution method is left to motor vehicle manufacturers and the consumers to whom they sell their

22.     This position comports with the basic lessons of microeconomics.  While there are arguably credible reasons to restrict an automaker with an existing network of independent dealers from selling in direct competition with those dealers, there is no reason to require a vehicle manufacturer to go out and contract with independent dealers in order to reach its customers.  Consumers are made better off when given the right to choose the selling mode and vehicle that they prefer, rather than having their state government choose it for them.

2.     **Barring Lucid from Selling Direct to Consumers in Texas Harms Consumers by Introducing the Risk of Double Marginalization**

23.     Selling vehicles through an independent dealer, as is required in Texas, introduces the risk of "double marginalization."  Under the traditional auto retail sales model, two independent parties strive to maximize their profits – the auto manufacturer and its dealers.  The auto manufacturer sets a wholesale price with a profit margin that maximizes its profits in light of "*inter*brand" competition for autos, that is, competition between different brands of automobile.  That wholesale price is an input cost for the independent dealer.  The dealer then sets a retail price that reflects the wholesale vehicle price, dealership costs, and "*intra*brand" competition in retailing, that is, competition between dealers of the same brand of automobile. When intrabrand competition is weak, the dealer maximizes profits by setting a retail price above the competitive price.  This situation results in what economists term "double marginalization." Compared to a system in which final selling prices are under the control of a single economic entity, such as occurs with Lucid's direct sales model, double marginalization results in higher prices to consumers, lower demand, and lower total profits.[14]

---

products." (FTC Staff Comment Before the New Jersey General Assembly Regarding Assembly Bills 2986, 3096, 3041, and 3216, May 16, 2014, p. 8.)  *See also* FTC Staff Comment Before the Missouri House of Representatives Regarding House Bill 1124, Which Would Expand the Current Prohibition on Direct-to-Consumer Sales by Manufacturers of Automobiles, May 15, 2014; FTC Staff Comment Regarding Michigan Senate Bill 268 Which Would Create a Limited Exception to Michigan Law, May 7, 2015.

[14] Roger D. Blair and Francine Lafontaine. 2005.  *The Economics of Franchising*, New York, New York: Cambridge University Press, pp. 182-188; W. Kip Viscusi, Joseph E. Harrington, and John M. Vernon. 1992. *Economics of Regulation and Antitrust*, Lexington, Massachusetts: D.C. Heath and Company, pp. 221-224.

24.     **Chart 1** is a simplified illustration of how eliminating double marginalization leads to lower prices and increased demand.[15]  With double marginalization (in orange), the dealer maximizes its profits by setting a sales price where its marginal revenue equals the wholesale price it pays for cars plus its marginal retail costs.  The resulting price is higher than the price the automaker would set if it sold direct.  Without double marginalization (in blue), the automaker with direct sales maximizes its profits by setting a price where its marginal revenue equals its marginal cost to produce and sell its vehicles.  The price without double marginalization is lower, resulting in increased demand.

**Chart 1**

**Illustration of Double Marginalization**



25.     As illustrated by **Chart 1**, a direct sales model, such as is used by Lucid, eliminates the separate process of setting a dealer mark-up.  Even if the manufacturer has the same costs to retail its vehicles as does an independent dealer, the final retail price is lower than

---

[15] A more detailed explanation is available in Roger D. Blair and Francine Lafontaine. 2005.  *The Economics of Franchising*, New York, New York: Cambridge University Press, pp. 182-188.

it would be if the vehicle was marked up by both the manufacturer and the dealer essentially because the manufacturer's cost for the vehicle is below the wholesale cost paid by the dealer.

26.     With its direct sales model, Lucid's prices are limited by interbrand competition among the different automakers.  Lucid wants consumers to buy its car rather than a BMW or a Mercedes and sets its price accordingly.  Lucid has strong incentives to manage its sales operations as efficiently as possible and has no incentive to raise its prices at the retail level beyond the level that best enables it to compete with other manufacturers.  Consumers benefit from the opportunity for increased price competition.

## VI.     CONCLUSION

27.     Lucid manufactures and sells innovative electric cars.  Lucid has determined that its business is best served by selling its vehicles direct to consumers.  It does not sell through independent dealers anywhere in the world.  Because an independent Lucid dealer would not be economically viable, Texas's requirement that Lucid sell its cars through an independent dealer effectively bars it from selling in the state.

28.     More generally, the unambiguous effect of Texas's law barring direct sales of cars by auto manufacturers is to stifle competition, harm consumers, and create an artificial barrier to the entry of new companies and technologies into the automobile market.  As an economist who has studied regulation and competition, it is my opinion that allowing Lucid to operate sales studios in Texas and sell direct to Texas consumers would have a positive effect on consumers as it would increase consumer choice and eliminate the risk of double marginalization.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Professor Fiona Scott Morton

Executed on August 23, 2022

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| Lucid Group USA, Inc., | |
| *Plaintiffs*, | |
| v. | |
| MONIQUE JOHNSON, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles; DANIEL AVITIA, in his official capacity as Acting Executive Director of the Texas Department of Motor Vehicles; and CORRIE THOMPSON, in her official capacity as Director of the Enforcement Division of the Texas Department of Motor Vehicles, | Civil Action No. 1:22-cv-01116 |
| *Defendants*. | |

**<u>Declaration of Andrew M. Grossman</u>**

I, Andrew M. Grossman, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am above the age of 18 years, have personal knowledge of the matters set forth below, and am in all respects competent to render this declaration.

2.     I am a Partner of the law firm of Baker & Hostetler LLP and am counsel for Plaintiff Lucid Motors USA Inc. ("Lucid").

3.     I submit this Declaration in support of Lucid's motion for summary judgment.

4.     A true and correct copy of the Federal Trade Commission's article, *Direct-to-consumer auto sales: It's not just about Tesla* dated May 11, 2015 is attached as Exhibit A.

5.     A true and correct copy of *Open Letter by Academics in Favor of Direct EV Sales and Service* dated April 14, 2021 is attached as Exhibit B.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 1st day of November, 2022.

_____
Andrew M. Grossman

# EXHIBIT A



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

Competition Matters

# Direct-to-consumer auto sales: It's not just about Tesla

By: Marina Lao, Debbie Feinstein, and Francine Lafontaine      May 11, 2015

A fundamental principle of competition is that consumers – not regulation – should determine what they buy and how they buy it. Consumers may benefit from the ability to buy cars directly from manufacturers – whether they are shopping for luxury cars or economy vehicles. The same competition principles should apply in either case.

For several years now, there have been reports of the challenges faced by Tesla Motors in selling its luxury electric cars directly to consumers. In state after state, the company has faced legislative and litigation resistance to its business plan to sell its products without using a network of third-party dealers like other auto manufacturers. Over the past year, FTC staff have urged in a [blog post](#) and [comment letters](#) to legislators that state prohibitions against direct consumer auto sales by manufacturers should be eased. Our point: States should allow consumers to choose not only the cars they buy, but also how they buy them.

Some states that closed the door to direct manufacturer sales, like New Jersey, have recently opened the door by a crack. Legislative changes there (and in several other states) now permit Tesla to operate a handful

of direct sales outlets in the state. But the opening in the law is a tiny one
—only a few outlets, and only for Tesla Motors.

Some other states, like Michigan, have gone the other way. In October
2014, the Michigan legislature passed and the governor signed legislation
that made wording changes to strengthen the statutory prohibitions on
manufacturer direct sales in that state. At that time, however, the
governor said   "[a] healthy, open discussion can and should be had over
whether the current business model in Michigan should be changed" and
encouraged the legislature to engage in such debate.

A recently-introduced bill in the Michigan legislature, SB 268, provides
the opportunity for this kind of debate. The bill would ease the
prohibitions for a product category known as "autocycles," and would
open the door for direct consumer sales by another potential new entrant
in auto manufacturing.

Elio Motors has announced plans to manufacture an innovative low-cost,
high-mileage, enclosed three-wheeled vehicle. According to
announcements by the company, it plans to offer its products for a base
price of $6800—less than a tenth the price of the cheapest Tesla Model
S. The firm plans to manufacture the vehicles at a facility in Shreveport,
Louisiana, beginning in 2016. As of March 29, 2015, it had accepted more
than 41,000 reservations for the vehicles. Like Tesla, Elio Motors does not
intend to establish an independent dealer network, but rather plans to
pursue a direct customer sales plan to keep down the price of its
products.

In a letter   commenting on the Michigan proposal, FTC staff supports
the movement to allow for direct sales to consumers—not only Tesla or
Elio, but for any company that decides to use that business model to
distribute its products. Blanket prohibitions on direct manufacturer sales
to consumers are an anomaly within the larger economy. Most

manufacturers and suppliers in other industries make decisions about how to design their distribution systems based on their own business considerations, responding to consumer demand. Many manufacturers choose some combination of direct sales and sales through independent retailers. Typically, no government intervention is needed to augment or alter these competitive dynamics—the market polices inefficient, unresponsive, or otherwise inadequate distribution practices on its own. If the government does intervene, it should adopt restrictions that are clearly linked to specific policy objectives that the legislature believes warrant deviation from the beneficial pressures of competition, and should be no broader than necessary to achieve those objectives.

Opening the door by a crack is a step in the right direction, and we urge policymakers in Michigan to take this small step. But beyond company-specific fixes lies a much larger issue: who should decide how consumers shop for products they want to buy? Protecting dealers from abuses by manufacturers does not justify a blanket prohibition like that in the current Michigan law, which extends to all vehicle manufacturers, even those like Tesla and Elio who have no interest in entering into a franchise agreement with any dealer.

Absent some legitimate public purpose, consumers would be better served if the choice of distribution method were left to motor vehicle manufacturers and the consumers to whom they sell their products.

*Marina is the Director of the Office of Policy Planning, Debbie is the Director of the Bureau of Competition, and Francine is the Director of the Bureau of Economics. The views expressed are their own, and do not necessarily reflect the opinion of the Commission or of any individual Commissioner.*

**Tags:** Competition | Office of Policy Planning | Bureau of Competition | Bureau of Economics | Automobiles

**More from the Competition Matters**

---

Competition Matters

## HSR threshold adjustments and reportability for 2022

the Premerger Notification Office Staff │ February 11, 2022

Competition Matters

## Making the Second Request Process Both More Streamlined and More Rigorous During this Unprecedented Merger Wave

Holly Vedova, Bureau of Competition │ September 28, 2021

Competition Matters

## Working Better Together Volume One: Advancing Both Consumer Protection and Antitrust Enforcement to Protect all Americans from Corporate Bad Actors

Holly Vedova and Samuel Levine │ September 24, 2021

Competition Matters

## Protecting Americans at the gas pump through aggressive antitrust enforcement

Holly Vedova, Bureau of Competition │ September 21, 2021

Get Business Blog updates

Subscribe

EXHIBIT B

## Open Letter by Academics in Favor of Direct EV Sales and Service

April 14, 2021

We, the signatories of this letter, are active or emeritus professors employed at public or private universities in the United States. We specialize in economics, competition policy, market regulation, industrial organization, or other disciplines bearing on the questions presented in this letter. We come from across the political spectrum, and have a wide variety of views on regulation, environmental and consumer protection, and free enterprise as a general matter, but find common ground on the important issue of automotive direct sales.

We write to urge that any state laws still prohibiting car companies from selling their cars directly to consumers, or opening service centers for those vehicles, be amended to permit direct sales and service of electric vehicles ("EVs").[1] While once there may have been valid dealer protection reasons for prohibiting direct distribution, those reasons are long gone. Prohibiting direct distribution of EVs is not supported by legitimate public policy objectives, and has a variety of negative consequences, including: (1) slowing the market penetration of EVs; (2) correspondingly, maintaining a higher share of internal combustion vehicles on the roads, with negative environmental consequences; (3) interfering with manufacturers' freedom to experiment with new distribution models for new technologies and market conditions, thus reducing the competitiveness of the U.S. EV industry and advantaging foreign competitors; (4) interfering with consumers' freedom to decide how they will purchase cars; and (5) interfering with free and functioning markets to privilege economic special interests.

For the past six or seven years, the direct sales issue has been associated primarily with Tesla's efforts to enter the market, and its state-by-state battles with the car dealers' lobby. Today, the right to sell directly remains vital to Tesla, but it is equally important to a new crop of American EV start-up companies including Rivian, Lordstown, Lucid, Bollinger, and others about to enter the market. It is also important to the legacy automobile companies like General Motors, Ford, and Chrysler, which should be allowed to compete with the start-ups on a level playing field. About half the states now permit at least some direct sales, although the particulars vary by state. We respectfully contend that all states should allow all car manufacturers to sell EVs directly to consumers, if they so choose.

---

[1] We include in our definition of EVs any vehicle not powered by internal combustion, including fuel cell vehicles or any other new technologies that may come to market. We take no position in this letter regarding direct distribution of gasoline-powered cars, which have been mostly distributed through franchised dealer networks since the middle of the twentieth century. We use "direct distribution" as a shorthand to include selling vehicles directly to consumers through company-owned retail centers or online activity, and opening service centers to service vehicles.

A brief review of the history of dealer franchise laws may help explain how we got to where we are today.  In the mid-twentieth century, car dealers were mostly "mom and pop" sole proprietorships. By contrast, the "Big Three" auto companies were hegemonic firms that faced relatively little domestic or foreign competition. The dealers began to complain to state legislatures that the car companies were taking advantage of them in a variety of ways.  This led almost all of the states to pass dealer franchise laws intended to protect the dealers.  Among other things, these laws prohibited a manufacturer from opening its own showrooms or service centers and transacting directly with customers.  The dealers successfully argued that if the manufacturers were allowed to distribute directly to consumers, they could unfairly undermine their own franchised dealers.

Fast-forward to 2021.  The situation is very different.  First, the dealership system has grown from its "mom and pop" roots to one where enormous companies operate large dealer networks.  The top 10 dealership groups alone earn over $97 billion in annual revenue.[2]  Second, the car manufacturer market has become far more competitive. Today, there are at least 15-20 major manufacturer groups selling cars in the U.S. This gives dealers more choices, and hence more leverage in contractual negotiations with manufacturers.  Third, and perhaps most importantly, technological and market changes have led new entrants into the market—particularly companies selling EVs—to choose to distribute directly to consumers and not to use franchised dealers at all.  As the Massachusetts Supreme Court has recognized, the original concerns that animated the direct distribution prohibitions—protecting a franchisee from its own franchisor—do not apply to a company that is not using franchisees.[3]

Not only have the original justifications for prohibiting direct distribution evaporated, but the advent of EV technology has created an urgent need to *permit* direct distribution. Virtually every significant EV start-up has taken the position that mandatory distribution only through established franchised dealers is not viable for EVs for a variety of reasons, including:[4]

> 1) **Dealership locations**: Dealerships are often found in out-of-the way locations. EV companies need to "bring the new technology to the consumer" in places like shopping malls and city centers.
> 2) **Inventory differences**: Large inventory is the lifeblood of traditional dealerships, but many EVs work on a build-to-order model.
> 3) **Longer sales cycles**: The franchised dealer model is based on high volume of fast-paced sales.   EV buyers take longer to educate

---

[2] https://s3-prod.autonews.com/data-protected/032519-2019Top150DealershipGroups-032519.pdf?djoDirectDownload=true.

[3] *Massachusetts State Auto Dealers Ass'n, Inc. v. Tesla Motors MA, Inc*., 15 N.E. 3d 1152, 1157 (Mass. 2014).

[4] The following list is drawn from testimony given by Tesla and Rivian at administrative and legislative hearings. *See* https://evannex.com/blogs/news/74602181-tesla-defends-direct-sales-model-at-ftc-talks-cites-unfair-opposition-from-gm.

themselves on EV sales, and therefore need to work with sales people who are not working on a commission model.

4) **Different profit models**: Traditional dealerships earn low profit margins on new car sales, and make it up on service.  EVs have a much smaller service component since they don't have service needs like oil changes or engine tune-ups.   Traditional dealerships therefore lack much of an incentive to sell EVs.

5) **Conflict of interest**. EV sales cannibalize internal combustion sales, which are the dealers' lifeblood. Dealers therefore lack the motivation to sell EVs.

6) **Direct customer relationship.** Optimal EV performance requires a direct relationship between the EV manufacturer and the customer for things like over-the-air updates and vehicle performance monitoring.

To be very clear, we take no position on how a manufacturer should decide to distribute EVs, or whether any particular strategy would be better than another one—those are matters to be determined by experimentation and market competition rather than academic opinion or government fiat.  Dealers may still be able to play some role in EV distribution and servicing, and some of the legacy companies have suggested they may try hybrid direct/dealer models.  The important point is that there are credible reasons to believe that the EV start-ups, which know their business better than anyone else does, are correct in claiming that mandating traditional dealer distribution will significantly impair their ability to sell EVs.  That, in turn, leads to a variety of negative consequences.

Most immediately, direct distribution prohibitions threaten to slow EV market penetration. This denies consumers the opportunity to take advantage of new technologies, and also flies in the face of federal and state policies prioritizing a transition to clean, renewable energy. The slower the adoption of EVs, the longer internal combustion cars stay on the road, contributing to carbon emissions. Environmental organizations have made reforming direct distribution laws a policy priority for this very reason. Further, by locking in incumbent technologies, direct distribution prohibitions threaten to limit the dynamism and growth of the U.S. EV industry, putting U.S. firms behind foreign competition.

 Direct distribution prohibitions are also bad for consumer interests.  The staff of the U.S. Federal Trade Commission—the leading consumer protection agency in the country— has taken the position that direct distribution bans are bad for consumers,[5] as have the Consumer Federation of America, Consumer Action, Consumers for Auto Reliability and Safety, and the American Antitrust Institute.[6]   While the dealers have argued that

---

[5] https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-regarding-michigan-senate-bill-268-which-would-create-limited-exception-current/150511michiganautocycle.pdf (statement by Directors of Bureaus of Economics and Competition and Office of Policy Planning).
[6] https://www.autonews.com/assets/PDF/CA98362217.PDF.

manufacturers will overcharge customers if they can sell directly to them,[7] the argument that adding a mandatory layer of costs between the manufacturer and the consumer will reduce consumer prices has no basis in economics.  There is no credible consumer protection argument in favor of prohibiting direct distribution. Consumers should be given the choice of how they buy their cars.

Finally, direct distribution prohibitions conflict with free enterprise and first principles of regulation.  Prohibiting direct distribution benefits car dealers by protecting them from competition, but that is not a legitimate basis for interfering with manufacturer and consumer freedom to decide how to buy and sell cars themselves.

The dealer protection laws were written for the mid-twentieth century.  It is time for a new approach.  We call on those states that still place limitations on direct sales and service by EV manufacturers to reform their laws to allow for direct distribution by any manufacturer selling EVs.

Signatories (schools listed for identification purposes only):[8]


R. Warren Anderson
Associate Professor of Economics
University of Michigan-Dearborn

Nicholas Bagley
Professor of Law
University of Michigan

Jonathan B. Baker
Research Professor of Law
American University Washington College of Law

Roger D. Blair
Professor of Economics
Affiliate Faulty of Law
University of Florida

---

[7] Daniel A. Crane, *Tesla, Dealer Franchise Laws, and the Politics of Crony Capitalism*, 101 Iowa L. Rev. 573, 594 n. 111 (2016) (collecting quotes from dealers).

[8] Signatories join in their individual capacities only, and their joining should not be construed as a statement about the views of their employers, clients, or any organization with which they are affiliated. No signatory has been compensated by any entity to prepare, organize, or join this letter, nor did any entity apart from the signatories have any part in its drafting or organization. In short, this letter represents our views only and was not paid for or procured by anyone else.

Per L Bylund
Assistant Professor of Entrepreneurship
Oklahoma State University – Spears School of Business

Steve Calandrillo
Jeffrey & Susan Brotman Professor of Law
University of Washington School of Law

Stephen Calkins
Professor of Law,
Wayne State University Law School

Dennis W. Carlton
David McDaniel Keller Professor of Economics
The University of Chicago Booth School of Business

Edward D. Cavanagh
Professor of Law
St. John's University School of Law

Felix B. Chang
Professor and Co-Director, Corporate Law Center
University of Cincinnati College of Law

Jay Pil Choi
University Distinguished Professor
Department of Economics
Michigan State University

James C. Cooper
Associate Professor of Law
Director, Program on Economics & Privacy
Antonin Scalia Law School
George Mason University

Daniel A. Crane
Frederick Paul Furth, Sr. Professor of Law
University of Michigan Law School

Joshua Paul Davis
Professor, Director of the Center for Law and Ethics, and Dean's Circle Scholar
University of San Francisco

Christopher Douglas
Associate Professor and Chair
Department of Economics
University of Michigan-Flint

Florian Ederer
Associate Professor of Economics
Yale University, School of Management

Einer Elhauge
Carroll and Milton Petrie Professor of Law
Harvard University

Kenneth G. Elzinga
Robert C. Taylor Professor of Economics
University of Virginia

Tammy R. Feldman, ALJ Managing Editor
Lecturer, Business Economics & Public Policy
University of Michigan - Ross School of Business

Harry First
Charles L. Denison Professor of Law
New York University School of Law

Eleanor M. Fox
Walter J. Derenberg Professor of Trade Regulation
New York University School of Law

Jon M. Garon
Professor of Law
Director, Intellectual Property, Cybersecurity, and Technology Law program
Nova Southeastern University | Shepard Broad College of Law

Martin Gaynor
E.J. Barone University Professor of Economics and Public Policy
Heinz College
Carnegie Mellon University

James Grimmelmann
Tessler Family Professor of Digital and Information Law
Cornell Tech and Cornell Law School

Robin D. Hanson
Associate Professor of Economics
George Mason University

George A. Hay
Charles Frank Reavis Sr. Professor of Law & Professor of Economics
Cornell Law School

Thomas Hazlett
Hugh H. Macaulay Endowed Professor of Economics
Clemson University

Erik Hovenkamp
Assistant Professor of Law
USC Gould School of Law

Herbert Hovenkamp
James G. Dinan University Professor
University of Pennsylvania Carey School of Law

Max Huffman
Professor of Law and Director, Online Programs
Indiana University – McKinney School of Law

Justin (Gus) Hurwitz
Associate Professor of Law
Menards Director, Nebraska Governance and Technology Center
Co-director, Space, Cyber, & Telecom Law Program
University of Nebraska College of Law

Benjamin Klein
Professor Emeritus of Economics
UCLA

Francine Lafontaine
Associate Dean for Business + Impact
William Davidson Professor of Business Economics and Public Policy
Professor of Economics, LSA
University of Michigan

Thom Lambert
Wall Chair in Corporate Law and Governance and Professor of Law
Center for Intellectual Property and Entrepreneurship
University of Missouri

Robert H. Lande
Venable Professor of Law
University of Baltimore School of Law

Marina Lao
Professor of Law
Seton Hall University School of Law

Mark A. Lemley
William H. Neukom Professor, Stanford Law School
Director, Stanford Program in Law, Science, and Technology
Senior Fellow, Stanford Institute for Economic Policy Research
Affiliated Professor, Stanford Symbolic Systems Program

Christopher R. Leslie
Chancellor's Professor of Law
School of Law, University of California - Irvine

John E. Lopatka
A. Robert Noll Distinguished Professor of Law
Pennsylvania State University
School of Law

Geoffrey A. Manne
President & Founder, International Center for Law & Economics
Distinguished Fellow, Northwestern University Center on Law, Business, and Economics

Christopher S. Martin
Associate Professor of Economics
Hillsdale College

Scott Masten
Professor of Business Economics and Public Policy
Ross School of Business
University of Michigan

Salil Mehra
Charles Klein Professor of Law and Government
Temple University
Beasley School of Law

A. Douglas Melamed
Professor of the Practice of Law
Stanford Law School

Peter S. Menell
Koret Professor of Law
Director, Berkeley Center for Law & Technology
Faculty Director, Berkeley Judicial Institute
University of California at Berkeley School of Law

Thomas Morgan
Oppenheim Professor Emeritus of Antitrust & Trade Regulation Law
George Washington University Law School

John Newman
Associate Professor of Law
University of Miami

Sean M. O'Connor
Professor of Law
Founding Director, Innovation Law Clinic
Executive Director. Center for the Protection of IP (CPIP)
George Mason University Antonin Scalia Law School

Barak Orbach
Professor of Law
University of Arizona
James E. Rogers College of Law

Mark J. Perry
Professor of Economics
University of Michigan- Flint

J.J. Prescott
Henry King Ransom Professor of Law
Co-director, Empirical Legal Studies Center
Co-director, Program in Law and Economics
University of Michigan

Barak Richman
Bartlett Professor of Law and Business Administration
Duke University

Stephen F. Ross
Professor of Law and Lewis H. Vovakis Distinguished Faculty Scholar
Executive Director, Penn State Center for the Study of Sport in Society

Daniel L. Rubinfeld
Robert L. Bridges Professor of Law and Professor of Economics Emeritus U.C. Berkeley
and Professor of Law, NYU

Chris Sagers
James A. Thomas Professor of Law
Cleveland State University

Laura Phillips Sawyer
Associate Professor of Law
University of Georgia School of Law

Fiona M. Scott Morton
Theodore Nierenberg Professor of Economics
Yale School of Management

Gregory H. Shill
Associate Professor of Law, University of Iowa College of Law
Affiliated Faculty Member, National Advanced Driving Simulator, University
of Iowa College of Engineering

Vernon Smith
Professor, George L. Argyros Endowed Chair in Finance and Economics, Professor of
Economics and Law
Smith Institute for Political Economy and Philosophy
Winner, Nobel Prize in Economic Sciences (2002)
Chapman University

Richard Squire
Alpin J. Cameron Chair in Law
Fordham University School of Law

Christopher Jon Sprigman
Murray and Kathleen Bring Professor of Law
New York University School of Law
Co-Director, Engelberg Center on Innovation Law and Policy

Maurice E. Stucke
Douglas A. Blaze Distinguished Professor of Law
University of Tennessee College of Law

Michael Sykuta
Associate Professor of Applied Economics
University of Missouri

Alex Tabarrok
Director: Center for Study of Public Choice
Bartley J. Madden Chair in Economics at the Mercatus Center
Department of Economics
George Mason University

Avishalom Tor
Professor of Law
Director, ND LAMB
Notre Dame Law School

Rory Van Loo
Associate Professor of Law
Peter Paul Career Development Professor
Boston University

Alexander "Sasha" Volokh
Associate Professor of Law
Emory University

Spencer Weber Waller
John Paul Stevens Chair in Competition Law
Loyola University Chicago School

Samuel N. Weinstein
Associate Professor of Law
Benjamin N. Cardozo School of Law

Lawrence J. White
Robert Kavesh Professor of Economics
General Editor, Review of Industrial Organization
Stern School of Business
New York University

Abraham L. Wickelgren
Fred and Emily Marshall Wulff Centennial Chair
University of Texas School of Law

Jane K. Winn
Professor of Law
University of Washington School of Law
Adjunct Professor, UW Human Centered Design & Engineering, College of Engineering
Adjunct Professor, UW Jackson School of International Studies

Gary Wolfram
William Simon Professor of Economics
Hillsdale College

Ramsi Woodcock
Assistant Professor
University of Kentucky Rosenberg College of Law and Gatton College of Business & Economics

Joshua D. Wright
University Professor of Law
Antonin Scalia Law School
George Mason University

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| Lucid Group USA, Inc.,<br><br>   *Plaintiffs*,<br><br>    v.<br><br>MONIQUE JOHNSON, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles; DANIEL AVITIA, in his official capacity as Acting Executive Director of the Texas Department of Motor Vehicles; and CORRIE THOMPSON, in her official capacity as Director of the Enforcement Division of the Texas Department of Motor Vehicles,<br><br>   *Defendants*. | Civil Action No. 1:22-cv-01116 |

## Declaration of Zachary Edson

I, Zachary Edson, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am above the age of 18 years, have personal knowledge of the matters set forth below, and am in all respects competent to render this declaration.

2.      I am Vice President of Sales and Service at Lucid Group USA, Inc. Previously, I was employed in various roles at Lucid USA, Inc. I have been employed in different roles at Lucid Group USA, Inc. and Lucid USA, Inc. for approximately seven years.

3.      I also worked for Tesla for over 3 years in member services and then later as the Director of Product Planning.

4.      I graduated from Pepperdine University in 1998 with a B.S. in Business Administration.

### A.      Lucid and the Lucid Air

5.      Atieva, Inc., is the parent company of Lucid Group USA, Inc., and Lucid USA, Inc. Lucid USA, Inc., is an American company that designs and manufacturers electric vehicles under the brand "Lucid." Lucid Group USA, Inc. is the sales and service entity that owns, operates, and controls retail locations and service centers in the United States. In this declaration, I refer to Lucid Group USA, Inc., and Lucid USA, Inc., collectively as "Lucid" as a matter of convenience because the Texas law at issue treats manufacturers and their affiliates the same.

6.      Lucid USA, Inc. (formerly Atieva USA, Inc.), was founded in 2007 to advance state of the art electric-vehicle battery performance and powertrain technology. Through intensive research and development, it brought to market electric-vehicle components that simultaneously achieved high performance, efficiency, safety, and durability. Its technologies and components were employed in electric vehicles like buses and racecars manufactured by third parties.

7.      In 2019, Lucid broke ground on a vehicle-manufacturing facility in Arizona, and commercial production and deliveries of the Lucid Air began in 2021.

8.      The Lucid Air was recognized as setting a new standard for electric-vehicle performance, which was made possible through Lucid's proprietary powertrain and battery technologies. The Air Grand Touring is EPA-certified for up to 516 miles of range on a single charge, achieves up to 4.6 miles per kilowatt-hour of charge, can be charged to 300 miles of range in approximately 22 minutes, and continually receives new features and refinements through Lucid's over-the-air update system.

9.      The Lucid Air was named MotorTrend's 2022 Car of the Year®, "Best EV" at MotorWeek's Drivers' Choice Awards, "Luxury Green Car of the Year" by Green Car Journal, "Best Car To Buy in 2022" by Green Car Reports, and a 2022 "Wards 10 Best Engines and Propulsion System" winner.

**B.      Lucid's Sales Model**

10.     Lucid determined that successfully launching its new luxury brand of vehicles would require a premium sales experience, one that avoided the stress, annoyances, and frustrations that consumers typically associate with purchasing new vehicles.

11.     Lucid's values as a company include providing an unsurpassed customer experience and treating its customers with the utmost respect through all stages of the sales process and thereafter.

12.     Lucid also recognized the need to educate consumers about the unique features and technologies of its vehicles. The reason its vehicles command a premium price is because they are premium products, employing Lucid's proprietary technologies, high-quality materials, and an unusual attention to detail. Prospective customers require education to understand what makes a Lucid vehicle a premium product and to address questions and concerns about Lucid's products and technologies and electric vehicles in general.

13.     Most new motor vehicles are sold through middlemen, franchised dealers that are independent of the vehicle manufacturer. Franchised dealers typically use sales

commissions for their personnel. The consequences of that sales model include high-pressure sales tactics, price-haggling, hidden fees, and upselling.

14.     Those things are inconsistent with Lucid's values and with the premium reputation that is essential to Lucid's success in the market.

15.     Lucid determined that the independent franchised-dealer model was not a viable way to provide a premium customer experience that matched the quality of its vehicles. To establish a new premium brand, Lucid needed to take full responsibility for every contact that a customer has with its brand, from a customer's initial expression of interest through sale and after-sale support and service. And there was no way to do that through the traditional franchised-dealer model, where independent dealers stand between a manufacturer and its customers.

16.     Lucid determined that the independent franchised-dealer model was not an economically viable way to bring its vehicles to market. To effectively market Lucid vehicles and provide a suitable customer experience, an independent dealer would have to make a large up-front investment to establish, build out, and operate a dealership. But an independent dealer of Lucid's vehicles would have no realistic likelihood of earning the income necessary to support that up-front investment. It is well-known in the industry that independent dealers earn a substantial part of their income from sources other than new-car sales, such as service, parts sales, and used-car sales. Because Lucid is a new manufacturer with few vehicles on the road, these categories of income would be limited for many years. Moreover, electric vehicles tend to require less service than internal-combustion vehicles, further reducing dealer income. And Lucid's uniform and transparent pricing, as discussed further below, would prevent independent dealers from being able to compete on price or earn any margin on sales.

17.     Lucid determined that the only viable way to establish its new brand and bring its vehicles to market was by selling them directly to consumers through Lucid-owned retail locations, called "Studios," without a middleman. Lucid's vehicles are available for purchase

through Studios that Lucid owns and operates in states allowing direct sales. Lucid has no independent dealers.  Some Studios do not participate in any sales activity.

18.     Lucid's sales process differs from the traditional car-dealership experience. Lucid sells its vehicles at uniform and transparent prices. This eliminates the haggling over prices and hidden fees that lead consumers to distrust motor-vehicle dealers.

19.     Lucid's Studio personnel are not paid on commission, and they are trained by Lucid to be responsive to customers and avoid hard-pressure sales tactics.

20.     Because pricing is transparent, Lucid's sales process is able to emphasize customer education, both about electric vehicles in general and Lucid's advanced technologies and products in particular.

21.     Each Lucid Air is made-to-order, and customers can design their own vehicles online or at a dealership, choosing the performance level and customizing features like the body color, interior, and finishes. This allows customers to decide for themselves what options they want and see the prices, without being pushed into accepting add-ons that they do not want and may not need.

22.     Upon placing an order, every Lucid customer is assigned and introduced to a Lucid employee known as a "Delivery Advisor" who serves as the point of contact between the customer and the team of Lucid employees responsible for the customer's vehicle. The Delivery Advisor answers customer questions, educates the customer about the vehicle, advises on and assists with preparations that may be necessary like arranging in-home charging, provides status updates, and then guides the customer on the delivery process. In this way, Lucid provides each customer with personalized service that is tailored to their needs and responsive to their questions and concerns.

23.     Lucid provides support and service, including warranty service, to owners of its vehicles. Because Lucid's vehicles employ the company's proprietary advanced technologies, Lucid is best positioned to provide the full range of support and service for its vehicles.

Moreover, providing support and service directly to consumers allows Lucid to quickly identify and address emerging issues.

24.    Lucid depends on the tight feedback loop between its customers and its operations. With direct access to customer inquiries and requests, Lucid provides timely information from the best-place sources, including product design and engineering teams, and continuously improves its products, sales practices, and service in response to customer communications.

25.    Because it controls all stages of the customer experience, Lucid takes full responsibility for every contact that a customer has with its brand—from a customer's initial expression of interest through sale and after-sale support and service.

26.    As part of its customer-first sales model, Lucid also sells its vehicles at uniform and transparent prices that are published on its website. There is no haggling or upselling.

27.    Lucid depends on direct sales to build its business from the ground up while providing unsurpassed customer service, uniform and transparent pricing, and a tight feedback loop to improve its business.

C.    **Texas Prohibits Lucid from Owning or Operating a Dealership in the State**

28.    Texas is an important market for Lucid because it is one of the nation's largest markets for new motor vehicles, especially electric vehicles. Texas consumers have shown strong interest in Lucid's vehicles through inquiries, vehicle reservations, and vehicle purchases.

29.    Lucid currently operates a facility in Houston where it provides warranty and repair service to Lucid owners.

30.    Lucid will soon open a Studio in Plano where consumers can learn about electric vehicles and Lucid's vehicles and technologies, view vehicle models, get answers to their questions about Lucid vehicles, and take demonstration drives.

31.     But consumers will not be able to purchase a new electric car at any of Lucid's vehicle galleries in Texas. Instead, a consumer must place an order at an out-of-state Lucid-owned dealership, either in person or online, and then have the vehicle delivered to Texas.

32.     Consumers cannot purchase directly at a vehicle gallery in Texas because state law prohibits Lucid Group USA, Inc., as an affiliate of a motor-vehicle manufacturer, from obtaining the license necessary to sell motor vehicles from an established physical location in the state.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 1st day of November, 2022.

Zachary Edson
Vice President of Sales and Service
Lucid Group USA, Inc.