## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| LUCID GROUP USA, INC., | Case No. 1:22-cv-01116-RP |
| Plaintiff, | **BRIEF OF PACIFIC LEGAL** |
| v. | **FOUNDATION AS *AMICUS*** |
| | ***CURIAE* IN SUPPORT OF** |
| MONIQUE JOHNSTON, in her official | **PLAINTIFF'S MOTION FOR** |
| capacity as Director of the Department of | **SUMMARY JUDGMENT** |
| Motor Vehicles; DANIEL AVITIA, in his | |
| official capacity as Executive Director of | |
| the Texas Department of Motor Vehicles; | |
| and CORRIE THOMPSON, in her official | |
| capacity as the Director of Enforcement | |
| Division of the Texas Department of | |
| Motor Vehicles, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................ii

INTEREST OF *AMICUS CURIAE* ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 1

ARGUMENT ............................................................................................... 3

   I.  ECONOMIC LIBERTY IS A CENTRAL CONCERN OF THE
      FOURTEENTH AMENDMENT .......................................................... 3

   II.  RATIONAL BASIS REVIEW REQUIRES A MEANINGFUL
       EXAMINATION OF THE MEANS AND ENDS OF LAWS THAT
       RESTRICT ECONOMIC FREEDOM ................................................. 5

     A.  Laws Restricting Economic Liberty Must Be Rationally Related to
        Achieving a Legitimate Objective, and Not Mere Protectionism ................. 5

     B.  Economic Protectionism Is Not a Legitimate State Interest ......................... 8

   III. TEXAS'S BAN ON DIRECT-TO-CONSUMER SALES FAILS RATIONAL
       BASIS REVIEW .............................................................................. 10

     A.  The Ban Is a One-Way Street that Only Benefits Dealerships ................... 10

     B.  Protectionism Does Not Serve the Public Interest ....................................... 15

CONCLUSION ......................................................................................... 18

CERTIFICATE OF SERVICE ................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aladdin's Castle, Inc. v. City of Mesquite,*
630 F.2d 1029 (5th Cir. 1980) ................................................................ 6

*Allgeyer v. Louisiana,*
165 U.S. 578 (1897) ................................................................ 5

*Barilla v. City of Houston,*
No. 4:20-CV-00145 (S.D. Tex. filed Jan. 15, 2020) .................................................. 1

*Brantley v. Kuntz,*
98 F. Supp. 3d 884 (W.D. Tex. 2015) ........................................................ 7

*Bruner v. Zawacki,*
997 F. Supp. 2d 691 (E.D. Ky. 2014).......................................................... 7

*Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd. of Texas Dep't of Transp.,*
156 S.W.3d 91 (Tex. App. 2004) .............................................................. 13

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ................................................................ 6

*Clayton v. Steinagel,*
885 F. Supp. 2d 1212 (D. Utah 2012) ....................................................... 8

*Craigmiles v. Giles,*
312 F.3d 220 (6th Cir. 2002) .................................................................. 8

*Doe v. Plyler,*
628 F.2d 448 (5th Cir. 1980) .................................................................. 7

*Ford Motor Co. v. Texas Dep't of Transp.,*
264 F.3d 493 (5th Cir. 2001) ........................................................12–13

*Frisbie v. United States,*
157 U.S. 160 (1895) ................................................................ 2

*Harper v. Lindsay,*
616 F.2d 849 (5th Cir. 1980) .................................................................. 6

*Heller v. Doe,*
    509 U.S. 312 (1993) ............................................................................ 5

*Hines v. Quillivan,*
    982 F.3d 266 (5th Cir. 2020) ......................................................... 5, 9

*Louisiana Seafood Management Council, Inc. v. Foster,*
    917 F. Supp. 439 (E.D. La. 1996) ................................................. 6–7

*Mathews v. Lucas,*
    427 U.S. 495 (1976) ............................................................................ 6

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ........................................................................... 4

*Merrifield v. Lockyer,*
    547 F.3d 978 (9th Cir. 2008) ........................................................... 8

*Meyer v. Nebraska,*
    262 U.S. 390 (1923) ........................................................................... 5

*Newell-Davis v. Phillips,*
    551 F. Supp. 3d 648 (E.D. La. 2021) ............................................. 1

*O'Donnell v. Harris Cnty.,*
    892 F.3d 147 (5th Cir. 2018) ........................................................... 7

*Reliable Consultants, Inc. v. Earle,*
    517 F.3d 738 (5th Cir. 2008) ........................................................... 6

*Romer v. Evans,*
    517 U.S. 620 (1996) ........................................................................... 9

*Santos v. City of Houston,*
    852 F. Supp. 601 (S.D. Tex. 1994) ................................................. 7

*Slaughter-House Cases*, 83 U.S. 36 (1873) ..................................... 4

*St. Joseph Abbey v. Castille,*
    712 F.3d 215 (5th Cir. 2013) ................................................*passim*

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas,*
    139 S. Ct. 2449 (2019) ...................................................................... 9

*Thompson v. Gallagher,*
    489 F.2d 443 (5th Cir. 1973) ........................................................... 6

*Tiwari v. Friedlander*,
No. 3:19-CV-884-JRW-CHL, 2020 WL 4745772 (W.D. Ky. Aug. 14, 2020) ........................................................................................................ 7

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) ........................................................................... 6, 9

*Zobel v. Williams*,
457 U.S. 55 (1982) ................................................................................ 6

**Statutes**

Civil Rights Acts of 1866 (14 Stat. 27-30) ..................................................... 4

Tex. Occ. Code Ann. § 2301.252(a) .............................................................. 12

Tex. Occ. Code Ann. § 2301.476 ............................................................ 12–14

Tex. Occ. Code Ann. § 2301.476(c) .............................................................. 12

Texas Occupations Code Chapter 2301 ......................................................... 2

**Other Authorities**

39th Cong. Globe 1757 ..................................................................................... 4

Amicus Br. of the International Truck and Engine Corporation, *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493 (5th Cir. 2001), (No. 00-50750), 2000 WL 33977191 ...................................................... 12

Barnett, Randy E., *Restoring the Lost Constitution* (Rev. Ed. 2014) ........................... 4

Bodisch, Gerald R., *Economic Effects of State Bans on Direct Manufacturer Sales to Car Buyer* (May 2009) https://www.justice.gov/sites/default/files/atr/legacy/2009/05/28/246 374.pdf ........................................................................................... 17–18

Calabresi, Steven G., & Leibowitz, Larissa C., *Monopolies and the Constitution: A History of Crony Capitalism*, 36 Harv. J.L. & Pub. Pol'y 983 (2013) ..................................................... 4

Crane, Daniel A., *Tesla, Dealer Franchise Laws, and the Politics of Crony Capitalism*, 101 Iowa L. Rev. 573 (2016) ...................................................... 10–11, 15–16

Ely, James W., Jr., *To Pursue Any Lawful Trade or Avocation: The Evolution of Unenumerated Economic Rights in the Nineteenth Century*,
8 U. Penn. J. Const. L. 917 (2006) ....................................................................... 3–4

Hartman, Kristy & Shields, Laura, *State Laws on Direct-Sales*, National Conference of State Legislatures, https://www.wispolitics.com/wp-content/uploads/2021/08/State-Laws-on-Direct-Sales.pdf ...................................................................... 10

Krusee, Deshotel, Texas H. Rsch. Org., B. Analysis H.B. 733, 80th Leg., Reg. Sess. (2007) ....................................................................... 14

Recurrent, *Texas Electric Vehicle Trend & Stats*, https://www.recurrentauto.com/research/texas-electric-vehicle-trends-stats (last visited November 19, 2022) ....................................................................... 17

Sandefur, Timothy, *Can You Get There from Here: How the Law Still Threatens King's Dream*,
22 Law & Ineq. 1 (2004) ....................................................................... 2

Siebert, Alexander, Texas H. Rsch. Org., B. Analysis H.B. 3092, 76th Leg., Reg. Sess. (1999) ....................................................................... 13

Smith, Richard L., *Franchise Regulation: An Economic Analysis of State Restrictions on Automobile Distribution*,
25 J. L. & Econ. 125 (1982) ....................................................................... 17

Zietlow, Rebecca E., *Slavery, Liberty, and the Right to Contract*,
19 Nev. L.J. 447 (2018) ....................................................................... 3

**INTEREST OF *AMICUS CURIAE***

Pacific Legal Foundation (PLF) is a nonprofit legal foundation that defends constitutional protections for individual liberty, including the right to earn a living free of arbitrary government interference. For over 40 years, PLF has litigated in support of the right of individuals to pursue economic opportunity, one of the central promises of the Fourteenth Amendment. PLF has participated in cases before the United States Supreme Court, the United States Courts of Appeal, and District Courts in the Fifth Circuit in support of economic liberty. *See, e.g.*, *Newell-Davis v. Phillips*, 551 F. Supp. 3d 648 (E.D. La. 2021), *appeal docketed*, No. 22-30166 (5th Cir. April 8, 2022); *Barilla v. City of Houston*, No. 4:20-CV-00145 (S.D. Tex. filed Jan. 15, 2020).

PLF attorneys are familiar with the legal issues raised by this case and the briefs filed with this Court. PLF believes that its public policy perspective and litigation experience in support of economic liberty will provide a valuable additional viewpoint on the issues presented in this case.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Automobiles have been at the center of innovation and economic opportunity in this country. Not only did Henry Ford rise to greatness through his invention of the Model T, the first affordable automobile, his product allowed others, in turn, to seek job opportunities beyond their immediate neighborhood. Transportation itself has historically been an occupation that favors people with fewer resources. Even today, driving a taxi, Uber, or helping people move their household goods remains an

easy path to entrepreneurship. Timothy Sandefur, *Can You Get There from Here: How the Law Still Threatens King's Dream*, 22 Law & Ineq. 1, 20−26 (2004).

But not everyone supports innovation. Incumbent businesses have an incentive to keep the status quo, and thus they frequently lobby for laws that keep legitimate competition out. The automobile industry is no exception. This case challenges a law that serves no other purpose than protecting incumbents from competition, to the detriment of entrepreneurs and consumers.

Chapter 2301 of the Texas Occupations Code prohibits electric vehicle manufacturers like Plaintiff from selling new vehicles directly to residents. It does so not to protect consumers from any sort of threat, but instead to protect car dealerships from competition. This direct-to-consumer sales ban deprives manufacturers of their economic liberty, including the right to "freely … contract for the price of his labor, services, or property." *Frisbie v. United States*, 157 U.S. 160, 165−66 (1895).

The right to earn a living free of arbitrary government interference is deeply rooted in the Fourteenth Amendment. The history surrounding the Amendment's drafting demonstrates that one of its central purposes was to unleash opportunity by protecting economic liberty from burdensome state laws. Shortly after the Amendment's passage, courts took seriously their role to protect economic liberty and actively struck down economic protectionism, restrictions on the right to contract, and other burdensome regulations. They did so by examining the relationship between a challenged law's means and ends. Laws that lacked a meaningful

relationship to a legitimate government end or that related solely to impermissible ends, like protecting favored groups from legitimate competition, failed that test.

Applying this precedent, Texas's ban violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The ban lacks any meaningful relationship to protecting public health or safety and instead grants a naked preference to automobile dealers, which is illegitimate. *St. Joseph Abbey v. Castille*, 712 F.3d 215, 222–23 (5th Cir. 2013). While incumbents may benefit from laws that protect them from having to compete, entrepreneurs and consumers suffer in the form of fewer choices, less innovation, and higher prices. This Court should vindicate the purpose and meaning of the Fourteenth Amendment and invalidate Texas's protectionist ban.

## ARGUMENT

## I.   ECONOMIC LIBERTY IS A CENTRAL CONCERN OF THE FOURTEENTH AMENDMENT

Economic rights were a central concern of the drafters of the Fourteenth Amendment. Even after slavery's abolition, states continued to subjugate freed blacks in the form of the "Black Codes," which deprived them of "the right to engage in any legitimate business," including the right to enter contracts and acquire property. Rebecca E. Zietlow, *Slavery, Liberty, and the Right to Contract*, 19 Nev. L.J. 447, 464 (2018). Congress intervened by passing the Civil Rights Act of 1866, which had contract and property rights at its core. James W. Ely, Jr.*, To Pursue Any Lawful Trade or Avocation: The Evolution of Unenumerated Economic Rights in the Nineteenth Century*, 8 U. Penn. J. Const. L. 917, 932 (2006). Support was based

3

"primarily on opposition to class legislation," but also on opposition to "the spirit of monopoly more generally," which deprives individuals of economic opportunity for crony reasons. Steven G. Calabresi & Larissa C. Leibowitz, *Monopolies and the Constitution: A History of Crony Capitalism*, 36 Harv. J.L. & Pub. Pol'y 983, 1039 (2013). The Act explicitly refers to several economic rights, stating that all "citizens … shall have the same right … to make and enforce contracts … to inherit, purchase, lease, sell, hold, and convey real and personal property … and to full and equal benefits of all laws and proceedings for the security of person and property, as is enjoyed by white citizens." Civil Rights Acts of 1866 (14 Stat. 27-30). Its sponsor, Senator Lyman Trumbull, confirmed that the Act was intended to protect economic rights, such as the right to "acquire and enjoy property." 39th Cong. Globe 1757.

After President Johnson vetoed the bill, Congress was able to surmount the veto with a supermajority vote, but it still worried about the Act's longevity. It therefore constitutionalized the Civil Rights Act in the form of the Fourteenth Amendment. Randy E. Barnett, *Restoring the Lost Constitution* 373−374 (Rev. Ed. 2014). In particular, the Privileges or Immunities Clause was intended to protect the rights of contract and property. *See McDonald v. City of Chicago*, 561 U.S. 742, 813, (2010) (Thomas, J., concurring in part). "From its very inception, therefore, there was an economic rights component to the Fourteenth Amendment." Ely, 8 U. Penn. J. Const. L. at 932.

After the Privileges or Immunities Clause was eviscerated in the *Slaughter-House Cases*, 83 U.S. 36 (1873), economic liberty found a safe haven in the Due

Process Clause. In *Allgeyer v. Louisiana*, 165 U.S. 578 (1897), for example, the Court affirmed that freedom of contract was among the liberties that could not be deprived without due process of law. In *Meyer v. Nebraska*, 262 U.S. 390 (1923), the Court similarly declared that the liberty protected under the Fourteenth Amendment "denotes not merely freedom from bodily restraint but also the right of the individual to contract [and] to engage in any of the common occupations of life[.]" *Id.* at 399. Those cases remain good law today.

## II.   RATIONAL BASIS REVIEW REQUIRES A MEANINGFUL EXAMINATION OF THE MEANS AND ENDS OF LAWS THAT RESTRICT ECONOMIC FREEDOM

### A.   Laws Restricting Economic Liberty Must Be Rationally Related to Achieving a Legitimate Objective, and Not Mere Protectionism

Properly applied, meaningful rational basis review allows plaintiffs to demonstrate through presentation of evidence that a statute that burdens economic liberty lacks a means-end fit. *St. Joseph Abbey*, 712 F.3d at 223; *Heller v. Doe*, 509 U.S. 312, 320 (1993). "Rational" must be "actually rational, not a matter of fiction." *Hines v. Quillivan*, 982 F.3d 266, 273 (5th Cir. 2020). Moreover, "although rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *St. Joseph Abbey*, 712 F.3d at 223. If the evidence shows that the law is not rationally tailored to its ends, or that the law only furthers illegitimate ends, then it is a deprivation of liberty (here, the ability to sell directly to consumers) without due process of law.

The rational basis test is "not a toothless one." *See Louisiana Seafood Management Council, Inc. v. Foster*, 917 F. Supp. 439, 446 (E.D. La. 1996) (*citing Mathews v. Lucas*, 427 U.S. 495, 510 (1976)). This review "does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation." *St. Joseph Abbey*, 712 F.3d. at 226. The Supreme Court has therefore struck down several economic regulations under rational basis review. *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Zobel v. Williams,* 457 U.S. 55, 56 (1982); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 538 (1973).

So has the Fifth Circuit. In *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 746−47 (5th Cir. 2008), the court found that a "heavy-handed" law banning the sale of adult devices lacked a rational connection to protecting children from sexual expression. *Id*. In *Aladdin's Castle, Inc. v. City of Mesquite*, 630 F.2d 1029, 1039−40 (5th Cir. 1980), the court found that an ordinance prohibiting children under seventeen from using coin-operated amusement rides did not rationally further the interests of preventing truancy and protecting children from people who promote unlawful activities because there was no evidence that these rides exposed children to such dangers. In *Harper v. Lindsay*, 616 F.2d 849, 855 (5th Cir. 1980), the court ruled that a window requirement for massage parlors lacked a rational connection to any legitimate purpose when other regulations existed to achieve the same end. And in *Thompson v. Gallagher*, 489 F.2d 443, 448−49 (5th Cir. 1973), the court held that an ordinance preventing the employment of veterans that were not honorably

discharged was not rationally related to the city's interest of recruiting a quality workforce. *See also Doe v. Plyler*, 628 F.2d 448, 458 (5th Cir. 1980) (invalidating economic policy under rational basis test); *O'Donnell v. Harris Cnty.*, 892 F.3d 147, 162−63 (5th Cir. 2018) (same).

District courts have likewise repeatedly struck down economic regulations using rational basis review. In *Brantley v. Kuntz*, 98 F. Supp. 3d 884, 893 (W.D. Tex. 2015), a court in this district held that the application of a licensing requirement to a hair braiding school had no rational connection to the advancement of public health or safety given other regulatory provisions and exemptions that undercut the state's justifications. In *Louisiana Seafood Mgmt. Council, Inc.*, 917 F. Supp. at 446, the court found that requiring rod and reel commercial fishermen to have previously acquired a net fishing license in order to be eligible for a commercial rod and reel license was arbitrary and did not rationally advance the interest of conservation. And in *Santos v. City of Houston*, 852 F. Supp. 601, 608−09 (S.D. Tex. 1994), the court found that an ordinance regulating jitney services failed rational basis review because the evidence demonstrated that jitneys were a "sacrificial lamb" in a deal the City had constructed to benefit an incumbent electric company.

Between 1970 to 2000, "the Supreme Court struck down at least a dozen economic laws as violating either the Equal Protection Clause or the Due Process Clause" using rational basis review. *Tiwari v. Friedlander*, No. 3:19-CV-884-JRW-CHL, 2020 WL 4745772, at *6 (W.D. Ky. Aug. 14, 2020); *Bruner v. Zawacki*, 997 F. Supp. 2d 691, 701 (E.D. Ky. 2014) (statutory scheme for in-state moving services

violated Due Process and Equal Protection clauses lacked a legitimate purpose and was pure protectionism); *Clayton v. Steinagel*, 885 F. Supp. 2d 1212, 1215 (D. Utah 2012) (licensing requirement applied to an African hair stylist violated substantive due process and equal protection because the requirement had no rational relationship to the state's interest in health and safety). As these decisions show, the rational basis test, while deferential, is not insurmountable, and requires meaningful consideration of the law's end as well as its fit to that end.

### B.     Economic Protectionism Is Not a Legitimate State Interest

Economic protectionism, alone, is not a legitimate state interest under the Fourteenth Amendment. In *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002), the Sixth Circuit invalidated a law that limited the sale of caskets to licensed funeral directors. It held that "protecting a discrete interest group from economic competition is not a legitimate governmental purpose," and struck down the challenged regulation as a violation of due process and equal protection. Similarly, in *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008), the Ninth Circuit invalidated a licensure law for pest removal specialists because its exemptions had no justification except illegitimate protectionism. The court held that "mere economic protectionism for the sake of economic protectionism is irrational with respect to determining if a classification survives rational basis review.... [E]conomic protectionism for its own sake, regardless of its relation to the common good, cannot be said to be in furtherance of a legitimate governmental interest." *Id.* at 991, n.15.

More broadly the Supreme Court has explained in several cases that legislative acts that merely seek to benefit some people, or burden others, rather than protect the general public, are not rationally related to a legitimate end. *See, e.g.*, *Moreno*, 413 U.S. at 533−36; *Romer v. Evans*, 517 U.S. 620, 632−33 (1996) ("[Legal] classifications [may] not [be] drawn for the purpose of disadvantaging the group burdened by the law."); *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2469 (2019) ("protectionism, we have stressed, is not [a legitimate state] interest").

The Fifth Circuit agrees that "pure economic protectionism is not by itself a legitimate state interest," and laws and regulations must be invalidated if they have no other purpose but shielding industry participants from competition. *Hines*, 982 F.3d at 274 (citing *St. Joseph Abbey*, 712 F.3d at 222–23). In *St. Joseph Abbey*, the Fifth Circuit struck down a rule issued by the Louisiana Board of Funeral Directors that granted funeral homes an exclusive right to sell caskets. *Id.* at 215. The State Board argued that "the challenged rules, insulating funeral directors from competition, are rationally related to the State's legitimate interest in regulating the funeral profession." *Id.* at 220. The court noted that "naked economic preferences are impermissible to the extent that they harm consumers." *Id.* at 223. The court then explained that the rule lacked any rational consumer-protection or public-health basis because the Federal Trade Commission found no evidence of fraud or deception by third-party casket sellers, and the state did not regulate how caskets were

constructed nor did the state require funeral directors to have special expertise about caskets. *St. Joseph Abbey*, 712 F.3d at 223–26.

### III.   TEXAS'S BAN ON DIRECT-TO-CONSUMER SALES FAILS RATIONAL BASIS REVIEW

#### A.   The Ban Is a One-Way Street that Only Benefits Dealerships

Laws that prevent automobile manufacturers from either selling their vehicles directly to consumers or from owning or operating their own dealerships exist in a minority of states. *See* Kristy Hartman & Laura Shields, *State Laws on Direct-Sales*, National Conference of State Legislatures, at 1, https://www.wispolitics.com/wp-content/uploads/2021/08/State-Laws-on-Direct-Sales.pdf. These laws are largely the Depression-era relics of a time when a few dominant auto manufacturers—primarily "The Big Three" consisting of Ford, General Motors, and Chrysler—could exert their control of the auto supply on small-scale dealers. Daniel A. Crane, *Tesla, Dealer Franchise Laws, and the Politics of Crony Capitalism*, 101 Iowa L. Rev. 573, 574 (2016). At the time, these manufacturers "completely dominated the U.S. car market, and the dealers … were unable to contractually protect themselves against a franchising manufacturer unfairly undermining its own franchised dealers at retail." *Id*. at 574−75. Direct-sale bans were thus aimed at preventing these few, powerful manufacturers from forcing cars on distributors that they could not sell or undercutting franchised dealers on price by opening competing dealerships. *Id*. at 578−79, 583.

Since then, the automobile market has grown beyond the Big Three and become considerably more competitive, diminishing the power of manufacturers to

impose one-sided transactions with dealers. *Id*. at 575. The dealerships themselves have grown to be a big business interest, a far cry from the small operations they once were when manufacturers were dominant. *Id*. at 600. Recognizing that more competition exists now than ever, even some of the initial targets of the direct-sales ban have come to support manufacturer restrictions. *Id*. at 589. General Motors and Ford have supported dealers in blocking direct distribution, as the exact same legal barriers these manufacturers faced as nascent companies can now be used against emerging new competitive technologies like electric vehicles. *Id*. at 589–90. Overall, the economic conditions that prompted direct-sales restrictions have completely changed over the last half-century, reducing the need for continuing regulations. *Id*. at 601. Moreover, technology that did not exist at the time manufacturer regulations were implemented further accentuates the outdatedness of these regulations, as it is much easier today for consumers to bypass dealers and purchase products directly from those who made them. *Id*.

Despite these significant changes in market power that no longer favor manufacturers, the laws restricting manufacturers persist. *Id*. at 575. Now, laws that were once meant to prevent automobile manufacturers from engaging in unfair trade practices serve to protect automobile dealerships from competition, as dealers "see direct distribution as a mortal threat and the existing laws as their property[.]" *Id*. at 601. This leaves "little doubt that the use of dealer franchise laws to block pure direct distribution is naked protectionism from competition for the benefit of car dealers." *Id*.

Texas's direct-to-consumer sales ban is among these leftover protectionist laws. Texas's automobile dealer's political action committee boasts that its lobbying efforts have earned Texas the reputation of having the most restrictive dealer-protection laws in the country. Amicus Br. of the International Truck and Engine Corporation, *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493 (5th Cir. 2001), (No. 00-50750), 2000 WL 33977191, at \*5. The ban is consistent with those of other states and "appears to reflect a genre of state laws favoring local automobile dealers over out-of-state manufacturers." *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 512 (5th Cir. 2001) (Jones, J., concurring).

Although the Texas legislature has claimed that the broad purpose of its regulatory regime of automobile dealerships and manufacturers is to guard the public from fraud and unfair trade practices,[1] the specific motive of Tex. Occ. Code Ann. §§ 2301.476(c), 2301.252(a) is instead protectionist insulation of automobile franchise dealers from competition by manufacturers. When the Texas legislature passed HB 3092 in 1999, codified at Tex. Occ. Code Ann. § 2301.476, the Texas House Research Organization Bill Analysis of HB 3092 noted that supporters of the bill said:

> Restricting manufacturer ownership of dealership is essential to the maintenance of competition among dealerships. If a manufacturer were

---

[1] *See Ford Motor Co.*, 264 F.3d at 500 ("The State's purpose for enacting the Code is set forth in § 1.02, which provides: 'The distribution and sale of new motor vehicles in this State vitally affects the general economy of the State and the public interest and welfare of its citizens. It is the policy of this State and the purpose of this Act to exercise the State's police power to insure a sound system of distributing and selling new motor vehicles through licensing and regulating the manufacturers, distributors, and franchised dealers of those vehicles to provide for compliance with manufacturer's warranties, and to prevent frauds, unfair practices, discrimination, impositions, and other abuses of our citizens.'")

allowed to hold an ownership interest in a dealership, it might be compelled out of self-interest to allow that dealership to succeed ahead of others. At the very least, manufacturers receive financial statements from dealers detailing their sales and profits on every good and service they provide.

Manufacturer-owned dealerships with access to this information without comparable data going back to the other dealers would unfairly give the manufacturer-owned dealerships a definite competitive edge. Manufacturers allege that owning dealerships would provide better service to customers and could reduce prices by cutting distribution costs. However, surveys of automobile purchasers find over 80 percent are satisfied with their dealers. Additionally, a study of automobile prices over the last 10 years shows that while the cost of vehicles to dealers has risen over $9,000, dealers' gross profit has risen less than $400 per vehicle in that time, a decrease in the gross profit percentage.

Alexander Siebert, Texas H. Rsch. Org., B. Analysis H.B. 3092, 76th Leg., Reg. Sess., at 4 (1999).

Such a motivation belies dealers' or the Texas legislature's concern for the general public. Not only does the bill analysis emphasize that banning manufacturer dealership ownership is "*essential*" to "*dealerships*," but nowhere do the proponents adduce how manufacturer-owned dealerships would harm the *general public*. Instead, the focus of proponents' concern is how competition from manufacturers would affect incumbents. The Fifth Circuit has confirmed that the legislative history behind § 5.02C(c), which was later recodified as § 2301.476, "indicates the legislature's intent to prevent manufacturers from utilizing their superior market position to compete against dealers in the retail car market." *Ford Motor Co.*, 264 F.3d at 500. Likewise, a Texas state court noted that Texas's dealership licensing requirements "protect[] dealers from market entry by potentially competing dealers." *Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd. of Texas Dep't of Transp.*, 156

S.W.3d 91, 95 (Tex. App. 2004). But with more car manufacturers in the market, manufacturers no longer enjoy the superior market position that provoked the initial direct-to-consumer sales bans. Instead, the dealerships are the ones whose market position is comfortably protected by existing laws.

Outdated concern over competition from manufacturer-owned dealerships has driven opposition to amendments loosening restrictions on manufacturers from selling vehicles to the public. When the Texas House of Representatives proposed HB 733 in 2007, amending Tex. Occ. Code Ann. § 2301.476, which permitted manufacturers who then already owned dealerships that sold used trucks to retain their ownership interests, opponents of the bill repeated the same protectionist arguments. Specifically, the House Research Organization Bill Analysis of HB 733 noted that opponents of the bill said:

> CSHB 733 could threaten the existence of small, independent dealerships at the benefit of large, sometimes multinational companies that do not have a vested interest in the concerns of local communities and economies…. Small dealerships cannot compete with large companies with huge inventories that offer financing packages that they cannot…. The intent of the initial legislation was to keep large manufacturers from crushing smaller independent dealerships…. Creating another exemption only would entice manufacturers of other vehicles to seek a similar waiver for their respective industries.

Deshotel Krusee, Texas H. Rsch. Org., B. Analysis H.B. 733, 80th Leg., Reg. Sess., at 4 (2007).

Undoubtedly, independent dealerships wish the public to believe that their interests are aligned with those of the general public. Such a belief, whatever its merits, does not change the ultimate purpose of Texas's manufacturer sales laws to

protect independent dealerships from competition, a purpose that dealerships have admitted to on multiple occasions.

Texas's prohibition against direct-to-consumer sales by automobile manufacturers shields independent franchise dealerships from competition by automobile manufacturers. Consequently, as detailed below, it also harms consumer welfare. Because Texas's prohibition on direct-to-consumer sales is "pure economic protectionism," it lacks a legitimate state interest and does not survive rational basis review.

## B. Protectionism Does Not Serve the Public Interest

The protectionist direct sales ban harms Texas consumers by restricting their choices, hampering innovation, and driving up the price of electric vehicles. While dealers benefit from a monopoly on new car sales, consumers and entrepreneurs suffer.

Because of the challenged laws, innovators face a nearly insurmountable barrier to entry into the automobile market in Texas. Dealers have immense control over what cars reach the market, since manufacturers must rely on them to reach consumers. This is especially detrimental to new technology like electric vehicles because incumbent technologies often have a grip on established distribution channels through long-established relationships, arrangements, and settled customer expectations. Sellers of new technology must therefore locate or create new channels of market access, which cannot be done in states like Texas where direct market access is closed to them. Crane, 101 Iowa L. Rev. at 579.

Dealers also have incentives to keep innovators like Lucid out of the car market. Since most of their business comes from selling traditional gasoline vehicles, dealers would undercut their own business by promoting the advantages of electric cars like Lucid's. Dealers have little reason to undermine their interests this way, so the best way for companies like Lucid to introduce their products to the market is to sell their vehicles directly to consumers. Having direct access to consumers gives Lucid and other electric car manufacturers a greater likelihood of success promoting their electric cars. *See id* at 580. As another electric car maker explained, "'[e]xisting franchise dealers have a fundamental conflict of interest between selling gasoline cars, which constitute the vast majority of their business, and selling the new technology of electric cars…[i]t is impossible for [traditional dealers] to explain the advantages of going electric without simultaneously undermining their traditional business. This would leave the electric car without a fair opportunity to make its case to an unfamiliar public.'" *Id*. Texas law nonetheless forces middlemen between the innovator and potential drivers. Texans who want to buy a new Lucid electric vehicle cannot do so from a Lucid-owned dealership, nor could they even buy one directly from Lucid on the internet (an increasingly popular trend). This dealer gatekeeping consequently deprives consumers of new and affordable technology, like self-driving or electric cars.

Manufacturer bans like Texas's have been shown to deprive consumers of significant savings. A 2009 study cited in an analysis by the U.S. Department of Justice's Antitrust Division showed that direct distribution could save consumers on

average $2,225 per vehicle. Gerald R. Bodisch, *Economic Effects of State Bans on Direct Manufacturer Sales to Car Buyer*, 4 (May 2009) https://www.justice.gov/sites/default/files/atr/legacy/2009/05/28/246374.pdf.   Under the current system, much of the higher costs go toward maintaining dealer inventories and clearing lots of less popular vehicles that customers do not prefer. *Id.*

In fact, Texas is feeling the impact of the direct-to-consumer sales ban on the cost of its used electric cars. There are more high-priced models for sale in Texas than in other states, with 20 percent of all used electric cars costing over $60,000. Recurrent, *Texas Electric Vehicle Trend & Stats*, https://www.recurrentauto.com/research/texas-electric-vehicle-trends-stats (last visited November 19, 2022). "Part of this may be because of Texas's direct sales ban on new Teslas, meaning that customers who might otherwise prefer a new Tesla instead purchase newer model years second hand." *Id.*

An earlier study of automobile franchise regulations between 1954 and 1972 found a 15.3 percent reduction in the number of new car dealerships in states which had enacted dealer preferences. Prices on cars in those states with a lower growth rate of new car dealerships increased by 13.7 percent. In 1972 alone, franchise acts transferred $6.7 billion from consumers to dealers. Richard L. Smith, *Franchise Regulation: An Economic Analysis of State Restrictions on Automobile Distribution*, 25 J. L. & Econ. 125, 149−54 (1982).

Notwithstanding the savings, consumers simply prefer the ease of buying vehicles directly from a manufacturer—perhaps through an app, or within minutes

through a web browser. The analysis from the Department of Justice cites surveys showing that many new car buyers in the United States would be interested in buying directly from manufacturers. Bodisch, *supra*, at 4. Almost half of the respondents in one survey said they would choose to buy cars directly from the manufacturer even if it did not save any money. *Id*. The ability to buy a new car directly from the manufacturer is a natural fit in a nation accustomed to purchasing its products directly online from makers. The direct sales ban takes away this basic choice from consumers that exists for nearly every other product.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment should be granted.

DATED:  November 29, 2022.

Respectfully submitted,

/s/ Erin Wilcox
ERIN WILCOX
ANDREW R. QUINIO*
ANASTASIA P. BODEN*
**PACIFIC LEGAL FOUNDATION**
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: EWilcox@pacificlegal.org
Email: AQuinio@pacificlegal.org
Email: ABoden@pacificlegal.org
*Pro Hac Vice pending*
*Attorneys for Pacific Legal Foundation*

## CERTIFICATE OF SERVICE

I hereby certify that I have served the forgoing document via the Court's Electronic Filing System to the following:

Andrew M. Grossman
Baker & Hostetler LLP
1050 Connecticut Ave, Nw, Suite 1100
Washington, DC 20036
202-861-1697
Email: agrossman@bakerlaw.com

Rachel Palmer Hooper
Billy M. Donley
Baker Hostetler
811 Main Street
Suite 1100
Houston, TX 77002
713-646-1329
Fax: 713-751-1717
Email: rhooper@bakerlaw.com
Email: bdonley@bakerlaw.com

*Counsel for Plaintiff Lucid Group USA, Inc.*

Caroline Alyssa Merideth
Office of the Attorney General
PO Box 12548, Capitol Station, MC-019
Austin, TX 78711-2548
512-463-2120
Fax: 512-320-0667
Email: caroline.merideth@oag.texas.gov

*Counsel for Defendants Monique Johnston, Daniel Avitia,
and Corrie Thompson, in their official capacities*

/s/ Erin Wilcox
ERIN WILCOX