**United States District Court for the Western District of Texas**

_____

**BRIEF OF LEGAL AND ECONOMIC SCHOLARS AND PUBLIC INTEREST GROUPS AS AMICI CURIAE IN SUPPORT OF LUCID GROUP USA'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

LIST OF AMICI ...…………………………………………………………………1

STATEMENT OF AMICI INTEREST …………………………………….....…2

SUMMARY OF ARGUMENT…………………………………...……….....3

ARGUMENT……………………………………………………….….…..4

    I.     DIRECT SALES PROHIBITIONS WERE INTENDED
         TO PROTECT DEALERS FROM
         INTRABRAND COMPETITION FROM THEIR
         FRANCHISING MANUFACTURES, NOT
         INTERBRAND COMPEITITON FROM
         NON-FRANCHISING MANUFACTURES…………….…....….…4

         A.    Direct Sales Prohibitions Arose from the
                Perception of Franchisee Exploitation by
                Franchising Manufacturers ……………………….….……5

         B.    Courts Have Recognized that Direct Sales Prohibitions
                Were Not Intended to Prevent Interbrand Competition
                By Non-Franchising Manufactures……………….…....…10

    II.    THERE IS NO CONSUMER PROTECTION BASIS FOR
         PROHIBITING DIRECT SALES TO CONSUMERS………..….13

         A.    There is No Consumer Protection Justification for
                 Prohibiting Direct Sales by Non-Franchising
                Manufacturers…………………………………………….....13

         B.    Prohibiting Non-Franchising Manufacturers from
                 Selling Directly Will Diminish Consumer Choice,
                Impede Innovation, and Slow the Penetration of EV
                Technology…………………………………………..17

CONCLUSION……………………………………………….………19

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Beard Motors, Inc. v. Toyota Motor Distrib., Inc.,*
  480 N.E.2d 303, 303 (Mass. 1985)……………………………………..10, 11, 12

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
  433 U.S. 36, 56 (1977)………………………………………….....………..16

*Greater New York Automobile Dealers Ass'n v. Department of Motor Vehicles*
  969 N.Y.S.2d 721 (N.Y. S. Ct. 2013)……………………………..………12

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
  551 U.S. 877, 878 (2007)……………………………………..…….…..12

*Massachusetts State Automobile Dealers Ass'n, Inc. v. Tesla Motors, M.A., Inc.,*
  15 N.E.3d 1152 (Mass. 2014)……..………………………………....10, 17

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
  473 U.S. 614 (1985)………………………………………………………..7

*St. Joseph Abbey v. Castille,*
  712 F.3d 215, 222 (5th Cir. 2013)……….…………………………….3

**Statutes and Regulations**

Cal. Veh. Code § 11713.3……………………………………………….9

**Other Authorities**

Automobile Dealers' Day in Court Act of 1956, Pub. L. No. 84-1026,
  70 Stat. 1125……………………………………………………7

BEDROS PETER PASHIGIAN, THE DISTRIBUTION OF AUTOMOBILES,
  AN ECONOMIC ANALYSIS OF THE FRANCHISE SYSTEM (1961)…..…6

CHARLES MASON HEWITT, JR., AUTOMOBILE FRANCHISE
  AGREEMENTS 23-40 (1956)…………………………………….…6

Cynthia Barmore, *Tesla Unplugged:  Automobile Franchise Laws and the Threat to the Electric Vehicle Market,* 18 Va. J.L. & Tech. 185, 189 (2013)…...8

Daniel A. Crane, *Tesla, Dealer Franchise Laws, and the Politics of Crony Capitalism*, 101 Iowa L. Rev. 573, 578-80 (2016)…………………………5, 6, 8

Daniel A. Crane, *Why Intra-Brand Dealer Competition Is Irrelevant to the Price Effects of Tesla's Vertical Integration,* 165 U. Pa. L. Rev. Online 179 (2017)…..………………………………………………………………15, 16

FED. TRADE COMM'N, ANNUAL REPORT OF THE FEDERAL TRADE COMMISSION FOR THE FISCAL YEAR ENDED JUNE 30, 1939, at 24-25 (1939), https:www.ftc.gov/sites/default/files/documents/reports_annual/annual -report1939/ar1939_0.pdf………………..…………………………...…....7

Francine Lafontaine & Fiona Scott Morton, *Markets: State Franchise Laws, Dealer Terminations, and the Auto Crisis*, 24 J. ECON. PERSP. 233, 234 (2010)……………………………………………………………………4, 5

Friedrich Kessler, *Automobile Dealer Franchises: Vertical Integration by Contract,* 66 YALE L.J. 1135, 1155 (1957)………………………………….6

Gerald R. Bodisch, *Economic Effects Of State Bans on Direct Manufacturer Sales to Car Buyers,* Economic Effects of State Bans on Direct Manufacturer Sales to Car Buyers (justice.gov)…………………………………………16

https://pluginamerica.org/wp-content/uploads/2021/04/Direct-Sales-Nationwide -Organizations-Open-Letter-4.13.pdf………………………………………..15

https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved= 2ahUKEwjdk6rEhIH7AhXirYkEHTfVAF0QFnoECA4QAQ&url=https%3A %2F%2Fwww.autonews.com%2Fassets%2FPDF%2FCA98362217.PDF& usg=AOvVaw2q-aEMuK_w6Dcepj_A27AP………………………….…15

James Surowiecki, *Dealer's Choice*, NEW YORKER (Sept. 4, 2006), http://www.newyorker.com/magazine/2006/09/04/dealers-choice-2…….…..6

JEAN TIROLE, THE THEORY OF INDUSTRIAL ORGANIZATION 174-75 (1988)…………...………………………………………………………....16

Letter to Senator Darwin L. Booher from Directors of FTC's Office of Policy Planning, Bureau of Competition, and Bureau of Economics (May 7, 2015), https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-regarding-michigan-senate-bill-268-which-would-create-limited-exception-current/1505michiganautocycle.pdf (statement by Directors of Bureaus of Economics and Competition and Office of Policy Planning)……...14

Sierra Club Releases First Ever Nationwide Investigation into Electric Vehicle Shopping Experience | Sierra Club; Dealership Survey | Electric Cars – Consumer Reports News…………………………………………………….19

S. REP. NO 2073 at 3 (1956)…………………………………….……………..…..6

*The Development of the Franchise Distribution System in the U.S. Automobile Industry*, 59 BUS. HIST. REV. 465, 465-66 (1985)……………………….…5

# LIST OF AMICI[1]

- Roger D. Blair Professor, Department of Economics, University of Florida
- Henry N. Butler, Henry G. Manne Professor of Law and Economics, Executive Director, Law & Economics Center, George Mason University
- Steve Calandrillo, Jeffrey & Susan Brotman Professor of Law, University of Washington School of Law
- Daniel A. Crane, Frederick Paul Furth Sr. Professor of Law, University of Michigan
- Nicholas Economides, Professor of Economics, Stern School of Business, New York University
- Herbert Hovenkamp, James G. Dinan University Professor, University of Pennsylvania
- Kathryn Judge, Harvey J. Goldschmid Professor of Law, Columbia Law School
- Benjamin Klein, Professor Emeritus of Economics, UCLA
- Francine Lafontaine, William Davidson Professor of Business Economics and Public Policy Professor of Economics, University of Michigan
- Marina Lao, Professor of Law, Seton Hall University School of Law
- Mark A. Lemley, William H. Neukom Professor, Stanford Law School Director, Stanford Program in Law, Science, and Technology; Senior Fellow, Stanford Institute for Economic Policy Research
- Stan Liebowitz, Ashbel Smith Professor of Economics, University of Texas, Dallas
- Geoffrey A. Manne, President & Founder | International Center for Law & Economics
- Scott Masten, Professor of Business Economics and Public Policy, University of Michigan

---

[1] Amici join this brief solely in their individual capacities and express only their individual views. Institutional affiliations are listed for identification purposes only.

- John O. McGinnis, Professor in Constitutional Law, Northwestern Pritzker School of Law
- Douglas Melamed, Scholar in Residence, Stanford Law School
- Heather Payne, Associate Professor of Law, Seton Hall University School of Law
- Michael Sykuta, Executive Director, Financial Research Institute (FRI) & Associate Professor, Applied Economics, University of Missouri
- Alex Tabarrok, Director: Center for Study of Public Choice, Bartley J. Madden Chair in Economics at the Mercatus Center, Department of Economics, George Mason University
- Rory Van Loo, Professor of Law, Michaels Faculty Research Scholar, Boston University
- Alexander Volokh, Associate Professor of Law, Emory University
- Samuel N. Weinstein, Professor of Law; Co-Director, Heyman Center on Corporate Law and Governance, Bejamin N. Cardozo School of Law
- Lawrence J. White, Robert Kavesh Professor in Economics, New York University
- Joshua D. Wright, University Professor of Law; Executive Director of the Global Antitrust Institute, George Mason University

## STATEMENT OF AMICI INTEREST

1.      Amici are law professors, economists, or other academics with expertise in competition law and economic regulation. Amici do not work for Lucid, nor have they been compensated in any way for their participation in this brief.

## SUMMARY OF ARGUMENT

2.      Amici understand that the legal issue before the Court on Lucid's Motion for Summary Judgment is whether the State of Texas's denial to Lucid of

the right to sell its own cars in the State of Texas has a rational basis or instead represents a constitutionally impermissible effort to protect a "discrete interest group from economic competition." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 222 (5th Cir. 2013) (citation omitted). Amici take no position on the proper legal standard under the due process and equal protection clauses of the Fourteenth Amendment. However, Amici submit that there is no legitimate basis in the history of dealer franchise regulation or in economic theory or public policy to prohibit an automobile manufacturer that does not have independent franchisees to sell its own cars to the consuming public. Amici make two points in support of their position.

3.     *First*, the history of direct sales prohibitions in dealer franchise laws unequivocally demonstrates that the only public policy rationale for prohibiting direct sales was to protect dealers in existing contractual relationships with franchising manufacturers from unfair intrabrand exploitation by the manufacturer. These laws were not intended to restrict interbrand competition by manufacturers that chose not to franchise at all. Amici take no position in this brief on whether the dealer protection rationales that ungirded direct sales prohibitions in the mid-twentieth century remain valid today, but those *dealer protection* rationales clearly do not support restricting competition by manufacturers that do not have franchisees.

4.     *Second*, there is no legitimate *consumer protection* justification for prohibiting a non-franchising manufacturer from selling its own cars to consumers.

Allowing manufacturers and consumers freely to choose whether they transact directly or through middlemen intensifies competition, and expands consumer choice and innovation. There is no merit to any claim that prohibiting direct sales will result in lower prices or other benefits to consumers. The only viable understanding of a prohibition on direct sales by a non-franchising manufacturer is that it is intended to prevent competition that would threaten the protected economic status of existing car dealers.

## ARGUMENT

## I. DIRECT SALES PROHIBITIONS WERE INTENDED TO PROTECT DEALERS FROM INTRABRAND COMPETITION FROM THEIR FRANCHISING MANUFACTURERS, NOT INTERBRAND COMPETITION FROM NON-FRANCHISING MANUFACTURERS

5.    The history of dealer protection laws unequivocally shows a single rationale for direct sales prohibitions: protecting dealers from exploitation by their franchising manufacturers. These statutes had nothing at all to do with restricting sales by non-franchising manufacturers, which would not have threatened the kinds of exploitations about which the dealers successfully complained in the mid-twentieth century when the dealer protection laws arose.

### A. Direct Sales Prohibitions Arose from the Perception of Franchisee Exploitation by Franchising Manufacturers

6.    Automotive manufacturer franchising of dealers began in 1898 with a franchise by General Motors to sell steam automobiles. *See* Francine Lafontaine &

Fiona Scott Morton, *Markets: State Franchise Laws, Dealer Terminations, and the Auto Crisis*, 24 J. ECON. PERSP. 233, 234 (2010). However, for the first few decades of the 20th century, franchising was not the predominant distribution model. Rather, manufacturers employed a variety of distribution methods including direct distribution through factory-owned stores and traveling salesmen, and sales through wholesalers, retail department stores, and consignment arrangements. *See* Thomas G. Marx, *The Development of the Franchise Distribution System in the U.S. Automobile Industry*, 59 BUS. HIST. REV. 465, 465-66 (1985). As automobile consumption intensified, however, the manufacturers moved increasingly toward an independent franchised dealer model in order to focus on their core competency in manufacturing and find additional sources of capital to fund their distribution operations. *See generally* Daniel A. Crane, *Tesla, Dealer Franchise Laws, and the Politics of Crony Capitalism*, 101 Iowa L. Rev. 573, 578-80 (2016).

7.     The dealer-franchise system that has largely prevailed since the mid-twentieth century grew out of lobbying efforts by automobile dealers from the 1930s to the 1950s in response to perceived abuses of the franchise relationship by car manufacturers. *See* Crane, *supra at* 577-79. At that time, General Motors, Ford, and Chrysler ("the Big Three") dominated the market. Dealers were largely family-owned "mom and pop" shops. Manufacturers were perceived as having grossly unequal bargaining power and were able to secure contracts that imposed draconian

terms on the dealers. *See* Friedrich Kessler, *Automobile Dealer Franchises: Vertical Integration by Contract*, 66 YALE L.J. 1135, 1155 (1957); CHARLES MASON HEWITT, JR., AUTOMOBILE FRANCHISE AGREEMENTS 23-40 (1956); BEDROS PETER PASHIGIAN, THE DISTRIBUTION OF AUTOMOBILES, AN ECONOMIC ANALYSIS OF THE FRANCHISE SYSTEM (1961). For example, during the Depression, Henry Ford kept his factories running at "full tilt" and allegedly was able to "force" dealers to buy inventories of Model Ts that they would be unable to sell, under threat of not getting any more inventory in the future if they refused delivery. *See* James Surowiecki, Dealer's Choice, NEW YORKER (Sept. 4, 2006), http://www.newyorker.com/magazine/2006/09/04/dealers-choice-2. General Motors was similarly perceived to be exploitative of its dealers. According to a 1956 Senate Committee report, franchise agreements of the 1950s typically did not require the manufacturer to supply the dealer with any inventory and allowed the manufacturer to terminate the franchise relationship at will without any showing of cause. S. REP. NO. 2073, at 3 (1956). Conversely, the manufacturers could often force dealerships to accept cars whether the dealer could sell them or not. Thus, the franchise agreements were perceived as shifting risk downward to dealers and reward upwards to the manufacturers.

8.     During the 1930s to 1950s, the dealers pressured Congress to enact a statutory scheme protecting them from the power of the Big Three. They obtained relatively little of what they wanted from the federal government. A 1939 report by the Federal Trade Commission ("FTC") found some franchising abuses by manufacturers, but also that the use of manufacturer power to squeeze the dealers actually created intensive retail competition to the benefit of consumers. FED. TRADE COMM'N, ANNUAL REPORT OF THE FEDERAL TRADE COMMISSION FOR THE FISCAL YEAR ENDED JUNE 30 1939, at 24-25 (1939), https://www.ftc.gov/sites/default/files/documents/reports_annual/annual-report-1939/ar1939_0.pdf. The FTC also accused the dealers themselves of employing various anti-consumer practices, such as "padding" new car prices, price fixing, and "packing" finance charges. Eventually, the dealers secured a modest federal victory with the Automobile Dealers' Day in Court Act of 1956, Pub. L. No. 84-1026, 70 Stat. 1125, which allows dealers to bring a federal suit against a manufacturer who, without good faith, fails to comply with the terms of a franchise agreement or terminates, cancels, or refuses to renew a franchise. *See generally Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985).

9.     The dealers secured more significant victories in state legislatures. During the same time period, states began to pass statutes governing automotive

franchise relations. Today, all 50 states have such laws. Their terms vary, but they commonly include prohibitions on forcing dealers to accept unwanted cars, protections against termination of franchise agreements, and restrictions on granting additional franchises in a franchised dealer's geographic market area. Crane, *supra at* 578-79.

10. One of the typical provisions in these dealer protection statutes—which is reflected in Texas's dealer protection law—is a prohibition on direct sales by a franchising manufacturer. *See* Cynthia Barmore, *Tesla Unplugged: Automobile Franchise Laws and the Threat to the Electric Vehicle Market*, 18 Va. J. L. & Tech. 185, 189 (2013). The rationale for these direct sales prohibitions was that it was unfair for a manufacturer to induce its franchised dealer to make significant investments in promoting the manufacturer's brand and then open up its own retail store in competition with its franchised dealer. Crane, *supra*. The manufacturer could ostensibly sell below its dealer's price (by keeping the wholesale price to the dealer high) and unfairly siphon off the benefits of the dealer's investment in the brand. To prevent such exploitation of their superior bargaining power, manufacturers would be prohibited from competing against their own franchised dealers. [2]

11. Since at the time of these statutes the three relevant manufacturers—

---

[2] Amici take no position on whether any of the original justifications for direct sales prohibitions as applied to franchising manufacturers were or remain viable.

General Motors, Ford, and Chrysler—were all in the franchising business, most state statutes did not specifically spell out that the statutory prohibition was intended to apply to franchising manufacturers. That was simply assumed. However, the structure of many of these statutes makes clear that manufacturer competition against its own franchisees was the exclusive concern. For example, the California statute prohibits a manufacturer from opening a retail store within a ten-mile radius of its franchised dealer. California Vehicle Code - VEH § 11713.3.

12.     This historical context provides reveals the purpose animating statutory prohibitions on manufacturer-direct sales. Direct sales prohibitions arose as part of a larger package of protections for dealers from the perception of unfair exploitation by their franchising manufacturer. These statutes were not intended to protect franchisees from interbrand competition from manufacturers that did not franchise at all.

**B. Courts Have Recognized that Direct Sales Prohibitions Were Not Intended to Prevent Interbrand Competition by Non-Franchising Manufacturers**

13.     Judicial decisions addressing other states' motor vehicle franchise acts reflect the historical context discussed above. The decision of the Massachusetts Supreme Court in *Massachusetts State Automobile Dealers Ass'n, Inc. v. Tesla Motors, M.A., Inc.*, 15 N.E.3d 1152 (Mass. 2014) is the leading precedent. The Massachusetts car dealers' association sued Tesla for unfair trade practices for opening a gallery in the state. The legal question presented was whether the dealers had standing to sue another electric vehicle manufacturer—Tesla—under amendments to the Massachusetts franchise dealer statute. Although the court only addressed the issue of standing—finding that the dealers lacked it—its reasoning showcases the importance of historical context in understanding the legislative rationale for direct sales prohibitions.

As the court explained, the direct sales prohibition "was enacted in recognition of the potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated dealers." *Id.* at 679 (citing *Beard Motors, Inc. v. Toyota Motor Distribs., Inc*., 480 N.E.2d 303, 303 (Mass. 1985)). The direct sales prohibition was part of a "Dealers' 'Bill of Rights' Provision," that "was intended to protect franchised dealerships from specific types of abuses by their manufacturers." *Id.* (citation omitted).

The statute created a private right of action for "any motor vehicle dealer" injured by a violation of the statute, and the dealers argued that they were such parties under a literal reading of the statute. *Id.* at 681. After casting doubt on whether the statute even applied to Tesla, the court came to what it thought the more significant point: The statute had to be read in the context of "cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished." *Id.* at 682 (citations omitted). The dealers argued that they were intended beneficiaries of the statute, since direct sales would permit Tesla to save costs and sell at a lower price to consumers, thus competing unfairly with the dealers. *Id.* The court rejected this argument. "The type of competitive injury" the dealers described "between unaffiliated entities" was "not within the statute's area of concern." *Id.* at 684. Historically, the statute was intended "to protect motor vehicle dealers from a host of unfair acts and practices historically directed at them ***by their own brand*** manufacturers and distributors." *Id.* at 684-85 (emphasis added). "It would be anomalous to find, within this detailed list of rights and protections that are conferred on dealers vis-à-vis their manufacturers and distributors, a lone provision giving dealers protection against competition from an unaffiliated manufacturer." *Id.* at 685. The court concluded that the direct sales prohibition "was intended and understood only to prohibit manufacturer-owned dealerships when, unlike Tesla, the manufacturer already had an affiliated dealer or dealers in

Massachusetts." *Id.* at 688.

The Massachusetts Supreme Court got the history exactly right. So did the New York Supreme Court in *Greater New York Automobile Dealers Ass'n v. Department of Motor Vehicles*, 969 N.Y.S.2d 721 (N.Y. S. Ct. 2013), another decision denying the dealers standing to challenge Tesla's opening of a retail operation. Like the Massachusetts court, the New York court understood the state's direct sales prohibition to regulate the relationship between a franchising manufacturer and its franchised dealer, not interbrand competition by non-franchising manufacturers:

> The Franchised Dealer Act regulates the relationship between a car company (manufacturer) and its franchised dealers. In order to commence an action for a violation of Article 17–A of the VTL Law, there must be a franchise relationship between the franchisor and the franchisee. Manufacturers and dealers cannot utilize the Franchised Dealer Act as a means to sue their competitors.

*Id.* at 726.

The United States Supreme Court has long recognized the critical distinction between the regulation of intrabrand competition—competition among separate sellers of the same brand of product—and interbrand competition—competition between sellers in different brands. *See, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 878 (2007). Since Lucid does not have any franchised dealers, its eligibility to open a dealership solely concerns interbrand competition—

competition between Lucid and dealers who sell different brands of cars. There is no historical evidence that the direct sales prohibitions in dealer protection statutes were motivated by concerns regarding interbrand competition. They were solely concerned with protecting dealers from exploitation by their own franchising manufacturers. And that concern has no application to non-franchising manufacturers.

## II. THERE IS NO CONSUMER PROTECTION BASIS FOR PROHIBITING DIRECT SALES TO CONSUMERS.

14.     As noted in the previous section, the historical concern with allowing car manufacturers to open their own retail stores—that they might unfairly undermine their own franchised dealers—simply does not apply to a manufacturer that does not employ dealers. Nor is there any other plausible justification for such a prohibition. To the contrary, prohibiting direct sales by non-franchising manufacturers will only harm consumer choice, impede innovation, and slow the penetration of EV technology.

### A.   There Is No Consumer Protection Justification for Prohibiting Direct Sales by Non-Franchising Manufacturers.

15.     As noted in the previous section, the only historically grounded legislative purpose for direct sales prohibitions was protecting dealers from exploitation by their franchising manufacturer. Nonetheless, in recent years lobbyists for existing car dealers have sought to recast the direct sales bans as consumer protection measures. These arguments have no basis in history, public

policy, or economics.

16.    *First*, the arguments are entirely contrary to the history of the dealer franchise acts. As noted above, the vehicle franchise acts of the mid-twentieth century, from which contemporary state statutes descend, were solely concerned with protecting *dealers*, not *consumers.* There is not a whiff of consumer-protection sentiment in these statutes.

17.    *Second*, it is notable that the arguments in favor of consumer protection are being advanced by dealers who stand to gain financially from the limitation of competition rather than by consumer advocates. The consumer advocates are all on the side of permitting direct sales. For example, the senior leadership of the Federal Trade Commission—the preeminent federal consumer protection organization—has expressed the view that direct sales prohibitions "operate as a special protection for dealers—a protection that is likely harming both competition and consumers."[3] Similarly, the Consumer Federation of America, Consumer Action, Consumers for Auto Reliability and Safety, and the American Antitrust Institute have argued that

---

[3] Letter to Senator Darwin L. Booher from Directors of FTC's Office of Policy Planning, Bureau of Competition, and Bureau of Economics (May 7, 2015), https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-regarding-michigan-senate-bill-268-which-would-create-limited-exception-current/150511michiganautocycle.pdf (statement by Directors of Bureaus of Economics and Competition and Office of Policy Planning).

direct sales prohibitions are harmful to consumer choice and should be repealed.[4] Not a single consumer organization has joined the dealers' self-serving claim that protecting them from interbrand competition will benefit consumers.

18. *Finally*, there is simply no plausible economic merit to the argument that prohibiting consumers from choosing to buy directly from a manufacturer is in consumers' interest. Such arguments have been repeatedly debunked by leading economists, including past senior leaders of the Justice Department's Antitrust Division and Federal Trade Commission.[5]

19. Under no viable economic theory would forcing manufacturers to sell through dealers decrease prices to consumers by eliminating the manufacturer's power to charge a monopoly retail mark-up. Any claim that forcing car manufacturers to sell through independent franchised dealers reduces prices to consumers would rest on the erroneous view that a manufacturer that vertically integrates into distribution can charge a monopoly mark-up by eliminating intrabrand retail competition for its cars. *See* Daniel A. Crane, *Why Intra-Brand Dealer Competition Is Irrelevant to the Price Effects of Tesla's Vertical Integration*,

---

[4] https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2a hUKEwjdk6rEhIH7AhXirYkEHTfVAF0QFnoECA4QAQ&url=https%3A%2F%2 Fwww.autonews.com%2Fassets%2FPDF%2FCA98362217.PDF&usg=AOvVaw2 q-aEMuK_w6Dcepj_A27AP.

[5] https://pluginamerica.org/wp-content/uploads/2021/04/Direct-Sales-Nationwide-Organizations-Open-Letter-4.13.pdf.

165 U. Pa. L. Rev. Online 179 (2017). As the Supreme Court has long recognized, manufacturers would earn lower, not higher, profits if the retail mark-up increased. *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 56 (1977).

20. By contrast, direct sales could lead to lower prices to consumers, for at least two reasons. *First*, vertical integration may allow the manufacturer to achieve marginal cost savings that could be passed on to consumers. *See*, *e.g.*, Gerald R. Bodisch, *Economic Effects of State Bans on Direct Manufacturer Sales to Car Buyers*, [Economic Effects Of State Bans On Direct Manufacturer Sales To Car Buyers (justice.gov)](). *Second*, if there is market power in the distribution chain, vertical integration might eliminate double marginalization—the successive monopoly mark-ups that can occur when separate economic actors in a vertical distribution chain set their prices to maximize their profits. See, e.g., JEAN TIROLE, THE THEORY OF INDUSTRIAL ORGANIZATION 174-75 (1988).

21. Indeed, existing-dealer groups have frankly admitted that direct sales will lead to *lower*, not higher, prices to consumers. In the previously discussed Massachusetts litigation, the dealers argued that "[u]nless the defendants are enjoined, they will be allowed to compete unfairly with the dealers as their model of manufacturer owned dealerships with remote service centers will allow Tesla and Tesla MA financial savings which would not be available to Massachusetts dealers who must spend considerably to conform to Massachusetts law. This could cause

inequitable pricing which also [could] cause consumer confusion and the inability to fairly consider the various automobiles offered." 15 N.E. at 1159. In order for the dealers to have injury, "financial savings" leading to "inequitable pricing" must mean *lower* prices—precisely what economic theory would predict.

22. The dealers have also argued that prohibiting manufacturers to run their own retail operations would protect consumers from unfair manufacturer denial of warranty reimbursement for repair services. That argument is economically erroneous, but in any event has no relevance to the Texas regulatory scheme, which does not prohibit a manufacturer from opening its own service centers.

23. In sum, there is no viable consumer protection reason for prohibiting direct sales.

## B. Prohibiting Non-Franchising Manufacturers from Selling Directly Will Diminish Consumer Choice, Impede Innovation, and Slow the Penetration of EV Technology.

24. Not only is there no viable justification for prohibiting direct sales by non-franchising manufacturers, but there are important reasons for allowing direct sales, particularly as applied to the new field of electric vehicles. Prohibiting consumers from buying directly from manufacturers limits consumer freedom and choice, impedes innovation, and retards the penetration of EV technology.

25. To amici's knowledge, every EV start-up that has announced its plans to sell EVs in the United States has announced that it will pursue a direct sales model

because selling through franchised dealers would be a significant competitive disadvantage. This list includes a large and diverse set of American companies—not just Lucid, but well-known manufacturers like Tesla, newer EV companies like Rivian, medium and heavy-duty truck manufacturers like Arrival, and solar-powered car makers like Aptera. These companies have uniformly argued that the franchise dealer model is not suitable for EV sales by start-up companies that do not already have an established dealer network.

26. The argument that direct sales are critical to the success of EV start-ups runs as follows: The traditional dealer model is based on high-pressure sales tactics to sell existing inventory to customers who already understand the technology, and then to earn the majority of the dealership's profits when the customer returns for service on the car. None of those assumptions work for EV sales. Customers need to be educated about the new technology, and most customers interact with an EV company a number of times before deciding to buy its product. There is no existing inventory sitting on the lot; EVs are typically build-to-order. And the profits dealers can expect from service are significantly lower than with internal combustion cars, since an EV's service needs tend to be much lower. Not surprisingly, secret shopper studies of EV by dealers by the Sierra Club and Consumer Reports have found that

existing dealers are ill-motivated and ill-prepared to sell EVs.[6]

27.     If the EV start-ups' arguments are correct, then prohibiting direct sales by non-franchising EV start-ups could have serious, negative consequences for innovation and EV market penetration. To be clear, amici take no position on whether these EV start-ups are correct, or have the right distribution strategy. Which distribution strategies work for which companies and which consumers can only be ascertained in a competitive market when companies and consumers can freely experiment and choose. Unless there is some rational public policy reason to prohibit non-franchising manufacturers from pursuing a direct sales strategy, that strategy should be permitted. As noted throughout this brief, there is no such rational policy reason. Neither the original justification for direct sales prohibitions, nor any more recent arguments by car dealers, support a prohibition on direct sales as applied to non-franchising manufacturers.[7]

## CONCLUSION

28.     Amici respectfully submit that there is no rational basis for prohibiting a non-franchising manufacturer like Lucid from selling its cars directly to consumers and that applying Texas law to bar Lucid from direct sales can only be understood

---

[6] Sierra Club Releases First Ever Nationwide Investigation into Electric Vehicle Shopping Experience | Sierra Club; Dealership Survey | Electric Cars - Consumer Reports News.
[7] Amici take no position on whether any of the original justifications for direct sales prohibitions as applied to franchising manufacturers are still viable.

as a measure to protect car dealers from economic competition.

December 12, 2022

Respectfully submitted,

**J. CHRISTOPHER BYRD, P.C.**

By: John C. "Chris" Byrd
State Bar No. 03547980
PO Box 359
Bulverde, TX 78163
(830) 249-3559 Phone
(830) 214-2181 Fax
cbyrd@chrisbyrdlaw.com
***Counsel for Amici***

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document has been electronically filed with the Court on December 12, 2022 and will be served on all related parties in accordance with federal rule of Civil Procedure 5.

**J. CHRISTOPHER BYRD, P.C.**

By: John C. "Chris" Byrd
State Bar No. 03547980
PO Box 359
Bulverde, TX 78163
(830) 249-3559 Phone
(830) 214-2181 Fax
cbyrd@chrisbyrdlaw.com
***Counsel for Amici***