## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| LUCID GROUP USA, INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>MONIQUE JOHNSTON, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles; DANIEL AVITIA, in his official capacity as Executive Director of the Texas Department of Motor Vehicles; and CORRIE THOMPSON, in her official capacity as Director of the Enforcement Division of the Texas Department of Motor Vehicles,<br><br>*Defendants.* | Civil Action No. 22-cv-01116-RP<br><br>**BRIEF OF *AMICUS CURIAE* AMERICANS FOR PROSPERITY FOUNDATION-TEXAS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

## DISCLOSURE STATEMENT

*Amicus curiae* Americans for Prosperity Foundation is a nonprofit corporation. It has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

## TABLE OF CONTENTS

DISCLOSURE STATEMENT.................................................................................. ii

TABLE OF CONTENTS..................................................................................... iii

TABLE OF AUTHORITIES................................................................................. iv

INTEREST OF *AMICUS CURIAE*....................................................................... 1

SUMMARY OF ARGUMENT.............................................................................. 1

ARGUMENT................................................................................................... 2

   I.   The Constitution Protects Economic Liberty.................................................. 2

   II.  The Constitution's Bar Against Irrational Economic Regulations Has Bite...................... 4

   III. Shielding Companies from Competition is Not a Legitimate State Interest Sufficient to Sustain Economic Regulation........................................................................... 7

   IV. Direct Sale Bans Harm Competition and Consumers without Justification...................... 8

      A. Harms to Competitive Process and Consumer Welfare…................................... 9

      B. Typical Justifications for Direct Sale Bans Should Be Rejected as Pretextual.................. 11

CONCLUSION............................................................................................... 17

CERTIFICATE OF SERVICE .............................................................................. 18

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allegheny Pittsburgh Coal Co. v. County Comm'n*,
    488 U.S. 336 (1989)..................................................................................8

*Allen v. Tooley*,
    80 Eng. Rep. 1055 (K.B. 1614).................................................... 3

*A.M. Capen's Co., Inc. v. Am. Trading and Prod. Corp.*,
    202 F.3d 469 (1st Cir. 2000)................................................15

*Barsky v. Bd. of Regents*,
    347 U.S. 442 (1954)..........................................................................3

*Borden's Farm Prods. Co. v. Baldwin*,
    293 U.S. 194 (1934)..........................................................................5

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)........................................................................11

*Corfield v. Coryell*,
    6 F. Cas. 546 (C.C.E.D. Pa. 1823)........................................................3

*Craigmiles v. Giles*,
    312 F.3d 220 (6th Cir. 2002)........................................................ 7, 11, 12, 15

*Dent v. West Virginia*,
    129 U.S. 114 (1889)..........................................................................3

*FCC v. Beach Commc'ns*,
    508 U.S. 307 (1993)..........................................................................5

*Ford Motor Co. v. Tex. DOT*,
    264 F.3d 493 (5th Cir. 2001)........................................ 7, 12, 13, 14, 15

*Gen. Motors Corp. v. Romein*,
    503 U.S. 181 (1992)..........................................................................4

*Greater Hous. Small Taxicab Co. Owners Ass'n v. City of Hous.*,
    660 F.3d 235 (5th Cir. 2011)........................................................ 6

*Greene v. McElroy*,
    360 U.S. 474 (1959)..........................................................................3

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989)........................................................................15

*Hettinga v. United States*,
   677 F.3d 471 (D.C. Cir. 2012)..............................................................5, 9

*Hines v. Quillivan*,
   982 F.3d 266 (5th Cir. 2020)..............................................................5, 7, 13

*Int'l Truck and Engine Corp. v. Bray*,
   372 F.3d 717 (5th Cir.2004)..............................................................13

*Mahone v. Addicks Util. Dist. of Harris Cnty.*,
   836 F.2d 921 (5th Cir. 1988)..............................................................4

*Marmon v. Mustang Aviation, Inc.*,
   430 S.W.2d 182 (Tex. 1968)..............................................................15

*Merrifield v. Lockyer*,
   547 F.3d 978 (9th Cir. 2008)..............................................................8

*Metropolitan Life Ins. Co. v. Ward*,
   470 U.S. 869 (1985)..............................................................8

*Newman Marchive P'ship, Inc. v. Hightower*,
   349 Fed. Appx. 963 (5th Cir. 2009)..............................................................12

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
   439 U.S. 96 (1978)..............................................................12

*Patel v. Tex. Dep't of Licensing & Regulation*,
   469 S.W.3d 69 (Tex. 2015)..............................................................2, 3, 5

*Philadelphia v. New Jersey*,
   437 U.S. 617 (1978)..............................................................5

*Powers v. Harris*,
   379 F.3d 1208 (10th Cir. 2004)..............................................................7

*Slaughter-House Cases*,
   83 U.S. (16 Wall.) 36 (1873)..............................................................3, 5, 6

*Slaughter v. Dobbs*,
   579 F. Supp. 3d 842 (S.D. Miss. 2022)..............................................................7, 11

*Smith v. Cahoon*,
   283 U.S. 553 (1931)..............................................................4, 5, 7, 8

*SonWest Co. v. Evertson*,
   No. 1:20-CV-842-RP, 2021 U.S. Dist. LEXIS 89508 (W.D. Tex. 2021).......11

*St. Joseph Abbey v. Castille*,
   712 F.3d 215 (5th Cir. 2013)..............................................................6, 7, 9, 10, 11, 15, 16

*The Case of the Monopolies,*
    77 Eng. Rep. 1260 (K.B. 1602)..........................................................................3

*Tiwari v. Friedlander,*
    26 F.4th 355 (6th Cir. 2022)..........................................................................5

*Tiwari v. Friedlander,*
    No. 3:19-CV-884-JRW-CHL,
    2020 U.S. Dist. LEXIS 146248 (W.D. Ky. Aug. 14, 2020).........................4, 5

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018)..................................................................................6

*United States v. Carolene Prods. Co.,*
    304 U.S. 144 (1938)...................................................................................5, 6

*Wal-Mart Stores v. Tex. Alcoholic Bev. Comm'n,*
    110 F. Supp. 3d 719 (W.D. Tex. 2015)......................................4, 5, 6, 11, 16

*Wal-Mart Stores v. Tex. Alcoholic Bev. Comm'n,*
    No. 1:15-cv-134-RP, 2017 U.S. Dist. LEXIS 230831 (W.D. Tex. 2017).........6

*Washington v. Glucksberg,*
    521 U.S. 702 (1997).....................................................................................3

*Whole Woman's Health v. Hellerstedt,*
    579 U.S. 582 (2016).....................................................................................6

**Constitution**

U.S. Const. amend. XIV, § 1.............................................................................4

**Statutes**

Tex. Bus. & Com. Code § 17.12......................................................................15

Tex. Bus. & Com. Code §§ 17.41–63.............................................................15

Tex. Occ. Code § 2301.351............................................................................15

Tex. Occ. Code § 2301.476(c)........................................................................12

Tex. Occ. Code § 2301.651............................................................................15

Tex. Occ. Code §§ 2301.801–805..................................................................15

Tex. Penal Code § 32.42..................................................................................................... 15

**Other Authorities**

Adam Griffin,
  *Protecting Economic Liberty in the Federal Courts: Theory, Precedent, Practice*,
  22 Fed. Soc. Rev. 232 (2021)....................................................................................... 6

Amy Coney Barrett,
  *Countering the Majoritarian Difficulty*,
  32 Const. Comment. 61 (2017)......................................................................................7

Danny Kenny, *Banning of Direct Electric Vehicle Sales Only Helps Car Dealers*,
  Real Clear Markets,
  https://www.realclearmarkets.com/articles/2022/09/23/banning_of_direct_electric_ve
  hicle_sales_only_helps_car_dealers_855145.html.........................................................9

Daniel A. Crane,
  *Tesla, Dealer, Franchise Laws, and the Politics of Crony Capitalism*,
  101 Iowa L. Rev. 573 (2016)........................................................................... 12, 14, 15

Gerald R. Bodisch, Econ. Analysis Grp., Economic Effects of State Bans on Direct
  Manufacturer Sales to Car Buyers, EAG 09-1 CA (May 2009)............................. 10, 14

James W. Ely Jr.,
  *"To Pursue Any Lawful Trade or Avocation": The Evolution of Unenumerated
  Economic Rights in the Nineteenth Century*,
  8 U. Pa. J. Const. L. 917 (2006)...................................................................................3

Joint Letter of the Antitrust Division of the U.S. Department of Justice and the Federal
  Trade Commission on Franchised Dealer Requirements to Sell and Service Motor
  Vehicles and Nebraska Legislative Bill 51 (March 14, 2019),
  https://www.justice.gov/atr/page/file/1146236/download...........................................17

Open Letter to New Jersey Governor Chris Christie on the Direct Automobile
  Distribution Ban, International Center for Law & Economics (March 26, 2014),
  http://laweconcenter.org/images/articles/tesla_letter_icle.pdf.....................................16

*Republicans Should Back Tesla, Creative Destruction at Its Best*, R Street (Mar. 18,
  2014), https://www.rstreet.org/2014/03/18/republicans-should-back-tesla-creative-
  destruction-at-its-best/.................................................................................................9

Steven G. Calabresi & Larissa C. Leibowitz,
  *Monopolies and the Constitution: A History of Crony Capitalism*,
  36 Harv. J.L. & Pub. Pol'y 983 (2013)........................................................................3, 5

Steven Menashi & Douglas H. Ginsburg,
  *Rational Basis With Economic Bite*,
  8 NYU J.L. & Liberty 1055 (2014)............................................................................. 11

Tex. House Research Org., Revising the Texas Motor Vehicle Commission Code:
    Analysis of H.B. 3092 (1999)...................................................................................... 12

The Federalist No. 10 (Madison)............................................................................ 4

Timothy Sandefur,
    *Is Economic Exclusion a Legitimate State Interest,*
    14 Wm. & Mary Bill of Rts. J. 1023, 1042 (2006)........................................................ 8

Timothy Sandefur,
    *The Right to Earn a Living,*
    6 Chap. L. Rev. 207 (2003)........................................................................................... 3

Todd Zywicki,
    *Rent-Seeking, Crony Capitalism, and the Crony Constitution,*
    23 S. Ct. Econ. Rev. 77 (2015)..................................................................................... 9

Will Zerhouni,
    *Tesla Takes On Michigan,*
    Cato Institute, Policy Analysis No. 834 (Feb. 27, 2018)................................................ 9

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Americans for Prosperity Foundation is a 501(c)(3) nonprofit organization that operates a state chapter in Texas ("AFPF-TX") that advocates for long-term solutions to the country's biggest problems. One of those key ideas is that the Constitution's promise of due process and equal protection protects liberty, including economic liberty.

AFPF-TX is interested in this case because it believes companies in all industries should be able to compete in the free market and supports consumer choice. AFPF-TX broadly opposes cronyism, rent seeking, and protectionist legislation shielding special interest groups from competition by creating senseless barriers to entry, such as the Direct-Sale Prohibition at issue in this case. AFPF-TX also believes naked economic protectionism is not a legitimate state interest sufficient to support economic regulation. Economic protectionism senselessly harms competition and consumer welfare. Texans deserve more purchasing power and choices for how to spend their hard-earned money free from senseless and unconstitutional government restrictions.

## SUMMARY OF ARGUMENT

A willing buyer of a legitimate product (here, a would-be EV purchaser) should be able to purchase from a willing seller (an EV manufacturer) without going through a government-mandated middleman (here, a brick-and-mortar car dealership)—all at increased cost to the consumer, who also has a reduced consumer experience. That makes no sense, particularly where, as here, the manufacturer is only barred from selling directly to the consumer—without a rent-seeking, government-mandated intermediary—with respect to *in*-state (as opposed to out-of-state) sales. Yet that is exactly what Texas's Direct-Distribution Prohibition does, harming both consumer welfare and competition without countervailing benefit—except, of course, in the form of pure economic protectionism benefitting the government-mandated middleman, which also

1

happens to be a powerful special interest group.

This is wrong. Texans should be free to buy, lease, and service the car of their choosing, in the manner of their choosing, from the seller of their choosing without government red tape or interference. Texas's Direct-Sale Prohibition is pure economic protectionism lining the coffers of a powerful interest group at the expense of consumers and the free market. It does nothing to protect consumers, in fact undermining consumer welfare and choice, harming the competitive process to boot, without any legitimate countervailing benefits to consumers or to competition.

This arrangement is also unconstitutional. Under the Constitution, as interpreted by the Supreme Court, economic regulations must be supported by a rational basis; that is, a rational connection to a *legitimate* government interest. Naked economic protectionism is not a legitimate justification for economic regulation. Here, as Plaintiff Lucid Group USA, Inc.'s ("Lucid") Motion for Summary Judgment, Dkt. No. 4, establishes beyond reasonable dispute, the sole justification for Texas's in-state Direct-Sales Prohibition is shielding a special interest group from economic competition. Texas's Direct-Sales Prohibition thus flunks the rational-basis test and violates due process and equal protection, as applied to Lucid's innovative direct-sale business model.

This Court should grant Lucid's Motion, declare Texas's Direct-Sales Prohibition unconstitutional as applied to Lucid's innovative direct-sales business model, and permanently enjoin Defendants from enforcing it against Lucid.

## ARGUMENT

### I.      The Constitution Protects Economic Liberty.

"Economic liberty is deeply rooted in this Nation's history and tradition[.]" *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 122 (Tex. 2015) (Willett, J., concurring) (cleaned up); *see also id.* at 95 (Willett, J., concurring) ("Cases stretching back centuries treat

2

economic liberty as constitutionally protected—we crossed that Rubicon long ago[.]"); *see also* James W. Ely Jr., *"To Pursue Any Lawful Trade or Avocation": The Evolution of Unenumerated Economic Rights in the Nineteenth Century*, 8 U. Pa. J. Const. L. 917, 953 (2006). *See generally* Steven G. Calabresi & Larissa C. Leibowitz, *Monopolies and the Constitution: A History of Crony Capitalism*, 36 Harv. J.L. & Pub. Pol'y 983 (2013). The same holds true with respect to the basic right to earn a living free from arbitrary government interference, which predates the Founding.[1] *See, e.g., The Case of the Monopolies*, 77 Eng. Rep. 1260 (K.B. 1602); *Allen v. Tooley*, 80 Eng. Rep. 1055 (K.B. 1614); *see Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 105 (1873) (Field, J., dissenting) ("[W]hen the Colonies separated from the mother country no privilege was more fully recognized or more completely incorporated into the fundamental law of the country than that every free subject in the British empire was entitled to pursue his happiness by following any of the known established trades and occupations of the country."). *Cf. Corfield v. Coryell*, 6 F. Cas. 546, 551–52 (C.C.E.D. Pa. 1823). *See generally* Timothy Sandefur, *The Right to Earn a Living,* 6 Chap. L. Rev. 207 (2003). This is unsurprising, for as Justice Douglas put it: "The great values of freedom are in the opportunities afforded man to press to new horizons, to pit his strength against the forces of nature, to match skills with his fellow man." *Barsky v. Bd. of Regents*, 347 U.S. 442, 472 (1954); *see also Dent v. West Virginia*, 129 U.S. 114, 121 (1889) ("This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions.").

---

[1] "The U.S. Supreme Court has repeatedly declared that the right to pursue a lawful calling 'free from unreasonable governmental interference' is guaranteed under the federal Constitution, and is 'objectively, deeply rooted in this Nation's history and tradition.'" *Patel*, 469 S.W.3d at 93 (Willett, J., concurring) (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959); *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997)).

Indeed, economic protectionism resulting in "wealth transfers were among the framing generation's chief concerns—transfers from weak factions to strong factions 'who are united and actuated by some common impulse of passion, or of interest, adverse to the rights of other citizens, or to the permanent and aggregate interests of the community.'" *Tiwari v. Friedlander*, No. 3:19-CV-884-JRW-CHL, 2020 U.S. Dist. LEXIS 146248, at \*26 (W.D. Ky. Aug. 14, 2020) (quoting The Federalist No. 10 (Madison)). To guard against this, "the generation that ratified our Constitution supplemented its structural protections [against factions] with a Bill of Rights, and the Civil War generation added still more protection against factions with the Fourteenth Amendment." *Tiwari*, 2020 U.S. Dist. LEXIS 146248, at \*26–27. As explained below, the Direct-Sales Prohibition, as applied to Lucid, violates these core constitutional guarantees.

## II. The Constitution's Bar Against Irrational Economic Regulations Has Bite.

The Fourteenth Amendment to the U.S. Constitution provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Under the Constitution, government regulation of economic activity must pass "the test of due process: a legitimate legislative purpose furthered by rational means." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992). Likewise, "the constitutional guaranty of equal protection of the laws is interposed against discriminations that are entirely arbitrary."[2] *Smith v. Cahoon*, 283 U.S. 553, 566–67 (1931); *see Hines v. Quillivan*, 982 F.3d 266, 272 (5th

---

[2] "The Fifth Circuit describes an equal protection challenge as focusing on three elements: (1) the classification; (2) the purpose which the classification is designed to serve; and (3) 'the "fit" between the classification and the purpose; that is, whether the state could rationally determine that by distinguishing among persons as it has, the state could accomplish its legitimate purpose.'" *Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 110 F. Supp. 3d 719, 724 (W.D. Tex. 2015) (quoting *Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921, 933 (5th Cir. 1988)).

Cir. 2020) ("To state a claim for equal protection, the plaintiff must prove that similarly situated individuals were treated differently." (cleaned up)). And "[t]hrough its Due Process and Equal Protection Clauses, the Constitution erects 'a virtually *per se* rule of invalidity' when 'simple economic protectionism is effected by state legislation.'"[3] *Tiwari*, 2020 U.S. Dist. LEXIS 146248, at *27 (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)).

To be sure, Lucid's due process and equal protection claims are subject to rational-basis review.[4] *See FCC v. Beach Commc'ns*, 508 U.S. 307, 314–15 (1993). And rational-basis scrutiny sets "a high bar. But it's not a rubber stamp. Between 1970 to 2000, applying rational-basis review, the Supreme Court struck down at least a dozen economic laws as violating either the Equal Protection Clause or the Due Process Clause." *Tiwari*, 2020 U.S. Dist. LEXIS 146248, at *13 & n.67 (collecting cases); *see also Hines,* 982 F.3d at 278 (Elrod, J., concurring in part, dissenting in part) ("Rational basis review is a level of scrutiny, not a rubber-stamping exercise.").

Importantly, any presumption that legislation is constitutional "is a presumption of fact, of the existence of factual conditions supporting the legislation. As such, it is a rebuttable presumption." *Borden's Farm Prods. Co. v. Baldwin*, 293 U.S. 194, 209 (1934); *see also United*

---

[3] *Cf. Slaughter-House Cases*, 83 U.S. (16 Wall.) at 97 (Field, J., dissenting) ("The privileges and immunities designated are those which of right belong to the citizens of all free governments[, including] . . . the right to pursue a lawful employment in a lawful manner, without other restraint than such as equally affects all persons."); Calabresi & Leibowitz, 36 Harv. J.L. & Pub. Pol'y at 1024 ("We think the Fourteenth Amendment . . . bans not only systems of caste but also all special or partial laws that single out certain persons or classes for special benefits or burdens."). AFPF-TX recognizes that, although "[r]ecent Supreme Court precedent does suggest this issue may be ripe for reconsideration," under controlling Supreme Court precedent the Privileges or Immunities Clause does not apply to corporations. *Wal-Mart Stores, Inc.*, 110 F. Supp. 3d at 730.

[4] *Cf. Tiwari v. Friedlander,* 26 F.4th 355, 368–69 (6th Cir. 2022) (Sutton, C.J.) (acknowledging criticisms of rational-basis test), cert. denied, No. 22-42 (U.S., Nov. 21, 2022); *Hettinga v. United States,* 677 F.3d 471, 480 (D.C. Cir. 2012) (Brown, J., concurring) (similar); *Patel,* 469 S.W.3d at 98–99 (Willett, J., concurring) (similar).

*States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938) ("[T]he existence of facts supporting the legislative judgment is to be presumed . . . unless in light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators."); *Wal-Mart Stores v. Tex. Alcoholic Bev. Comm'n*, No. 1:15-cv-134-RP, 2017 U.S. Dist. LEXIS 230831, at *5 (W.D. Tex. May 22, 2017) ("Rational basis review is a highly deferential inquiry, but it is nonetheless a fact-intensive inquiry."). *See generally* Adam Griffin, *Protecting Economic Liberty in the Federal Courts: Theory, Precedent, Practice*, 22 Fed. Soc. Rev. 232, 234–36 (2021).[5]

This means "[t]he great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir. 2013). "A necessary corollary to and implication of rationality as a test is that there will be situations where proffered reasons are not rational." *Greater Hous. Small Taxicab Co. Owners Ass'n v. City of Hous.*, 660 F.3d 235, 239 (5th Cir. 2011) (cleaned up). And "a hypothetical rationale, even post hoc, cannot be fantasy."[6] *St. Joseph Abbey*, 712 F.3d at 223. In other words, "'rational' still must be actually rational, not a matter of fiction." *Hines*, 982 F.3d

---

[5] AFPF-TX recognizes that "this Court is of course, bound by controlling precedent." *Wal-Mart Stores, Inc.*, 110 F. Supp. 3d at 730. AFPF-TX nonetheless respectfully believes *Carolene Products* footnote 4 is untethered to the Constitution's original public meaning. *Cf. Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 643 (2016) (Thomas, J., dissenting) ("[O]ur Constitution renounces the notion that some constitutional rights are more equal than others. . . . A law either infringes a constitutional right, or not; there is no room for the judiciary to invent tolerable degrees of encroachment."). The *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, were also wrongly decided and should be revisited by the Supreme Court. *See* Griffin, 22 Fed. Soc. Rev. at 242.

[6] "[A]lthough rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *St. Joseph Abbey*, 712 F.3d at 223. Accordingly, this Court may properly consider extrinsic evidence showing that Texas's direct-sale ban is solely motivated by naked economic protectionism and does not further any legitimate state interest. *See also Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) ("[W]e may consider plaintiffs' extrinsic evidence[.]").

at 273 (citation omitted). *Cf.* Amy Coney Barrett, *Countering the Majoritarian Difficulty*, 32 Const. Comment. 61, 71 (2017) ("A rational basis test ought not mean that courts are obliged to accept explanations that beggar all belief."). In short, the Constitution's proscription against irrational economic regulation, as interpreted by the Supreme Court, has bite, requiring that economic regulations must, in fact, rationally relate to a *legitimate* government interest.

### III.    Shielding Companies from Competition is Not a Legitimate State Interest Sufficient to Sustain Economic Regulation.

As Lucid explains, the Direct-Sales Prohibition functions as naked economic protectionism, as applied to Lucid's direct-sales business model. *Cf. Ford Motor Co. v. Tex. DOT*, 264 F.3d 493, 502 (5th Cir. 2001) (Tex. Occ. Code § 2301.476(c) "protects dealers from competition from manufacturers"). That is not a legitimate state interest sufficient to justify it, as applied to Lucid.

"Courts have repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose." *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002); *see also Slaughter v. Dobbs*, 579 F. Supp. 3d 842, 848 (S.D. Miss. 2022) ("pure economic protectionism" is "an illegitimate government interest"). Indeed, the Fifth Circuit has "held [that] . . . pure economic protectionism is not by itself a legitimate state interest." *Hines*, 982 F.3d at 274 (citing *St. Joseph Abbey*, 712 F.3d at 222–23); *see also St. Joseph Abbey*, 712 F.3d at 222 ("neither precedent nor broader principles suggest that mere economic protection of a particular industry is a legitimate governmental purpose"). The Supreme Court has also "suggest[ed] that bare economic protectionism does not meet the legitimacy requirement" necessary to sustain economic legislation. *Powers v. Harris*, 379 F.3d 1208, 1226 n.1 (10th Cir. 2004) (Tymkovich, J., concurring in part and concurring in the judgment) (citing *Smith*, 283 U.S. 553 (holding that a bonding requirement favoring agricultural

interests over other industries is not legitimate); *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869 (1985) (holding that a desire to improve the local economy by fostering in-state insurance companies at the expense of out-of-state companies is not legitimate); *Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336 (1989) (holding that a county tax assessment system discriminating against recent sales and protecting certain property owners is "wholly irrational").

That is unsurprising. "[M]ere economic protectionism for the sake of economic protectionism is irrational[.]" *Merrifield v. Lockyer*, 547 F.3d 978, 991 n.15 (9th Cir. 2008). "[E]conomic protectionism for its own sake, regardless of its relation to the common good, cannot be said to be in furtherance of a legitimate governmental interest." *Id.* Timothy Sandefur has put it more plainly: "Economic protectionism is a perversion of legal authority because it is a mere use of force for the benefit of a particular, private interest group. It limits the freedom of some members of society solely for the benefit of others, with no public justification." Timothy Sandefur, *Is Economic Exclusion a Legitimate State Interest*, 14 Wm. & Mary Bill of Rts. J. 1023, 1042 (2006). That observation resonates here, aptly describing Texas's Direct-Sales Prohibition's effect, as applied to Lucid.

## IV.     Direct Sale Bans Harm Competition and Consumers without Justification.

More broadly, the Direct-Sale Prohibition harms the competitive process without any countervailing benefits to consumer welfare. As Lucid's expert, Professor Fiona Scott Morton, Theodore Nierenberg Professor of Economics at the Yale University School of Management, explains: "Texas's direct sales ban stifles competition, harms consumers, and creates an artificial barrier to the entry of new companies and technologies into the automobile market." Morton Decl., Dkt. No. 4-1, ¶ 2. And this Court should reject any suggestion to the contrary, as applied to Lucid's innovative direct-sales business model.

### A.  Harms to Competitive Process and Consumer Welfare.

Direct sale bans, like that at issue here, are "a quintessential example of how cronyism and lobbying are corrupting the free market and destroying innovation, growth and jobs across the country."[7] *Republicans Should Back Tesla, Creative Destruction at Its Best*, R Street (Mar. 18, 2014), https://www.rstreet.org/2014/03/18/republicans-should-back-tesla-creative-destruction-at-its-best/. *See generally* Todd Zywicki, *Rent-Seeking, Crony Capitalism, and the Crony Constitution*, 23 S. Ct. Econ. Rev. 77 (2015) (discussing the problem of rent seeking and crony capitalism). These restrictions "inhibit innovation and free-market competition by using regulatory schemes designed for entirely different contexts and different eras." Will Zerhouni, *Tesla Takes On Michigan*, Cato Institute, Policy Analysis No. 834 (Feb. 27, 2018), https://www.cato.org/policy-analysis/tesla-takes-michigan. These laws operate as naked economic preferences, lining the coffers of a favored special interest group.[8]

"[N]aked economic preferences are impermissible to the extent that they harm consumers." *St. Joseph Abbey*, 712 F.3d at 223. That principle resonates here. The Direct-Sales Prohibition not only harms the competitive process but also irrationally harms consumer welfare, reducing consumer choice. *See* Morton Decl., Dkt. No. 40-1, ¶¶ 17–28. As a DOJ economist has broadly observed: "Perhaps the most obvious benefit from direct manufacturer sales would be greater customer satisfaction, as auto producers better match production with consumer preferences ranging from basic attributes on standard models to meeting individual specifications for customized cars." Gerald R. Bodisch, Econ. Analysis Grp., *Economic Effects of State Bans*

---

[7] *Cf. Hettinga*, 677 F.3d at 480 (Brown, J., concurring) ("America's cowboy capitalism was long ago disarmed by a democratic process increasingly dominated by powerful groups with economic interests antithetical to competitors and consumers.").

[8] As one commentator put it: "These laws preventing direct sales serve only car dealers, whose only concern is to line their own pockets. They don't help the planet, and they certainly don't ensure freedom of choice for consumers." Danny Kenny, *Banning of Direct Electric Vehicle Sales Only Helps Car Dealers*, Real Clear Markets, https://www.realclearmarkets.com/articles/2022/09/23/banning_of_direct_electric_vehicle_sales_only_helps_car_dealers_855145.html

*on Direct Manufacturer Sales to Car Buyers*, EAG 09-1 CA, at 4 (May 2009) (hereinafter "DOJ Competition Advocacy Paper")[9]; *see also* Edson Decl., Dkt. No. 4-1, ¶¶ 13–14 ("Franchised dealers typically use sales commissions for their personnel.  The consequences of that sales model include high-pressure sales tactics, price-haggling, hidden fees, and upselling. Those things are inconsistent with Lucid's values[.]"); *id.* ¶ 18 ("Lucid's sales process differs from the traditional car-dealership experience. Lucid sells its vehicles at uniform and transparent prices. This eliminates the haggling over prices and hidden fees that lead consumers to distrust motor-vehicle dealers."). "Direct manufacturer car sales may [also] have the potential to reduce inventory costs." DOJ Competition Advocacy Paper at 4. Conversely, the Direct-Sale Prohibition does "nothing to protect consumers." *See St. Joseph Abbey*, 712 F.3d at 226; *see also* Open Letter by Academics in Favor of Direct EV Sales and Service (hereinafter "Open Letter"), 4 (April 14, 2021) (Grossman Decl., Dkt. No. 4-1, Ex. B) ("Direct distribution prohibitions are . . . bad for consumer interests.").

In short, the Texas Direct-Sale Prohibition, like other direct-sale bans, is cronyism, nothing more. All that it does is protect a favored special interest group (auto dealers) from economic competition to the detriment of consumers and competition. *See also* Open Letter at 4 ("Prohibiting direct distribution benefits car dealers by protecting them from competition, but that is not a legitimate basis for interfering with manufacturer and consumer freedom to decide how to buy and sell cars themselves."). As Professor Morton put it, the "unambiguous effect" of this law "is to stifle competition, harm consumers, and create an artificial barrier to the entry of new companies and technologies into the automobile market." Morton Decl., Dkt. No. 4-1, ¶ 28. "This measure to privilege certain businessmen over others at the expense of consumers is not

---

[9] https://www.justice.gov/sites/default/files/atr/legacy/2009/05/28/246374.pdf.

animated by a legitimate governmental purpose and cannot survive even rational basis review."[10] *Craigmiles*, 312 F.3d at 229.

### B. Typical Justifications for Direct Sale Bans Should Be Rejected as Pretextual.

This Court should reject any pretextual suggestion to the contrary. "[G]reat deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation." *St. Joseph Abbey*, 712 F.3d at 226; *see also Slaughter*, 579 F. Supp. 3d at 846 ("In a recent application of rational-basis scrutiny, the Fifth Circuit held that courts need not take a state's justifications at face value where they seem implausible or impermissible." (citing *St. Joseph Abbey*, 712 F.3d at 226)). "[A] hypothetical rationale, even post hoc, cannot be fantasy[.]" *St. Joseph Abbey*, 712 F.3d at 223. And the State's "chosen means" of economic regulation "must rationally relate to the state interests it articulates[.]" *Id.*; *see also Wal-Mart Stores, Inc.*, 110 F. Supp. 3d at 726 ("'[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.'" (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985)); *SonWest Co. v. Evertson*, No. 1:20-CV-842-RP, 2021 U.S. Dist. LEXIS 89508, at *13 (W.D. Tex. May 11, 2021) ("'[t]o pass rational basis review, it is not sufficient for the state action merely to serve some legitimate government purpose. Instead, there must be some rational basis for the classification, which must serve legitimate state ends.'" (quoting *Newman Marchive P'ship, Inc. v. Hightower*, 349 Fed. Appx. 963, 965 (5th Cir. 2009)). Direct sale bans, like the Direct-Sale Prohibition at issue here, do not meet this test, at least as applied to direct-sale

---

[10] "[T]he principle that states may not act upon naked preferences should not be thought to threaten any legislature's regulatory agenda. Rather, that principle reflects a view of legitimacy in the legislative process that has persisted, in one verbal formulation or another, from the founding era through *Carolene Products* and beyond[.]" Steven Menashi & Douglas H. Ginsburg, *Rational Basis With Economic Bite*, 8 NYU J.L. & Liberty 1055, 1104 (2014).

manufacturers like Lucid.

Put simply, the policy arguments the dealers' lobby typically advances to justify direct-sale bans should not be taken seriously. And this Court should reject any attempt to recast this dealer-protection law as a consumer protection statute. *See* Daniel A. Crane, *Tesla, Dealer Franchise Laws, and the Politics of Crony Capitalism*, 101 Iowa L. Rev. 573, 593 (2016). And as demonstrated below, and by Lucid's Motion, Pl. MSJ, Dkt. No. 4, "[n]o sophisticated economic analysis is required to see the pretextual nature of," *see Craigmiles*, 312 F.3d at 229, the typical arguments in favor of the dealers favored government-mandated middleman status.

The purported "disparity in bargaining power between automobile manufacturers and their dealers" has often been invoked to justify the type of restriction at issue here. *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 100–02 & n.7 (1978). Historically, "direct distribution prohibitions were expressly justified as part of a package of protections for dealers against the exercise of superior manufacturer bargaining power. Manufacturers were assumed to pursue franchisee relationships . . . *and pure direct distribution was not considered or discussed.*" Crane, 101 Iowa L. Rev. at 579.   Consistent with this history, Tex. Occ. Code § 2301.476(c) was meant to shield franchised dealers from competition from manufacturers, which could supposedly exert coercive market power. *See* Tex. House Research Org., Revising the Texas Motor Vehicle Commission Code: Analysis of H.B. 3092 (1999). *Cf. Ford Motor Co.*, 264 F.3d at 500 ("Specifically, with respect to the addition of § 5.02C(c), the legislative history indicates the legislature's intent to prevent manufacturers from utilizing their superior market position to compete against dealers in the retail car market.").

But, as Lucid explains, that argument does not hold water here: "As applied to direct-sales manufacturers . . . there is no possibility of wielding market power or leverage to

disadvantage dealers because there are no independent dealers in the mix."[11] Pl. MSJ, Dkt. No. 4, at 14. *See also* Compl., Dkt. No. 1, ¶ 45 ("Direct-sales-only manufacturers like Lucid have no independent franchised dealers, and so there is no competitive-power imbalance or manufacturer–franchisee relationship for the state to regulate."); Morton Decl., Dkt. No. 4-1, ¶ 20 ("It is important to emphasize that there is no risk of harm to competition from Lucid's direct sales model."). In fact, as Professor Morton explains, "[b]ecause an independent Lucid dealer would not be economically viable, Texas's requirement that Lucid sell its cars through an independent dealer effectively bars it from selling in the state." Morton Decl., Dkt. No. 4-1, ¶ 27; *see also* Edson Decl., Dkt. No. 4-1, ¶¶ 16–17. Because Lucid flatly rejects the independent-franchised-dealer model, any suggestion that the Direct-Sale Prohibition is justified by a bargaining-power rationale is sheer fantasy that should be rejected out of hand. *Cf. Hines*, 982 F.3d at 278 (Elrod, J., concurring in part, dissenting in part) ("When a plaintiff provides a court with undisputed context that betrays the otherwise rational basis the state has offered, the state can no longer expect the court's deference.").

As to putative consumer welfare justifications for direct-sale bans like Texas's Direct-Sale Prohibition, "[t]he dealers usually lead with, and lean most heavily on, the argument that distribution through dealers is necessary to reduce prices to consumers." Crane, 101 Iowa L. Rev. at 593. Not so. As Professor Crane has explained, this argument—which the dealers

---

[11] Fifth Circuit precedent upholding the Direct-Sales Prohibition's predecessor statute against prior challenges turned on the proposition that "Texas's purpose for passing section 2301.476(c)'s predecessor—'to prevent vertically integrated companies from taking advantage of their market position' and 'to prevent frauds, unfair practices, discrimination, impositions, and other abuses of [its] citizens'--are legitimate state interests" and "a reasonable legislator could have believed section 2301.476(c)'s predecessor would further those legitimate interests." *Int'l Truck and Engine Corp. v. Bray*, 372 F.3d 717, 728 (5th Cir.2004) (quoting *Ford Motor Co.*, 264 F.3d at 503–04). Neither rationale applies to Lucid's innovative direct-sale business model. And neither decision involved an analogous as-applied due process challenge. *See* Pl. MSJ, Dkt. No. 4, at 14 n.13.

themselves don't buy—"contravenes economic principles" and lacks empirical support; in short, "[t]he consumer price reduction theory is farcical." *Id.* at 594–96; *see* DOJ Competition Advocacy Paper at 6–10 (addressing dealer concerns). "[I]f anything, vertical integration by manufacturers should result in a lowering of retail prices, even if there are no efficiencies or cost savings to vertical integration." Crane, 101 Iowa L. Rev. at 594; *see also* DOJ Competition Advocacy Paper at 4 ("Direct manufacturer car sales may have the potential to reduce inventory costs."). *Cf. Ford Motor Co..,* 264 F.3d at 512 (Jones, J., specially concurring).

Another "'consumer welfare' argument offered by the dealers is that dealer distribution is necessary to ensure that customers receive adequate levels of service. But there is no reason to think that manufacturers . . . have any incentive to offer subpar service through their company-owned stores." Crane, 101 Iowa L. Rev. at 596. After all, as Professor Crane explains: "Car manufacturers make multi-billion-dollar investments to create new car technologies and brands, investments they cannot recoup without creating long-term customer loyalty. In the case of EV technology, these incentives are particularly acute[.]" *Id.* at 596–97. That holds true for Lucid's customer-centric business model. *See* Edson Decl., Dkt. No. 4-1, ¶¶ 10–17 (describing Lucid's consumer-focused sales model).

Likewise, arguments that direct-sale bans, like that at issue here, are "necessary in order to ensure compliance with state regulatory requirements," "promote vehicle safety," and protect "unique bastions of virtue in local communities" are equally unserious. *See* Crane, 101 Iowa L. Rev. at 598–601. In fact, the Direct-Sale Prohibition territorial limitations fatally *undermine* any suggestion that it furthers the State's interest in consumer welfare and protecting Texans from unfair and deceptive practices.[12] *See* Pl. MSJ, Dkt. No. 4, at 11–13; *see also* Open Letter at 4

---

[12] *Cf. Ford Motor Co.,* 264 F.3d at 503 (one of "State's asserted purposes for passing [predecessor statute]—'to prevent frauds, unfair practices, discrimination, impositions, and other abuses of our citizens'—[is] legitimate state interest[].").

("There is no credible consumer protection argument in favor of prohibiting direct distribution."). The reason why is that Texas's direct sale ban "forc[es]" vehicle sales to take place outside of Texas borders mak[ing] it more difficult, or even impossible, for Texas regulators to protect Texas consumers." Compl., Dkt. No. 1, ¶ 3. Texas consumer-protection laws already apply to *all* in-state dealership, regardless of who owns or operates these dealerships. *See, e.g.,* Tex. Occ. Code §§ 2301.351, 2301.651, 2301.801–805, including prohibitions against deceptive sales practices, *see, e.g.,* Tex. Bus. & Com. Code §§ 17.12, 17.41–63, Tex. Penal Code § 32.42. In other words, Texas "already polices inappropriate sales tactics by all sellers." *St. Joseph Abbey*, 712 F.3d at 225. The Direct-Sale Prohibition, as applied to Plaintiff, renders these statutory provisions—which reflect the Texas Legislature's judgment on consumer-protection policy—meaningless. *See also Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989); *Marmon v. Mustang Aviation, Inc.*, 430 S.W.2d 182, 187 (Tex. 1968); *A.M. Capen's Co., Inc. v. Am. Trading and Prod. Corp.*, 202 F.3d 469, 473 (1st Cir. 2000).

In the end, "[n]o sophisticated economic analysis is required to see the pretextual nature of," *Craigmiles*, 312 F.3d at 229, any possible legitimate justification for the Direct-Sale Prohibition. The challenged Direct-Sales Prohibition simply will not "fit" any legitimate government interests Defendants may assert, at least as applied to Lucid, and this Court should view any such post hoc assertions with a particularly jaundiced eye. *See St. Joseph Abbey*, 712 F.3d at 221, 223; *Wal-Mart Stores, Inc.*, 110 F. Supp. 3d at 725–27. As seventy eminent economics and law professors wrote regarding a similar direct-sale ban: "In sum, we have not heard a single argument for a direct distribution ban that makes any sense. To the contrary, these arguments simply bolster . . . [the case] that the regulations in question are motivated by economic protectionism that favors dealers at the expense of consumers and innovative technologies." Open Letter to New Jersey Governor Chris Christie on the Direct Automobile

Distribution Ban, International Center for Law & Economics (March 26, 2014), http://laweconcenter.org/images/articles/tesla_letter_icle.pdf; *see also* Open Letter at 1 ("Prohibiting direct distribution of EVs is not supported by legitimate public policy objectives, and has a variety of negative consequences[.]"). That sentiment sums up Lucid's arguments against the Direct-Sales Prohibition well.

Underscoring the irrationality of this type of protectionist legislation, the FTC—the federal agency tasked with protecting consumers and competition—has also long advocated *against* direct-sale bans. *See* Marina Lao, Debbie Feinstein, and Francine Lafontaine, *Direct-to-Consumer Auto Sales: It's Not Just About Tesla* (May 11, 2015) (Grossman Decl., Dkt. No. 4-1, Ex. A). As the FTC has explained: "A fundamental principle of competition is that consumers—not regulation—should determine what they buy and how they buy it. Consumers may benefit from the ability to buy cars directly from manufacturers—whether they are shopping for luxury cars or economy vehicles." *Id.* "States should allow consumers to choose not only the cars they buy, but also how they buy them."[13] *Id.* The FTC is correct, and Texas's irrational Direct-Sales Prohibition is unconstitutional, as applied to Lucid.

## CONCLUSION

For these reasons, this Court should grant summary judgment in favor of Lucid, declare that Texas's Direct-Sales Prohibition is unconstitutional as applied to Lucid, and enter a permanent injunction prohibiting Defendants from enforcing the Direct-Sales Prohibition against

---

[13] A DOJ economist has also echoed this theme: "The salient point is that whether or not direct manufacturer sale of autos is to evolve as a distribution channel in the United States should be determined by the preferences of consumers and the ability of auto producers to meet those preferences, rather than being precluded by fiat." DOJ Competition Advocacy Paper at 4; *see also* Joint Letter of the Antitrust Division of the U.S. Department of Justice and the Federal Trade Commission on Franchised Dealer Requirements to Sell and Service Motor Vehicles and Nebraska Legislative Bill 51, 3–4 (March 14, 2019), https://www.justice.gov/atr/page/file/1146236/download.

Lucid.

Respectfully submitted,

**LOVINS | TROSCLAIR, P.L.L.C.**

*/s/ Michael E. Lovins*
Michael E. Lovins
State Bar No. 24032555
Michael@LovinsLaw.com
1301 S. Capital of Texas Highway
Building A, Suite 136
Austin, Texas 78746
Telephone: (512) 535-1649
Facsimile: (214) 972-1047

**ATTORNEY FOR AMERICANS FOR
PROSPERITY FOUNDATION**

## CERTIFICATE OF SERVICE

I certify that on January 6, 2023 I electronically filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Michael E. Lovins*
Michael E. Lovins