IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LUCID GROUP USA, INC., | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| MONIQUE JOHNSTON, in her official | § | |
| capacity as Director of the Motor Vehicle | § | |
| Division of the Texas Department of Motor | § | |
| Vehicles, DANIEL AVITIA, in his official | § | |
| capacity as Executive Director of the Texas | § | Case No. 1:22-cv-01116-RP |
| Department of Motor Vehicles; and | § | |
| CORRIE THOMPSON, in her official | § | |
| capacity as Director of the Enforcement | § | |
| Division of the Texas Department of Motor | § | |
| Vehicles, | § | |
| *Defendants*, | § | |
| | § | |
| TEXAS AUTOMOBILE DEALERS | § | |
| ASSOCIATION, | § | |
| *Intervenor-Defendant*. | § | |

**INTERVENOR-DEFENDANT TEXAS AUTOMOBILE DEALERS ASSOCIATION'S
MOTION TO EXCLUDE AND/OR LIMIT THE TESTIMONY OF FIONA SCOTT
MORTON AND BRIEF IN SUPPORT**

Robert T. Mowrey
  Texas Bar No. 14607500
  *rmowrey@lockelord.com*
Thomas G. Yoxall
  Texas Bar No. 00785304
  *tyoxall@lockelord.com*
W. Scott Hastings
  Texas Bar No. 24002241
  *shastings@lockelord.com*
Daron L. Janis
  Texas Bar No. 24060015
  *djanis @lockelord.com*
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-6776

**ATTORNEYS FOR TEXAS AUTOMOBILE
DEALERS ASSOCIATION**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ......................................................................................................... ii

INDEX OF AUTHORTIES ................................................................................................... iii

INDEX OF EXHIBITS .......................................................................................................... iv

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................3

ARGUMENT ..........................................................................................................................3

A.    Lucid Admits Morton's Economic Opinions Are Irrelevant. ...............................4

B.    Morton's Speculation that an Independent Lucid Dealer Would Not Be
       Economically Viable Should Be Excluded..........................................................5

       1.    New Car Sales ................................................................................................5

       2.    Used Car Sales ...............................................................................................7

       3.    Service and Repairs........................................................................................8

       4.    Financing.......................................................................................................10

       5.    Concluding Comments on Economic Viability .............................................10

C.    Morton's Opinions on Double Marginalization Should Be Excluded................12

D.    Morton's Opinions About Consumer Protection Should Be Excluded. .............13

E.    Morton's Comments on Manufacturing Costs Should Be Excluded.................15

CONCLUSION......................................................................................................................16

CERTIFICATE OF SERVICE .............................................................................................17

# INDEX OF AUTHORTIES

**Page(s)**

**CASES**

*Allstate v. Abbott*,
495 F.3d 151 (5th Cir. 2007) ...................................................................14

*Daubert v. Merrill Dow Pharm., Inc.*
509 U.S. 579 (1993)............................................................................2, 3, 4

*Ford v. Tex. Dept. of Transp.*,
264 F.3d 493 (5th Cir. 2001) ......................................................................2

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................................................................................4

*Moore v. Ashland Chem. Inc.*,
151 F.3d 269 (5th Cir. 1998) ......................................................................3

*Watkins v. Telsmith, Inc.*,
121 F.3d 984 (5th Cir. 1997) ......................................................................3

**STATUTES AND RULES**

Fed. R. Evid. 402.................................................................................................3, 4

Fed. R. Evid. 702.................................................................................................2, 3

## <u>INDEX OF EXHIBITS</u>

A. Morton's July 26, 2023 Report

B. Morton's October 17, 2023 Rebuttal Report

C. Excerpts of Morton's January 23, 2024 Deposition

D. Walter's July 26, 2023 Report

E. Lucid 2022 Form 10-K (excerpt)

F. Lucid Group Third Quarter 2023 Earnings Report (excerpt)

G. Thomas G. Marx, The Development of the Franchise Distribution System in the U.S. Automobile Industry, <u>Business History Review</u> Vol. 59, No. 3, p.465, 470-74 (Autumn 1985)

H. Ralph C. Epstein, <u>The Automobile Industry—Its Economic and Commercial Development</u> 133-36. (Chicago: A.W. Shaw Company 1920) (excerpt)

I. James M. Rubenstein, <u>Making and Selling Cars:  Innovation and Change in the U.S. Automotive Industry</u> 267 (The John Hopkins Univ. Press, 2001) (excerpt)

J. Francine Lafontaine and Fiona Scott Morton, *Markets:  State Franchise Laws, Dealer Terminations, and the Auto Crisis*, <u>Journal of Economic Perspectives</u> Vol. 24, No. 3 at 239 (Summer 2010) (excerpt)

K. Eileen Falkenberg Hull, *Lucid Gravity Designed to Minimize Production Problems*, <u>Newsweek</u> (Jan. 6, 2024)

L. Laurence Iliff, *VinFast Plans U.S. Dealer Network with 125 Sales Points in First Phase*, <u>Automotive News</u> (Nov. 10, 2023)

M. Laurence Iliff, *Fisker Targets 50 Franchised Dealers in U.S., Canada*, <u>Automotive News</u> (Jan. 5, 2024)

N. *Hybrids, Sedans Have Fewest Problems in Consumer Reports' 2022 Annual Auto Reliability Survey; Electric Vehicles and Full-Size Pickup Trucks Are Least Reliable*, <u>Consumer Reports</u> (Nov. 15, 2022)

O. *Electric Vehicles Are Improving, but Charging and Battery Issues Persist in Consumer Reports' 2023 Annual Auto Reliability Survey*, <u>Consumer Reports</u> (Nov. 29, 2023)

P. *Tesla Reliability and Repair Costs—The True Story*, <u>Top Speed</u> (Sept. 13, 2023)

Q. Nathan Gomez and Joseph White, *Rental Giant Hertz Dumps EVs, Including Tesla, for Gas Cars*, <u>Reuters</u> (Jan. 12, 2024)

R.  Rebecca Heilweil, *Missing Parts, Long Waits, and a Dead Mouse:  The Perils of Getting a Tesla Fixed*, <u>Vox</u> at 3 (Aug. 24, 2022) (attached by Tesla as Ex. F, ECF 135-7, Case No. 3:23-cv-01145-TLT, *Lambrix v. Tesla, Inc.*, (N.D. Cal. Dec. 22, 2023))

S.  Steve Stecklow and Norihiko Shirouzu, *Tesla Created Secret Team to Suppress Thousands of Driving Range Complaints*, <u>Reuters</u> (July 27, 2023)

T.  Laurence Iliff, Fisker, *VinFast Head to NADA Looking for Dealer Partners*, <u>Automotive News</u> (Jan. 31, 2024)

U.  Kevin Williams*, Lucid CEO:  $50,000 Model 3, Model Y Competitor Coming Sooner than You Think*, <u>Inside EVs</u> (Jan. 26, 2024)

V.  Lucid's January 29, 2024 Response to TADA's Requests for Admission

W.  January 31, 2024 Transcript of Motion to Compel Hearing (excerpt)

X.  The Feb. 5, 2024 Declaration of W. Scott Hastings Authenticating Published Sources

Intervenor-Defendant Texas Automobile Dealers Association ("TADA") moves to exclude and/or limit the testimony of Fiona Scott Morton ("Morton") who has been designated to provide expert witness testimony on behalf of Plaintiff Lucid Group, USA, Inc. ("Lucid").

## INTRODUCTION

Lucid is challenging the constitutionality of decades-old laws in Texas that history has shown benefit and protect consumers by prohibiting vertical integration in the sale of new motor vehicles.[1] Lucid has designated Morton as an expert witness to support Lucid's attempt to change Texas law to support Lucid's self-selected business model and preferences. But in response to TADA's requests for admission, Lucid admits that the subjects of Morton's testimony are not relevant to the issues presented. *See* Lucid Responses to Requests for Admission Nos. 1, 7, & 9.

Morton is an economics professor. She is not an expert on constitutional law, nor is she intending to testify on the issue whether Texas law meets the rational basis test applicable to this case. Morton Dep. at 53:9-24, 76:10-77:2. As reflected in Morton's Report and Rebuttal Report, which are being filed as Exhibits A & B to this motion, Morton is being proffered to offer economic opinions on the following issues that are subject to this motion:

1. "An independent dealer would not be economically viable." Report at ¶1; *see also* Report at ¶¶18-19, 30; Rebuttal Report at ¶12.

2. "Allowing Lucid to own and operate sales Studios in Texas and to sell directly to Texas consumers would … eliminate the risk of higher prices from double marginalization." Report at ¶1; *see also* Report at ¶¶20, 26-29, 31; Rebuttal Report at ¶¶20-24.

3. "[B]anning direct sales by manufacturers and requiring cars to be sold and serviced through independent dealers does not further that interest" of "protecting [Texas] citizens from unfair practices." Report at ¶15; *see also* Report at ¶16 ("There is no plausible explanation for why a vertically-integrated car manufacturer would be

---

[1] *See* Thomas G. Marx, The Development of the Franchise Distribution System in the U.S. Automobile Industry, <u>Business History Review</u> Vol. 59, No. 3, p.465, 470-74 (Autumn 1985) (explaining how historical experiments in vehicle distribution ultimately led to the emergence of the independent franchise dealer model as the only one that could provide the sales and services that consumers needed and demanded).

any more likely to engage in unfair practices than an independent dealer in light of their economic incentives and anti-fraud laws.").

Morton offers theories on these issues, but she has analyzed no facts or data related to this case that would support her theories. As a result, her opinions are speculative, unreliable, and not supported by a sufficient factual foundation. Her testimony should be excluded or limited under Fed. R. Evid. 702 and *Daubert v. Merrill Dow Pharm., Inc.* 509 U.S. 579 (1993).

In the end, Morton probably best captured her view on economics as follows:

Q: So you think that the automobile industry is like the supermarket situation?

A: I think that markets, I believe in capitalism and markets and free markets and choices of businesses to run their own business the way they want and the ability of consumers to leave that business if they don't like those choices.

Morton Dep. at 142:20-143:4. But the sale and distribution of automobiles is not like running a grocery store or selling soft-serve ice cream.[2] Texas (and every other state in the country) heavily regulates the sale and distribution of automobiles. *See* Francine Lafontaine and Fiona Scott Morton, *Markets: State Franchise Laws, Dealer Terminations, and the Auto Crisis*, <u>Journal of Economic Perspectives</u> Vol. 24, No. 3 at 239 (Summer 2010). Morton, by contrast, believes that the relationship between manufacturers and dealers "could be handled perfectly ordinarily by normal contract law and other laws. I'm not sure that we need very much regulation of that." Morton Dep. at 158:3-18. Of course, Morton is not opining on a blank slate. The right to regulate the sale and distribution of automobiles is well established and has been upheld against numerous constitutional challenges. *See, e.g., Ford v. Tex. Dept. of Transp.*, 264 F.3d 493 (5th Cir. 2001). Morton's economic views on free market economies do not override the right of the State to regulate the sale and distribution of automobiles.

---

[2]     At the January 31, 2024 hearing on TADA's motion to compel, Lucid tried to compare selling automobiles to selling "soft serve ice cream." Transcript at 28:2-15, 37:12-16.

## FACTUAL BACKGROUND

Morton is an economist.  She has an extensive history representing EV manufacturers, including Lucid, Tesla, and Rivian, but she has never represented an automobile dealer or a consumer adverse to a manufacturer.  Morton Dep. at 11:2-7, 12:9-11, 13:4-15, 178:8-15.

Although her usual practice when forming opinions in a case is to speak with business representatives of the party that hires her, she could not recall if she spoke to anyone from Lucid about this matter (other than counsel).  *Id.* at 21:23-22:7.  She did not review the declaration that Lucid's Zak Edson submitted in this case.  *Id.* at 21:6-8.  For her opinions, she relied upon public reports about Lucid's business model, but she has never been to a Lucid Showroom or repair center, and she has never driven a Lucid vehicle.  *Id.* at 22:16-23:22, 47:8-10.  Morton has also never been to a Texas automobile dealership.  *Id.* at 23:23-25.

The opinions Morton is presenting to this Court are ones that she has never presented to the Texas Legislature for consideration.  *Id.* at 70:1-71:12.

## ARGUMENT

Under Fed. R. Evid. 402, only relevant evidence is admissible.  Federal Rule of Evidence 702 further provides that:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In determining whether an expert's testimony is admissible under Rule 702, the principles articulated in *Daubert* apply.  Under *Daubert*, expert testimony is only admissible upon a showing that (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable.  *See Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith,*

*Inc.,* 121 F.3d 984, 989 (5th Cir. 1997). The Supreme Court offered the following, non-exhaustive list of factors that courts may use in evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. 509 U.S. at 593-94. The trial court must act as a gatekeeper to determine the admission of expert testimony. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999). When carrying out this task, courts have broad latitude to determine the reliability of an expert's testimony. *Id.* at 151-52.

A.    LUCID ADMITS MORTON'S ECONOMIC OPINIONS ARE IRRELEVANT.

Under Rule 402, only relevant evidence is admissible. Lucid, however, has admitted that the economic testimony Lucid seeks to offer in this case is not relevant. In Request for Admission No. 1, TADA asked Lucid to: "Admit that the economic necessity of the direct-to-consumer sales for Lucid's business model has nothing to do with the rationality of the prohibition at issue in this case." Lucid responded with an unqualified, unobjected-to admission: "Admit." Lucid further admitted that "the economics of Lucid's business operations has nothing to do with the rationality of the prohibition at issue in this case" and that "Lucid's ability to prosper under an independent-dealer model has nothing to do with the prohibition at issue in this dispute." *See* Lucid's Responses to TADA's Requests for Admission Nos. 7 & 9. Accordingly, by Lucid's own unqualified admissions, Morton's speculation about the economic viability of a franchised dealer model and, relatedly, Lucid's alleged need to use a direct-to-consumer sales model is irrelevant and should be excluded from this case. Fed. R. Evid. 402.

4

**B.    MORTON'S SPECULATION THAT AN INDEPENDENT LUCID DEALER WOULD NOT BE ECONOMICALLY VIABLE SHOULD BE EXCLUDED.**

When offering an opinion on whether an independent Lucid dealer would be or could be economically viable, one would expect Morton to have analyzed factual or financial records to explain her opinions. But she did not. She conducted no analysis of Lucid's operations, not even regarding Lucid's results of operations when selling vehicles in the states where such conduct is allowed. She conducted no studies of any data related to the Texas market to analyze the economics for automobile dealerships in Texas. Without conducting any such studies, her opinion that a Lucid dealership would not be economically viable is pure speculation.

Although Morton reviewed no facts or data to support her opinions, she identifies four areas where independent automobile dealers earn revenue—(1) new car sales, (2) used car sales, (3) service and repairs, and (4) financing—and then opines that an independent Lucid dealer would not be able to earn profits from these sources. *See* Report at ¶¶18-19; Morton Dep. at 129:17-23. Her theories are based on assumptions that are either not supported by real-world facts, or worse, are based upon Lucid's self-imposed limitations. *See* Jan. 31, 2024 Tr. at 42:7-8 (Lucid explaining "Our injury in fact is that we simply can't carry out our business model.").

*1.    New Car Sales*

Starting with the ability to earn profits from new car sales, Morton argues that an independent Lucid dealer would have "no margin" to earn a profit from selling new cars. Report at ¶19 ("the hypothetical independent Lucid dealer would be expected to earn zero margin on new car sales in perpetuity …"). The first problem with her assumption is that it depends on Lucid setting the retail prices for its vehicles. *Id.* Instead of offering an expert opinion, Morton is just repeating Lucid's circular reasoning that (a) because Lucid wants to be able to set the retail price for selling its vehicles to consumers and (b) Lucid wants to set that retail price as the same price

5

as to which it would sell a vehicle to a dealer, then (c) the dealer will not earn a margin on sales. In other words, an independent Lucid dealer would not be able to earn a profit on new car sales because Lucid would not allow it to earn a profit. Morton admits that she performed no analysis of Lucid's pricing, costs, or profits when forming her opinion in this case. Morton Dep. at 50:6-18. Instead, she is opining on a concept of "very simple math," because "an independent dealership in the world you're imaging that buys at that price and sells at the price earns zero." *Id.* at 153:8-20.

Morton's and Lucid's circular logic completely ignores that the use of independent dealerships allows manufacturers to focus on building motor vehicles and dealerships to focus on retail sales. Each gets to focus on what presumably it can do best. Morton makes no accommodation in her analysis for Lucid to be able to save costs and charge lower wholesale prices to dealerships based on the dealerships handling many roles in the retail sales process. In other words, Morton is assuming that wholesale prices and retail prices would be the same for Lucid even though, in the real world, wholesale prices are almost always lower than retail prices, reflecting the fact that the retail seller is handling (and incurring the expense for) retail sales functions.

In her Rebuttal Report and at her deposition, Morton reluctantly admitted that an independent dealership could earn a profit from new car sales if the dealership is able to perform retail sales roles more efficiently than Lucid could. *See* Morton Dep. at 173:22-174:17; Rebuttal Report at ¶¶21 & 24. This admission is consistent with the history and experience in the early days of the automobile industry where manufacturers shifted to using independent dealerships because the dealerships were able to better serve consumers and the retail market. *See* Ralph C. Epstein, The Automobile Industry—Its Economic and Commercial Development 133-36.

(Chicago: A.W. Shaw Company 1920); Thomas G. Marx, *The Development of the Franchise Distribution System in the U.S. Automobile Industry*, <u>Business History Review</u>, Vol. 59, No. 3, p. 465. 470 (Autumn 1985).

2.      *Used Car Sales*

Morton also concludes that an independent Lucid dealership would not be able to earn sufficient profits from used car sales, but her opinion is based entirely upon her understanding that "the pool of available Lucid used vehicles will be exceedingly small for years to come." Report at ¶19.[3]  Morton's opinion is based on an assumption that is contradicted by the real-world experience of the types of used vehicles dealerships sell.  A dealership is not limited to just selling used cars of the same make or model.  A dealership can sell used vehicles that it acquired as trade-ins or from other sources, regardless of the make or model acquired.  Thus, even a Lucid dealership could earn revenues and profits from selling used vehicles.  *See* Morton Dep. at 133:7-22.

Morton performed no analysis of the viability of an independent Lucid dealership assuming real-world business conditions in which the dealership would sell used vehicles of different brands too.  *See* Morton Dep. at 135:10-136:17 ("I didn't do a quantitative analysis, that is Herb Walter's job.").[4]  Morton's focus on the sale of only Lucid-branded used vehicles is yet another example in which Morton is blindly accepting rules Lucid seeks to impose to justify foregoing dealerships.  As Lucid's other expert, Mr. Walter, explains:  "While Lucid plans to sell used vehicles, previously owned Lucid vehicles, Lucid does not expect to sell non-Lucid used vehicles to the public." Walter Report at ¶38.  But just because Lucid would seek to impose its own rules to prevent dealerships

---

[3]    Morton's focus on the volume of used vehicles Lucid allegedly could sell is also inconsistent with how Lucid has approached discovery in this case, seeking to avoid any scrutiny of Lucid's own business practices.  *See* Lucid's Responses to TADA's Requests for Admission Nos. 7, 9, 11, 13, 15.

[4]    Contrary to Morton's speculation, Walter did not perform a quantitative analysis of any revenues or profits a Lucid dealership could earn.  *See generally* Walter Report.

from earning a profit, does not mean that an actual independent dealership that is not obligated to follow Lucid's anti-competitive rules would be unable to earn profits on used car sales.

Indeed, Texas consumers would benefit by having the option to trade-in their vehicles at a Lucid dealership, which also gives the dealership an opportunity to earn profits. *See* Rebuttal Report at ¶17 (recognizing that "some buyers may prefer the 'one-stop-shop'"). The fact that Lucid prefers to deprive dealerships of their ability to earn a profit on used car sales does not mean that an actual dealership is economically unviable.

### 3. Service and Repairs

Morton also discounts the ability for an independent Lucid dealership to earn revenues and profits from performing service and repairs. Morton writes: "Lucid's service and parts revenue will be quite limited due to the relatively small scale of sales, Lucid's plan to provide service through non-traditional channels (over-the-air or with mobile service vehicles), and with electric vehicles' lower maintenance costs." Report at ¶19. Once again, though, Morton has performed no analysis of the facts to assess whether her assumptions are reasonable. *See* Morton Dep. at 144:15-20 ("Not my own studies, no."), 148:13-15 (admitting she is not an expert on automobile repairs and service). Real-world data shows that her assumptions are not appropriate.

Lucid's "small scale of sales" does not equate with an inability of a dealership to earn revenues and profits from sales. Many motor vehicle manufacturers have relatively small volumes of sales like Lucid. Morton Dep. at 162:5-8. Morton has no knowledge regarding Lucid actual or anticipated sales volumes, which means she has no basis to opine on how such volumes impact the need for service and repairs.[5] *See id.* at 165:15-23. Morton performed no study or assessment

---

[5] Recent statements from Lucid's CEO further undermine Morton's statements in this case because Lucid intends to expand the volume of cars that it sells by offering lower cost alternatives. *See* Kevin Williams, *Lucid CEO: $50,000 Model 3, Model Y Competitor Coming Sooner than You Think*, Inside EVs (Jan. 26, 2024). Of course, if Lucid sells more cars, those vehicles will need more service and repairs.

regarding how other manufacturers are able to create a viable dealership network despite their relatively small sales volumes, while Lucid allegedly could not.

Morton cites Lucid's approach to service and the allegedly lower costs for EV maintenance as reasons why a dealership would not have a profitable service department. *See* Morton Dep. at 144:4-14. She admits, however, that if Lucid's vehicles turn out to be less reliable, there is a greater chance for a dealership to earn a profit. *Id.* at 161:4-17 ("directionally, that's correct"). Morton reviewed no real-world facts to support her conclusions. *Id.* at 144:15-20 ("Not my own studies, no."). *Consumer Reports* and *J.D. Power* find that plug-in EVs are the most unreliable of all type of motor vehicles, which directly contradicts Morton's assumption that Lucid vehicle will need less repairs than other types of vehicles.[6] *See* Morton Dep. at 153:8-154:11 (relying on "Lucid successfully produc[ing] a car with a good—with a good reliability track record").[7] Morton has performed no study or analysis on the reliability of Lucid automobiles. But published reports show that the cost of EV repairs often far exceed the costs associated with repairing traditional vehicles, which is a reason Hertz recently cited as a cause when it decided to sell about one-third of its EV fleet nationwide. *See* Nathan Gomez and Joseph White, *Rental Giant Hertz Dumps EVs, Including Tesla, for Gas Cars*, Reuters (Jan. 12, 2024). In short, Morton does not have a reliable record to offer any opinions related to EV repairs or the amount of profits (if any) a hypothetical Lucid dealer could earn.[8]

---

[6]  *See Hybrids, Sedans Have Fewest Problems in Consumer Reports' 2022 Annual Auto Reliability Survey; Electric Vehicles and Full-Size Pickup Trucks Are Least Reliable*, Consumer Reports (Nov. 15, 2022); *Electric Vehicles Are Improving, but Charging and Battery Issues Persist in Consumer Reports' 2023 Annual Auto Reliability Survey*, Consumer Reports (Nov. 29, 2023); *see also Tesla Reliability and Repair Costs—The True Story*, Top Speed (Sept. 13, 2023).

[7]  Morton recognizes *Consumer Reports* as a credible source. Morton Dep. at 171:8-16.

[8]  It is not clear why Morton discusses the alleged reduced costs of service for EV vehicles because, during her deposition, Morton confirmed that her opinions in this case apply to any new manufacturer entering the market, and not just an EV manufacturer. Morton Dep. at 42:22-43:7.

Morton's reliance on Lucid's use of non-traditional channels for service is also flawed. Lucid's Third Quarter 2023 Earning Release dated November 7, 2023 explains that Lucid has only 41 vehicles in its global mobile service fleet.  2023 Q3 Earnings Release at 10.  It is illogical to assume that such a small service fleet would be adequate to serve Texas, much less the entire United States and other parts of the world.

    *4.*    *Financing*

Although Morton recognizes that traditional dealerships earn some revenue from financing, she does not explain why this revenue source would be unavailable to a Lucid dealership.  *Compare* Report at ¶18 with Report at ¶19.  Notably, Lucid's other expert, Mr. Walter, recognized that Lucid plans to assist its customers with financing through Bank of America "and may receive a financing transaction fee."  Walter Report at ¶39.  Neither Morton nor Walter analyzed the amount of that financing fee or how a Lucid financing fee compares to the financing fees charged by independent dealerships.  Accordingly, it is bald speculation for Morton to say that financing fees would be unavailable to hypothetical Lucid dealers.

    *5.*    *Concluding Comments on Economic Viability*

As explained above, most of Morton's arguments regarding economic viability for an independent Lucid dealership are based on assumptions that a dealership would have to follow Lucid's preferred methods of doing business.  But Lucid does not get to dictate the rules that are applied to determine whether dealerships are economically viable or whether Texas law is constitutional.  It is ironic that Lucid and its expert would argue that an independent dealership would not be economically viable when there are serious questions regarding the viability of Lucid as an entity.  Lucid admits it has already lost billions of dollars, has never earned a profit in any year of its operations, and "expects to incur increasing expenses and substantial losses for the foreseeable future."  2022 Form 10-K.  Public reports state that Lucid is losing over $227,000 per

automobile sold.[9]  Lucid admits it has a "limited operating history" and "limited experience in high volume sales."  2022 Form 10-K.  It even identifies its lack of "a third-party retail product distribution and full-service network" as a risk that may adversely affect its operations.  *Id.*  Under these circumstances, the Court should be particularly hesitant to accept the unproven and unreliable theories of Lucid's expert who has not conducted any studies or analyzed real-world data when forming her opinions on economic viability.

Weighing against Morton's belief that it would not be economically viable for Lucid to use independent dealers, other EV start-ups have already publicly announced that after initially attempting to sell directly to consumers, they are now changing course and planning to build their networks using independent dealers.[10]  *See* Morton Dep. at 51:2-12 (admitting she had never heard of some of the new EV manufacturers who are using dealerships).  Tesla's Elon Musk has also publicly stated that he would consider using independent dealers in the future if he finds the right fit.[11]   Morton Dep. 65:12-24.   This experience is also consistent with what automobile manufacturers concluded in the first few centuries of automobile sales when they all adopted the independent franchise model.[12]  *See* Epstein, *supra*, at 132-36; James M. Rubenstein, Making and Selling Cars:  Innovation and Change in the U.S. Automotive Industry 267 (The John Hopkins Univ. Press, 2001).  Given that Morton's opinions are not support by a reliable record and are

---

[9]    *See* Eileen Falkenberg Hull, *Lucid Gravity Designed to Minimize Production Problems*, Newsweek (Jan. 6, 2024).

[10]   *See* Laurence Iliff, *VinFast Plans U.S. Dealer Network with 125 Sales Points in First Phase,* Automotive News (Nov. 10, 2023); Laurence Iliff, *Fisker Targets 50 Franchised Dealers in U.S., Canada*, Automotive News (Jan. 5, 2024); Laurence Iliff, *Fisker, VinFast Head to NADA Looking for Dealer Partners*, Automotive News (Jan. 31, 2024).

[11]   *See* https://www.wsj.com/video/elon-musk-weighs-in-on-franchise-dealers/5FEB2EFF-78C1-4F6F-915F-60F342598564.

[12]   Morton agreed that, in the abstract, it is appropriate to consider history in the analysis.  Morton Dep. at 61:9-19.  Nevertheless, she also admitted that she did not even consider what would happen if a new EV manufacturer wanted to use dealers after it started selling direct to consumers.  *Id.* at 63:25-65:5, 66:25-67:7

based on unfounded assumptions as articulated above, she should not be allowed to speculate or testify that independent Lucid dealers would not be viable.

## C.   MORTON'S OPINIONS ON DOUBLE MARGINALIZATION SHOULD BE EXCLUDED.

The Court should also exclude Morton's opinions regarding double marginalization and the theory that the risk of double marginalization may be avoided by allowing manufacturers to sell direct to consumers.  Report at ¶¶1, 20, 26-29, 31; Rebuttal Report at ¶¶20-24.  Double marginalization is an economic concept that allegedly results in "higher prices to consumers, lower demand, and lower total profits," when both a manufacturer and retail dealer "strive to maximize their profits."  Report at ¶26; *see also* Morton Dep. at 172:20-173:3. The flaw in Morton's opinion is that, while she has articulated this theory, she has conducted no studies or analysis to determine if double marginalization is a real risk in the Texas retail automobile industry.

Morton recognizes that competition among different brands of dealerships—"inter-brand competition"—impacts the retail prices at which automobiles can be sold.  Report at ¶29.  There is a limit to what consumers will pay for a specific vehicle, as well as a limit on what dealers may charge for a specific vehicle to be able to sell it.  Without assessing vehicle pricing and competition, it is not possible to assume that double marginalization will raise the retail prices that consumers must pay for an automobile above the competitive price for the vehicle.  *See* Morton Dep. at 173:22-174:17 (acknowledging that it is "[t]heoretically" possible that an independent dealer may lower prices to consumer); 179:12-180:4 ("is it for sure known that the franchise model sets a higher price that the vertically-integrated model?  No.").

Morton recognizes that a manufacturer would want to maximize its profits while selling vehicles, even if the sales are direct to consumers.  She further acknowledges that if dealerships are able to perform their roles more efficiently or at less cost than a manufacturer performing the

same role in a direct-sale model, the use of dealerships will not necessarily raise the costs of vehicles to consumers. *See* Rebuttal Report at ¶21 ("the result becomes ambiguous"). It is possible that a dealership can reduce overall costs while still earning a profit. Morton Dep. at 174:4-17. Thus, the reasons Morton describes "the result" as "ambiguous" here is that she conducted no study or analysis of the finances or economics of Lucid's business model or the impact of using dealerships. Instead, she is discussing an academic "potential harm," not a "certainty." Rebuttal Report at ¶24.

Ultimately, Morton faults TADA's expert, Mr. Stockton, for relying upon well-established history to support his statement that "there are reasons to believe that retailing costs would be higher for manufacturers than for independent dealers." Rebuttal Report at ¶¶22-23. However, in her Report, Morton offered no opinions or analysis of retailing costs for Lucid, dealers, or anyone else. And in her Rebuttal, she now cites a single statement from a Ford Motor Company earnings call. But she has conducted no independent scrutiny of that hearsay assertion. In short, Morton does not have a reliable factual basis for dismissing the lessons of history so quickly. History is important because it addresses new entrants to the automobile market, which is exactly the situation Lucid is presenting as a new entrant here seeking to change the law.

### D.    MORTON'S OPINIONS ABOUT CONSUMER PROTECTION SHOULD BE EXCLUDED.

Morton also opines that Texas law banning manufacturers from selling direct to retail consumer (*i.e.,* vertical integration) does not protect consumers against unfair competition, *see* Report at ¶¶15-16, but she has no reliable basis to support that opinion. Morton conducted no studies of Lucid consumers or customer complaints and, thus, she has no factual basis for offering her opinion other than her general opposition as a consistent testifier for EV manufacturers to vertical integration restrictions. Morton Dep. at 172:8-19. However, courts recognize that there

are many legitimate reasons to believe that vertical integration restrictions protect consumers. *See, e.g., Allstate v. Abbott*, 495 F.3d 151, 164 (5th Cir. 2007). Just as in *Allstate*, there is an inherent conflict between manufacturers and consumers. Here, new entrants in the EV market have a strong incentive in trying to grow their brand, focusing on increasing manufacturing capacity, which often comes at the expense of the consumer.

Recent articles reporting on Tesla customer experiences illustrate this point. "Tesla drivers tend to visit service centers at nearly the same rate as the owners of premium gas power vehicles, such as Lexus or Audi[.]" Rebecca Heilweil, *Missing Parts, Long Waits, and a Dead Mouse: The Perils of Getting a Tesla Fixed*, Vox at 3 (Aug. 24, 2022).[13] However, "Tesla's manufacturing output has historically increased at a significantly higher rate than the number of Tesla service centers." *Id.* As a result, consumers have reported extended waits and difficulties obtaining service and repairs. "Service does not seem to be Tesla's strong suit." *Id.* at 5. "A major problem seems to be Tesla service centers don't have enough capacity." *Id.* at 6. And the problem is only getting worse. *Id.* at 8. It has been reported that "it seems as though Tesla's focus on manufacturing – and selling more cars to more new customers – still comes before fixing the cars that people already purchased." *Id.* at 5.[14]

"Major carmakers have nearly 10,000 dealerships nationwide, and there are thousands more independent mechanics, as of last year. Tesla has about 160 services centers in the U.S. according to its website." *Id.* at 9. But "J.D. Power notes that overall service satisfaction for EVs is still significantly lower than for internal combustion engines." *Id.* There is nothing irrational

---

[13] Tesla filed this article in federal court in California. *See* ECF 135-7, Case No. 3:23-cv-01145-TLT, *Lambrix v. Tesla, Inc.*, (N.D. Cal. Dec. 22, 2023).

[14] Other reports have found that Tesla has employed secret teams to suppress customer complaints about driving ranges and efficiency. *See* Steve Stecklow and Norihiko Shirouzu, *Tesla Created Secret Team to Suppress Thousands of Driving Range Complaints*, Reuters (July 27, 2023).

about Texas concluding that consumers are better protected by laws prohibiting manufacturers controlling the entire retail automotive experience, which avoids manufacturers selling new vehicles in Texas without having a reliable and adequate dealership support network in place.

Morton also does not explain the basis of her opinions regarding consumer protection or her qualifications to render such opinions. She has conducted no studies or analysis of the reliability of Lucid vehicles. Moreover, protecting consumers from unfair practices and conflicts of interest with manufacturers is more than just a matter of economics.

Morton does not believe that the significant potential conflict of interest between manufacturers and consumers is relevant to this case. Morton Dep. at 104:4-21. During her deposition, Morton testified as follows:

> Q: Have you done any analysis of Lucid to determine how it is balancing its investments in selling vehicles and raising a profit from new consumers versus having a sufficient support infrastructure to take care of its existing customer?
>
> A: No, because every manufacturer varies on that front, and it has no relationship to whether there is a reason to block having this distribution channel.

Morton Dep. at 105:7-16. Morton's point here is significant because TADA agrees that different manufacturers perform differently with respect to customer service and consumer protection. But the point Morton missed is that one reason that *all* motor vehicle manufacturers are prohibited from selling direct to consumers in Texas is to protect consumers from those manufacturers who put their own profit motives ahead of consumer safety. This is the conflict of interest at issue. It is not irrelevant.

### E.    MORTON'S COMMENTS ON MANUFACTURING COSTS SHOULD BE EXCLUDED.

In Paragraph 13 of her Report, Morton provides background information on Lucid's business model. In this paragraph, she is merely repeating Lucid's self-serving assertions and not offering an opinion of her own. Moreover, she has repeated statements for which she had no

independent understanding of what they mean. For example, she writes: "[t]he 4.6 miles/kWh efficiency of its Lucid Air Grand Touring sedan is unprecedented, reducing both its manufacturing costs and total costs for its consumers." Report at ¶13. During her deposition, she had no explanation to connect this alleged efficiency to "reducing … its manufacturing costs." Morton Dep. at 166:5-23 ("Well, that's a scientific question that I don't know the answer to.") & 167:10-18 ("I can point to where Lucid says it. I cannot independently verify it with my skill set."). Morton conducted no studies or analysis of her own regarding Lucid manufacturing costs or cost of ownership for Lucid consumers. The Court should not allow Morton to offer unsupported statements on these topics, which are nothing more than merely repeating Lucid's sales pitch and are unreliable, speculative, and misleading.

**CONCLUSION**

The Court should grant TADA's motion and should exclude and/or limit Morton's testimony as set forth above.

Respectfully submitted,

*/s/ Robert T. Mowrey*
Robert T. Mowrey
  Texas Bar No. 14607500
  *rmowrey@lockelord.com*
Thomas G. Yoxall
  Texas Bar No. 00785304
  *tyoxall@lockelord.com*
W. Scott Hastings
  Texas Bar No. 24002241
  *shastings@lockelord.com*
Daron L. Janis
  Texas Bar No. 24060015
  *djanis @lockelord.com*
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-6776
Telephone: (214) 740-8000
Facsimile:  (214) 740-8800

**ATTORNEYS FOR TEXAS AUTOMOBILE
DEALERS ASSOCIATION**

## CERTIFICATE OF CONFERENCE

TADA has conferred with counsel for Plaintiff Lucid Group USA, Inc. regarding this motion.  Lucid opposes TADA's motion.

*/s/ Robert T. Mowrey*
Robert T. Mowrey

## CERTIFICATE OF SERVICE

I certify that on February 5, 2024, a true and correct copy of this document is being served on all counsel of record via the Court's electronic filing system.

*/s/ Robert T. Mowrey*
Robert T. Mowrey

17