EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| LUCID GROUP USA, INC., | |
| *Plaintiff*, | |
| v. | |
| MONIQUE JOHNSON, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles; DANIEL AVITIA, in his official capacity as Acting Executive Director of the Texas Department of Motor Vehicles; and CORRIE THOMPSON, in her official capacity as Director of the Enforcement Division of the Texas Department of Motor Vehicles, | Civil Action No. 1:22-cv-01116-RP |
| *Defendants*. | |

<u>**Expert Report of Professor Fiona Scott Morton**</u>

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................... 1

II.   QUALIFICATIONS ...................................................................................... 1

III.  LUCID'S DIRECT SALES AND SERVICE MODEL ..................................... 3

IV.   LUCID'S INCENTIVES TO SERVE CUSTOMERS WELL AND COMPLY
      WITH CONSUMER PROTECTION LAWS ARE AT LEAST AS STRONG AS
      THOSE OF INDEPENDENT DEALERS ....................................................... 4

V.    AN INDEPENDENT LUCID DEALER WOULD NOT BE ECONOMICALLY
      VIABLE ...................................................................................................... 6

VI.   ECONOMIC HARM RESULTING FROM PROHIBITING LUCID'S DIRECT
      SALES MODEL ........................................................................................... 7

         1.    Barring Lucid from Selling Direct to Consumers in Texas Harms
               Consumers by Reducing Consumer Choice ................................. 8
         2.    Barring Lucid from Selling Direct to Consumers in Texas Harms
               Consumers by Introducing the Risk of Double Marginalization .............. 9

VII.  CONCLUSION ........................................................................................... 11

## I.    **INTRODUCTION**

1.      I have been retained by Lucid Group USA, Inc. ("Lucid") in connection with its lawsuit against the Texas Department of Motor Vehicles.  Lucid has asked me to prepare this brief report to explain the economic harm that results from Texas's ban on direct sales of automobiles by their manufacturers and absence of any economic basis for application of that ban to manufacturers like Lucid that do not utilize independent dealers.

2.      As I explain in the main body of this report, Lucid has powerful incentives to serve customers well and comply with consumer protection laws.  These incentives are at least as strong as those of an independent dealer.  Furthermore, an independent Lucid dealer would not be economically viable.  Thus, requiring Lucid to sell its vehicles through an independent dealer effectively bars Lucid from selling in Texas.  More generally, Texas's direct sales ban stifles competition, harms consumers, and creates an artificial barrier to the entry of new companies and technologies into the automobile market.  Allowing Lucid to own and operate sales Studios in Texas and to sell directly to Texas consumers would increase consumer choice and eliminate the risk of higher prices from double marginalization.

## II.    **QUALIFICATIONS**

3.      I am the Theodore Nierenberg Professor of Economics at the Yale University School of Management, where I teach courses in the area of competitive strategy and conduct research into empirical industrial organization.  I am also a Visiting Professor at the University of Edinburgh, a Senior Consultant at Charles River Associates, and a Research Associate at the National Bureau of Economic Research.  I hold a Bachelor's degree in Economics from Yale and a Ph.D. in Economics from the Massachusetts Institute of Technology.

4.      I have been a professor at Yale since 1999, during which time I have been the Senior Associate Dean for Faculty Development.  Before becoming a professor at Yale, I was an Assistant Professor of Economics and Strategy at the University of Chicago's Graduate School

of Business.  Before that, I was an Assistant Professor of Strategic Management at Stanford
University's Graduate School of Business.

5.      From 2011 to 2012, I held the position of Deputy Assistant Attorney General for
Economic Analysis in the Antitrust Division of the US Department of Justice.  In this role, I
supervised the economists in the Antitrust Division analyzing the cases that came before the
Division.  In many of these cases, the economists at the Division developed and assessed
evidence of whether an organization's behavior was pro- or anti-competitive in light of the net
impact of the behavior on consumers in terms of price, innovation, or quality.

6.      I teach two courses at the Yale School of Management:  Competitive Strategy,
and Advanced Competition Economics and Policy.  Competitive Strategy is an MBA elective
course covering theories of how firms compete, including competition with respect to price,
quantity, entry and exit into the market, research and development, and product differentiation.
Advanced Competition Economics and Policy focuses on antitrust concepts.

7.      I have published dozens of articles in peer-reviewed journals.  I also have served
in an editing role on various academic economics journals, and I referee for a number of
journals, including the *Review of Economic Studies*, the *Quarterly Journal of Economics*, the
*RAND Journal of Economics*, the *Journal of Industrial Economics*, and the *Journal of Law and
Economics*.  I am also a member of the American Economic Association.

8.      My research is in the field of empirical industrial organization, which is the
application of empirical methods to the field of industrial organization.  The field of industrial
organization examines the structure of firms and markets, including competitive markets and
monopolies.  My work focuses on empirical studies of competition among companies and firms,
including in areas such as pricing and entry.

9.      I have researched and published peer-reviewed articles about the automotive
industry, including on price negotiation in US auto retailing, state franchising laws related to
dealer terminations, internet auto retailing and transactions, price discrimination against women
and minorities at dealerships, and inventory fluctuations at dealerships.  Several of these papers

received recognition in the profession, including the Green Award from the *Journal of Marketing Research* for the paper on internet auto retailing and transactions.

10.    I have testified as a qualified expert about the auto dealer franchise system, including the economics of the auto dealer franchise system.  **Attachment 1** is a copy of my curriculum vitae.

11.    To prepare this report, I have reviewed legal filings in this matter, my prior research on retail sales and the dealership model in the automotive industry,[1] as well as academic articles and publicly available information concerning Lucid, its retail strategy, and the economics of automobile distribution.   A list of the materials I have reviewed and relied upon is in **Attachment 2**.  I understand that discovery is ongoing in this matter.  While the opinions presented herein are complete based upon the information and documents available to me to date, I reserve the right to expand, modify or reduce my findings and conclusions based upon my review of any further disclosures made by any other expert, additional information, or documentation provided in this matter, or on testimony and exhibits introduced at subsequent depositions or hearings.

12.    Lucid has retained me at an hourly rate of $1,200 per hour.  I have been assisted by Ann McDermott.  Our invoices are attached as **Attachment 3**.  Our work in July 2023 has not yet been invoiced but totals $6,880 through July 25.[2]  This compensation is not contingent in any way on the outcome of this matter.

## III.    LUCID'S DIRECT SALES AND SERVICE MODEL

13.    Lucid is a new and innovative US manufacturer of all-electric automobiles.  Its Lucid Air sedans have EPA-rated ranges of up to 516 miles, over 1,100 horsepower, and

---

[1] For example, Fiona Scott Morton, Florian Zettelmeyer, and Jorge Silva-Risso, "Internet Car Retailing," *The Journal of Industrial Economics* 49, no. 4 (2001): 501-519; Francine Lafontaine and Fiona Scott Morton, "State Franchise Laws, Dealer Terminations, and the Auto Crisis," *Journal of Economic Perspectives*, 24, no. 3 (2010): 233-250 and online appendix, available at http://www.e-jep.org; Fiona Scott Morton and Ann McDermott, "Retail Auto Sales: Tesla v. State Vehicle Franchise Laws (2017)," in John E. Kwoka, Jr. and Lawrence J. White (eds.), *The Antitrust Revolution, Economics, Competition, and Policy (7th Edition)*.  New York: Oxford University Press (2018).

[2] One hour of my time at $1,220 per hour and 8 hours of Ms. McDermott's time at $710 per hour.

charging speeds of up to 300 miles in 22 minutes.[3]  The 4.6 miles/kWh efficiency of its Lucid

Air Grand Touring sedan is unprecedented, reducing both its manufacturing costs and total

ownership costs for its customers.[4]  *MotorTrend* has named Lucid Air its 2022 Car of the Year.[5]

Lucid manufactures its cars in its Arizona plant, currently configured for a capacity of up to

34,000 cars per year, with an expansion underway to bring its capacity to 90,000 vehicles per

year in 2024.[6]

14.     Lucid has adopted a direct sales and service model to sell its new and innovative

vehicles.  Cars are sold at a fixed, uniform price that depends only on the configuration of

options and accessories chosen by the customer.  Sales are either online or at Lucid "Studios,"

staffed by Lucid employees.  As of March 31, 2023, Lucid has 40 Studios and service centers in

operation worldwide, with more expected to follow.[7]  All sales of Lucid automobiles are direct

from the manufacturer – there are no independent dealerships selling Lucid's cars.  Because

Texas bars direct sales of new vehicles by auto manufacturers, Lucid is not permitted to sell its

innovative cars in Texas.[8]

## IV.  LUCID'S INCENTIVES TO SERVE CUSTOMERS WELL AND COMPLY WITH CONSUMER PROTECTION LAWS ARE AT LEAST AS STRONG AS THOSE OF INDEPENDENT DEALERS

15.     The State of Texas has argued that banning direct sales of motor vehicles furthers

the State's interest in protecting its citizens from unfair practices.[9]  Yet banning direct sales by

vehicle manufacturers and requiring cars to be sold and serviced through independent dealers

---

[3] Lucid Group, Inc., 10-K, December 31, 2022, pp. 7, 9.

[4] Lucid Group, Inc., Second Quarter 2022 Earnings Release, August 3, 2022, p. 26, available at
https://ir.lucidmotors.com/static-files/8bdec76d-808a-4a7b-bacf-0853ae53d6ee.

[5] MotorTrend Press Release, "The Lucid Air Is the 2022 MotorTrend Car of the Year," November 15, 2021,
available at https://www.motortrend.com/news/lucid-air-2022-car-of-the-year/.

[6] Lucid Group, Inc., 10-K, December 31, 2022, p. 7.

[7] Lucid Group, Inc., 10-Q, March 31, 2023, p. 32.

[8] Lucid currently operates a Studio in Plano, Texas.  Vehicle sales are prohibited at the location.  It also operates a
service and delivery center in Houston.

[9] Lucid Group USA, Inc. v. Monique Johnston et al., Defendants' Motion to Dismiss, p. 2.

does not further that interest.  Consumer advocacy groups have characterized bans on direct sales as "unnecessary for consumer protection."[10]

16.     As an economic matter, there is nothing inherent about vehicle manufacturers that makes them more likely than independent dealers to engage in unfair practices.  Engaging in unfair practices harms a manufacturer's brand and can ruin its relationship with its customers.  Independent dealers also have an interest in avoiding unfair practices, but there is no evidence or theoretical reason for why a dealer's interest would be stronger than that of a manufacturer.  If anything, a manufacturer has a greater incentive than independent dealers to ensure the long-term growth of its brand and relationship with customers, because a manufacturer can keep a customer even if the customer moves from one geographic location to another, whereas independent dealers are likely to lose customers who move.  These incentives are magnified in the case of Lucid, which is a relatively new market entrant trying to establish its brand through word-of-mouth and goodwill.  Moreover, numerous state and federal laws barring fraud and other unfair business practices apply to auto manufacturers just as they do to independent dealers or any other business.  As a result, every manufacturer has strong incentives to avoid such practices.  There is no plausible explanation for why a vertically integrated car manufacturer would be any more likely to engage in unfair practices than an independent dealer in light of these economic incentives and anti-fraud laws.

17.     Over the past decade, consumer advocacy groups, public policy centers, leading academics, and the Federal Trade Commission have opposed Texas's ban and similar bans in other states as anti-consumer and protectionist.[11]  This is not to say that all franchised dealers

---

[10] "Sign-on Statement to State Government Leaders About the Anti-Consumer Effects of Laws Prohibiting Direct Distribution of Automobiles," February 6, 2015, available at http://www.autonews.com/assets/PDF/CA98362217.PDF.  For context, *see* Mackinac Center, "Public Letter on Direct Automobile Sales," February 18, 2015, available at https://www.mackinac.org/21003.

[11] Georgeta Dragiou, "Ban on Direct Auto Sales Hurts Consumers and Innovation in Texas," February 25, 2016, available at https://www.tribtalk.org/2016/02/25/ban-on-direct-auto-sales-hurts-consumers-and-innovation-in-texas/; Mississippi Center for Public Policy, "Bill to Ban Direct Vehicle Sales is Anti-Consumer Choice," February 24, 2022, available at https://mspolicy.org/bill-to-ban-direct-vehicle-sales-is-anti-consumer-choice/; "Sign-on Statement to State Government Leaders About the Anti-Consumer Effects of Laws Prohibiting Direct Distribution of Automobiles," February 6, 2015, available at http://www.autonews.com/assets/PDF/CA98362217.PDF; Geoffrey A.

engage in fraud or other unfair business practices. Rather, it is to say that a law requiring cars to be sold by franchised dealers cannot reasonably be justified as an effort to avoid unfair business practices, particularly when there is no plausible basis to conclude that car manufacturers are more likely to engage in such practices than dealers.

## V.    AN INDEPENDENT LUCID DEALER WOULD NOT BE ECONOMICALLY VIABLE

18.    An independent dealership would not be economically viable under Lucid's direct sales and service model. Under the independent dealership model, the dealer has a contract with a vehicle manufacturer. The dealer buys vehicles from the manufacturer and maintains an inventory of vehicles on its lot. The dealer maintains a showroom and sales staff to sell new vehicles, and offers service and repairs, including warranty and non-warranty repairs for vehicles produced by the manufacturer and non-warranty service work for vehicles produced by other manufacturers. Typically, commissions or volume-based bonuses are important for compensation of the sales team.[12] The staff is also incentivized through commissions to sell "add-ons" such as additional features, service contracts, and warranties. Prices for new vehicles and "add-ons" are usually negotiable, with the dealer attempting to obtain the highest price possible. In 2016-2020, the average traditional dealership derived just 12% of its profits from the sale of new vehicles.[13] Vehicle service, financing, and used car sales were more important sources of profit.[14]

---

Manne, et al., "Open Letter by Academics in Favor of Direct EV Sales and Service," April 14, 2021, available at https://laweconcenter.org/resources/open-letter-by-academics-in-favor-of-direct-ev-sales-and-service/?doing_wp_cron=1688658804.8335630893707275390625; Mackinac Center, "Public Letter on Direct Automobile Sales," February 18, 2015, available at https://www.mackinac.org/21003; Marina Lao, Debbie Feinstein and Francine Lafontaine, FTC Competition Matters Blog, "Direct-to-Consumer Auto Sales: It's Not Just About Tesla," May 11, 2015; FTC Staff Comment Before the Michigan Senate Regarding Senate Bill 268, May 7, 2015.

[12] Indeed, "How Much Does a Car Salesperson Make?," July 21, 2022, available at https://www.indeed.com/career-advice/pay-salary/how-much-does-a-car-salesperson-make; Edmunds, "Where Does the Car Dealer Make Money?," June 13, 2019, available at https://www.edmunds.com/car-buying/where-does-the-car-dealer-make-money.html.

[13] New car sales, net of profits from F&I, generated 12% of an average dealership's gross margin in 2016-2020. National Automobile Dealers Association, "Dealership Financial Profiles," available at https://www.nada.org/dealershipfinancialprofile/.

[14] National Automobile Dealers Association, "Dealership Financial Profiles," available at https://web.archive.org/web/20210525084743/https://www.nada.org/dealershipfinancialprofile/.

19.     Based on Lucid's product and scale, Lucid's sales and service model makes sense for its business, while the independent dealership model does not.  The hypothetical independent Lucid dealer would need to compete with Lucid's fixed and uniform retail prices, available online and in its Studios, leaving it no margin with which to fund its buildings and inventory. Two significant sources of income for traditional dealers – service and parts and used vehicle sales – would not be available or would be greatly reduced for a hypothetical independent dealer selling Lucid cars.  Lucid's service and parts revenue will be quite limited due to the relatively small scale of sales, Lucid's plans to provide service through non-traditional channels (over-the-air or with mobile service vehicles), and electric vehicles' lower maintenance requirements.[15]  In addition, the pool of available Lucid used vehicles will be exceedingly small for years to come. Moreover, because the product (as well as the company) is new and novel, selling Lucid's all-electric vehicles will require different selling behavior, different sales skills, and a different environment than are required for motor vehicle sales generally.  Again, this would require Lucid-specific investments by a dealer.  In brief, the hypothetical independent Lucid dealer would be expected to earn zero margin on new car sales in perpetuity while bearing significant fixed costs, leading to financial losses.  For these reasons, the independent dealer sales model is not viable for Lucid's vehicles.

## VI.    ECONOMIC HARM RESULTING FROM PROHIBITING LUCID'S DIRECT SALES MODEL

20.     This section explains how Texas's prohibition on direct sales by auto manufacturers protects incumbent manufacturers and dealers at the expense of competition and consumers.  It shows that authorizing Lucid to open and operate sales Studios in Texas would benefit consumers by increasing consumer choice and eliminating the risk of double marginalization.

---

[15] EVs do not require oil changes, spark plug replacements, or timing belt replacements, among other routine maintenance tasks.  A recent study estimated maintenance costs per mile for EVs are 41% less than those for comparable gas-powered vehicles.  Energy Systems Division, Argonne National Laboratory, "Comprehensive Total Cost of Ownership, Quantification for Vehicles with Direct Size Classes and Powertrains," April 2021, pp. 82-85, available at https://publications.anl.gov/anlpubs/2021/05/167399.pdf.

1.    **Barring Lucid from Selling Direct to Consumers in Texas Harms Consumers by Reducing Consumer Choice**

21.    Lucid's direct sales model, including uniform prices and a low-pressure and relaxed environment in which consumers can shop for a car, is rare in the auto industry. This alternative model is good for the consumer because it creates more choices, and some consumers may prefer the new model over traditional car buying. If consumers like this retail experience, and the retail experience is one factor that drives Lucid's sales, this will put competitive pressure on traditional dealers. Competing dealers will want to improve their own buying experience in order to retain consumers, and all consumers will benefit from the resulting competition.

22.    If Lucid is not permitted to sell its vehicles in Texas, Texans will be denied ready access to Lucid's new vehicles. Potential Lucid buyers might not hear of Lucid cars or obtain purchase information. Consumers in Texas would thereby be denied choices in their car buying. Dealers of competing automakers would have fewer incentives to compete on the basis of lower prices or superior customer service.

23.    It is important to emphasize that there is no risk of harm to competition from Lucid's direct sales model. If Lucid's direct-sales model or its vehicles are not desired by consumers or if consumers judge Lucid's car prices to be too high, Lucid's cars will not be purchased. This is standard and expected in a competitive market.

24.    The two government agencies tasked with enforcing US competition laws, the Federal Trade Commission ("FTC") and the US Department of Justice, support the conclusion that bans on direct sales by vehicle manufacturers harm competition and consumers.[16] In multiple submissions to state legislatures, the FTC has explained that giving automakers the freedom to choose the sales model that makes the most sense for them, and letting the market determine whether they succeed or fail, is in the best interest of consumers and competition.[17]

---

[16] Joint Letter of the Antitrust Division of the U.S. Department of Justice and the Federal Trade Commission on Franchised Dealer Requirements to Sell and Service Motor Vehicles and Nebraska Legislative Bill 51, March 14, 2019, available at https://www.justice.gov/atr/page/file/1146236/download.

[17] "Our principal point is this: absent some legitimate public purpose, consumers would be better served if the choice of distribution method is left to motor vehicle manufacturers and the consumers to whom they sell their

25.    This position comports with the basic lessons of microeconomics.  While there are arguably credible reasons to restrict an automaker with an existing network of independent dealers from selling in direct competition with those dealers, there is no reason to require a vehicle manufacturer to go out and contract with independent dealers in order to reach its customers.  Consumers are made better off when given the right to choose the selling mode and vehicle that they prefer, rather than having their state government choose it for them.

### 2.    Barring Lucid from Selling Direct to Consumers in Texas Harms Consumers by Introducing the Risk of Double Marginalization

26.    Selling vehicles through an independent dealer, as is required in Texas, introduces the risk of "double marginalization."  Under the traditional auto retail sales model, two independent parties strive to maximize their profits – the auto manufacturer and its dealers.  The auto manufacturer sets a wholesale price with a profit margin that maximizes its profits in light of "*inter*brand" competition for autos, that is, competition between different brands of automobile.  That wholesale price is an input cost for the independent dealer.  The dealer then sets a retail price that reflects the wholesale vehicle price, dealership costs, and "*intra*brand" competition in retailing, that is, competition between dealers of the same brand of automobile.  When intrabrand competition is weak, the dealer maximizes profits by setting a retail price above the competitive price.  This situation results in what economists term "double marginalization."  Compared to a system in which final selling prices are under the control of a single economic entity, such as occurs with Lucid's direct sales model, double marginalization results in higher prices to consumers, lower demand, and lower total profits.[18]

---

products." (FTC Staff Comment Before the New Jersey General Assembly Regarding Assembly Bills 2986, 3096, 3041, and 3216, May 16, 2014, p. 8.)  *See also* FTC Staff Comment Before the Missouri House of Representatives Regarding House Bill 1124, Which Would Expand the Current Prohibition on Direct-to-Consumer Sales by Manufacturers of Automobiles, May 15, 2014; FTC Staff Comment Regarding Michigan Senate Bill 268 Which Would Create a Limited Exception to Michigan Law, May 7, 2015.

[18] Roger D. Blair and Francine Lafontaine. 2005.  *The Economics of Franchising*, New York, New York: Cambridge University Press, pp. 182-188; W. Kip Viscusi, Joseph E. Harrington, and John M. Vernon. 1992. *Economics of Regulation and Antitrust*, Lexington, Massachusetts: D.C. Heath and Company, pp. 221-224.

27.    **Chart 1** is a simplified illustration of how eliminating double marginalization leads to lower prices and increased demand.[19]  With double marginalization (in orange), the dealer maximizes its profits by setting a sales price where its marginal revenue equals the wholesale price it pays for cars plus its marginal retail costs.  The resulting price is higher than the price the automaker would set if it sold direct.  Without double marginalization (in blue), the automaker with direct sales maximizes its profits by setting a price where its marginal revenue equals its marginal cost to produce and sell its vehicles.  The price without double marginalization is lower, resulting in increased demand.

**Chart 1**

**Illustration of Double Marginalization**

28.    As illustrated by **Chart 1**, a direct sales model, such as is used by Lucid, eliminates the separate process of setting a dealer mark-up.  Even if the manufacturer has the same costs to retail its vehicles as does an independent dealer, the final retail price is lower than

---

[19] A more detailed explanation is available in Roger D. Blair and Francine Lafontaine. 2005.  *The Economics of Franchising*, New York, New York: Cambridge University Press, pp. 182-188.

it would be if the vehicle was marked up by both the manufacturer and the dealer essentially because the manufacturer's cost for the vehicle is below the wholesale cost paid by the dealer.

29.     With its direct sales model, Lucid's prices are limited by interbrand competition among the different automakers.  Lucid wants consumers to buy its car rather than a BMW or a Mercedes and sets its price accordingly.  Lucid has strong incentives to manage its sales operations as efficiently as possible and has no incentive to raise its prices at the retail level beyond the level that best enables it to compete with other manufacturers.  Consumers benefit from the opportunity for increased price competition.

## VII.    <u>CONCLUSION</u>

30.     Lucid manufactures and sells innovative electric cars.  Lucid has determined that its business is best served by selling its vehicles direct to consumers.  It does not sell through independent dealers anywhere in the world.  Because an independent Lucid dealer would not be economically viable, Texas's requirement that Lucid sell its cars through an independent dealer effectively bars it from selling in the state.

31.     More generally, the unambiguous effect of Texas's law barring direct sales of cars by auto manufacturers is to stifle competition, harm consumers, and create an artificial barrier to the entry of new companies and technologies into the automobile market.  As an economist who has studied regulation and competition, it is my opinion that allowing Lucid to operate sales Studios in Texas and sell direct to Texas consumers would have a positive effect on consumers as it would increase consumer choice and eliminate the risk of double marginalization.

_____
Professor Fiona Scott Morton

Executed on July 25, 2023

**Attachment 1**



## Fiona M. Scott Morton
Senior Consultant

PhD, Economics
Massachusetts Institute of Technology

BA (magna cum laude), Economics
Yale University

Fiona M. Scott Morton is the Theodore Nierenberg Professor of Economics at the Yale School of Management. From May 2011 to December 2012, she was Deputy Assistant Attorney General for Economic Analysis with the Antitrust Division of the US Department of Justice. Dr. Scott Morton ensured that the Division's economic team provided sound analysis in support of the DOJ's enforcement action and policy, particularly with its work related to analyzing the competitive effects of mergers as well as assessing the competitive implications of certain contractual practices of firms. While at the DOJ, she frequently spoke on antitrust enforcement in high-technology industries as well as patents and their portfolio acquisitions.

An expert in competitive strategy, Dr. Scott Morton's research focuses on empirical studies of competition among firms in areas such as pricing, entry, and product differentiation. She has served in an editing role on various academic economics journals and has published articles in the *American Economic Review*, the *RAND Journal of Economics*, the *Journal of Industrial Economics,* and the *Quarterly Journal of Economics*.

Her expertise and research area is the study of firms, markets, and competition. Her research and consulting work have involved a variety of industries such as merchant shipping, wineries, funeral homes, ecommerce, auto retailing, magazines, healthcare and a number of areas in the pharmaceutical industry including competition, generic entry, and procurement of pharmaceuticals for Medicaid and Medicare. Professor Scott Morton's research is widely disseminated in top scholarly publications and through frequent invited research seminars and conferences.

She has taught at the business schools of Stanford and the University of Chicago and served as Associate Dean for Faculty Development at Yale School of Management from 2006–2010. She won the school's teaching award in 2007 and 2016.

## Employment and affiliations

2014–Present        *Theodore Nierenberg Professor of Economics*, Yale School of Management

2008–Present        *Visiting Professor*, University of Edinburgh Economics Department

2013–Present        *Senior Consultant*, Charles River Associates

2002–2014           *Professor of Economics*, Yale School of Management

2011–2012           *Deputy Assistant Attorney General for Economic Analysis*, Antitrust Division, US Department of Justice

2006–2011           *Senior Consultant*, Charles River Associates

| 2006–2010 | *Senior Associate Dean for Faculty Development*, Yale School of Management |
| 2005–2006 | *Adam Smith Visiting Fellow*, Department of Economics, University of Edinburgh, Scotland |
| 2000–2002 | *James L. Frank '32 Associate Professor of Private Enterprise and Management*, Yale School of Management |
| 1999–2000 | *Associate Professor of Economics and Strategy*, Yale School of Management |
| 1997–1999 | *Assistant Professor of Economics and Strategy*, Graduate School of Business, University of Chicago |
| 1994–1997 | *Assistant Professor of Strategic Management*, Graduate School of Business, Stanford University |
| 1991–1992 | *Instructor for Economics 10*, Prof. Martin Feldstein, Harvard University |

## Scholarly publications

"Physician Agency, Consumerism, and the Consumption of Lower-Limb MRI Scans." With Michael Chernew, Zack Cooper, and Eugene Larsen Hallock. *Journal of Health Economics*, Vol. 76, March 2021.

"Surprise! Out of Network Billing for Emergency Care in the United States." With Zack Cooper and Nathan Shekita. *Journal of Political Economy*: 128: 9: 3626–3677, 2020.

"Out-Of-Network Billing And Negotiated Payments For Hospital-Based Physicians." With Zack Cooper and Nathan Shekita. *Health Affairs*: 39: 1, December 16, 2019.

"Do Increasing Markups Matter? Lessons from Empirical Industrial Organization." With Steven Berry and Martin Gaynor. *The Journal of Economic Perspectives,* 33: 3: 44–68, 2019.

"Antitrust and Innovation: Welcoming and Protecting Disruption." With Guilio Federico and Carl Shapiro. In *Innovation Policy and the Economy*, Josh Lerner and Scott Stern, eds. vol. 20. NBER, 2019.

Scott Morton, Fiona (chair) et al., (2019) Report of the Market Structure and Antitrust Subcommittee, Digital Platforms Project, George J Stigler Center for the Study of the Economy and the State, The University of Chicago Booth School of Business, June 2019.

"The Impacts of the Entry of Biosimilars: Evidence from Europe." With Ariel Dora Stern, and Scott Stern. *Review of Industrial Organization*, 53, No. 1 (August 2018): 173-210 (https://doi.org/10.1007/s11151-018-9630-3)

"The antitrust case against platform MFNs." With Jonathan Baker. *Yale Law Journal*, May 2018.

"The antitrust case against horizontal shareholding." With Herbert Hovenkamp. *Yale Law Journal*, May 2018.

"The Impact of Consumer Inattention on Insurer Pricing in the Medicare Part D Program." With Kate Ho and Joseph Hogan. *RAND Journal of Economics*, 48(4): 877–905, 2017.

"A Proposal to Limit the Anticompetitive Power of Institutional Investors." With Eric A. Posner and E. Glen Weyl. *Antitrust Law Journal*, 81(3): 669–728, 2017.

"A Unifying Analytical Framework for Loyalty Rebates." With Zachary Abrahamson. *Antitrust Law Journal*, 81(3):  777–836, 2017.

"Contracts that Reference Rivals."  Chapter 7, <u>Antitrust Economics for Lawyers</u>.  LexisNexis, 2017.

"Enabling Competition in Pharmaceutical Markets." With Lysle Boller. *Brookings Institution, Hutchins Center Paper # 30*, 2017.

"Out-of-Network Emergency-Physician Bills—An Unwelcome Surprise." With Zack Cooper. *New England Journal of Medicine,* 375(20): 1915–1918; Reprinted in *NEJM Catalyst,* December 2016.

"Market Size and Pharmaceutical Innovation." With Pierre Dubois, Olivier de Mouzon, and Paul Seabright. *RAND Journal of Economics,* 46(4): 844–871, 2015.

"Patent Assertions: Are We Any Closer to Aligning Reward to Contribution?" With Carl Shapiro. *NBER Innovation Policy and the Economy,* 2015.

"Strategic Patent Acquisitions." With Carl Shapiro. *Antitrust Law Journal,* 79(2): 463–499, 2014.

"Hospitals, Market Share, and Consolidation: How Should Policy React?" With David Cutler. *Journal of the American Medical Association,* 310(18), 1964–70, November 2013.

"Pay-for-Delay." *Competition Policy International,* 9(2), 2013.

"Research into biomarkers: How does drug procurement affect the design of clinical trials?" With Paul Seabright. *Health Management, Policy, and Innovation,* 1(3), 2013.

"Contracts that Reference Rivals." *Antitrust Magazine*, 72–79, Summer 2013.

"Developing an Administrable MFN Enforcement Policy." With Steven Salop. *Antitrust Magazine*, 65–73, Spring 2013.

"Standard Setting Organizations Can Help Solve the Standard Essential Patents Licensing Problem." With Kai-Uwe Kuhn and Howard Shelanski. *CPI Antitrust Chronicle,* March 2013.

"The Year in Review: Economics at the Antitrust Division: 2011." With W. Robert Majure. *Review of Industrial Organization*, 41(4):  321–331, 2012.

"What Matters in a Price Negotiation: Evidence from the US Auto Retailing Industry." With Florian Zettelmeyer and Jorge Silva-Risso. *Quantitative Marketing and Economics,* 9: 365–402, 2011.

"Data Impediments to Empirical Work in Health Insurance Markets." With Leemore Dafny, David Dranove, and Frank Limbrock. *BE Journal of Economic Analysis and Policy,* 11(2): Article 8, 2011.

"The Medium-Term Impact of Medicare Part D on Pharmaceutical Prices." With Mark Duggan. *American Economic Review Papers and Proceedings,* 101(3): 387–392, 2011.

"Pharmaceutical Markets." With Margaret Kyle. *Handbook of Health Economics*, vol. 2, ch. 12, 763–823, Elsevier, 2011.

"State Franchise Laws, Dealer Terminations, and the Auto Crisis." With Francine Lafontaine. *Journal of Economic Perspectives,* 24(3): 233–50, 2010.

"The Effect of the Medicare Drug Benefit on Pharmaceutical Prices and Utilization." With Mark Duggan. *American Economic Review,* 100(1): 590–607, 2010.

"Providing Prescription Drug Coverage to the Elderly: America's Experiment with Medicare Part D." With Mark Duggan and Patrick Healey. *Journal of Economic Perspectives,* 22(4): 69–92, 2008.

"State Casket Sales Restrictions: a Pointless Undertaking?" With Judith A. Chevalier. *The Journal of Law and Economics,* 51(1) 1–23, 2008.

"How the Internet Lowers Prices: Evidence from Matched Survey and Auto Transaction Data." with Florian Zettelmeyer and Jorge Silva-Risso. *Journal of Marketing Research,* 43(2): 168–181, 2006.

"The Distortionary Effects of Government Procurement: Evidence from Medicaid Prescription Drug Purchasing." With Mark Duggan. *The Quarterly Journal of Economics,* 121(1): 1–30, 2006.

"Behavioral Biases Meet the Market: The Case of Magazine Subscription Prices." With Sharon M. Oster. *The Berkeley Electronic Press: Advances in Economic Analysis & Policy,* 5(1) Article 1, 2005.

"Consumer Benefit from Use of the Internet" *NBER Innovation Policy and the Economy*, 6: 67–90, 2005.

"The Strategic Positioning of Store Brands in Retailer-Manufacturer Negotiations." With Florian Zettelmeyer. *Review of Industrial Organization,* 24(2): 161–194, 2004.

"Consumer Information and Discrimination: Does the Internet Affect the Pricing of New Cars to Woman and Minorities?" With Florian Zettelmeyer and Jorge Silva-Risso. *Quantitative Marketing and Economics,* 1(1): 65–92, 2003.

"Love or Money? The Effects of Owner Motivation in the California Wine Industry." With Joel M. Podolny. *The Journal of Industrial Economics,* 50(4): 431–456, 2002.

"Horizontal Integration Between Brand and Generic Firms in the Pharmaceutical Industry." *Journal of Economics & Management Strategy,* 11(1): 135–168, 2002.

"Internet Car Retailing." With Florian Zettelmeyer and Jorge Silva-Risso. *The Journal of Industrial Economics,* 49(4): 501–519, 2001.

"Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry." *International Journal of Industrial Organization,* 18(7): 1085–1104, 2000.

"Social Status, Entry, and Predation: The Case of British Shipping Cartels 1879–1929." With Joel Podolny. *The Journal of Industrial Economics,* 47 (1): 41–67, 1999.

"Entry decisions in the generic pharmaceutical industry" *The RAND Journal of Economics,* 30(3): 421–440, 1999.

"Misclassification of the Dependent Variable in a Discrete-Response Setting." With J.A. Hausman and Jason Abrevaya. *Journal of Econometrics,* 87(2): 239–269, 1998.

"Entry and Predation: British Shipping Cartels 1879–1929." *Journal of Economics & Management Strategy,* 6(4): 679–724, 1997.

"The Strategic Response by Pharmaceutical Firms to the Medicaid Most-Favored Customer Rules." *The RAND Journal of Economics,* 28(2): 269–290, 1997.

"The Interaction between a Most-Favored Customer Clause and Price Dispersion: An Empirical Examination of the Medicaid Rebate Rules of 1990 *Journal of Economics & Management Strategy,* 6(1): 151–174, 1997.

## Working papers

"Addictive Technology and its Implications for Antitrust Enforcement." With J. Niels Rosenquist and Samuel Weinstein, Working paper, 2020.

"Interoperability as an Antitrust Remedy." With Michael Kades, 2020.

"A Roadmap for an Antitrust Case against Facebook." With David Dinielli, Working paper, 2020.

"A Roadmap for a Digital Advertising Monopolization Case against Google" With David Dinielli. Working paper, 2020.

"A Roadmap for a Monopolization Case against Google Regarding the Search Market." With David Dinielli. Working paper, 2020.

"The 2010 HMGs Ten Years Later: Where Do We Go From Here?" With Steven Salop. Solicited for a special issue of the *Review of Industrial Organization*. 2020.

"Evaluating the Evidence on Vertical Mergers." With Marissa Beck. Working paper, 2020.

"Testing the Theory of Common Stock Ownership" NBER working paper #27515. With Lysle Boller. 2020.

"A Model of Generic Drug Shortages: Supply Disruptions, Demand Substitution, and Price Control." With Kim Sang-Hyun. 2015.

"Referring Physicians Leave Money on the Table:  Where Is It?"  With Michael Chernew and Zack Cooper. 2017.

"Differentiated to Death." With Judith Chevalier and David Harrington. 2011.

"Scarcity Rents in Car Retailing: Evidence from Inventory Fluctuations at Dealerships." With Florian Zettelmeyer and Jorge Silva-Risso. NBER Working Paper No. 12177, 2006.

"Cowboys or Cowards: Why Are Internet Car Prices Lower?" With Florian Zettelmeyer and Jorge Silva-Risso. NBER Working Paper No. 8667, 2001.

## Research in progress

"Performances of Indexes that Do Not Hold Rivals."  With Will Goetzmann and Natalie Zhu.

"The Causes of High Pharmaceutical Prices."  With Craig Garthwaite.

"Common Ownership and Index Membership." With Lysle Boller.

"The Impact of Price Information on Search and Healthcare Spending." With Michael Chernew and Zack Cooper.

"Adding Market Investigations to the US antitrust toolkit." With Michael Enseki-Frank.

## Awards

| | |
|---|---|
| 2020 | Yale School of Management Alumni Association Elective Teaching Award: one of two teaching prizes awarded at Yale SOM for the academic year 2019–20 |
| 2020 | Grant support for the Thurman Arnold Project at Yale from the Anti-Monopoly Fund and Microsoft Corporation |
| 2019 | Grant support for the Thurman Arnold Project at Yale from the Knight Foundation and Omidyar Network |
| 2016 | Yale School of Management Alumni Association Elective Teaching Award: one of two teaching prizes awarded at Yale SOM for the academic year 2015–16 |
| 2014 | HEMA/KPPI Distinguished Visitor, Kellogg GSM, Northwestern University |
| 2011 | Health Care Research Award, National Institute for Health Care Management for "The Effect of Medicare Part D on Pharmaceutical Prices and Utilization." With Mark Duggan. *American Economic Review* 100(1): 590–607. |
| 2011 | National Science Foundation Research Grant 1064341 for "*The Industrial Organization of the Biologics Industry: Theory, Empirics and Policy.*" |
| 2011 | Excellence in Refereeing Award 2011, *American Economic Review* |
| 2010 | Excellence in Refereeing Award 2010, *American Economic Review* |
| 2007 | Yale School of Management Alumni Association Teaching Award, the only teaching prize awarded at Yale School of Management for the academic year 2006–2007 |
| 2007 | Green Award, *Journal of Marketing Research*, for the paper "How the Internet Lowers Prices: Evidence from Matched Survey and Automobile Transaction Data." |
| 2005–2008 | National Science Foundation Research Grant 0518858 for "The Effect of Government Procurement of Pharmaceuticals." With Mark Duggan, University of Maryland. http://www.nsf.gov/awardsearch/showAward.do?AwardNumber=0518858 |
| 2001–2003 | National Science Foundation Research Grant 0111885 for "The Effect of Internet Car Shopping on Prices and Discrimination." With Florian Zettelmeyer, UC-Berkeley. http://www.nsf.gov/awardsearch/showAward.do?AwardNumber=0111885 |
| 1998–2002 | National Science Foundation Research Grant 9810178 for "Studies of Competition." http://www.nsf.gov/awardsearch/showAward.do?AwardNumber=9810178 |
| 1995 | Distinguished Teaching Commendation: One of three "second prizes" given by Stanford MBA students for excellence in teaching during the academic year 1994–95 |
| 1993–1994 | Program on the Pharmaceutical Industry, MIT, grant for full tuition and stipend |

## Courses taught

*Competition Economics and Policy*: Elective MBA course covering topics in competition enforcement such as cartels, horizontal mergers, monopolization, vertical restraints, exclusive dealing, MFNs, predatory pricing, and IP. The law is taught but the focus is on the economics and managerial implications.

*Competitive Strategy:* Elective MBA course covering topics in I.O. such as price and quantity competition, entry, and antitrust, as well as strategy concepts such as industry analysis, competitive advantage, and sustainability

*The Competitor Perspective*: One element of the core curriculum for first-year MBAs that provides introductory analysis of competition using tools from economics, marketing, accounting, and politics

## PhD students supervised (institution, year; first placement)

Andrea Coscelli (Stanford GSB, 1998; University College London)

Brian Viard (University of Chicago GSB, 2000; Stanford GSB)

Paris Cleanthous (Yale, 2003; NYU Stern)

Juan Esteban Carranza (Yale, 2004; Wisconsin-Madison)

Henry Schneider (Yale, 2006; Cornell Johnson School)

Fabian Duarte (Yale, 2010; RAND)

Maliheh Birjandi-Feriz (Yale, 2018; Analysis Group)

Rebecca McKibbin (Yale, 2018, University of Sidney)

## Memberships and professional service

American Economic Association

NBER, Research Associate, Industrial Organization

First Western Bancorp Inc. (now Sky Bank, Bowling Green, Ohio), Board of Directors (1998–1999)

StreamSage.com, Advisory Board (2000–2004)

*Economic Policy*, Panel (2002–2004)

*Review of Industrial Organization*, Editorial Board (2002–2004)

*The Journal of Industrial Economics*, Associate Editor (2003–2006)

*International Journal of Industrial Organization*, Co-Editor (2005–2008)

*BE Journal of Economics Analysis and Policy*, Editor (2006–2010)

American Economic Association Committee on the Status of Women in the Economics Profession, Board (2007–2009)

*Journal of Economic Perspectives*, Associate Editor (2007–2010)

Scientific Committee, Center for European Economic Research (ZEW) ICT conference (2010)

Program Committee, American Economic Association Meetings (2010)

Scientific Committee, FTC microeconomics conference (2010)

*American Economic Review*, Board of Editors (2011–2013)

Research Advisory Board, CEFAGE, Portugal, member (2013– )

Wharton Business Economics and Public Policy Department, External Review Committee (2016)

AEA Committee on Government Relations (2017–2019)

## Invited research presentations

Dartmouth Econ, MIT Econ, Harvard Econ, Harvard Business School, Harvard School of Public Health, Boston University, Yale Econ, Yale Law, SUNY Stony Brook Econ, Columbia Econ, Columbia Business School, NYU Stern, U. Penn Wharton School, Univ. of Maryland Econ, Department of Justice, Federal Trade Commission, Univ. of Delaware Econ, Duke Econ, Univ. of Virginia Econ, Carnegie Mellon Heinz School, Northwestern Econ, Northwestern Kellogg GSM, Chicago Econ, Chicago GSB, Purdue Econ, Univ. of Michigan Business School, Washington Univ. St. Louis Olin School, Iowa State Econ, University of Tennessee Knoxville, Univ. of Rochester Business School, Cornell Econ, Univ. of Texas at Austin, Univ. of Arizona, Stanford GSB, UC Berkeley Econ, UC Berkeley Haas School, UCLA Econ, RAND, Univ. of Toronto Econ (Canada), Univ. of British Columbia (Canada), Victoria University (Canada), HEC Montreal (Canada), Queens University (Canada), Univ. of Munich (Germany), Univ. of Linz (Austria), DG Competition (Belgium), London School of Economics (England), Office of Fair Trading (England), Oxford University (England), Cambridge University (England), University of Warwick (England), Imperial College (England), UCL (England), Edinburgh University (Scotland), Stirling University (Scotland), European University Institute (Italy), IDEI Toulouse (France), University of Auckland (New Zealand)

## Conferences (presenter or discussant)

Boston University healthcare I.O. conference: 1995, 1999, 2004

Stanford Strategy Conference: 1996, 1997 (organizer), 1999, 2000

Harvard Business School Strategy Conference: 1999, 2004

Economic Policy Conference: 2002 spring and fall, 2003 fall, 2004 fall

American Economics Assn. Meetings: 2001, 2002, 2004, 2005, 2007, 2008, 2010, 2016, 2020

NBER IO Summer Institute: 1998, 2001 (organizer and presenter), 2003, 2007 (organizer), 2008, 2010, 2013 (organizer), 2014, 2016, 2018, 2019

NBER IO Winter Meetings: 1995, 1996, 2000, 2004, 2016, 2018, 2019

NBER e-commerce group conferences: 2000, 2001

NBER conference on non-profits: 2002

NBER conference on IO of healthcare: 1998

NBER conference on innovation policy: 2005, 2015

IDEI (Toulouse) e-commerce conference: 2001, 2003 (co-author presented), 2005

IDEI (Toulouse) pharmaceutical and healthcare conference: 2008

IDEI (Toulouse) Standard Essential Patent conference: 2013

Univ. of British Columbia IO conference: 2004, 2014, 2016

WZB Institute Behavioral IO conference, Berlin, Germany: 2005

CEPR Applied IO conference: 2006

UCL Behavioral IO conference, England: 2006

NBER conference on intellectual property: 2006

ASHE conference: 2008

NBER Public Economics: spring meeting 2009

FTC Microeconomics Conference: 2010 keynote, 2019

Yale Marketing IO conference: 2011

Milton Friedman Healthcare Conference, University of Chicago: 2011

ABA Spring Antitrust meeting: 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2019, 2020 (virtual)

Northwestern Law School conference on Antitrust Economics: 2011 keynote, 2012 keynote, 2013, 2014, 2015, 2016, 2017, 2019

EARIE: 2012, 2013

Barcelona GSE Summer Forum: 2013

Kaiser Permanente Healthcare and IO conference: 2013 (organizer)

Northwestern Healthcare Markets Conference: 2014, 2017

IDEI Toulouse TIGER Health conference: 2014

FTC/DOJ Conditional Pricing Practices: 2014

NBER Innovation Summer Institute: 2014, 2015

NBER Digitization Summer Institute: 2014

NBER Economics of Health Insurance Exchanges: 2014

Utah Winter Business Economics Conference: 2014, 2017

**The Digital Broadband Migration**

Silicon Flatirons conference, University of Colorado Law School: 2015, 2017

FTC/DOJ Healthcare Conference: 2015

CRESSE summer conference: 2015, 2017, 2019

Yale Conference on Healthcare Consolidation: 2015 (organizer)

FTC Auto Distribution workshop: 2016

Yale SOM Conference on Problems with Global Antitrust Enforcement: 2016 (organizer)

Searle International Competition Economist meeting: 2016

University of Montreal summer IO conference: 2016

ICN Chief Economist Workshop at UBC: 2016

Center for Equitable Growth antitrust conference: 2106

Competition, Concentration and Antitrust, Stigler Center, Booth School of Business, University of Chicago: 2017 (keynote), 2018, 2019 (chair)

American Antitrust Institute Airline roundtable: 2016

Highland Health Economics Conference: 2017 (organizer)

Law, Competition & Markets Paris conference (Columbia University): 2017

EUI: Disruptive Innovation and Competition Policy: 2017

University of East Anglia, Centre for Competition Policy, pharmaceutical conference: 2017

Academic and Practitioner Symposium on Mutual Funds and ETFs (Darden): 2017

5th BRICS International Competition Conference (Brazil): 2017

Unlocking the Promise of Antitrust Enforcement, American University: 2017 (co-organizer)

MACCI conference, Mannheim, Germany 2018, summer school: 2019

Brookings Institute conference: pharmaceutical competition 2017, patient cost-sharing: 2018

Kaiser pharmaceutical pricing conference: 2018

Bates White healthcare conference: 2018

FTC Hearings on Competition and Consumer Protection in the 21st Century: 9/21, 11/1, & 12/6, 2018

BU TPRI conference: 2018

Berlin Center for Consumer Policies conference: 2019

University of Pennsylvania Law School "Post-Chicago Antitrust Revolution," 2019 (co-organizer)

## Other invited speaking engagements

Canadian Economics Association keynote, 2021 (scheduled)

Royal Econometric Society virtual panel, 2020

CEPR Applied IO virtual panel, 2020

Mexican Competition Authority (COFECE), 2020

American Society for Heath Economics AEA luncheon, 2020

Merrick Lecture, University of Virginia, 2019

Griswald Symposium panel, Princeton University, 2019

Shaping Competition Policy in the Era of Digitisation, European Commission, 2019

Stanford Institute for Economic Policy and Research, 2018

DG Competition, series on effects-based analysis of unilateral conduct, 2017

Scotchmer Lecture, Toulouse IDEI, 2017

EC Roundtable, Regulatory Environment for Online Platforms, 2015

Digital Forum, IDEI, Paris, France, 2015

Inaugural *NEJM Exchange* debate, 2015

Competition Policy Lecture, University of Toronto Rotman School, 2014

Landsdowne Lecture, University of Victoria, Canada, 2013

Conference on Healthcare Reform, Baker Institute, Rice University, 2013, 2019

ChIPs Women in IP Summit, 2013

## Refereed publications

*Review of Economic Studies, Quarterly Journal of Economics, The RAND Journal of Economics, The Journal of Industrial Economics, Journal of Economics & Management Strategy, Journal of Health Economics, Review of Industrial Organization, International Journal of Industrial Organization, American Economic Review, National Science Foundation, Journal of Law and Economics, Journal of Political Economy, Journal of Law, Economics, and Organization, Marketing Science, Management Science, Strategic Management Journal, Review of Economics and Statistics, Journal of Econometrics, Econometrica, European Economic Review, Berkeley Electronic Journals, The American Journal of Managed Care, Contemporary Economic Policy.*

## Government testimony

Senate Judiciary Committee, Subcommittee on Antitrust, Competition Policy, and Consumer Rights on "*Your Doctor/Pharmacist/Insurer Will See You Now: Competitive Implications of Vertical Consolidation in the Healthcare Industry*," June 12, 2019

Senate Judiciary Committee on "Understanding the Digital Advertising Ecosystem and the Impact of Data Privacy and Competition Policy," May 21, 2019

House Committee on the Judiciary, Subcommittee on Regulatory Reform, Commercial and Antitrust Law on "Diagnosing the Problem: Exploring the Effects of Consolidation and Anticompetitive Conduct in Health Care Markets," March 7, 2019

House Committee on the Judiciary, Subcommittee on Courts, Intellectual Property, and the Internet, Hearing on "International Trade Commission (ITC) Patent Litigation," April 2016

House Committee on the Judiciary, Subcommittee on Courts, Intellectual Property, and the Internet, Hearing on "International Trade Commission (ITC) Patent Litigation" (April 2016).

House Oversight and Government Reform Committee Hearing, "*The Medicare Drug Benefit: Are Private Insurers Getting Good Discounts for the Taxpayer?*," July 2008

Senate Finance Committee Hearing, "*Prescription Drug Pricing and Negotiation: An Overview and Economic Perspectives for the Medicare Prescription Drug Benefit*," January 2007

FTC hearings, "*Possible Anticompetitive Efforts to Restrict Competition on the Internet*," Auto Panel, October 2002

## Testimony in litigated or arbitrated matters

Retained on behalf of C R Bard, submitted report, was deposed, and testified at trial in AngioDynamics, Inc. v. C.R. Bard, Inc. et al, 1:17-CV-0598, Northern District of New York.  Deposed February 25, 2020.  Testified October 3, 2022.

Retained on behalf of the US Federal Trade Commission, submitted expert reports, and deposed in the Matter of Illumina, Inc. and GRAIL, Inc., US Federal Trade Commission, Docket No. 9401. Deposed August 3, 2021. Testified September 16, 2021.

Retained on behalf of HTC Corporation and HTC America, Inc., submitted expert report in arbitration proceedings between HTC Corporation, Claimant, and Telefonaktiebolaget LM Ericsson, Respondent, International Chamber of Commerce International Court of Arbitration Case No. 24176/MK, October 30, 2020.

Retained on behalf of the State of New York, and testified in deposition and trial in *State of New York et al v. Deutsche Telekom AG et al*, Case No. 1:19-cv-5434-VM-RWL, Southern District of New York, 2019.

Retained on behalf of HTC Corporation and HTC America, Inc., submitted expert reports, and deposed in HTC Corporation and HTC America, Inc. v. Telefonaktiebolaget LM Ericsson and Ericsson Inc., U.S. District Court, Eastern District of Texas, Case No. 6:18-cv-00243-JRG (June 2018-2019).

Retained on behalf of Apple, Inc., and deposed in *In re: Qualcomm Litigation*, Case No. 3:17-CV-00108-GPC-MDD (consolidated with Case No. 3:17-CV-01010-GPC-MDD) deposed October 26, 2018.

Retained on behalf of Apple Inc., submitted expert report, expert reply report and supplemental expert report, deposed and testified at trial *In the Matter of Certain Mobile Electronic Devices and Radio Frequency and Processing Components Thereof (II)*, before the U.S. International Trade Commission (2018), 337-TA-1093.  Deposed July 31, 2018.  ITC hearing testimony September 21, 2018.

Retained on behalf of the US Federal Trade Commission, submitted expert reports, and deposed *In the Matter of Otto Bock HealthCare North America, Inc.*, U.S. Federal Trade Commission, Docket. No. 9378.  Deposed June 15, 2018. Testified August 29-30, 2018.

Retained on behalf of ASUS Computer International and ASUStek Computer Incorporated, submitted expert reports and deposed in *ASUS Computer International and ASUStek Computer Inc. v. Interdigital, Inc., Interdigital Communications, Inc., Interdigital Technology Corp., IPR Licensing, Inc., and Interdigital Patent Holdings, Inc.*, United States District Court, Northern District Of California, San Jose Division, Case No. 15-cv-1716 BLF. Deposed July 9, 2018.

Retained on behalf of Apple Inc., submitted expert report and expert reply report, deposed and testified at trial *In the Matter of Certain Mobile Electronic Devices and Radio Frequency and Processing Components Thereof*, before the U.S. International Trade Commission (2018), 337-TA-1065.  Deposed April 5, 2018.  ITC hearing testimony June 25, 2018.

Retained on behalf of Tesla, submitted expert report and expert reply report, and deposed in the matter of *Tesla Motors, Inc. v. Ruth Johnson, in her official capacity of Secretary of State and Chief Motor Vehicle Administrator, Bill Shuette, in his official capacity as Attorney General, and Rick Snyder, in his official capacity as Governor*. U.S. District Court, Western District of Michigan, Case No. 1:16-CV-01158-JTN-ESC (2017-2018). Deposed June 2018.

Retained on behalf of Apple Inc., submitted expert reports and deposed *In the Matter of Certain Mobile Electronic Devices and Radio Frequency and Processing Components Thereof*, before the U.S. International Trade Commission, Inv. No. 337-TA-1065 (2018).

Retained on behalf of Honda Motor Co., Ltd., Honda North America, Inc., American Honda Motor Co., Inc., Honda of America Mfg., Inc., Honda Manufacturing of Alabama, LLC, and Honda R&D Americas, Inc., submitted expert report and direct witness statement, and deposed *In the Matter of Certain Thermoplastic-Encapsulated Electric Motors, Components Thereof, and Products and Vehicles Containing Same II*, International Trade Commission, Inv. No. 337-TA-1073 (2017-2018).

Retained on behalf of Arista Networks Inc., submitted expert report and deposed in *Arista Networks Inc. v. Cisco Systems Inc.*, U.S. District Court for the Northern District of California, Case No. 5:16-cv-00923 (2017-2018).

Retained on behalf of Capital One Financial Corporation, submitted expert reports and declaration, and deposed in *Intellectual Ventures I LLC, et al.,* v. *Capital One Financial Corp., et al.,* v. *Intellectual Ventures Management, LLC, Invention Investment Fund I, L.P., and Invention Investment Fund II, LLC,* U.S. District Court for the District of Maryland, Southern District, Case No.  8:14-CV-00111-PWG (2017).

Retained on behalf of Microsoft Corporation, deposed in the matter of *Microsoft Corporation et al v. Evolved Wireless LLC*, U.S. District Court, District of Delaware, Case No. 1:15-cv-00547-UNA (2017).

Retained on behalf of SK hynix, deposed and testified at trial *In the Matter of Certain Memory Modules and Components Thereof, and Products Containing Same*, International Trade Commission, Inv. No. 337-TA-1023 (2017).

Retained by Charter Communications, filed multiple statements with the FCC related to its proposed acquisition of Time Warner Cable and Bright House Networks (2015).

Retained on behalf of Microsoft Corporation and submitted expert report in *Surfcast, Inc. v. Microsoft Corporation*, U.S. District Court for the District of Maine, Case No. 2:12-CV-00333-JDL (June 2014).

Retained on behalf of Amgen, submitted expert report, and deposed in *United States of America et al. ex rel. Kassie Westmoreland v. Amgen Inc. et al.*, U.S. District Court of Massachusetts, Civil Action No. 06-10972-WGY (2011).

Retained on behalf of Johnson & Johnson and submitted expert report in *Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc., et al.*, Commonwealth Court of Pennsylvania, No. 212 M.D. 2004 (2010).

Retained on behalf of BMS, submitted expert report, and testified at trial in *Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc., et al.*, Commonwealth Court of Pennsylvania, No. 212 M.D. 2004 (2010).

Retained on behalf of Chrysler Group LLC, submitted expert report, and testified in selected arbitration hearings *in re Arbitrations Pursuant to Section 747 of H.R. 3288 between Chrysler Group LLC (New Chrysler) and "Covered Dealerships*," American Arbitration Association (2010).

Retained on behalf of Johnson & Johnson and deposed in *State of Wisconsin v. Abbott Laboratories, Inc., et al.*, Circuit Court for Dane County, Wisconsin, 04 CV 1709 (2009).

Retained on behalf of AstraZeneca and testified at trial in *Commonwealth of Kentucky v. Alpharma USPD, Inc., et al.*, Franklin Circuit Court–Div. I, Kentucky, Civil Action No. 04-CI-1487 (2009).

Retained on behalf of Sandoz and testified at trial in Commonwealth of *Kentucky v. Alpharma USPD, Inc., et al.*, Franklin Circuit Court–Div. I, Kentucky, Civil Action No. 04-CI-1487 (2009).

Retained on behalf of Boehringher Ingelheim, submitted expert report, and deposed in *United States of America ex rel. Ven-A-Care of the Florida Keys et al. v. Boehrinhger Ingelheim Corp. et al.*, US District Court of Massachusetts, Civil Action No. 00-10698-MEL (2009).

Retained on behalf of Sandoz, deposed, and testified at trial in *State of Alabama v. Abbott Laboratories, Inc., et al.*, Circuit Court of Montgomery County, Alabama, CV-2005-219 (2009).

Retained on behalf of Pfizer, deposed, and testified at trial in *State of Wisconsin v. Abbott Laboratories, Inc., et al.*, Circuit Court for Dane County, Wisconsin, 04 CV 1709 (2009).

Retained on behalf of Bristol-Myers Squibb and deposed in *State of Alabama v. Abbott Laboratories, Inc., et al.*, Circuit Court of Montgomery County, Alabama, CV-2005-219 (2008).

Retained on behalf of GlaxoSmithKline and Novartis, deposed, and testified at trial in *State of Alabama v. Abbott Laboratories, Inc., et al.*, Circuit Court of Montgomery County, Alabama, CV-2005-219 (2008).

Prepared and delivered educational materials for the Court and examined at hearing in *Commonwealth of Massachusetts v. Mylan Laboratories, Inc., Ivax Corporation, Warrick Pharmaceutical Corporation, Watson Pharmaceuticals, Inc., Schein Pharmaceutical, Inc., Teva Pharmaceuticals USA, Inc., Par Pharmaceutical, Inc., Purepac Pharmaceutical Co., and Roxane Laboratories, Inc.*, US District Court of Massachusetts, Civil Action No. 03-11865-PBS (2008).

Retained on behalf of defendants, submitted expert report, deposed, and testified at trial in *Commonwealth of Massachusetts v. Mylan Laboratories, Inc., Ivax Corporation, Warrick Pharmaceutical*

*Corporation, Watson Pharmaceuticals, Inc., Schein Pharmaceutical, Inc., Teva Pharmaceuticals USA, Inc., Par Pharmaceutical, Inc., Purepac Pharmaceutical Co., and Roxane Laboratories, Inc.*, US District Court of Massachusetts, Civil Action No. 03-11865-PBS (2008, 2010).

Retained on behalf of AstraZeneca, deposed, and testified at trial in *State of Alabama v. Abbott Laboratories, Inc., et al.*, Circuit Court of Montgomery County, Alabama, CV-2005-219 (2008).

Retained on behalf of MedStar Health and submitted expert report in *In re Hypodermic Products Antitrust Litigation*, MDL No. 1730, US District Court of the District of New Jersey, 05-CV-1602 (2007).

Retained on behalf of Schering-Plough, submitted expert report, and deposed in *In re Schering-Plough Corporation Securities Litigation*, US District Court of the District of New Jersey, 01-CV-0829 (2007).

Retained on behalf of Pfizer, submitted expert report, and deposed in *In re Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court of Massachusetts, MDL No MDL 1629 (2007).

Submitted expert report on behalf of fast-track defendants in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, US District Court of Massachusetts, MDL No. 1456, 01-CV-012257-PBS (2006).

Retained on behalf of Teva USA and submitted expert report in IP damages litigation *Abbott Laboratories v. Andrx Pharmaceuticals Inc., and Teva Pharmaceuticals USA, Inc. and Roxane Laboratories Inc.*, US District Court for the Northern District of Illinois Eastern Division, No. 05 C 1490 (2005).

## Administrative Hearings

Retained on behalf of Lucid USA, Inc., submitted an expert report and testified in a formal evidentiary hearing pursuant to VA. Code §§ 46.2-1572(4), before the Department of Motor Vehicles for the Commonwealth of Virginia (April 28, 2021).

Retained on behalf of Rivian Automotive, LLC, submitted a witness statement for a formal evidentiary hearing pursuant to VA. Code §§ 46.2-1572(4), before the Department of Motor Vehicles for the Commonwealth of Virginia (December 9, 2021).

Retained on behalf of Tesla, submitted expert report, and testified in Tesla Motors, Inc.'s application for New Motor Vehicle Dealer License before the Arizona Department of Transportation Executive Hearing Office (July 2016).

Retained on behalf of Tesla, submitted expert reports, and testified in formal evidentiary hearing pursuant to VA. Code §§ 46.2-1572(4) and 46.2-1573, before the Department of Motor Vehicles for the Commonwealth of Virginia (June 2016).

Retained on behalf of Tesla, submitted expert report, and testified in Tesla Motors, Inc.'s application for Motor Vehicle Dealer License before the North Carolina Wake County Division of Motor Vehicles, Hearing Section (May 2016).

Retained on behalf of Tesla, submitted witness declaration, and testified in *Tesla Motors Utah, Inc. vs. Motor Vehicle Enforcement Division of the Utah State Tax Commission*, in a matter before the Utah State Tax Commission (August 2015).

Retained on behalf of Tesla and testified in *Georgia Automobile Dealers Association vs. Tesla Motors, Inc.*, in a matter before the Georgia Office of State Administrative Hearings (February 2015).

**Attachment 2**

# Attachment 2

## Documents Reviewed and Relied Upon

**Legal**

| |
|---|
| Lucid Group USA, Inc. v. Monique Johnston et al., Complaint |
| Lucid Group USA, Inc. v. Monique Johnston et al., Defendants' Motion to Dismiss |
| Lucid Group USA, Inc. v. Monique Johnston et al., Defendants' Reply in Support of Motion to Dismiss |
| Lucid Group USA, Inc. v. Monique Johnston et al., Intervenor-Defendant Texas Automobile Dealers Association's Initial Rule 26(a) Disclosures |
| Lucid Group USA, Inc. v. Monique Johnston et al., Plaintiff's Motion of Summary Judgment and its Appendix |
| Lucid Group USA, Inc. v. Monique Johnston et al., Plaintiff's Response in Opposition to Motion to Dismiss |

**Academic Publications**

| |
|---|
| Fiona Scott Morton and Ann McDermott, "Retail Auto Sales: Tesla v. State Vehicle Franchise Laws (2017)," in John E. Kwoka, Jr. and Lawrence J. White (eds.), *The Antitrust Revolution, Economics, Competition, and Policy (7th Edition)* . New York: Oxford University Press (2018) |
| Fiona Scott Morton, Florian Zettelmeyer, and Jorge Silva-Risso, "Internet Car Retailing," *The Journal of Industrial Economics* 49, no. 4 (2001): 501-519 |
| Francine Lafontaine and Fiona Scott Morton, "State Franchise Laws, Dealer Terminations, and the Auto Crisis," *Journal of Economic Perspectives* , 24, no. 3 (2010): 233-250 and online appendix, available at http://www.e-jep.org |
| Roger D. Blair and Francine Lafontaine. 2005. *The Economics of Franchising* , New York, New York: Cambridge University Press, pp. 182-188. |
| W. Kip Viscusi, Joseph E. Harrington, and John M. Vernon. 1992. *Economics of Regulation and Antitrust* , Lexington, Massachusetts: D.C. Heath and Company, pp. 221-224. |

**Other Public Information**

| |
|---|
| Edmunds, "Where Does the Car Dealer Make Money?," June 13, 2019, available at https://www.edmunds.com/car-buying/where-does-the-car-dealer-make-money.html |
| Energy Systems Division, Argonne National Laboratory, "Comprehensive Total Cost of Ownership, Quantification for Vehicles with Direct Size Classes and Powertrains," April 2021, pp. 82-85, available at https://publications.anl.gov/anlpubs/2021/05/167399.pdf |
| FTC Staff Comment Before the Michigan Senate Regarding Senate Bill 268, May 7, 2015 |
| FTC Staff Comment Before the Missouri House of Representatives Regarding House Bill 1124, Which Would Expand the Current Prohibition on Direct-to-Consumer Sales by Manufacturers of Automobiles, May 15, 2014 |
| FTC Staff Comment Before the New Jersey General Assembly Regarding Assembly Bills 2986, 3096, 3041, and 3216, May 16, 2014 |
| Geoffrey A. Manne, et al., "Open Letter by Academics in Favor of Direct EV Sales and Service," April 14, 2021, available at  https://laweconcenter.org/resources/open-letter-by-academics-in-favor-of-direct-ev-sales-and-service/?doing_wp_cron=1688658804.8335630893707275390625 |
| Georgeta Dragiou, "Ban on Direct Auto Sales Hurts Consumers and Innovation in Texas," February 25, 2016, available at https://www.tribtalk.org/2016/02/25/ban-on-direct-auto-sales-hurts-consumers-and-innovation-in-texas/ |
| Indeed, "How Much Does a Car Salesperson Make?," July 21, 2022, available at https://www.indeed.com/career-advice/pay-salary/how-much-does-a-car-salesperson-make |

Joint Letter of the Antitrust Division of the U.S. Department of Justice and the Federal Trade Commission on Franchised Dealer Requirements to Sell and Service Motor Vehicles and Nebraska Legislative Bill 51, March 14, 2019, available at https://www.justice.gov/atr/page/file/1146236/download

Lucid Group, Inc., 10-K, December 31, 2022

Lucid Group, Inc., 10-Q, March 31, 2023

Lucid Group, Inc., Second Quarter 2022 Earnings Release, August 3, 2022, p. 26, available at https://ir.lucidmotors.com/static-files/8bdec76d-808a-4a7b-bacf-0853ae53d6ee

Mackinac Center, "Public Letter on Direct Automobile Sales," February 18, 2015, available at https://www.mackinac.org/21003

Marina Lao, Debbie Feinstein and Francine Lafontaine, FTC Competition Matters Blog, "Direct-to-Consumer Auto Sales: It's Not Just About Tesla," May 11, 2015

Mississippi Center for Public Policy, "Bill to Ban Direct Vehicle Sales is Anti-Consumer Choice," February 24, 2022, available at https://mspolicy.org/bill-to-ban-direct-vehicle-sales-is-anti-consumer-choice/

MotorTrend Press Release, "The Lucid Air Is the 2022 MotorTrend Car of the Year," November 15, 2021, available at https://www.motortrend.com/news/lucid-air-2022-car-of-the-year/

National Automobile Dealers Association, "Dealership Financial Profiles," available at https://web.archive.org/web/20210525084743/https://www.nada.org/dealershipfinancialprofile/

Sign-on Statement to State Government Leaders About the Anti-Consumer Effects of Laws Prohibiting Direct Distribution of Automobiles," February 6, 2015, available at http://www.autonews.com/assets/PDF/CA98362217.PDF

**Attachment 3**



CRA No. D37590

July 14, 2022

Billy Donley
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002-6111

bdonley@bakerlaw.com

**Re**:  **Lucid Group, Inc vs. Texas Department of Motor Vehicles**

Dear Billy,

Enclosed is our billing for professional services rendered in connection with the above referenced matter for the period through June 30, 2022.

If you have any questions, please do not hesitate to contact me at 617-425-3000 or tfarrar@crai.com.

Sincerely,

Tarrice Farrar
Billing Analyst

Enclosure



CRA No. D37590

July 14, 2022

Billy Donley
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002-6111

bdonley@bakerlaw.com

**CRA Invoice Number:**　　　**1076252**

**Re:**　　**Lucid Group, Inc vs. Texas Department of Motor Vehicles**

Activity Dates:  through June 30, 2022

|  |  |
|---|---|
| Professional Fees | 7,927.50 |

| | |
|---|---|
| **Total Invoice:** | **USD 7,927.50** |

**Please remit payment via:**

| Wire: | ACH: | Lockbox: |
|---|---|---|
| CRA International | CRA International | CRA International |
| Account#: 1139714659 | Account#: 1139714659 | PO Box 845960 |
| ABA#: 011500120 | ABA#: 211070175 | Boston, MA  02284-5960 |
| SWIFT#: CTZIUS33 | RBS Citizens Bank | |
| RBS Citizens Bank | 1 Citizens Dr | |
| 1 Citizens Dr | Riverside, RI 02915 | |
| Riverside, RI 02915 | | |

NOTE:　　CRA International's United States Federal Taxpayer Identification Number is 04-2372210.
　　　　　CRA International's Canadian Business Number is 860548858.

Invoices are due and payable upon receipt. CRA International, Inc. reserves the option to charge interest on invoices that are outstanding more than 30 days, at a rate equal to the lower of 1.5% per month or the maximum rate permitted under applicable law.

CRA No. D37590

July 14, 2022

Billy Donley
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002-6111

bdonley@bakerlaw.com

**CRA Invoice Number:      1076252**

**Re:      Lucid Group, Inc vs. Texas Department of Motor Vehicles**

PROFESSIONAL SERVICES FOR THE PERIOD  THROUGH JUNE 30, 2022

| PROFESSIONAL FEES | HOURS | RATE | AMOUNT |
|---|---|---|---|
| McDermott, Ann | 10.50 | 755.00 | 7,927.50 |
| TOTAL PROFESSIONAL FEES | 10.50 | | USD 7,927.50 |

| | **TOTAL INVOICE** | **USD 7,927.50** |
|---|---|---|



CRA No. D37590

September 22, 2022

Billy Donley
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002-6111

bdonley@bakerlaw.com

**Re**:     <u>**Lucid Group, Inc vs. Texas Department of Motor Vehicles**</u>

Dear Billy,

Enclosed is our billing for professional services rendered in connection with the above referenced matter for the period August 1, 2022 through August 31, 2022.

If you have any questions, please do not hesitate to contact me at 617-425-3000 or tfarrar@crai.com.

Sincerely,

Tarrice Farrar
Billing Analyst

Enclosure



CRA No. D37590

September 22, 2022

Billy Donley
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002-6111

bdonley@bakerlaw.com

**CRA Invoice Number:**    **1078613**

**Re:**    <u>**Lucid Group, Inc vs. Texas Department of Motor Vehicles**</u>

Activity Dates: August 1, 2022 through August 31, 2022

| | |
|---|---|
| Professional Fees | 12,336.25 |

**Total Invoice:**    **USD 12,336.25**

**Please remit payment via:**

| Wire: | ACH: | Lockbox: |
|---|---|---|
| CRA International | CRA International | CRA International |
| Account#: 1139714659 | Account#: 1139714659 | PO Box 845960 |
| ABA#: 011500120 | ABA#: 211070175 | Boston, MA  02284-5960 |
| SWIFT#: CTZIUS33 | RBS Citizens Bank | |
| RBS Citizens Bank | 1 Citizens Dr | |
| 1 Citizens Dr | Riverside, RI 02915 | |
| Riverside, RI 02915 | | |

NOTE:    CRA International's United States Federal Taxpayer Identification Number is 04-2372210.
            CRA International's Canadian Business Number is 860548858.

Invoices are due and payable upon receipt. CRA International, Inc. reserves the option to charge interest on invoices that are
outstanding more than 30 days, at a rate equal to the lower of 1.5% per month or the maximum rate permitted under applicable law.

CRA No. D37590

September 22, 2022

Billy Donley
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002-6111

bdonley@bakerlaw.com

**CRA Invoice Number:        1078613**

**Re:        <u>Lucid Group, Inc vs. Texas Department of Motor Vehicles</u>**

PROFESSIONAL SERVICES FOR THE PERIOD AUGUST 1, 2022 THROUGH AUGUST 31, 2022

| PROFESSIONAL FEES | <u>HOURS</u> | <u>RATE</u> | <u>AMOUNT</u> |
|---|---|---|---|
| Scott-Morton, Fiona | 1.00 | 1,200.00 | 1,200.00 |
| McDermott, Ann | 14.75 | 755.00 | 11,136.25 |
| TOTAL PROFESSIONAL FEES | 15.75 | | USD 12,336.25 |

| | | |
|---|---|---|
| **TOTAL INVOICE** | | **USD 12,336.25** |



CRA No. D37590

February 14, 2023

Billy Donley
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002-6111

bdonley@bakerlaw.com

**Re**:        <u>**Lucid Group, Inc vs. Texas Department of Motor Vehicles**</u>

Dear Billy,

Enclosed is our billing for professional services rendered in connection with the above referenced matter for the period January 1, 2023 through January 31, 2023.

If you have any questions, please do not hesitate to contact me at 617-425-3000 or tfarrar@crai.com.

Sincerely,

Tarrice Farrar
Billing Analyst

Enclosure



CRA No. D37590

February 14, 2023

Billy Donley
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002-6111

bdonley@bakerlaw.com

**CRA Invoice Number:**          **1083504**

**Re:**          **Lucid Group, Inc vs. Texas Department of Motor Vehicles**

Activity Dates: January 1, 2023 through January 31, 2023

| | |
|---|---|
| Professional Fees | 4,152.50 |

**Total Invoice:**          **USD 4,152.50**

**Please remit payment via:**

| **Wire:** | **ACH:** | **Lockbox:** |
|---|---|---|
| CRA International | CRA International | CRA International |
| Account#: 1139714659 | Account#: 1139714659 | PO Box 845960 |
| ABA#: 011500120 | ABA#: 211070175 | Boston, MA  02284-5960 |
| SWIFT#: CTZIUS33 | RBS Citizens Bank | |
| RBS Citizens Bank | 1 Citizens Dr | |
| 1 Citizens Dr | Riverside, RI 02915 | |
| Riverside, RI 02915 | | |

NOTE:    CRA International's United States Federal Taxpayer Identification Number is 04-2372210.
             CRA International's Canadian Business Number is 860548858.

Invoices are due and payable upon receipt. CRA International, Inc. reserves the option to charge interest on invoices that are outstanding more than 30 days, at a rate equal to the lower of 1.5% per month or the maximum rate permitted under applicable law.

CRA No. D37590

February 14, 2023

Billy Donley
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002-6111

bdonley@bakerlaw.com

**CRA Invoice Number:** **1083504**

**Re:** **Lucid Group, Inc vs. Texas Department of Motor Vehicles**

PROFESSIONAL SERVICES FOR THE PERIOD JANUARY 1, 2023 THROUGH JANUARY 31, 2023

| PROFESSIONAL FEES | HOURS | RATE | AMOUNT |
|---|---|---|---|
| McDermott, Ann | 5.50 | 755.00 | 4,152.50 |
| TOTAL PROFESSIONAL FEES | 5.50 | | USD 4,152.50 |

| | | |
|---|---|---|
| **TOTAL INVOICE** | | **USD 4,152.50** |