# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | |
|---|---|
| LUCID GROUP USA, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> MONIQUE JOHNSON, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles; DANIEL AVITIA, in his official capacity as Acting Executive Director of the Texas Department of Motor Vehicles; and CORRIE THOMPSON, in her official capacity as Director of the Enforcement Division of the Texas Department of Motor Vehicles, <br><br> *Defendants*. | Civil Action No. 1:22-cv-01116-RP <br><br> REBUTTAL EXPERT REPORT of FIONA SCOTT MORTON |

**TABLE OF CONTENTS**

<u>**Page**</u>

I. **INTRODUCTION AND SUMMARY OF OPINIONS** ............................................ 1

II. **QUALIFICATIONS AND MATERIALS RELIED UPON** ................................. 2

III. **NOTHING IN LUCID'S DIRECT SALES MODEL IS CONTRARY TO TEXAS'S LEGITIMATE INTERESTS** ........................................................................................ 2

    A. **Requiring Lucid to Sell Through Independent Dealers Would Be Unlikely to Result in Broader and Larger Retail Capacity in Texas** ... 3

    B. **Lucid's Direct Service Model Is Unlikely to Result in Less Investment or Slower Service in Texas Than Would the Independent Dealer Model** ......................................................................................................... 4

    C. **Allowing Direct Sales by Lucid in Texas Will Not Reduce its Incentives to Support Longer Product Cycles** ......................................... 5

IV. **SALES THROUGH INDEPENDENT DEALERS INTRODUCE THE RISK OF DOUBLE MARGINALIZATION TO AUTO SALES** ........................................ 6

V. **RESPONSES TO OTHER ARGUMENTS BY DR. HOUSE** ............................... 8

VI. **CONCLUSION** ................................................................................................. 9

## I.   INTRODUCTION AND SUMMARY OF OPINIONS

1. On July 25, 2023, I submitted a report for this matter which concluded that Texas's ban on direct sales of motor vehicles stifles competition, harms consumers, and creates an artificial barrier to the entry of new companies and technologies into the automobile market.[1] I explained that allowing Lucid to own and operate sales Studios in Texas and to sell directly to Texas consumers would increase consumer choice and eliminate the risk of higher prices from double marginalization.

2. In response, reports have been filed by Donald House and Edward Stockton, economists retained by the Texas Automobile Dealers Association ("TADA").[2] These reports address many issues, not all of which are relevant to this case. This rebuttal report responds to specific critiques of my initial report as well as to certain new arguments put forward. I do not respond to every argument made. Any failure to respond should not be interpreted as agreement.

3. Mr. Stockton contends that specific characteristics of the independent dealer sales model may result in "systematic" outcomes preferred by the state to outcomes with direct distribution. His arguments for this admittedly tangential point are not persuasive. I explain below that requiring Lucid to sell through independent dealers would be unlikely to result in broader and larger retail capacity in Texas. I also explain that there is nothing in Lucid's direct service model, which is not at issue in this litigation, that is likely to result in less investment or slower service. Finally, I agree with Mr. Stockton that his point about product cycle lengths is irrelevant in the case of OEMs such as Lucid which sell their cars direct to consumers.

4. Both Mr. Stockton and Dr. House critique my conclusion that barring Lucid from selling direct to consumers in Texas harms consumers by introducing the risk of double marginalization. Both point out that my model assumes Lucid's distribution

---

[1] Expert Report of Professor Fiona Scott Morton, July 25, 2023 ["Scott Morton Initial Report"].

[2] Expert Report of Donald R. House, Sr., on behalf of TADA, September 15, 2023 ["House Report"]; Expert Report of Edward M. Stockton, M.S., on behalf of TADA, September 15, 2023 ["Stockton Report"].

costs are no higher than those of an independent dealer. Both speculate that Lucid's costs could be higher than those of an independent dealer, but neither submits compelling support for their positions. A recent statement from Ford's CEO indicates that Ford's distribution costs are significantly higher than those of OEMs with a direct sales model. My model's assumption is reasonable and thus so is my conclusion.

5. Dr. House contends Lucid's uniform pricing policy harms competition and that it makes no sense from an economics standpoint to assume cost savings achieved through Lucid's sales model could put pressure on pricing by rival OEMs. I explain that neither point is valid.

6. After a careful review of the two reports, I find there is nothing raised that would cause me to modify or adjust the conclusions I set out in my initial report.

## II. QUALIFICATIONS AND MATERIALS RELIED UPON

7. My qualifications and billing rate are as shown in my initial report. A list of the materials I have reviewed and relied upon is in **Attachment 1**. I understand that discovery is ongoing in this matter. While the opinions presented herein are complete based upon the information and documents available to me to date, I continue to reserve the right to expand, modify or reduce my findings and conclusions based upon my review of any further disclosures made by any other expert, additional information, or documentation provided in this matter, or on testimony and exhibits introduced at subsequent depositions or hearings.

## III. NOTHING IN LUCID'S DIRECT SALES MODEL IS CONTRARY TO TEXAS'S LEGITIMATE INTERESTS

8. Mr. Stockton devotes many pages of his report to arguments for the general preferability of independent distribution over direct distribution, even as he acknowledges his arguments are not in response to any assertions by Lucid.[3]

---

[3] Stockton Report, pp. 18-25, fn. 17.

9.  Nothing in my report was meant to suggest that all auto sales should be through direct distribution. My focus is much narrower. Specifically, my focus is on the impact on consumers of Texas's ban on direct sales of automobiles by manufacturers with no existing sales agreements with independent dealers. I conclude that Texas consumers would benefit if the state were to allow Lucid, an automaker with a direct sales model in operation across the U.S., to sell its vehicles direct to consumers in Texas.

10. While recognizing that the general arguments made by Mr. Stockton are only tangential to the matter at hand, I review and address them in the text that follows.

## A. Requiring Lucid to Sell Through Independent Dealers Would Be Unlikely to Result in Broader and Larger Retail Capacity in Texas

11. Mr. Stockton argues that because independent dealers share costs with OEMs to open new dealership locations, OEMs' incentives to expand their networks are higher than they would be if they bore all the costs alone.[4] There are at least two facts that make this argument irrelevant to the case at hand.

12. First, this case is predicated on Lucid's desire to expand its sales network into Texas. As I explained in my initial report, the independent dealer sales model is not viable for Lucid's vehicles.[5] Requiring Lucid to sell its vehicles through independent dealers effectively bars it from selling in Texas. Thus, in this instance, the ban on direct sales means that there will be fewer dealership locations in Texas than there would be otherwise. Texas consumers will be disadvantaged as a result.

13. Second, Mr. Stockton's theoretical argument does not account for state franchise laws, including those of Texas. These laws significantly increase the costs to OEMs of opening new locations with independent dealers, or of relocating as the

---

[4] Mr. Stockton acknowledges that this theoretical result only holds if there is a potential franchisee (Stockton Report, fn. 19).

[5] Scott Morton Initial Report, ¶¶18-19.

geography of demand shifts.[6]  For instance, state regulations allow the board of the Texas Department of Motor Vehicles to bar an OEM from opening a new dealership or relocating an existing dealership within 15 miles of one of its existing dealers if the incumbent dealer protests the expansion.[7]  My research has shown that OEMs such as Toyota and Honda, who entered the U.S. marketplace after franchise laws were in place in many states, tend to have fewer and larger franchises than is the case for the historic Big 3 automakers.[8]

14. I conclude that requiring Lucid to sell through independent dealers in Texas would be unlikely to result in broader and larger retail capacity.

### B. Lucid's Direct Service Model Is Unlikely to Result in Less Investment or Slower Service in Texas Than Would the Independent Dealer Model

15. Mr. Stockton's discussions of dealer service quality and ancillary product sales are far off topic from the new car sales-related issues raised in this litigation.  It is my understanding that it is not disputed that Lucid is free to directly service its vehicles in Texas.  As I explained in my initial report, Lucid's incentives to serve its customers well and to comply with consumer protection laws are at least as strong as those of independent dealers.[9]  Lucid's use of over-the-air ("OTA") service and its ability to partner with independent auto repair shops to expand its network are lower cost but not necessarily inferior options to the OEM-dedicated service centers operated by independent dealers.[10]

---

[6] Francine Lafontaine and Fiona Scott Morton, "State Franchise Laws, Dealer Terminations, and the Auto Crisis," *Journal of Economic Perspectives*, 24, no. 3 (2010): 233-250 ["*Lafontaine and Scott Morton (2010)*"] at 240.

[7] Texas Occupations Code, Title 14, Chapter 2301, at §2301.652 ("Denial of License Application: Dealership").

[8] *Lafontaine and Scott Morton (2010)* at 244-246.

[9] Scott Morton Initial Report, ¶¶15-17.

[10] Dr. House notes that Lucid is expanding its network of third-party body shop and repair shops to better serve its customer base (House Report, p. 6).

16.     Lucid's ability to handle many recalls through OTA software fixes certainly appears to accelerate their resolution. A September 2023 search of recalls for the 2023 Lucid Air found four, two of which appear to have been addressed OTA before notices were even sent to consumers.[11]

17.     As for ancillary product sales, certainly there are many other sources consumers can turn to, both online and in brick-and-mortar locations, for used cars or auto financing. As my initial report notes, some buyers may prefer the "one-stop-shop" array of products offered at a typical independent dealership. In those cases, Lucid's direct sales model may cause it to lose sales opportunities. This outcome does no harm to competition.[12]

### C. Allowing Direct Sales by Lucid in Texas Will Not Reduce its Incentives to Support Longer Product Cycles

18.     Mr. Stockton argues that that there are good reasons to believe that under the independent dealership model, independent dealers prefer longer product cycles for new vehicles than do their OEMs.[13] His argument is focused on the tension between OEM's desire to sell new model year vehicles to their dealers and dealers' desire to clear their inventory of unsold vehicles from the prior model year first. Of course, a basic component of Lucid's direct sales model is that buyers typically order exactly the model and features they desire, rather than buying from inventory on a car lot. Lucid's Studios generally have little or no inventory on site.

19.     Mr. Stockton agrees that his point is of little validity for an OEM such as Lucid, selling direct to consumers, stating "Clearly the preferences of OEMs regarding product cycle length would differ in the case in which the OEM is selling the older

---

[11] National Highway Traffic Safety Administration, "2023 Lucid Air," visited on September 22, 2023, *available at* https://www.nhtsa.gov/vehicle/2023/LUCID/AIR/4%252520DR/4WD#recalls. On September 22, 2023, notices for two of the recalls were expected to be mailed on September 25, 2023, but OTA updates had already been released.

[12] Scott Morton Initial Report, ¶23.

[13] Stockton Report, ¶41-42, fn. 20.

models at retail…"[14] Such would be the case in a direct sales model. Thus, even Mr. Stockton appears to agree this concern is irrelevant when considering Lucid's direct sales in Texas.

## IV. SALES THROUGH INDEPENDENT DEALERS INTRODUCE THE RISK OF DOUBLE MARGINALIZATION TO AUTO SALES

20. My initial report explains that by allowing Lucid to open and operate its Studios in Texas, consumers would benefit from the elimination of the risk of double marginalization on the sales price for Lucid's new vehicles.[15] Mr. Stockton agrees that double marginalization is "technically important,"[16] a "valid economic concern,"[17] and that sales of new vehicles are subject to double marginalization.[18] Nonetheless, both Mr. Stockton and Dr. House raise concerns over my analysis. I address those concerns in this section.

21. Mr. Stockton points out that the illustration of double marginalization in my initial report shows the OEM and the independent dealer with the same marginal cost of retail sales.[19] I agree with Mr. Stockton that if one assumes instead that the independent dealer's cost of retail sales is less than that of the OEM, the outcome becomes ambiguous.

22. Mr. Stockton goes on to argue that the assumption that an OEM can sell its vehicles at a cost that is less than or equal to the independent dealer's cost of retail sales is a bad one, pointing to OEM retail experiences from a century ago.[20]

---

[14] Stockton Report, fn. 20.

[15] Scott Morton Initial Report, ¶¶20, 26-29.

[16] Stockton Report, ¶22.

[17] Stockton Report, ¶47.

[18] Stockton Report, ¶62.

[19] Stockton Report, ¶48.

[20] Stockton Report, ¶¶49-61.

Summarizing his review of sales experiences in the 1920s, he states "there are reasons to believe retailing costs would be higher for manufacturers than for independent dealers."[21]

23. Mr. Stockton offers no data to support an argument that Lucid's selling costs per car would be higher than those for an independent dealer of Lucid vehicles. I am not aware of any information to indicate that they would be. In a recent earnings call, Jim Farley, CEO of Ford Motor Company, estimated that Ford's per-vehicle distribution costs are $2,000 higher than those of the EV manufacturers with direct sales. He attributed $600-$700 of the difference to dealer inventory costs and another $600 to higher selling, SG&A, and advertisement costs, noting "We have three tiers of marketing."[22] That Ford's independent dealer sales model results in higher fixed costs and higher inventory costs than rival direct sales models supports my assumption that retail costs for an independent dealer selling Lucid cars would not be less than Lucid's costs.

24. Dr. House simply mischaracterizes my double marginalization analysis. He states "Prof. Morton claims that the independent dealership model results in higher new vehicles prices…"[23] My analysis identifies a potential harm, not a certainty. Specifically, I explain that when intrabrand competition is weak, the independent dealer maximizes its profits by setting a retail price about the competitive price.[24] Dr. House later describes my double marginalization analysis as encompassing after-sale service costs.[25] My analysis addresses new vehicle sales only.

---

[21] Stockton Report, ¶¶54.

[22] Ford Motor Company, "Second Quarter 2022 Earnings Call," July 28, 2022, p. 8, *available at* https://s201.q4cdn.com/693218008/files/doc_financials/2022/q2/Ford-2022-Second-Quarter-Earnings-Call.pdf.

[23] House Report, p. 12.

[24] Scott Morton Initial Report, ¶26.

[25] "The double marginalization analysis assumes that the manufactures [sic] cost of after-sale services would be less than that incurred through the independent dealership model." House Report, p. 13.

## V.     RESPONSES TO OTHER ARGUMENTS BY DR. HOUSE

25.     Dr. House argues that Lucid's uniform pricing "leaves consumers without a competitive Lucid option where there is greater local competition and lower prices."[26] Likewise, he notes that Lucid underprices its cars in areas with little competition.[27] Such "underpricing" is presumably to the benefit of consumers in those latter areas. Dr. House ignores that uniform national pricing is an essential component of Lucid's direct sales model. Lucid believes that its customers value the transparency and fairness of a fixed price for its vehicles and that this strategy gives it a competitive advantage over other sellers of luxury vehicles. Lucid's prices are listed on its website and are, thus, available to all U.S. consumers at all times. Consumers are not harmed by transparent and uniform prices and, as I noted in my initial report, some consumers may prefer it.[28]

26.     Dr. House characterizes Lucid as a "fringe competitor" and states "It makes no sense to assume that potential cost savings captured by a fringe competitor will result in lower prices across all brands and models of vehicles."[29] Accepting for the sake of argument Dr. House's characterization of Lucid as a "fringe competitor," the proposition that fringe competition cannot result in lower prices is incorrect. Indeed, the text that Dr. House cites for his argument explicitly draws the opposite conclusion. Specifically, the authors explain that the presence of fringe competitors can cause dominant firms – i.e., price-setting firms that face smaller, price-taking firms[30] – to charge lower prices than they would in the absence of such competition.[31]

---

[26] House Report, p. 6.

[27] House Report, p. 6.

[28] Scott Morton Initial Report, ¶21.

[29] House Report, p. 14.

[30] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 3rd Edition, 2000 ["*Carlton and Perloff (2000)*"], pp. 107-108.

[31] "We draw two main conclusions. First, it is generally not in a profit-maximizing dominant firm's best interest to set its price so low that it drives all competitive fringe firms out of the market. *Second, the presence of competitive-fringe firms or the threat of entry by additional firms may force a dominant firm to set a price lower than the price a monopoly would set ….*" (italics added). *Carlton and Perloff (2000)*, p. 110.

## VI. CONCLUSION

27. I have seen nothing in the reports submitted on behalf of TADA to cause me to modify my opinions in this matter. As stated in my initial report, I find that the unambiguous effect of Texas's law barring direct sales of cars by auto manufacturers is to stifle competition, harm consumers, and create an artificial barrier to the entry of new companies and technologies into the automobile market. As an economist who has studied regulation and competition, it is my opinion that allowing Lucid to operate sales Studios in Texas and sell direct to Texas consumers would have a positive effect on consumers as it would increase consumer choice and eliminate the risk of double marginalization.

_____

Fiona Scott Morton

Executed on October 17, 2023

**Attachment 1**

# Attachment 1

## Documents Reviewed and Relied Upon

**Expert Reports**

| |
|---|
| Expert Report of Professor Fiona Scott Morton, July 25, 2023 |
| Expert Report of Donald R. House, Sr., on behalf of TADA, September 15, 2023 |
| Expert Report of Edward M. Stockton, M.S., on behalf of TADA, September 15, 2023 |

**Academic Publications**

| |
|---|
| Francine Lafontaine and Fiona Scott Morton, "State Franchise Laws, Dealer Terminations, and the Auto Crisis," *Journal of Economic Perspectives*, 24, no. 3 (2010): 233-250 and online appendix, available at http://www.e-jep.org |
| Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 3rd Edition, 2000, pp. 107-110. |

**Other Public Information**

| |
|---|
| Texas Occupations Code, Title 14, Chapter 2301 |
| National Highway Traffic Safety Administration, "2023 Lucid Air," visited on September 22, 2023, *available at* https://www.nhtsa.gov/vehicle/2023/LUCID/AIR/4%252520DR/4WD#recalls |
| Ford Motor Company, "Second Quarter 2022 Earnings Call," July 28, 2022, p. 8, *available at* https://s201.q4cdn.com/693218008/files/doc_financials/2022/q2/Ford-2022-Second-Quarter-Earnings-Call.pdf |