EXHIBIT C

Fiona Scott Morton - January 23, 2024

1

2  IN THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF TEXAS
3  AUSTIN DIVISION
   Case No. 1:22-cv-01116-RP
4  ------------------------------------x
   LUCID GROUP USA, INC.,
5          Plaintiff,
6
        - against -
7
8  MONIQUE JOHNSTON, in her official
   Capacity as Director of the Motor Vehicle
9  Division of the Texas Department of Motor
   Vehicles, DANIEL AVITIA, in his official
10 Capacity as Executive Director of the Texas
   Department of Motor Vehicles; and
11 CORRIE THOMPSON, in her official
   Capacity as Director of the Enforcement
12 Division of the Texas Department of Motor
   Vehicles,
13         Defendants.
14 TEXAS AUTOMOBILE DEALERS
   ASSOCIATION,
15         Intervenor-Defendant.
   ------------------------------------x
16              January 23, 2024
                10:07 a.m.
17
18      Deposition of FIONA SCOTT MORTON,
19 Ph.D., taken by Intervenor-Defendant,
20 pursuant to Notice, held at the offices of
21 BakerHostetler, 45 Rockefeller Plaza, New
22 York, New York, before Todd DeSimone, a
23 Registered Professional Reporter and Notary
24 Public of the State of New York.
25

Fiona Scott Morton - January 23, 2024

```
 1
 2   A P P E A R A N C E S :
 3   BAKER HOSTETLER
     1050 Connecticut Avenue, NW
 4   Suite 1100
     Washington, D.C. 20036
 5        Attorneys for Plaintiff
     BY:    PAUL M. LEVINE, ESQ.
 6          pmlevine@bakerlaw.com
 7
 8
     LOCKE LORD LLP
 9   2200 Ross Avenue
     Suite 2800
10   Dallas, Texas 75201
          Attorneys for Intervenor-Defendant
11        Texas Automobile Dealers Association
     BY:    W. SCOTT HASTINGS, ESQ.
12          shastings@lockelord.com
            THOMAS G. YOXALL, ESQ. (Via Zoom)
13          tyoxall@lockelord.com
14
15
16   ATTORNEY GENERAL OF TEXAS
     P.O. Box 12548
17   Austin, Texas 78711
          Attorneys for Defendants
18   BY:    JOHNATHAN STONE, ESQ.
            johnathan.stone@oag.texas.gov
19          ZACHARY RHINES, ESQ. (Via Zoom)
            zachary.rhines@oag.texas.gov
20
21
22
23
24
25
```

1          MORTON, Ph.D.

2          MR. HASTINGS:  Sure.  I know

3     Don House, who is one of the experts on

4     this case, is on the line.  I don't

5     know if she is on yet or not, but Karen

6     Phillips with the Texas Automobile

7     Dealers Association may be joining us

8     for all or part of this deposition.

9          MR. STONE:  And on our end, we

10    currently have Zachary Rhines on the

11    line and we may be joined by Terry

12    Vannoy from the DMV listening in.

13         THE VIDEOGRAPHER:  Thank you.

14    Would the court reporter please swear

15    in the witness and then counsel may

16    proceed.

17              *   *   *

18    F I O N A   S C O T T   M O R T O N,

19    Ph.D.,

20    called as a witness, having been first

21    duly sworn, was examined and testified

22    as follows:

23 EXAMINATION BY MR. HASTINGS:

24    Q.    Professor Morton, could you

25 please just state your full name for the

Fiona Scott Morton - January 23, 2024

```
 1                  MORTON, Ph.D.
 2  record.
 3       A.     Fiona Margaret Scott Morton.
 4       Q.     And where do you live?
 5       A.     New Haven, Connecticut.
 6       Q.     Have you ever lived in Texas?
 7       A.     No.
 8              (Exhibit 1 marked for
 9  identification.)
10              (Exhibit 2 marked for
11  identification.)
12              (Exhibit 3 marked for
13  identification.)
14              (Exhibit 4 marked for
15  identification.)
16       Q.     Dr. Morton, I have put several
17  documents in front of you, a copy of the
18  deposition notice, the declaration you
19  filed in this case, or that Lucid filed in
20  this case that is your declaration, your
21  expert report, and your rebuttal expert
22  report.  So I wanted you to know that those
23  are Exhibits 1 through 4 that are in front
24  of you.  Feel free to look at them at any
25  point during the day of course if you need
```

Fiona Scott Morton - January 23, 2024

1          MORTON, Ph.D.

2     Q.    Professor Morton, am I correct

3  in understanding that you provided some

4  expert testimony for Lucid in Virginia?

5     A.    Yes, I worked with Lucid in

6  Virginia.  I don't recall exactly what the

7  format was there.

8     Q.    Could you tell us, what was the

9  nature of the issues you were addressing

10 for Lucid?

11    A.    Oh, the same ones that are here

12 in the sense of is it -- is there any

13 reason to stop the manufacturer that wants

14 to sell through a store from operating in a

15 particular state when it comes to

16 competition and the welfare of the people.

17    Q.    And did the State of Virginia,

18 and I don't know the ins and outs of

19 Virginia as to which department they call

20 it, but did the State of Virginia oppose

21 Lucid's request?

22    A.    I don't recollect whether it

23 was the State or the dealerships or who

24 exactly, I'm sorry.

25    Q.    Do you know if there were any

1                MORTON, Ph.D.

2    economists or expert witnesses presented on

3    behalf of the other side of that dispute?

4         A.    I don't recall.

5         Q.    So you would not recall who

6    they were?

7         A.    No.  I don't know if there were

8    any, so definitely not who they were.

9         Q.    And am I correct in

10   understanding that you also provided expert

11   witness work for Rivian in Virginia?

12        A.    Yes.

13        Q.    Could you tell us the nature of

14   the work that you did for Rivian related to

15   Virginia proceedings?

16        A.    Again, it's the same issue,

17   whether there is any issue for a state to

18   be concerned with a vertically-integrated

19   manufacturer selling its own automobiles

20   and the impact on competition.

21        Q.    And was Rivian's request

22   opposed by either the State or the dealers?

23        A.    I don't recall.

24        Q.    Do you recall if any experts or

25   economists were presented by the other side

Fiona Scott Morton - January 23, 2024

1          MORTON, Ph.D.
2   of that dispute in that proceeding?
3       A.    I don't recall.
4       Q.    Let's go to C.  Well, let me
5   start more generally.  I understand that
6   you have also done significant work for
7   Tesla; is that right?
8               MR. LEVINE:  I object to the
9       form.  But you can answer.
10      A.    I have answered this or spoken
11  about this same issue on behalf of Tesla in
12  a few states.  I see here, just refreshing
13  my recollection, it looks like it is
14  Arizona, Virginia, North Carolina, Utah and
15  Georgia.
16      Q.    Are you aware of any other
17  states that you provided testimony on
18  behalf of Tesla on this issue?
19      A.    If you took this from my CV, I
20  don't recall from memory all the states,
21  but they are written in my list of
22  testimony, so if this is an accurate
23  reflection of that, then that would be
24  complete.
25      Q.    Fair enough.  And I'm not

Fiona Scott Morton - January 23, 2024

```
1                MORTON, Ph.D.
2   reports published by SIGTARP?
3        A.     No.
4        Q.     And so you would not have
5   reviewed any reports SIGTARP published
6   related to the reduction of the number of
7   dealerships related to the Chrysler and GM
8   bailouts?
9        A.     Correct.
10       Q.     Okay.  So who is Francine
11  Lafontaine?
12       A.     She is a professor of economics
13  at the University of Michigan.
14       Q.     And am I correct in
15  understanding that you have written several
16  articles or quite a few articles and done
17  research with her on many occasions?
18       A.     I think "many" would be too
19  strong.  We have certainly done a couple of
20  projects together and I have known her for
21  several decades, we're friends.
22       Q.     Are the opinions that you are
23  offering in this case on behalf of Lucid
24  related to the Texas restrictions on the
25  manufacturer selling direct to a consumer,
```

1           MORTON, Ph.D.

2   are your opinions specific to an EV

3   manufacturer or do they apply to any new

4   manufacturer trying to enter the market?

5        A.    They apply to any manufacturer

6   that wants to enter the market who doesn't

7   have existing franchise dealers.

8        Q.    So as I understand your

9   testimony, your study in this area began

10  when you were working on your paper in 2010

11  with Professor Lafontaine?

12       A.    That's correct, although the

13  way economics works, I'm afraid to say we

14  have to work on the paper before it gets

15  published.

16       Q.    Yes.

17       A.    I don't recall exactly when we

18  started, but probably the end of 2008 or,

19  anyway, 2009 let's say.

20       Q.    And sometimes it takes a really

21  long time to get through that process,

22  doesn't it?

23       A.    This one was quick because it

24  is the Journal of Economic Perspectives,

25  but you are well informed, yes, normally it

Fiona Scott Morton - January 23, 2024

```
 1                MORTON, Ph.D.
 2       A.      Yes.  That was quite a small
 3  project.  I did not visit a Rivian
 4  showroom.
 5       Q.      Have you ever visited a Lucid
 6  showroom?
 7       A.      No, I have not.
 8       Q.      Have you ever driven a Lucid
 9  vehicle?
10       A.      No.
11       Q.      Have you ever driven a Rivian
12  vehicle?
13       A.      No.
14       Q.      You have driven a Tesla?
15       A.      I have.
16       Q.      What kind of car do you drive?
17       A.      I have a Tesla and a VW.
18       Q.      Have you experienced any
19  problems with your Tesla?
20       A.      One time the cap on the
21  electric charging place on the car popped
22  up and wouldn't close.
23       Q.      You had to get it repaired?
24       A.      Tesla came to my driveway,
25  repaired it while I was at work, went away
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2  to assess whether it would enhance
 3  competition to allow that strategy, along
 4  with every other one, to compete for
 5  consumers in Texas.
 6       Q.    So then is it fair to say that
 7  you have done no analysis of, you know,
 8  Lucid's pricing or Lucid's cost or its
 9  profits?
10       A.    That's right.  I have read the
11  documents that we mentioned before, the
12  10-K, the 10-Q, the earnings.  I have an
13  understanding of the strategy that they are
14  putting forward and the reasons why they
15  think it is best.  But I have not done
16  independent analysis of anything like
17  optimal price or expected profit or
18  anything like that.
19       Q.    Do you know, and I'm not asking
20  for a specific dollar number, just kind of
21  in general, do you know how much Charles
22  River & Associates has been paid for your
23  work as an expert in the EV industry
24  related to these direct sales issues?
25       A.    No, I don't.
```

Fiona Scott Morton - January 23, 2024

```
1                    MORTON, Ph.D.
2        Q.      Are you familiar with Fisker?
3        A.      I have heard of them.
4        Q.      What do you know about Fisker?
5        A.      It is a startup car company,
6   and I don't know anything else actually.
7        Q.      What about VinFast?
8        A.      I'm not familiar with that
9   name.
10       Q.      So you have never worked for
11  either Fisker or VinFast?
12       A.      Correct.
```



Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2       A.      That's correct.
 3       Q.      And you were there for it looks
 4  like a year or two?
 5       A.      That's correct.
 6       Q.      But you were not there as a
 7  lawyer, were you?
 8       A.      That's correct.
 9       Q.      You do not hold a legal degree,
10  do you?
11       A.      That's correct.
12       Q.      And you're not an expert on
13  constitutional law, are you?
14       A.      Correct.
15       Q.      Other than this matter, have
16  you ever been providing testimony in a case
17  raising constitutional challenge to a state
18  statute?
19       A.      Well, as we've just discussed,
20  I am not a legal expert, so I would
21  prefer -- well, not I would prefer -- I am
22  not qualified to answer that question.  I
23  don't know if the matters that I've worked
24  on have had constitutional issues.
25       Q.      Fair enough.  There is an
```

Fiona Scott Morton - January 23, 2024

```
1            MORTON, Ph.D.
2       Q.    Do you believe it is
3   appropriate for economists to consider
4   historical events?
5       A.    Sometimes those are
6   illuminating for the matter at hand.  It
7   depends, of course, on what exact issue you
8   are trying to illuminate.
9       Q.    So in the abstract it is
10  perfectly fine to consider historical
11  events, you may decide they are not
12  relevant to a specific circumstance, but
13  considering historical events is certainly
14  appropriate?
15      A.    I would not rule out
16  considering historical events.  It is
17  possible that considering a particular
18  historical event in a particular context is
19  inappropriate.  That's also true.
20      Q.    Are you testifying in this case
21  that there is no room for disagreement of
22  opinion on whether manufacturers should be
23  allowed to sell direct to consumers?
24      A.    A manufacturer that does not
25  already have franchise dealers in a state,
```

```
 1              MORTON, Ph.D.
 2   you believe it should be allowed to sell
 3   direct, right?
 4        A.     That's correct.
 5        Q.     What happens if,
 6   hypothetically, if that's allowed, okay,
 7   let's say the courts agree or the State
 8   changes its mind and agrees with you, and
 9   that's allowed that this new manufacturer
10   can sell direct to consumers in Texas, so
11   that's our hypothetical scenario, what
12   happens if the manufacturer changes its
13   mind and decides after it starts selling
14   direct to the consumers that it wants to
15   have dealers?
16        A.     Then it would set up some
17   dealers.
18        Q.     But then wouldn't that raise
19   the problem of the manufacturer potentially
20   competing against its own dealerships?
21        A.     Oh, sorry, I thought you meant
22   the manufacturer changes formats completely
23   and stops having stores and has
24   dealerships.
25        Q.     No.  I'm saying if the
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2   manufacturer starts selling direct to the
 3   consumers and then decides, you know, it
 4   would be great to have some dealers to help
 5   me reach other parts of the state, for
 6   example, what would happen?
 7         A.     I don't know.
 8         Q.     Have you ever considered that?
 9         A.     I think there would be a
10   response on the part of regulators.  I
11   don't know what that would be.
12         Q.     Have you done the analysis or
13   considered what happens in that
14   circumstance?
15         A.     No.
16         Q.     So in forming your opinions do
17   you have an opinion one way or the other of
18   whether when Lucid, you know, a
19   manufacturer with no dealerships, enters
20   the industry whether it also would have to
21   commit that it was never going to use
22   dealers, do you have an opinion one way or
23   the other on whether it would have to make
24   such a commitment?
25         A.     I have not -- so that's not in
```

Fiona Scott Morton - January 23, 2024

```
1                MORTON, Ph.D.
2   my report.  It's not something I've
3   considered until now.  No, I don't have an
4   opinion yet.  I would have to think about
5   it.
6       Q.     Professor Morton, I will throw
7   out a guess, you are familiar with Elon
8   Musk, right?
9       A.     I have heard of him, yes.
10      Q.     Have you ever met him?
11      A.     No.
12      Q.     Have you ever heard Mr. Musk
13  testify that, as the CEO of Tesla, that he
14  would consider using dealerships in the
15  future?
16      A.     I may have heard that at some
17  point, but I don't -- I didn't hear it
18  live.  I may have read a secondhand report
19  or something like that.
20      Q.     And, I mean, you're not
21  disagreeing that he said that?
22      A.     I don't have independent
23  verification of it, but I'm not
24  disagreeing, no.
25      Q.     And I don't have the exact
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2   words in front of me either.  Do you have
 3   an opinion one way or the other of whether,
 4   from an economic perspective, that is
 5   reasonable for a manufacturer to kind of go
 6   on its own for a while, build its brand,
 7   but then eventually switch over and use
 8   dealerships, is that a reasonable
 9   consideration?
10        A.    What do you mean, a reasonable
11   consideration?
12        Q.    Is that, from an economic
13   perspective, is that a reasonable thing for
14   a business to consider?
15        A.    So I don't know how to process
16   that question.  We don't -- economics
17   doesn't tell you about whether something is
18   reasonable or not.  I can answer a question
19   about if the firm is profit-maximizing and
20   trying to minimize cost and maximize
21   revenue, what kind of distribution channels
22   it's going to pick.  But I don't know
23   how -- I can't answer this question.  It
24   doesn't make sense.
25        Q.    When forming your opinions in
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2  this case, did you take into consideration
 3  the possibility that the manufacturer who
 4  is looking to sell direct to the consumers
 5  might switch over and want to start using
 6  dealers too, did you consider that?
 7      A.     No, I did not.
 8      Q.     And I want to make sure that I
 9  have this right.  Your testimony, you're
10  not planning to offer testimony that
11  someone was -- someone's opinions are
12  irrational, I mean, obviously that's a
13  different word than wrong, okay, in this
14  case are you planning to offer any
15  testimony that someone's opinions are
16  irrational?
17              MR. LEVINE:  I object to the
18      form.
19      A.     I don't know what you're going
20  to show me on the stand, so I think it is a
21  bit difficult to commit in an environment
22  where I have no idea what I'm going to be
23  asked.
24              But if you are talking about
25  Dr. House and Mr. Stockton, again, I'm
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2      A.    I do not.  I mean, maybe I was
 3  told at the time, I have forgotten.
 4      Q.    And so if I went down each one
 5  and asked you, you know, do you know
 6  whether the state either -- whether the
 7  ultimate resolution was either in favor of
 8  the EV manufacturer or the state for each
 9  of those proceedings, you would not recall
10  today?
11      A.    That's correct.
12      Q.    Thank you.  You just saved us a
13  lot of time.
14            MR. LEVINE:  We're done with
15      the deposition?
16            MR. HASTINGS:  Not quite.
17            THE WITNESS:  Before lunch
18      would be a record.  Go ahead.
19      Q.    Have you ever testified before
20  the Texas legislature?
21      A.    No.
22      Q.    So the opinions that you are
23  offering in this case are opinions that you
24  have not personally presented to the Texas
25  legislature, right?
```

1          MORTON, Ph.D.

2     A.    I have never testified before

3  the Texas legislature.

4     Q.    Are you aware of anyone, you

5  know, any of your clients, any of the

6  lawyers you have worked with, are you aware

7  of anyone presenting your opinions on

8  EVs -- manufacturers selling direct to

9  consumers, are you aware of any of those

10 parties presenting those opinions to the

11 Texas legislature?

12    A.    I don't know if they did.

13    Q.    Are you aware of any states

14 other than Texas that currently prohibit

15 manufacturers from selling automobiles and

16 motor vehicles direct to consumers?

17    A.    I know generally that those

18 states exist, but I don't know which ones,

19 other than Texas of course.

20    Q.    And do you know which states

21 allow manufacturers to sell direct to

22 consumers?

23    A.    I know that California does,

24 that's where Tesla began.  I don't recall

25 which others.

Fiona Scott Morton - January 23, 2024

```
1                    MORTON, Ph.D.
2          A.      No.
3          Q.      Do you know who Maryanne Keller
4     is?
5          A.      That name sounds familiar, but
6     I can't remember who that is exactly.
7          Q.      Do you know who Patrick
8     Anderson is?
9          A.      No.
10         Q.      Now, this lawsuit that Lucid
11    has filed is governed by a rational basis
12    standard, and I know you're not a lawyer so
13    I'm not asking you to testify about what
14    the law is and how it's being interpreted,
15    just to be clear.  Are you familiar with
16    the rational basis standard?
17         A.      I'm an economist.  I have read
18    about it, that's the extent of my
19    knowledge.
20         Q.      Are you intending to opine
21    whether the rational basis standard has
22    been met or satisfied by Lucid in this
23    case?
24         A.      To the extent that's a legal
25    conclusion, then I will not be drawing any
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2   legal conclusions.  To the extent that
 3   it -- that one of the elements a person
 4   could care about would be whether there is
 5   an economic argument for blocking a certain
 6   kind of distribution method or that there
 7   is an economic argument in favor of
 8   competition in a state, then those could be
 9   elements of somebody arguing a rational
10   basis, but I will not be drawing any legal
11   conclusions.
12        Q.    And it's my understanding that
13   you are familiar with the Fifth Circuit's
14   decision in the Ford versus the Texas
15   Department of Transportation case, right?
16        A.    Yes, a little bit, that's
17   right.
18        Q.    I mean, I've seen you cite it
19   and discuss it in some articles that you
20   have written, or at least one article that
21   you have written.  So you have read the
22   decision?
23        A.    Well, I must have done, but it
24   would be some years ago, not recently.
25        Q.    Do you know if -- let me first
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2  that is aligning my profit with what the
 3  consumer wants.
 4       Q.    If you saw evidence of EV
 5  manufacturers focused on increasing its
 6  profits and selling more vehicles at the
 7  expense of taking care of and repairing
 8  vehicles for the people they have already
 9  sold to, would that be a relevant
10  consideration for purposes of your opinions
11  of whether it is appropriate to have
12  restrictions on manufacturers selling
13  direct to consumers?
14              MR. LEVINE:  I object to the
15       form.
16       A.    I don't think it's relevant to
17  whether manufacturers should be allowed to
18  sell direct to consumers.
19       Q.    Why is it not relevant?
20       A.    Because that issue arises in
21  any form of distribution channel.
22       Q.    What do you mean by any -- what
23  do you mean it arises in any form of
24  distribution channel?
25       A.    Whether I have franchise
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2   dealers or have a different manufacturer
 3   that have stores, they both have a problem
 4   of trying to balance dedicating resources
 5   to how much do I invest in, I don't know,
 6   the old consumers versus new consumers.
 7         Q.    Have you done any analysis of
 8   Lucid to determine how it is balancing its
 9   investments in selling vehicles and raising
10   a profit from new consumers versus having a
11   sufficient support infrastructure to take
12   care of its existing customers?
13         A.    No, because every manufacturer
14   varies on that front, and it has no
15   relationship to whether there is a reason
16   to block having this distribution channel.
17         Q.    Have you done an analysis of
18   that issue for any EV manufacturers about
19   how it is balancing their profit motives
20   versus having the infrastructure to take
21   care of their existing customers?
22         A.    No, again, because managerial
23   talent and how the strategy of the firm is
24   chosen is not relevant to whether there's a
25   good reason to block a certain distribution
```

Fiona Scott Morton - January 23, 2024

```
 1                MORTON, Ph.D.
 2   trying to imply.
 3        Q.    I think you are reading
 4   something into my question that was not
 5   there.  I wasn't implying anything.  I was
 6   asking you the question of are you aware
 7   that traditional dealerships earn a
 8   relatively small percentage of their
 9   profits compared to their overall profits?
10        A.    That relatively small
11   percentage of profits represents real
12   dollars for the consumers buying new cars,
13   usually thousands of dollars per car,
14   definitely hundreds of dollars per car,
15   which is not relatively small to those
16   consumers.
17        Q.    What do you understand are the
18   sources of revenues for traditional
19   dealerships?
20        A.    Generally I understand that to
21   be new car sales, used car sales, markups
22   on financing and insurance and extra spray
23   coatings and repair work.
24        Q.    And so when you are talking
25   about there being in the hypothetical Lucid
```

Fiona Scott Morton - January 23, 2024

```
 1                    MORTON, Ph.D.
 2   idea.
 3                    MR. HASTINGS:  Objection,
 4        nonresponsive.
 5                    MR. STONE:  Objection,
 6        nonresponsive.
 7        Q.    So are you aware of any reason
 8   why Lucid, either directly or through an
 9   independent dealer, could not resell used
10   vehicles that were traded in as people
11   bought their new Lucid automobile?
12        A.    Could Lucid find a way to do
13   that at their stores?  Probably, if they
14   wanted to.
15        Q.    And are you aware of any reason
16   why if there was an independent dealer
17   selling Lucids that they couldn't also
18   resell the cars that were traded in to
19   generate revenues?
20        A.    They could have if they wanted
21   to.  It is just an asset.  Anybody can buy
22   and sell a used car.
23        Q.    And when you opine that an
24   independent Lucid dealership would not --
25   would not be economically viable, you have
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2  role for them, and they should go work for
 3  a manufacturer that uses a franchise dealer
 4  model where they can make all the kinds of
 5  money you are talking about.
 6              MR. HASTINGS:  Objection,
 7      nonresponsive.
 8              MR. STONE:  Objection,
 9      nonresponsive.
10      Q.      My question is when you formed
11  your opinions that a hypothetical
12  independent Lucid dealer would not be
13  economically viable, you did not factor in
14  the possibility that they could be earning
15  revenues on the trade-in of vehicles, not
16  that they had to earn and deal with
17  trade-ins, but they could earn revenues off
18  of the trade-ins, that didn't factor into
19  your analysis, did it?
20      A.      So I didn't do a quantitative
21  analysis, that is Herb Walter's job, but it
22  does factor into my analysis because
23  there's no reason for the consumer to be
24  buying at that dealership.  They are going
25  to buy online, which is more convenient,
```

Fiona Scott Morton - January 23, 2024

```
1                    MORTON, Ph.D.
2    doesn't involve hassle, lets them buy the
3    car, lets it get delivered to their house.
4    So why would they be going to that place to
5    turn in their used car as opposed to
6    shopping around and turning in their used
7    car anywhere they want?  It is not -- there
8    is no reason to do that.  There is no
9    valuable economic activity that that entity
10   is providing, because there is lots of
11   places you can trade in your used car, or,
12   sorry, sell your used car, because you
13   wouldn't be trading it for anything, you
14   would just be getting money for it, and you
15   would be buying your Lucid on the web at
16   the fixed price in a relaxed, hassle-free,
17   pressure-free environment.
18        Q.    So your understanding is that
19   the majority of Lucid sales would be over
20   the internet without someone physically
21   coming to a location?
22        A.    Often, my understanding is that
23   often the way these sales work is that
24   people visit and test drive and have
25   questions repeatedly and might go to a
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2  reason to force a new car manufacturer to
 3  do it.
 4      Q.    And are you saying that you
 5  believe there is no role for the
 6  legislature and the government to be
 7  involved in regulating the need to have the
 8  ability for trade-ins through dealerships
 9  and from the manufacturer too?
10      A.    I don't see a market failure
11  there, I see a perfectly functioning market
12  in used cars.  I don't see why you would --
13  the legislature would say to a supermarket
14  you must offer three sizes of organic
15  mangos.  You let the supermarket decide
16  what they are going to offer and if
17  consumers don't like the range at that
18  supermarket they go to a different one.  It
19  is a bit the same here.
20      Q.    So you think that the
21  automobile industry is like the supermarket
22  situation?
23      A.    I think that markets, I believe
24  in capitalism and markets and free markets
25  and choices of businesses to run their
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2    business the way they want and the ability
3    of consumers to leave that business if they
4    don't like those choices.
5         Q.    Is the automobile market
6    comparable to the supermarket market?
7         A.    In the sense that people are
8    spending their own money and choosing
9    between either varieties of cars or
10   varieties of food and service and
11   locations, they display that same economic
12   force that is present when there is
13   competition and choice.
14              I have different foods within
15   the supermarket, different supermarkets, I
16   have different cars within the dealership,
17   I have different dealerships, and we want
18   the consumers to take full advantage of
19   that choice and vibrant competition and to
20   be free to take their business elsewhere if
21   they don't like what that particular outlet
22   is offering.
23        Q.    The traditional dealerships,
24   one of their sources of revenues is vehicle
25   repairs and service.  You're aware of that,
```

Fiona Scott Morton - January 23, 2024

```
 1                 MORTON, Ph.D.
 2   right?
 3        A.     Yes.
 4        Q.     Wouldn't that source of revenue
 5   be available to a hypothetical Lucid
 6   independent dealer?
 7        A.     I think that it would be, but
 8   let's keep in mind that electric cars just
 9   don't have as many moving parts, they don't
10   need to be repaired and serviced in nearly
11   the same frequency.  You can do the wiper
12   blades yourself.  So at least my
13   understanding of the available revenue from
14   repairs, it would be far, far less.
15        Q.     Have you done any studies or
16   analysis of the amount of repairs and
17   services that EVs need as compared to
18   traditional internal combustion engine
19   vehicles?
20        A.     Not my own studies, no.
21        Q.     And in coming to the conclusion
22   that an EV would require less service and
23   repairs, what are you relying upon?
24        A.     General knowledge from the
25   market and also of course my own knowledge
```

Fiona Scott Morton - January 23, 2024

```
 1                    MORTON, Ph.D.
 2        on the subject.
 3                    MR. STONE:  You are the one
 4        that proffered her.
 5                    MR. LEVINE:  You can read her
 6        report and you can see what she is
 7        proffered on.
 8                    MR. HASTINGS:  That's a fair
 9        point there.
10        Q.      So, Dr. Morton, you have never
11   worked as a mechanic, have you?
12        A.      That's correct.
13        Q.      You're not an expert in
14   automobile repairs and service, are you?
15        A.      That's correct.
16        Q.      And the reason I'm talking to
17   you about repairs is because repairs is a
18   traditional source of revenue for
19   traditional dealerships, that's why I'm
20   talking to you about it.
21                    So my question is why wouldn't
22   repairs be a source of revenue for a Lucid
23   dealership, if there was one?
24        A.      Because they would be a lot
25   smaller.
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2        responsive.
3              MR. STONE:  It was not.  The
4        question was about the legislature.
5              MR. LEVINE:  She answered what
6        she thought was an important
7        consideration.
8        Q.    So your opinion is that a Lucid
9   dealership would not be economically
10  viable, but you've done no quantification
11  of how much revenues or how much profits a
12  Lucid dealership could earn, have you?
13       A.    Well, I have, in the sense that
14  if the car is available at a certain price
15  on the web, and that's the fixed price, a
16  dealership, an independent dealership in
17  the world you're imagining that buys at
18  that price and sells at that price earns
19  zero.  So that's a very simple math
20  problem.  It earns zero.
21              And if there are over-the-air
22  updates and Lucid successfully produces a
23  car with a good -- with a good reliability
24  track record, then that means that the
25  amount in repairs would be less, and
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2   perhaps substantially less, and therefore
 3   we're talking about -- and the sales model
 4   that Lucid would prefer to use is a
 5   no-pressure, education-friendly sales
 6   model, which dealerships do not offer.
 7              So when you start putting it
 8   all together you see that there is just
 9   qualitatively a lot less reason to have a
10   dealership, and that's why, of course Lucid
11   has decided to have stores.
12        Q.    So in doing the analysis of the
13   economic viability, you focused of course,
14   as you said, on the internet sales and
15   uniform pricing, but you're not taking into
16   account the possibility of generating
17   revenues from selling used vehicles that
18   are traded in or the possibility of earning
19   revenues from repairs of the vehicles?
20              MR. LEVINE:  It is misquoting
21        what's in her expert report.
22        A.    I also mentioned in the
23   previous answer that repairs would be
24   substantially smaller.  I also mentioned
25   that the sales process that dealerships use
```

Fiona Scott Morton - January 23, 2024

```
 1                MORTON, Ph.D.
 2   the unsafe cars and so forth, yes.
 3        Q.     And the State has a role in
 4   regulating the relationship between
 5   manufacturers and dealers, right?
 6        A.     I actually think that those
 7   usually could be handled perfectly
 8   ordinarily by normal contract law and other
 9   laws.  I'm not sure that we need very much
10   regulation of that.
11                As previously mentioned, the
12   special case of whether a manufacturer can
13   compete with its own dealers is tricky,
14   that could be improved possibly with some
15   regulation, but I have not studied that
16   issue, so I don't really know yet from my
17   own opinion what the best way to regulate
18   that would be.
19        Q.     I want to go back to the
20   economic viability of a Lucid dealership,
21   and one of the things we talked about was
22   repairs, and if I heard you correctly, your
23   testimony is that if Lucid makes a good
24   vehicle and does what it hopes it can do,
25   which is create a vehicle that needs less
```

```
 1              MORTON, Ph.D.
 2   or do not think it is a good idea to have
 3   franchise dealers or anything.
 4              One of the things you did say
 5   is that if a vehicle is more reliable, that
 6   there would be less opportunity for repair
 7   revenues, and I think we're in agreement on
 8   that, that if a vehicle is more reliable
 9   and less parts and needs less repairs,
10   there is less opportunity for repair
11   revenue.  And my only question for you is
12   if that assumption proves wrong, that the
13   vehicle is not more reliable, there
14   actually is a greater opportunity for
15   repairs, yes or no?
16       A.     Certainly directionally that's
17   correct.
18       Q.     Okay, thank you.  Does the
19   volume of car sales for Lucid, does that
20   impact your opinion?
21       A.     Yes, it does.
22       Q.     Can you explain that for me?
23   How does volume and the volume that Lucid
24   is selling impact your opinions?
25       A.     Any hypothetical sale -- any
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2  sales by the hypothetical Lucid dealer
 3  would be very minimal and would have to
 4  cover significant fixed cost.
 5       Q.      Are you aware of the fact that
 6  there are a lot of automobile manufacturers
 7  that sell relatively small numbers of cars?
 8       A.      Yes.
 9       Q.      Particularly in the luxury
10  environment, luxury vehicle market, right?
11       A.      I don't know that, about that.
12       Q.      I mean, for example,
13  Lamborghini has become pretty popular, a
14  lot of people -- well, not a lot of
15  people -- some people buy Lamborghinis,
16  they don't sell very many cars, but they
17  manage to sell through dealerships, right?
18              MR. LEVINE:  Objection.  "Some
19       people," probably still too broad.
20       A.      I don't know anything about
21  Lamborghini.
22       Q.      Right.  But there are makes of
23  cars where they have been successfully sold
24  through the dealership model even though
25  the volume of cars is relatively low, the
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2        Q.    And some of them are doing it
3   successfully, aren't they?
4        A.    I don't know.
5        Q.    I'm sorry, I'm jumping around a
6   little bit, but I was asking you about
7   capacity.  Do you have an understanding as
8   to what Lucid's capacity is for
9   manufacturing vehicles?
10       A.    I think I have a statistic in
11  the report somewhere about what they are
12  building to produce, but I don't have it
13  memorized.  Oh, here we go, 90,000 vehicles
14  per year in 2024 is what I have.
15       Q.    And do you know how many
16  vehicles Lucid sold last year?
17       A.    No, I don't.
18       Q.    It is significantly less than
19  90,000, isn't it?
20       A.    I don't know.
21       Q.    Do you know how many vehicles
22  Lucid is planning to sell overseas?
23       A.    No, I don't.
24       Q.    Do you know how much of Lucid's
25  capacity that it is building in the United
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2   States that it intends to sell in other
 3   countries?
 4        A.    No, I don't.
 5        Q.    If you have got your report in
 6   front of you, and I believe this is in
 7   paragraph 13, there is a statement that
 8   says "The 4.6 miles per" it looks like "per
 9   kilowatt hour efficiency of the Lucid Air
10   Grand Touring Sedan is unprecedented,
11   reducing both its manufacturing cost and
12   total ownership costs for its customers."
13              Do you see that language?
14        A.    I do.
15        Q.    And that's your language,
16   right?
17        A.    Yes.
18        Q.    One thing I was trying to
19   understand is how does this 4.6 miles per
20   kilowatt hour efficiency impact
21   manufacturing costs?
22        A.    Well, that's a scientific
23   question that I don't know the answer to.
24        Q.    Okay.  So where did you get the
25   statement then?
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2       A.    Well, the footnote is to the
3  earnings release from 2022.
4       Q.    Okay.  So you don't have any
5  personal knowledge about whether that is
6  true, whether that impacts --
7       A.    I can't evaluate it as an
8  engineering matter.  I have no ability to
9  evaluate that.
10      Q.    Right.  So you don't have a
11 basis to offer an opinion that this 4.6
12 miles per kilowatt hour of efficiency
13 reduces manufacturing costs, that's not
14 something you are capable and prepared to
15 do, are you?
16      A.    I can point to where Lucid says
17 it.  I cannot independently verify it with
18 my skill set.
19      Q.    And we have talked a lot about
20 repairs.  You would agree, though, that EVs
21 do not eliminate all types of service and
22 repairs that need to happen for vehicles,
23 right?
24      A.    That's correct.
25      Q.    I mean, they still need tires,
```

Fiona Scott Morton - January 23, 2024

1           MORTON, Ph.D.
2       A.      Well, that's the sense in which
3   we care about reputable, that it's being
4   unbiased and not serving the interests of
5   the manufacturer, and if we're going to
6   evaluate cars, that's the sense of
7   reputable that we care about.
8       Q.      Do you believe that Consumer
9   Reports is a reputable source for
10  evaluating the reliability of products?
11      A.      I think so, in general.
12      Q.      And have you reviewed Consumer
13  Reports related to electric vehicles?
14      A.      I don't recall doing that.  But
15  I don't know, I can't remember everything
16  that's in my materials.
17      Q.      Dr. Morton, can you explain
18  what the concept of double-marginalization
19  is?
20          MR. LEVINE:  Before we jump to
21      that topic, can we take a short break?
22          MR. HASTINGS:  Sure.
23          MR. LEVINE:  Thanks.
24          THE VIDEOGRAPHER:  Off the
25      record at 14:12, marking the end of

Fiona Scott Morton - January 23, 2024

1              MORTON, Ph.D.

2         media unit number three.

3              (Recess taken.)

4              THE VIDEOGRAPHER:  On the

5         record at 14:23, marking the beginning

6         of media unit number four.

7    BY MR. HASTINGS:

8         Q.    Dr. Morton, did you review any

9    customer complaints from Lucid customers

10   related to its vehicles?

11        A.    No, I did not.

12        Q.    And have you reviewed any

13   surveys or other data about consumer

14   satisfaction with Lucid vehicles?

15        A.    I don't recall off the top of

16   my head.  In the report I discuss a

17   vehicle, and there may be something there.

18              I don't see anything, so I

19   think I did not review such a report.

20        Q.    All right.  Getting back to

21   double-marginalization, could you explain

22   for us what double-marginalization is?

23        A.    Yes.  It's the increased price

24   that occurs when a firm with market power

25   sells an input to another firm with market

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2   power that then sets a price to end
3   consumers.
4        Q.    And so with
5   double-marginalization, both of those
6   entities with the market power would be
7   increasing price to generate a profit?
8        A.    They would be setting markups
9   over their own costs to generate a profit.
10       Q.    And in your rebuttal report,
11  and this is paragraph 21, you write that
12  "Mr. Stockton points out that the
13  illustration of double-marginalization in
14  my initial report shows the OEM and the
15  independent dealer with the same marginal
16  cost of retail sales," and then you
17  continue, you say "I agree with
18  Mr. Stockton that if one assumes instead
19  that the independent dealer's cost of
20  retail sales is less than that of the OEM,
21  the outcome becomes ambiguous."
22             What do you mean by that?
23       A.    I mean that if the independent
24  dealer's cost of retail sales is lower than
25  the OEM's cost of retail sales, then you
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2    can't immediately sign what the final price
3    comparison will be.
4         Q.    And does that mean that there
5    is a possibility, obviously not a
6    certainty, but a possibility if the cost of
7    retail sales is less for the independent
8    reseller, that there's a possibility that
9    having the independent reseller involved
10   could actually lower the price to the
11   consumer?
12        A.    That's a hypothetical that I
13   don't believe is supported by the evidence.
14   Theoretically what you said is true, but
15   it's not very relevant for this case
16   because that's not what the evidence
17   demonstrates in general.
18        Q.    Okay.  And what evidence are
19   you referring to regarding Lucid's sales of
20   vehicles?
21        A.    So Mr. Stockton talks about
22   evidence from 100 years ago, but I cite in
23   the report a Ford number, Ford's per
24   vehicle distribution costs are $2,000
25   higher than those of manufacturers with
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2       A.    It's not clear to me why the
3  existing franchise dealer should get the
4  profits that used to be going to a
5  different franchise dealer engaged in
6  entirely different activities.  I'm
7  confused why that's a good idea.
8       Q.    Have you ever testified or
9  offered expert opinions on behalf of an
10 automobile dealership?
11      A.    No, I have not.
12      Q.    Have you ever testified or
13 offered opinions on behalf of a consumer of
14 automobiles against a manufacturer?
15      A.    No, I have not.
16      Q.    In paragraph 24 of your
17 rebuttal report you write "Dr. House simply
18 mischaracterizes my double-marginalization
19 analysis.  He states 'Professor Morton
20 claims that the independent dealership
21 model results in higher new vehicle
22 prices...'  My analysis identifies a
23 potential harm, not a certainty."
24            Do you see that?
25      A.    I do.
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2       Q.    Isn't it true, though, if you
3  take your statements here, that you agree
4  that the double-marginalization does not --
5  it's not a certainty that
6  double-marginalization will result in
7  higher new vehicle prices, that is what you
8  are saying here, isn't it?
9       A.    Higher compared to what?  I'm
10 sorry, I don't understand the question.
11      Q.    Okay.  Let me try that again.
12            I mean, I'm just reading
13 through your statements.  Your conclusion
14 here in paragraph 24 is agreeing that
15 double-marginalization is not certain to
16 result in higher prices of new automobiles.
17 Do you agree with that?
18      A.    Let me fix your question.  If
19 we took -- if we took Lucid's
20 vertically-integrated model and the
21 existing franchise model, one has
22 double-marginalization, the franchise
23 model, the other doesn't, is it for sure
24 known that the franchise model sets a
25 higher price than the vertically-integrated
```

Fiona Scott Morton - January 23, 2024

```
 1                 MORTON, Ph.D.
 2   model?  No.  It's probably -- it is very
 3   likely from the evidence that we have, but
 4   it's not a certainty, it is just probable.
 5                 MR. HASTINGS:  I will pass the
 6        witness.
 7                 MR. STONE:  I'm going to pass
 8        the witness as well.  I have no
 9        questions.  I will reserve them until
10        trial.
11                 MR. LEVINE:  I just have one or
12        two follow-ups quickly.
13   EXAMINATION BY MR. LEVINE:
14        Q.    In paragraph 19 of your expert
15   report, which is Exhibit 3, it's on page 7.
16        A.    Yup, got it.
17        Q.    You talk about that -- you say
18   "Lucid's service and parts revenue will be
19   quite limited due to relatively small scale
20   of sales."
21                 Can you explain how that small
22   scale of sales impacts the revenue that
23   would be available to a hypothetical
24   independent dealer?
25        A.    Yes.  The hypothetical
```

1          MORTON, Ph.D.

2          THE VIDEOGRAPHER:  This

3     concludes today's testimony given by

4     Fiona Scott Morton, Ph.D., as

5     stipulated by all parties.  The total

6     number of media units used was four and

7     will be retained by Veritext Legal

8     Solutions.  Off the record at 14:37.

9

10          [TIME NOTED:  2:37 p.m.]

11

        _____

12      FIONA SCOTT MORTON, Ph.D.

13

_____

14  Subscribed and sworn to

    before me this _____

15  day of _____, 2024.

16  _____

      Notary Public

17

18

19

20

21

22

23

24

25

1

2              CERTIFICATION

3

4      I,   TODD DeSIMONE, a Notary Public for

5   and within the State of New York, do hereby

6   certify:

7      That the witness whose testimony as

8   herein set forth, was duly sworn by me; and

9   that the within transcript is a true record

10   of the testimony given by said witness.

11      I further certify that I am not related

12   to any of the parties to this action by

13   blood or marriage, and that I am in no way

14   interested in the outcome of this matter.

15      IN WITNESS WHEREOF, I have hereunto set

16   my hand this 23rd day of January, 2024.

17

18                 *Todd DeSimone*

19           TODD DESIMONE

20

21           *        *        *

22

23

24

25