# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| **LUCID GROUP USA, INC.,**<br>    **Plaintiff,**<br>v.<br>**MONIQUE JOHNSTON, et al.,**<br>    **Defendants.** | **1:22-CV-1116-RP** |

## EXPERT REPORT OF HERBERT E. WALTER
## SUBMITTED BY LUCID USA, INC.

# REPORT OF HERBERT E. WALTER
## July 26, 2023

1. I am an independent consultant with more than 40 years of financial and management consulting experience applying my financial, accounting, and quantitative background to the analysis of business transactions, development of financial models, evaluation of performance, and assessment of financial condition.

2. I am a retired partner of PricewaterhouseCoopers LLP, where I worked for 32 years, the last 20 years as a partner. I retired from PricewaterhouseCoopers on July 1, 2009.

3. My experience includes evaluating the financial condition and financial performance of numerous companies across a variety of industries, including automobile dealerships and other entities in the automotive retail sector. My work has been performed to improve financial management and business performance, determine liability in adversary proceedings, and quantify alleged damages.

4. I have more than 30 years of experience in the automotive industry, most of which has focused on automotive retail. I have studied hundreds of dealerships across the United States—including dealerships in Texas—by (1) reviewing their financial records to evaluate the financial and operational performance of dealerships overall, and of each department; (2) evaluating their financing and capital structure; (3) studying their sales and inventory management; (4) analyzing their relationship with manufacturers, finance companies, and customers; and (5) reviewing their performance according to the franchise agreements. I have been retained by most major vehicle manufacturers including Audi, Ford, GM, Honda, Hyundai, Jaguar, Kia, Lamborghini, Lucid, Nissan, Porsche, Rivian, Stellantis (formerly Chrysler, Fiat Chrysler Automobiles, or FCA), Subaru, Suzuki, Tesla, Toyota, and VW. I have also consulted for manufacturers and dealers in cases in which incumbent dealership(s) objected to the opening of a new dealership or to the relocation of a dealership closer to incumbent dealership(s). This work has involved dealerships ranging from small, exclusive-brand dealerships to major dealerships owned by large, privately capitalized companies or public companies.

5. I have been qualified to testify as an expert regarding the retail operations of independent franchised dealerships and have testified concerning my opinions in federal and state court trials and in administrative hearings approximately 50 times in roughly 20 states. My work related to dealerships in Texas has included evaluating their financial and operating performance as described above, both individually and as part of groups of dealerships included in composite financial results. My work relating to dealerships in Texas has resulted in testimony multiple times at court trials and at hearings before the Texas Department of Transportation, Motor Vehicle Division.

1

Report of Herbert E. Walter
Lucid Motors—United States District Court for the Western District of Texas Austin Division
July 26, 2023

6. I base my findings and opinions on the summarized work and analysis described below, on materials considered that are listed below, as well as on my background and experience. I have included my Resume and Schedule of Testimony Provided during the Previous Four Years as of July 2023; see Attachment 1.

7. Staff from Urban Science Applications, Inc. ("Urban Science"), working at my direction, assisted me on this matter.

8. Baker & Hostetler LLP ("Baker Hostetler"), on behalf of Lucid USA, Inc. and Lucid Group USA, Inc. ("Lucid"), asked me to compare the business model for selling new cars exclusively through a network of manufacturer affiliated stores to that of independently-owned dealerships that have been franchised from automotive manufacturers (referred to as "franchised dealerships").

9. In preparation for my testimony, I interviewed Mr. Zak Edson, Lucid's Vice President of Sales and Service, about Lucid's sales model. Except as otherwise identified in this report, this interview was confirmatory of Mr. Edson's declaration.[1]

## SUMMARY OF FINDINGS AND OPINIONS

10. I understand that Lucid manufactures and sells only electric vehicles. According to Lucid's 2022 Form 10-K, "we implement a direct sales and service strategy to maintain control over the customer experience and ensure that interactions are aligned with the Lucid brand. We enable this tight control over the customer experience by vertically integrating our sales operations instead of relying on a traditional outsourced dealership model. We are also scaling our own service operations to support customers, in addition to growing our established network of partnerships with body shops and other ancillary service partners that meet our expectations for customer service."[2]

11. As of May 8, 2023, Lucid has opened thirty-one retail studio and service centers in the United States.[3] Lucid believes that owning its sales network provides an opportunity to

---

[1] Declaration of Zachary Edson, dated November 21, 2022.
[2] Lucid's 2022 Form 10-K, page 9.
[3] Lucid Motors First Quarter 2023 Earnings Release.

2

Report of Herbert E. Walter
Lucid Motors—United States District Court for the Western District of Texas Austin Division
July 26, 2023

control the customer experience and ensure that customer interactions are on-brand and pressure-free.[4]

**Lucid Studio and Service Network as of Q1 2023 Earnings Release[5]**



12. Lucid provides the customer with the option to either place an order online or through one of its Studios. Lucid believes that its direct-to-consumer sales model, combined with a digitally enhanced experience through its website and a refined in-store experience, creates opportunities to tailor to each customer's purchase and ownership preferences.[6]

13. As a new entrant in automotive retail, Lucid is seeking to establish itself as a luxury brand with its vehicle, the Lucid Air, as "a luxury electric sedan that redefines both the luxury car segment and the electric vehicle space."[7] Moreover, "Lucid's business and prospects will heavily depend on its ability to develop, maintain and strengthen the brand associated with luxury and technological excellence. Promoting and positioning its brand will likely depend significantly on Lucid's ability to provide a consistently high-quality customer experience."[8]

14. There are vast disparities between Lucid's direct-to-consumer sales model and the franchised dealership model. There are also substantial differences among independent franchised

---

[4] Registration Statement, page 191.
[5] Lucid's Q1 2023 presentation to its shareholders.
[6] Registration Statement, page 207.
[7] Registration Statement, page 20.
[8] Registration Statement, page 63.

3

Report of Herbert E. Walter
Lucid Motors—United States District Court for the Western District of Texas Austin Division
July 26, 2023

dealerships both between same-brand dealerships (intra-brand) and dealerships from different brands (inter-brand), even within the same segment.

15. One of the principles on which Lucid competes is by providing customers with a sales and service experience different from that provided by the franchised dealership model. Automotive manufacturers long ago chose to adopt—and are now wedded to—the franchised dealership model, with whatever benefits they have derived from that model and the problems inherent with it. Lucid, by contrast, is a new entrant seeking to popularize a new technology consistent with its clean-energy mission and has built its business model on direct contact with customers as well as on a highly differentiated sales and service experience.

16. Depriving Lucid of its ability to compete in Texas against long-established manufacturers by providing superior sales and service would make it significantly more difficult for Lucid to enter and thrive in the automotive retail market. Lucid needs to be able to compete against other electric vehicle ("EV") manufacturers, such as Tesla and Rivian, who have also chosen not to adopt a franchised dealership model.

17. When selling new vehicles through independent franchised dealers, manufacturers lose direct control over their brand and image. Each franchised dealership is an independent business and often has to be encouraged, bargained with, persuaded, and incentivized to adopt a manufacturer's desired changes. This requires additional staffing and systems, which increases costs.

18. The inefficiencies in operating two retail distribution networks—company-owned retail locations and franchised dealerships—would exacerbate the differences between direct-to-consumer models permitted in other states and the franchised dealership model discussed throughout this report, including the following:

    a. Traditional dealerships are typically massive operations with high overhead, requiring a high volume of fast-paced vehicle sales and service work to remain profitable. This varies dramatically from Lucid's direct-to-consumer sales model, which relies on much smaller facilities that focus on customer education and the highest-quality customer service.

    b. Lucid offers uniform, fixed pricing for sales through Lucid Studios and on Lucid's website. Traditional dealerships that mark up the retail price of the Lucid cars they sell to cover their costs and make a profit will be unable to compete with Lucid's direct-to-consumer vehicle pricing.

    c. Traditional dealerships derive significant profits from the sale of service and parts, used vehicles, and financing and insurance products. These sources of profits would be largely unavailable to an independent franchised dealership selling Lucid cars because Lucid has

4

Report of Herbert E. Walter
Lucid Motors—United States District Court for the Western District of Texas Austin Division
July 26, 2023

     the ability in Texas, and plans to continue, to perform all warranty work as well as to facilitate the resale of off-lease vehicles.

d. Moreover, Lucid operates a service center that provides warranty and customer-pay service work, and it can purchase and resell off-lease Lucid vehicles in Texas, thus making these potential sources of profits even less likely, if not unavailable, for an independent franchised dealership.

e. Independent franchised dealerships rely on manufacturers to assist in funding advertising and incentive programs. While Lucid advertises its brand and cars, it does not support dealership advertising and it does plan to offer incentive programs through independent franchised dealerships.

## I.    THE FRANCHISED DEALERSHIP MODEL

**Facility**

19. Franchised dealerships are typically massive operations, with large facilities located on acres of land that incur substantial overhead costs. Corporations often own multiple dealerships, frequently tens and sometimes hundreds of dealerships. Franchised dealerships must sell large volumes of new vehicles because the profit margin from the sale of new vehicles is low. In addition, due to the low profit margin on new vehicle sales, dealerships must rely on margins derived from substantial sales of used vehicles and service and parts to remain profitable. This significant volume of sales of both new and used vehicles is designed around business processes for traditional dealerships that have large lots on which to store their new and used vehicle inventory.

20. Traditional franchised dealerships require many millions of dollars in financing to fund the cost of purchasing vehicle inventory. The business model for a traditional dealership is centered on acquiring, selling, and servicing large numbers of new and used vehicles. The dealership must generate the sales and related profits from all of its departments to support this massive operation and to produce a bottom-line profit.

**Pricing**

21. Independent franchised dealerships do not adhere to fixed vehicle prices, but rather negotiate prices with customers in an effort to sell the vehicle for the highest price possible.[9] The price of a vehicle is frequently obscured by the multiple transactions taking place simultaneously—for example, a new vehicle sale, a used vehicle trade-in, vehicle financing,

---

[9] A few manufactures and traditional dealerships have experimented with "no haggle" pricing for new vehicles. There are also various buying programs that offer purchaser pre-arranged discounts when purchasing a vehicle through these programs, e.g., AAA, Costco, and the American Bar Association.

5

Report of Herbert E. Walter
Lucid Motors—United States District Court for the Western District of Texas Austin Division
July 26, 2023

and the sale of add-ons sold with the vehicle, such as an extended service contract or various insurance products. Each of these components associated with a single new vehicle transaction provides an independent franchised dealership with the opportunity to generate profits.

**Profit Centers**

22. Independent franchised dealerships rely heavily on profits from sales of service and parts, used car sales, and sales of various other add-ons. They operate multiple departments that are generally grouped as: (1) new vehicle sales, (2) service, parts sales, and body shop sales ("fixed departments"), and (3) used vehicle sales.[10] In 2020[11] the new vehicle sales department of a traditional dealership generated over half of the dealership's revenue (55%[12]) but contributed much less to its gross profit (27%[13]). Conversely, traditional dealerships relied on the fixed departments to generate proportionately less of the dealership's revenue (12%[14]) but contributed more to its gross profit (46%[15]).




NADA Average Dealership Profile
Percentage of Sales and Gross Profit by Department
2020

23. Independent franchised dealerships maximize profits from their fixed departments by leveraging the large base of vehicles eligible for service. Independent franchised dealerships have generally been in business for a long time and have sold many new and used vehicles

---

[10] The financing and insurance department operates within and supports both the new and the used vehicle departments.
[11] The most recent year for which NADA published an average dealership profile including both sales and gross profits by department.
[12] NADA Average Dealership Profile—December 2020.
[13] NADA Average Dealership Profile—December 2020.
[14] NADA Average Dealership Profile—December 2020.
[15] NADA Average Dealership Profile—December 2020.

6

Report of Herbert E. Walter
Lucid Motors—United States District Court for the Western District of Texas Austin Division
July 26, 2023

that need servicing throughout these vehicles' lives. The base of vehicles from which these dealerships draw most of their service and parts business is referred to in the industry as its units in operation ("UIO") or vehicles in operation ("VIO").[16]

24. Independent franchised dealerships may also increase profits from their service and parts department by pushing the sale of additional services, which is referred to as "upselling." Dealerships often compensate their service advisors with commissions, incentivizing them to recommend additional work to customers. In addition, service work is paid on a flat rate, meaning that service employees are compensated by the job rather than by the hour. This can encourage service technicians to rush work, thereby maximizing their compensation and the dealership's profits.

25. Sales of used vehicles is a major source of profit for independent franchised dealerships. These dealerships realize a profit on used vehicle sales by obtaining used vehicles at lower trade-in prices or from auctions and reselling them at higher retail prices. Independent franchised dealerships acquire approximately 65% of the used vehicles they sell through trade-ins on new or used vehicle purchases.[17]

26. The financing and insurance ("F&I") department of an independent franchised dealership is highly lucrative, contributing more than half of the average dealership's new vehicle department's gross profit.[18] The F&I department generally charges a "dealership markup" on the interest rate a lender offers. If a lender, for example, agrees to finance a customer's vehicle purchase loan for 5.0% interest, the dealership may charge that customer 6.0% interest and retain the 1.0% markup as profit. The markup percentage can vary from brand to brand, dealership to dealership, and vehicle purchase deal to deal. Employees of a traditional dealership's F&I department typically earn a commission for selling F&I products to new and used vehicle customers.

**Purchase Process**

27. An independent franchised dealership typically relies on a high-pressure sales approach that incentivizes closing sales as quickly as possible at the highest price. Dealerships are incentivized to sell products quickly not only to make sufficient profits to sustain their business model, but because the highest performing dealerships in terms of new vehicle sales earn relatively more vehicle allocation from their franchising manufacturers. Ideally, from

---

[16] UIO is typically measured based on the five to seven most recent model years for a given vehicle brand, as these are the vehicles most likely to be brought into a dealership for service work.
[17] NADA Data: Annual Financial Profile of America's Franchised New-Vehicle Dealerships 2020, page 10.
[18] NADA Average Dealership Profile—December 2020. New Department Gross Profit = $7,192,489 * 26.9% = $1,934,780. New Department F&I Gross Profit = $32,442,238 * 3.2% = $1,038,152. New Department F&I Gross Profit as a Percent of New Department Gross Profit = $1,038,152 / $1,934,780 = 53.7%.

7

Report of Herbert E. Walter
Lucid Motors—United States District Court for the Western District of Texas Austin Division
July 26, 2023

the dealership's perspective, a potential customer drives to the dealership in a used vehicle and drives away in a new vehicle.

28. Customers often arrive at a franchised dealership with the intent of purchasing a specific new vehicle. Many customers have researched the vehicle brand and model along with competitive brands and models before visiting the dealership. The salesperson, therefore, need not spend significant time educating the customer about a vehicle.

29. Independent franchised dealerships generally incentivize a high-pressure sales environment in which dealerships attempt to makes sales as quickly and for as much as possible. Salespeople earn most of their compensation through commissions from new vehicle sales along with compensation for pushing and selling add-on products, like financing, service packages, or other ancillary items. Departmental profits contribute to commissions and bonuses for the dealership's management team. This structure contributes to the inconsistency of customer service with respect to new vehicles sales varying from salesperson to salesperson, from dealership to dealership, and from brand to brand.

## II.  LUCID'S DIRECT-TO-CONSUMER SALES MODEL

**Facility**

30. I understand Lucid's Studios are relatively small retail operations unlike the massive enterprises, with large facilities located on acres of land, which is typical of franchised dealerships. Lucid's Studios have showroom vehicles and demonstrator vehicles, the latter providing test drives for potential customers, but Studios do not have large inventories of new or used vehicles. New vehicles can be sourced for a sale either from manufacturing to a customer's order specification or by searching the limited inventory among Lucid's U.S. Studios. An independent franchised dealership could not take advantage of the breadth of vehicle sourcing options available to a Lucid Studio.

31. At many locations the service center is not located with the Studio but is a separate facility. This again contrasts with franchised dealerships that have large, on-site service operations with numerous service bays and vehicle lifts, specialized equipment, brand-specific special tooling, and parts inventory.

**Pricing**

32. Lucid manages the customer experience from the initial point of contact with a potential customer, through the new vehicle sales process, and throughout the service life of the vehicle.

33. Information on Lucid's cars, such as price, warranties, and financing, is transparent and uniform, that is, there is no negotiation of the vehicle's price. The price depends on the

8

Report of Herbert E. Walter
Lucid Motors—United States District Court for the Western District of Texas Austin Division
July 26, 2023

configuration of and options for each car, but nothing else. Lucid customers will pay the same price whether they purchase through Lucid's website, at a local Studio, or at a Studio in a different state.

**Profit Centers**

34. Unlike traditional franchised dealerships, most of Lucid's profit contributions come from the sale of new Lucid cars, and not from servicing Lucid cars, selling used vehicles, or selling financing and insurance products.

35. Lucid does not derive significant profits from its service and parts department. Lucid's service base—the Lucid cars on the road that need servicing—is and will continue to be extremely small compared to that of a traditional franchised dealership. In addition, for roughly the first four or more years following the sale of its new vehicles, most service work will be warranty work.

36. Lucid's national service platform takes advantage of new technologies that reduce the need for customer trips to the Lucid service center. Lucid can perform over-the-air remote diagnostics, software updates, and offer continuous improvements to the vehicle's software. As a customer convenience, Lucid performs some service work that is not over the air via a fleet of mobile servicing vans.

37. Lucid pays its service employees by the hour and not by the service job, unlike the service employees at franchised dealerships. Additionally, Lucid does not pay service advisors on a commission basis, including incentives to upsell additional service work beyond the work that brought the vehicle to the dealership.

38. Lucid does not expect to derive significant profits from used vehicle sales. While Lucid plans to sell used, previously owned Lucid cars, Lucid does not expect to sell non-Lucid used vehicles to the public. From a practical standpoint, for several years there will be few used Lucid vehicles that could be available for resale. Therefore, used vehicle sales will not be an opportunity for significant profits.

39. Lucid does not operate a financing department as part of its Studios. Lucid can assist customers to obtain financing directly through its relationship with Bank of America and may receive a financing transaction fee. Unlike traditional dealership financing arrangements, I understand Lucid does not increase the offered customer's interest rate. Therefore, financing will not be an opportunity for significant profits.

40. Lucid expects its Studios to be small and have little or no new or used vehicle inventory. This inventory profile is in sharp contrast to franchised dealerships that typically have significant new and used vehicle inventory.

9

Report of Herbert E. Walter
Lucid Motors—United States District Court for the Western District of Texas Austin Division
July 26, 2023

41. I understand that through its Studios, Lucid maintains control over all aspects of the experience of its customers for both its sales and its service operations. This control enables it to provide its desired customer experience at all stages of the car-buying process, thereby solidifying its brand reputation and promoting its cars. By maintaining small Studios and custom-made cars, rather than massive facilities and large vehicle inventories, Lucid is not burdened with the overhead cost associated with traditional dealerships that would inevitably be passed to consumers through increased retail prices.

### III. EXISTING TEXAS DEALERSHIPS ARE CONTRACTUALLY PROHIBITED FROM SELLING LUCID CARS ALONGSIDE NEW VEHICLES FROM OTHER MANUFACTURERS

42. Traditional dealerships are generally prohibited from selling Lucid cars alongside new vehicles made by other manufacturers. Manufacturers have developed and implemented various programs to reinforce their brand images. This is the case not only for automotive dealerships, but for fast-food restaurants, retail establishments, and service industry locations. For traditional dealerships, these programs have included facility image programs that present a manufacturer's brand in a consistent and recognizable way. As a result, the facades, showrooms, and service areas of most dealerships for a brand have the same elements, including building design, wall color, flooring, furniture and fixtures, and signage.

43. Concurrently, with the focus on implementing brand image programs, manufacturers typically require that dealerships sell only their brand's new vehicles. It would be incongruous to have a brand image facility for a given brand, while having multiple brands on display in that facility. As a result, traditional dealerships are generally prohibited from selling multiple brands in a single facility.

44. Dualed dealerships—dealerships that sell more than one manufacturer's new vehicles from a single facility—were once popular but are now rare. Driven by manufacturers' desire to protect the exclusivity of their brands, the trend for many years has been to "de-dual" dealerships. Many dealerships that were once dualed have moved into separate buildings so that showroom displays, sales staff, and service lanes and bays are separated by brand.

### IV. CONCLUSION

45. A hypothetical independent franchised dealership would need to mark up the price of Lucid cars to absorb the cost of the dealership's overhead, advertising, and customer incentives programs. As discussed throughout this report, it would need to derive most of its profits from new car sales, but it would not be able to do so because at marked-up prices an independent franchised dealership would not be able to compete with Lucid's fixed pricing available from Lucid's website or Lucid company-owned Studios in another state.

10

Report of Herbert E. Walter
Lucid Motors—United States District Court for the Western District of Texas Austin Division
July 26, 2023

46. A hypothetical independent franchised dealership could not derive significant revenue or profits from servicing Lucid cars. Lucid operates a service center in Texas and could open additional service centers as the volume of vehicle sales necessitates additional service facilities. Moreover, The UIO base of a few Lucid cars will be dramatically lower than the UIO base of thousands of vehicles typically relied on by dealerships to generate a profit from service. There will simply not be enough Lucid cars on the road to generate the service profits necessary to support the franchised dealership model. Furthermore, Lucid already performs warranty and service work on Lucid vehicles in Texas and plans to continue to do so regardless of the outcome of this litigation.[19]

47. To be economically viable, an independent franchise dealership must operate profitably. A dealership that is not profitable certainly cannot serve customers with the level of customer contact, service, and care necessary for the dealership to succeed and grow or for it to contribute to Lucid as the company continues to build its brand. Thus, it would not be viable for Lucid to sell its cars to consumers through independent franchised dealerships in Texas. Rather, by maintaining control over all aspects of the experience of its customers, Lucid will be able to provide its desired customer experience to the benefit of Lucid's customers.

## MATERIALS CONSIDERED

48. In addition to my knowledge, experience, the above referenced discussion with Zak Edson, among the documents reviewed and considered in conducting my analysis are:

    1. Lucid's complaint in this matter
    2. Lucid's motion for summary judgement
    3. Judge Robert Pitman's denial of Lucid's motion to dismiss
    4. Lucid's registration statement
    5. Lucid's 2022 Form 10-K
    6. Lucid's Q1 2023 presentation to its shareholders
    7. Declaration of Zachary Edson
    8. Declaration of Professor Fiona Scott Morton
    9. Expert Report of Fiona Scott Morton
    10. 2020 NADA Dealership Profile Report
    11. Texas Occupations Code 2301.603

## OTHER

49. The opinions presented above are based upon the information and documents made available to me to date. I reserve the right to expand, modify, or update my findings and conclusions based upon my review of any further documents produced, disclosures made by any other

---

[19] Tex. Occ. Code Ann. § 2301.603(a) and discussion with Zak Edson.

11

Report of Herbert E. Walter
Lucid Motors—United States District Court for the Western District of Texas Austin Division
July 26, 2023

expert, additional information or documentation provided, or on testimony and exhibits introduced at subsequent depositions or at a hearing in this matter, or if any updates or corrections are appropriate.

50. This report has been prepared solely in connection with this matter. Urban Science and I disclaim any contractual or other responsibility to others based on the use of this report and, accordingly, this information may not be relied upon by anyone other than in connection with the above-referenced matter.

51. Urban Science's and my compensation are in no way contingent on the outcome of the hearing in this matter. My hourly rate is $1,200 per hour plus expenses. Urban Science employee rates range from $125 to $500 per hour plus expenses. I will provide a summary of hours spent on this report in the near future.

52. For purposes of presenting my testimony, I may use the attachments or exhibits in the form of schedules to summarize my findings and analysis. I may also use certain demonstrative aids and illustrations to assist in presenting technical concepts and analysis.

_____
Herbert E. Walter

12

Report of Herbert E. Walter
Lucid Motors—United States District Court for the Western District of Texas Austin Division
July 26, 2023

Herbert E. Walter<br>(703) 801-3580

---

| | |
|---|---|
| **POSITION** | Herbert E. Walter, LLC, Independent Consultant |
| **Education and Certification** | MBA, University of Cincinnati, 1980<br>Concentrations: Finance and Quantitative Analysis<br><br>BBA, University of Cincinnati, *summa cum laude*, 1977<br>Majors: Accounting and Quantitative Analysis<br><br>CPA Retired: Ohio<br>CFE Retired |
| **Range of Experience** | Mr. Walter has more than 40 years of financial and management consulting experience. He has more than 30 years of experience studying and analyzing the motor vehicle retail industry sector, including the relationships among manufacturers, distributors, dealerships, finance companies, customers, and insurance companies. His work has involved evaluating the performance of dealerships, both individually and as part of groups of dealerships included in composite financial results. His work has involved dealerships across the United States ranging from small, exclusive-brand dealerships to major dealerships owned by large, privately capitalized companies or by publicly owned companies.<br><br>Mr. Walter has been retained by most major vehicle manufacturers, including Audi, Ford, General Motors, Honda, Hyundai, Jaguar, Kia, Lamborghini, Lucid, Nissan, Porsche, Rivian, Stellantis (formerly Chrysler, Fiat Chrysler Automobiles, or FCA), Subaru, Suzuki, Tesla, Toyota, Volkswagen, and Volvo Trucks. He has been qualified to testify as an expert regarding the automotive retail industry sector and has testified in federal and state court trials, in Department of Motor Vehicles administrative hearings, and in arbitration proceedings in approximately 20 states on 50 or more occasions. |
| **Professional and Business History** | PricewaterhouseCoopers, Retired Partner, July 1, 2009<br>PricewaterhouseCoopers, Partner, 1998 to 2009<br>Price Waterhouse, Partner, 1989 to 1998<br>Price Waterhouse, Staff, Senior, Manager, and Senior Manager, 1977-1989<br>City of Cincinnati Regional Computer Center, Co-op Student, 1974 to 1977 |
| **Professional and Business Experience** | Evaluated the production, distribution, and sale of vehicles and related products and services throughout the United States and internationally in connection with matters involving:<br>• Dealership add points and relocations<br>• Dealership buy/sell transactions<br>• Dealership terminations<br>• Vehicle distribution, allocation, and inventory management<br>• Manufacturer incentive programs<br>• Dealership financing and capital structure<br>• Customer vehicle financing, leasing, and insurance products<br>• Questionable financial reporting or fraudulent transactions<br>• Dealership parts and service transactions, including warranty claims<br>• Collision damage, repair, and insurance claims<br><br>Analyzed the financial and alleged damages aspects of proposed consumer class actions involving claimed vehicle defects, including the following:<br>• New and used vehicle sales<br>• Vehicle purchasers, including retail consumers, rental companies, and other fleet buyers<br>• Vehicle retail and trade-in pricing and margins<br>• Vehicle retail purchases, lease transactions, and rental company transactions, with and without risk/repurchase option<br>• Vehicle auction transactions<br>• Vehicle value retention and pricing trends<br>• Parts warranties and extended service contracts |

Attachment 1

# Herbert E. Walter
## Schedule of Testimony Provided During the Previous Four Years as of July 2023

| **Matter** | **Court** | **Law Firm** | **Testimony** |
|---|---|---|---|
| <u>Lucid USA, Inc., Petitioner</u> | Commonwealth of Virginia Department of Motor Vehicles | BakerHostetler | Hearing: Apr 2021 |
| Coyle Nissan, LLC v. <u>Nissan North America, Inc.</u> | United States District Court, Southern District of Indiana, New Albany Division | Dorsey & Whitney LLP | Depo: Nov 2020 |
| Whitey's Nissan, Inc. dba Nissan of Mansfield v. <u>Nissan North America, Inc.</u> | Court of Common Pleas, Richland County, Ohio | Dorsey & Whitney LLP | Depo: July 2020 |
| Altomare Auto Group, LLC v. <u>Volkswagen Group of America, Inc. D/B/A Volkswagen of America, Inc., VW Credit, Inc.</u>, and Park Avenue Union, LLC | Superior Court of New Jersey, Law Division – Union County | Barack Ferrazzano Kirschbaum & Nagelberg LLP | Depo: Jan 2020 |
| Barber Group, Inc., d/b/a Barber Honda, Protestant v. <u>American Honda Motor Co., Inc., Respondent</u> | State of California, New Motor Vehicle Board | Nelson Mullins Riley & Scarborough LLP | Depo: Jan 2019<br>Trial: Jan 2020 |

Underline indicates client

Attachment 1