# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

LUCID GROUP USA, INC.,

    *Plaintiff*,

        v.

MONIQUE JOHNSTON, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles; DANIEL AVITIA, in his official capacity as Executive Director of the Texas Department of Motor Vehicles; and CORRIE THOMPSON, in her official capacity as Director of the Enforcement Division of the Texas Department of Motor Vehicles,

    *Defendants*.

Civil Action No. 1:22-cv-01116-RP

## Plaintiff's Response in Opposition To Intervenor-Defendant's
## Motion to Exclude or Limit the Testimony of Dr. Fiona Scott Morton

# Table of Contents

**Page**

Introduction…………………………………………………………………........1

Legal and Factual Background ……………………………………………….........2

    A.    The Legal Question as to Which Dr. Scott Morton's Testimony Is Relevant ...................................................................................................2

    B.    Dr. Scott Morton's Expert Opinions ....................................................3

Legal Standard ………………………………………………………….........4

Argument ……………………………………………………………………4

    I.    The Court Should Not Exclude or Limit Dr. Scott Morton's Testimony Because The Trial in This Case Will Be a Bench Trial ........................................5

    II.    TADA Fails to Establish that Dr. Scott Morton's Opinions are Irrelevant or Unreliable ...............................................................................................5

        A.    The Court Should Not Limit Dr. Scott Morton's Testimony on Her Opinion That an Independent Lucid Dealer Would Not Be Economically Viable.................................................................5

            1.    This opinion is relevant.................................................5

            2.    This opinion is reliable.................................................7

        B.    The Court Should Not Limit Dr. Scott Morton's Testimony on Her Opinion That the Texas Prohibition Harms Consumers by Increasing the Risk of Double Marginalization ........................ 12

        C.    The Court Should Not Limit Dr. Scott Morton's Testimony on Her Opinion That Direct-Sales Manufacturers' Incentive to Serve Customers Well Is at Least as Strong as Those of Independent Dealers ................................................................................ 14

        D.    The Court Should Not Limit Dr. Scott Morton's Testimony Concerning Background Information on Lucid's Direct-Sales-Only Model ................................................................................ 15

        E.    TADA's Motion Provides No Basis to Exclude the Entirety of Dr. Scott Morton's Testimony ................................................... 16

Conclusion …………………………………………………………………17

# Table of Authorities

## Cases

*Air Evac EMS, Inc. v. Sullivan,*
  331 F. Supp. 3d 650 (W.D. Tex. 2018)..................................................................5

*Daubert v. Merrell Down Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993)..................................................................................................4

*FB & SB Leasing, LLC v. Chubb Lloyds Ins. Co. of Texas,*
  No. 521CV00756JKPRBF, 2022 WL 2715001 (W.D. Tex. July 1, 2022) ............10

*Intell. Ventures I LLC v. Cap. One Fin. Corp.,*
  280 F. Supp. 3d 691 (D. Md. 2017) ........................................................................3

*Lucid Grp. USA, Inc. v. Johnston,*
  No. 1:22-CV-1116-RP, 2023 WL 5688153 (W.D. Tex. June 21, 2023) ............2, 7

*In re MBS Mgmt. Servs., Inc.,*
  690 F.3d 352 (5th Cir. 2012) ..................................................................................4

*Merrifield v. Lockyer,*
  547 F.3d 978 (9th Cir. 2008) ..................................................................................2

*MM Steel, L.P. v. JSW Steel (USA) Inc.,*
  806 F.3d 835 (5th Cir. 2015) ................................................................................15

*St. Joseph Abbey v. Castille,*
  712 F.3d 215 (5th Cir. 2013) ..................................................................................2

*St. Joseph Abbey v. Castille,*
  835 F. Supp. 2d 149 (E.D. La. 2011), aff'd, 712 F.3d 215 (5th Cir. 2013) ............2

*St. Joseph Abbey v. Castille,*
  No. CIV.A. 10-2717, 2011 WL 2182046 (E.D. La. June 3, 2011)...........................2

*United States v. 14.38 Acres of Land,*
  80 F.3d 1074 (5th Cir. 1996) ..........................................................................10, 16

*United States v. Patel,*
  No. 3:21-CR-220 (VAB), 2023 WL 2643815 (D. Conn. Mar. 27, 2023) ..............12

*US Airways, Inc. v. Sabre Holdings Corp.,*
  No. 11 CIV. 2725 (LGS), 2022 WL 1042273 (S.D.N.Y. Apr. 5, 2022)................12

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n,*
  No. 1:15-CV-134-RP, 2017 WL 11715451 (W.D. Tex. May 22, 2017)..........7, 12

*Wells v. SmithKline Beecham Corp.*,
    601 F.3d 375 (5th Cir. 2010) ................................................................................13

*Whitehouse Hotel Ltd. P'ship v. Comm'r*,
    615 F.3d 321 (5th Cir. 2010) ..................................................................................4

**Statutes and Rules**

Fed. R. Evid 702 ..............................................................................................4, 5, 12

## Index of Exhibits

1. Excerpts from Transcript of Deposition of Donald Reed House, Sr., January 24, 2024.

2. Excerpts from Transcript of Deposition of Fiona Scott Morton, January 23, 2024.

3. Expert Report of Herbert E. Walter, July 2023.

4. Expert Report of Edward M. Stockton, M.S., September 2023.

Plaintiff Lucid Group USA, Inc. (collectively, with its manufacturing affiliate Lucid Motors USA, Inc., "Lucid") respectfully submits this response to the Motion to Exclude or Limit the Testimony of Dr. Fiona Scott Morton filed by Intervenor-Defendant Texas Automobile Dealers Association ("TADA").

## Introduction

Dr. Scott Morton is the world-renowned Theodore Nirenberg Professor of Economics at Yale University School of Management, where she has published numerous peer-reviewed articles about empirical industrial organization and competitive strategy, including many articles specifically about the automotive industry. Her expert report in this case applies her extensive background in economic theory to explain how Texas's prohibition of the direct-sales-only business model harms consumers. Dr. Scott Morton is clearly qualified to render this opinion and her methodology is well-recognized and reliable. Her testimony is therefore admissible under any standard, but obviously so under the lenient standards for admission of expert testimony in a bench trial.

In seeking to exclude her testimony, TADA largely seeks to argue the merits of its case in ways that do not go to the admissibility of Dr. Scott Morton's opinions. TADA criticizes the sources and materials she relies upon, such as publicly documented facts about Lucid. Putting aside TADA's own expert's concession of those facts, TADA's criticism of these materials goes to the weight of Dr. Scott Morton's opinions and not their admissibility. TADA also conducts a line-by-line assessment of the merits of Dr. Scott Morton's opinions, but TADA's (incorrect) assertion that Dr. Scott Morton's opinions are wrong likewise provides no basis for exclusion.

The only argument TADA advances that goes to the admissibility of Dr. Scott Morton's testimony is its assertion that her testimony is irrelevant. TADA does not explain why her testimony is irrelevant to whether the Texas prohibition lacks a rational basis, nor could it. Courts considering constitutional claims challenging economic regulations often have considered expert economic testimony. TADA instead argues that Lucid has conceded that the economic necessity to Lucid of its direct-sales-only business model is irrelevant. This argument fails for two reasons. First is that while Lucid believes that this issue is not relevant to the rationality of the Texas

1

prohibition, *TADA* has asserted that it is relevant to both standing and the merits. Unless TADA wants to admit that it is wrong, it cannot prevent Lucid from introducing evidence to rebut its arguments. Second is that TADA's relevance argument rests on a misunderstanding of one of Dr. Scott Morton's opinions: She does not opine that the direct-sales-only business model is necessary to Lucid; she opines that an independent Lucid dealer would not be economically viable and thus the Texas prohibition effectively prevents Texas consumers from purchasing Lucid vehicles in Texas. Properly understood, TADA does not and cannot argue that this opinion is irrelevant.

## Legal and Factual Background

### A. The Legal Question as to Which Dr. Scott Morton's Testimony Is Relevant

As this Court recognized in denying the motion to dismiss, there is a "well-established framework" for analyzing Lucid's as-applied challenge to Texas's prohibition of its direct-sales-only business model under the Due Process and Equal Protection Clauses of the U.S. Constitution. *Lucid Grp. USA, Inc. v. Johnston*, No. 1:22-CV-1116-RP, 2023 WL 5688153, at *3 (W.D. Tex. June 21, 2023). Under that framework, this Court must ultimately decide whether that prohibition "bears a rational relationship to some legitimate end." *Id.* (quotation marks omitted). While this standard is relatively deferential, "the ends-means 'connection cannot be fantasy,' and courts need not take a state's justifications at face value where they seem implausible or impermissible," and "plaintiffs may … negate a seemingly plausible basis for the law by adducing evidence of irrationality." *Id.* (quoting *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223, 226 (5th Cir. 2013)). Moreover, "[p]ure economic protectionism, unaccompanied by any other legitimate government purpose, is not a legitimate state interest for the purpose of a rational-basis analysis." *Id.*

Courts evaluating economic regulations under this framework frequently have admitted and relied upon expert testimony, including expert economic opinions. *See, e.g.*, *St. Joseph Abbey v. Castille*, 835 F. Supp. 2d 149, 155 (E.D. La. 2011), aff'd, 712 F.3d 215 (5th Cir. 2013) (relying on "expert on economics of national funeral markets and the national market for third party casket sales"); *St. Joseph Abbey v. Castille*, No. CIV.A. 10-2717, 2011 WL 2182046, at *1 (E.D. La. June 3, 2011) (denying motion to exclude expert); *see also, e.g.*, *Merrifield v. Lockyer*, 547 F.3d 978,

982 (9th Cir. 2008) ("Several experts entered depositions and declarations, including those who testified on the effectiveness of non-pesticide pest control and on the potential rationale behind the licensing rules and the 1995 exemption therefrom.").

## B.    Dr. Scott Morton's Expert Opinions

Dr. Scott Morton is, as one court described her, a "highly credentialed and impressive economic expert." *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 280 F. Supp. 3d 691, 699 (D. Md. 2017). She is the Theodore Nirenberg Professor of Economics at Yale University School of Management, where she has been a professor since 1999, teaches courses on competitive strategy, and conducts academic research into empirical industrial organization. Ex. A at 1.[1] She also is, among other things, a visiting professor at the University of Edinburgh and a research associate at the National Bureau of Economic Research. *Id.* She received a bachelor's degree in economics from Yale University and a Ph.D. in Economics from the Massachusetts Institute of Technology. *Id.*

Prior to her time at Yale, Dr. Scott Morton was an assistant professor at the University of Chicago's and Stanford University's Graduate Schools of Business. *Id.* at 1–2. From 2011 to 2012, she was the Deputy Assistant Attorney General for Economic Analysis in the Antitrust Division of the U.S. Department of Justice, where she supervised the Department's economists in analyzing competitive conduct and consumer impact. *Id.* at 2. She has published dozens of peer-reviewed articles, including articles "about the automotive industry, including on price negotiating in US auto retailing, state franchising laws related to dealer terminations, price discrimination against women and minorities at dealerships, and inventory fluctuations at dealerships." *Id.* She has testified before Congress on seven occasions and before the FTC on one occasion. *Id.*, Attachment 1. She also has testified as a qualified expert in many cases, including those about the auto dealer franchise system. *Id.* at 3.

In her expert report, Dr. Scott Morton sets out four specific opinions: (1) a direct-sales-only manufacturer's incentives "to serve customers well and comply with consumer protection

---

[1] Citations to exhibits generally refer to the exhibits attached to TADA's motion to exclude; this memorandum refers to Lucid's exhibits as "Pl. Ex. [number]."

laws are at least as strong as those of independent dealers," *id.* at 4, § IV; (2) "[a]n independent dealership would not be economically viable under Lucid's direct sales and service model," *id.* at 6, § V; (3) "barring Lucid from selling direct to consumers in Texas harms consumers by reducing consumer choice," *id.* at 8, § VI.1; and (4) "barring Lucid from selling direct to consumers in Texas harms consumers by introducing the risk of double marginalization," *id.* at 9, § VI.2. These opinions were informed both by Dr. Scott Morton's extensive background in economic theory as well as her review of many materials pertinent to the issues at hand, including filings in this case, public documents providing background information on Lucid, and academic and other publications on the economics of state franchise laws and competition policy. *Id.*, Attachment 2 (listing materials relied upon).

## Legal Standard

When a case is tried to a jury, Federal Rule of Evidence 702 requires that "the trial judge serve[] as a gatekeeper to ensure the reliability and relevance of expert testimony." *In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 357 (5th Cir. 2012). However, this gatekeeping role "is significantly diminished in bench trials … because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence." *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010); *In re MBS*, 690 F.3d at 357 ("[M]ost of the safeguards provided for in *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), are not as essential … where a judge sits as the trier of fact in place of a jury." (cleaned up)).

## Argument

The Court should deny TADA's motion to exclude or limit Dr. Scott Morton's testimony for two independent reasons. First is that, if there is a trial in this case, it will be a bench trial and consequently no need for the Court to gatekeep the testimony it may consider. Second is that, even if a fulsome review of the reliability and relevance of Dr. Scott Morton's testimony were necessary, her expert testimony easily satisfies the requirements of Rule 702.

I.      **The Court Should Not Exclude or Limit Dr. Scott Morton's Testimony Because The Trial in This Case Will Be a Bench Trial**

Shockingly, TADA's motion does not even mention that this case will proceed, at most, to a bench trial—a fact which dramatically alters the Court's gatekeeping role under Rule 702. "There is no jury demand in this case, and thus the Court is the trier of fact." *Air Evac EMS, Inc. v. Sullivan*, 331 F. Supp. 3d 650, 657 (W.D. Tex. 2018). Consistent with the legal standard above, the Court therefore need not wade into TADA's motion because "the danger against which [TADA] seeks to guard—namely, the consideration of inadmissible expert and lay testimony—is not present here" because "the Court will not rely on any evidence for an improper purpose." *Id.*

II.     **TADA Fails to Establish that Dr. Scott Morton's Opinions are Irrelevant or Unreliable**

Even if ordinary gatekeeping standards applied, Dr. Scott Morton's opinions readily satisfy them. Dr. Scott Morton is a world-renowned economist with extensive experience not just in competitive markets and consumer impact generally, but also specifically with respect to the automotive industry and state franchise laws. If her testimony does not make it past the gate, no expert's would.

A.  **The Court Should Not Limit Dr. Scott Morton's Testimony on Her Opinion That an Independent Lucid Dealer Would Not Be Economically Viable**

As an initial matter, the Court should not limit Dr. Scott Morton's testimony regarding her opinion that "[a]n independent dealership would not be economically viable under Lucid's direct sales and service model." Ex. A, at 6, § V; Ex. B at 5, ¶ 12.

1. *This opinion is relevant*

TADA first argues (Mot. at 4) that Dr. Scott Morton's opinion about economic viability is irrelevant. TADA does not attempt to explain why, as a legal matter, the opinion is irrelevant under the legal framework governing Lucid's claims discussed above. TADA only cites Lucid's admission, in response to a request for admission, that "the economic necessity of direct-to-

consumer sales for Lucid's business model has nothing to do with the rationality of the prohibition at issue in this case." *Id.* (citing Ex. V). This "gotcha" argument fails for two reasons.

To begin with, TADA cannot fault Lucid for proffering expert opinion on an issue that *TADA asserts is relevant.* According to TADA, whether the franchise model would be economically viable for Lucid is the "crux of the case" on the merits and also relevant to Lucid's standing. TADA Mot. to Compel, ECF No. 55, at 6–7 & n.2. Lucid disagrees: as explained in Lucid's briefing on the motion to compel, Lucid believes that its refusal to employ independent dealers and desire to sell directly to consumers in Texas are sufficient to support its standing to challenge application of Texas's prohibition and to substantiate that application of this prohibition limits access to the Texas market by manufacturers like Lucid that employ the direct-sales-only model. Unless TADA wants to concede that its arguments to the contrary are legally flawed, Lucid should not be precluded from introducing evidence to rebut TADA's assertions. Noticeably, while TADA's motion to exclude repeatedly states that "Lucid admits" that the economic viability of the franchise model is irrelevant,[2] not once does the motion state that *TADA* believes the issue is irrelevant or that the other defendants do.

Moreover, TADA's relevance argument rests on its repeated misunderstanding of Dr. Scott Morton's opinion. As Lucid already explained in opposition to TADA's motion to compel the production of evidence regarding the economic necessity to Lucid of its direct-sales-only business model:

> TADA … cites the declaration of Fiona Scott Morton, Ph.D., to argue that Lucid put its profits and economic viability at issue, calling that information "the crux of Lucid's case." *See* Mot. at 6-7 (citing ECF 4-1 ¶¶ 15-16, 23-24). In fact, the crux of Lucid's case is the irrationality of the Prohibition. In any event, TADA misrepresents Dr. Scott Morton's position because she does not address *Lucid's* profits. Rather, she contends that the franchised-dealer model is not "economically viable" because "the hypothetical independent Lucid dealer would be expected to

---

[2] Mot. at 1 ("Lucid admits that the subjects of Morton's testimony are not relevant to the issues presented."); *id.* at 4 ("Lucid Admits Morton's Economic Opinions Are Irrelevant."); *id.* ("Lucid … has admitted that the economic testimony Lucid seeks to offer in this case is not relevant."); *id.* ("[B]y Lucid's own unqualified admissions, Morton's speculation about the economic viability of a franchised dealer model and, relatedly, Lucid's alleged need to use a direct-to-consumer sales model is irrelevant.").

> earn zero margin on new car sales in perpetuity while bearing significant risk, leading to financial losses" without the benefits from the usual parts, service, and other revenue sources that make up nearly 90% of the profits a franchised dealer relies upon. *See* ECF 4-1, Scott Morton Decl. ¶¶ 15-16. As a result, "requiring Lucid to sell vehicles through an independent dealer effectively bars Lucid from selling in Texas." *See* ECF 4-1, Scott Morton Decl. ¶ 2.2.

Opp. to Mot. to Compel, ECF No. 56, at 4–5. Properly understood, TADA's motion makes no argument why Dr. Scott Morton's opinion on this point is irrelevant. Nor could it, as this Court cited Lucid's allegation that "the ban does not advance consumer welfare because it 'limit[s] access to the Texas market by manufacturers like Lucid that employ the direct-sales-only model'" in holding that Lucid's complaint plausibly "negat[ed] the rational connection between Section 2301.476(c), as applied, and the legitimate interests articulated by Defendants." *Lucid Grp.*, 2023 WL 5688153, at *6.

### 2. *This opinion is reliable*

Dr. Scott Morton's opinion that an independent Lucid dealer would not be economically viable also is reliable. Her report identifies four profit centers for independent dealers—new car sales, vehicle service and repair, financing, and used car sales—and then explains why an independent Lucid dealer's ability to extract profits from these areas would be limited.[3] Ex. A, at 6–7, § V. TADA's motion spends seven pages endeavoring to explain why Dr. Scott Morton's analysis on each point is wrong, but the Court should decline TADA's invitation to review her report "line-by-line in order to render a conclusion on the merits of [her] opinion. Such is the purpose of a trial, not a *Daubert* motion." *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, No. 1:15-CV-134-RP, 2017 WL 11715451, at *4 (W.D. Tex. May 22, 2017). In any event, TADA's line-by-line attack on the merits of Dr. Scott Morton's report is unfounded.

---

[3] TADA's arguments highlight the irrationality of the Texas prohibition because most of the issues are irrelevant to the rationality of the prohibition, which is a ban on the sales of new cars in Texas by anyone other than an independent franchised dealer. Lucid can already do, among other things, warranty service and repair, financing, and sales of Lucid vehicles that have been leased or that come out of its rental fleet. And while TADA touts (incorrectly) Lucid's so-called admissions on economic viability, TADA seemingly ignores Lucid's other admission that ancillary topics such as Lucid's "service, repair, and warranty information" is irrelevant to the rationality of the Prohibition. *See* ECF No. 60-2 at 5-6 (response to request for admission no. 17); *see also* Pl. Ex. 1, House Dep. at 23:9-26:6 (explaining that Lucid can do repairs and service work in Texas). The only relevance of things like warranty service to the prohibition is that they underscore its irrationality, given that Texas law permits Lucid to do everything but sell new vehicles from within Texas.

*New Car Sales*—TADA argues that an independent Lucid dealer could earn a profit on new car sales if Lucid permitted it to charge consumers higher prices. Mot. at 5–6. Unlike traditional manufacturers and franchised dealers, Lucid charges a "fixed and uniform" price for its cars nationwide, which would limit an independent dealer's ability to raise prices to Texas consumers to make a profit. Ex. A, at ¶ 19. Even if an independent dealer could theoretically charge prices higher than Lucid charges, the higher prices would not be competitive with those offered by Lucid directly and could only harm consumers.

TADA also argues that dealers might be able to "earn a profit from new car sales *if* the dealership is able to perform retail sales roles more efficiently than Lucid could." Mot. at 6 (emphasis added). But that assumes, without basis, that Lucid would sell its vehicles to independent dealers at prices less than the fixed and uniform prices that it has set for its vehicles. *See* ECF No. 4-1, Edson Decl. ¶ 16 ("And Lucid's uniform and transparent pricing, as discussed further below, would prevent independent dealers from being able to compete on price or earn any margin on sales."); *see also id.* ¶¶ 18, 26 (explaining uniform price scheme). In addition, as noted in Dr. Scott Morton's rebuttal report, Ford's per-vehicle distribution costs are $2,000 higher than those of direct-sales-only manufacturers, Ex. B, ¶ 23, casting serious doubt on TADA's unsupported assumption about the efficiency of franchised dealers.

*Used Car Sales*—TADA disagrees with Dr. Scott Morton's opinion that an independent dealer's ability to earn a profit from used car sales will be limited because "the pool of available Lucid vehicles will be exceedingly small for years to come." Ex. A, at 7. TADA notes that independent dealers are "not limited to just selling used cars of the same make or model" because "[a] dealership can sell used vehicles that it acquired as trade-ins or from other sources, regardless of the make or model acquired." Mot. at 7. This argument assumes that Lucid would permit independent dealers to sell other brands of vehicles, notwithstanding the need for Lucid dealers to focus on the unique environment necessary to sell Lucid vehicles discussed below. Regardless, since sales of new Lucid cars will be limited, trade-ins from customers buying those cars will be limited. *See* Pl. Ex. 2, Scott Morton Dep. at 139:13–16 ("So the fact that the dealer is making

money on used cars is a feature—is like a spill-over from the fact that they are selling new cars.");
180:14-181:20 (explaining that dealer cannot profitably run a used car business with limited sales).

While it is unclear, TADA's motion could be read to suggest that Lucid should sell its vehicles through independent dealers that do not specialize in or focus on selling primarily Lucid vehicles, such that the dealers earn most of their profit from other brands. To the extent that this is TADA's argument, it conflicts not only with the traditional franchise business model of its members—where dealers focus on specific brands of new cars, *see* Pl. Ex. 3, Walter Expert Report ¶¶ 42–44—but also with Dr. Scott Morton's explanation that "selling Lucid's all-electric vehicles will require different selling behavior, different sales skills, and a different environment than are required for motor vehicle sales generally" because, among other things, the dealers will need to be well-versed in electric vehicles and, specifically, Lucid's vehicles. Ex. A, at 7; *see also* ECF No. 4-1, Edson Decl. ¶ 15 ("To establish a new premium brand, Lucid needed to take full responsibility for every contact that a customer has with its brand, from a customer's initial expression of interest through sale and after-sale support and service.").

*Service and Repairs*—TADA disagrees with Dr. Scott Morton's opinion that an independent dealer's ability to earn a profit from servicing and repairing Lucid vehicles "will be quite limited due to the small scale of sales, Lucid's plans to provide service through non-traditional channels (over-the-air or with mobile service vehicles), and electric vehicles' lower maintenance requirements." Ex. A, at 7.

TADA argues that the "assumptions" on which this opinion relies "are not appropriate." Mot. at 8. But Dr. Scott Morton relied on, among other things, publicly documented facts about Lucid in forming this opinion. For example, the report's assertion that Lucid can service vehicles through over-the-air channels is not an "assumption," it is a fact supported by material identified and considered by Dr. Scott Morton.[4] Indeed, Lucid currently operates service centers in Houston

---

[4] It is also a fact not seriously in dispute. A simple google search for "Lucid over the air updates" shows an extensive list of updates that Lucid has provided through software updates. *See* https://www.lucidupdates.com/ota-updates.html. Even TADA's expert Donald House recognized that "Lucid has a facility by which they can upgrade or modify the software that is installed in a vehicle and can do that remotely." *See* Pl. Ex. 1, House Dep. At 131:1-17. Similarly, Lucid's other expert Herb Walter opined that "Lucid can perform over-the-air remote diagnostics, software updates,

and Austin, plus additional mobile service centers in Texas, and plans to continue to provide service itself in Texas.[5] To the extent that TADA criticizes Dr. Scott Morton for not considering other background material, that "affect[s] the weight to be assigned [her] opinion rather than its admissibility." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996); *FB & SB Leasing, LLC v. Chubb Lloyds Ins. Co. of Texas*, No. 521CV00756JKPRBF, 2022 WL 2715001, at *1 n.1 (W.D. Tex. July 1, 2022) (same). Regardless, TADA's criticisms are unfounded.

TADA notes its own counsel's assertion at a deposition that "some people buy Lamborghinis, they don't sell very many cars, but they manage to sell through dealerships, right?" Ex. C, Tr. 162. To state the obvious, TADA's counsel's question at a deposition about Lamborghinis does not render Dr. Scott Morton's opinion unreliable. TADA argues that "Morton has no knowledge regarding Lucid actual or anticipated sales volumes." Mot. at 8. But, as noted, Dr. Scott Morton relied on filings in this case as well as public documents about Lucid to provide background information for her report. *See* p. 4, *supra*. Dr. Scott Morton's factual recitation is also consistent with the facts presented by Lucid in this case. *See, e.g.*, ECF 4-1, Edson Decl. ¶ 16 ("It is well-known in the industry that independent dealers earn a substantial part of their income from sources other than new-car sales, such as service, parts sales, and used-car sales. Because Lucid is a new manufacturer with few vehicles on the road, these categories of income would be limited for many years. Moreover, electric vehicles tend to require less service than internal-combustion vehicles, further reducing dealer income."). TADA also argues that "if Lucid's vehicles turn out to be less reliable, there is a greater chance for a dealership to earn a profit." Mot. at 9. That analysis still presumes a sufficient sales volume to justify a profitable service base.[6] And if Lucid's vehicles were unreliable, that would further depress their sales. Presumably most dealers hope to earn profits on service and repairs based on *volume*, and not because the cars they sell are clunkers.

---

and offer continuous improvements to the vehicle's software," a point that TADA has not challenged either. *See* Pl. Ex. 3, Walter Expert Report. ¶ 36.

[5] *See* https://lucidmotors.com/locations.

[6] Again, Herb Walter has rendered a similar opinion that TADA has decided not to contest. *See* Pl. Ex. 3, Walter Expert Report ¶ 35 ("Lucid does not derive significant profits from its service and parts department. Lucid's service base—the Lucid cars on the road that need servicing—is and will continue to be extremely small compared to that of a traditional franchised dealership.").

Moreover, TADA's argument ignores the fact that Lucid's ability to provide over-the-air updates and fixes to its vehicles in many instances (in addition to in-person repairs at its service centers) will detract from a dealership's repair profits. TADA similarly ignores Dr. Scott Morton's statement that electric vehicles "do not require oil changes, spark plug replacements, or timing belt replacements, among other tasks," leading to one study estimating that the "maintenance costs per mile for electric vehicles are 41% less than for comparable gas-powered vehicles." Ex. A, at 7 n.15. (Note also that the difference in servicing and maintaining electric vehicles also renders TADA's suggestion that Lucid could simply team up with a Lamborghini dealer even more ridiculous.)

*Financing*—TADA is correct that Dr. Scott Morton does not specifically analyze an independent dealer's ability to earn a profit from financing sales of Lucid's vehicles. Mot. at 10. An independent dealer's ability to profit from financing would be limited by the fact that, as explained by her report, sales of Lucid cars will be small for the indefinite future.

TADA states that "Lucid has never earned a profit in any of its years of operations"— hardly unusual for a startup, *see* Pl. Ex. 2, Scott Morton Dep. at 124:8-17—and that "other EV start-ups have already publicly announced that after initially attempting to sell directly to consumers, they are now changing course and planning to build their networks using independent dealers." Mot. at 10–11. The fact that a couple of other startups are *planning* to use independent dealers in some minor way does nothing to undermine the reliability of Dr. Scott Morton's opinion that a Lucid independent dealer would not be economically viable.

### B. The Court Should Not Limit Dr. Scott Morton's Testimony on Her Opinion That the Texas Prohibition Harms Consumers by Increasing the Risk of Double Marginalization

The Court also should not limit Dr. Scott Morton's testimony concerning her opinion that "barring Lucid from selling direct to consumers in Texas harms consumers by introducing the risk of double marginalization," Ex. A, at 9, § VI.2; *see also* Ex. B, ¶¶ 20–24 (rebuttal report). Double marginalization exists where "two independent entities strive to maximize their profits—the auto

manufacturer and its dealers." *Id.* Because two entities, instead of one, are seeking to profit from vehicle sales, "double marginalization results in higher prices to consumers." *Id.* By contrast, a direct-sales-only business model "eliminates the separate process of setting a dealer markup." *Id.* at 10.

TADA first argues that "[t]he flaw in Morton's opinion is that, while she has articulated this theory, she has conducted no studies or analysis to determine if double marginalization is a real risk in the Texas retail automobile industry." Mot. at 12. But Dr. Scott Morton based this opinion on well-recognized economic principles supplemented by her particular expertise with the automobile industry. *See* p. 4, *supra*; *see also* Pl. Ex. 4, Expert Report of Edward Stockton ¶ 20 (TADA expert conceding that "double marginalization is a recognized economic concept"); House Dep. at 147:18-148:23 (TADA expert conceding consumers will pay more if they buy vehicle from franchised dealers under Lucid's uniform pricing scheme). This sort of expert testimony is regularly admitted under Rule 702. *See, e.g.*, *United States v. Patel*, No. 3:21-CR-220 (VAB), 2023 WL 2643815, at *39 (D. Conn. Mar. 27, 2023) ("Dennis Carlton has appropriately based this opinion on his specialized experience and economic theory."); *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 CIV. 2725 (LGS), 2022 WL 1042273, at *1 (S.D.N.Y. Apr. 5, 2022) ("To the extent that Professor Stiglitz relies on economic theory and his professional analysis and judgment of the relevant market dynamics, that testimony is permissible."); *Wal-Mart Stores*, 2017 WL 11715451, at *4 ("Professor Elzinga's opinions are grounded in reasonably sound economic theory and empirical analysis and are thus sufficiently reliable to be admissible."). Rule 702 does not limit experts to testifying only about empirical studies, much less empirical studies that they personally conducted specific to the case at hand.

TADA next argues that it is "not possible to assume that double marginalization" raises the retail prices for cars in Texas because "an independent dealer may lower prices to the consumer" by "perform[ing] their roles more efficiently or at less cost than a manufacturer." Mot. at 12. This argument does not undermine Dr. Scott Morton's opinion (much less render it unreliable). Even accepting TADA's unsupported assumption that a hypothetical independent Lucid dealer might be

more efficient, *contra* p. 8, *supra*, that efficiency at most would help *offset* the increased costs imposed by double marginalization—it would not eliminate the double marginalization. And, again, TADA's analysis is based upon the faulty assumption that Lucid would somehow sell its vehicles to franchised dealers for less than the rest of the world. *See* p. 8, *supra*.

TADA finally faults Dr. Scott Morton for only "identif[ying] a potential harm, not a certainty." Ex. B, ¶ 24; Mot. at 13. But TADA's expert Edward Stockton conceded that franchised dealers (obviously) make a profit on new vehicle prices beyond their purchase price from the manufacturer—the undisputed definition of double marginalization. Pl. Ex. 4, Stockton Expert Report ¶ 21; *see also* Pl. Ex. 1, House Dep. at 152:14-153:2 (explaining that a franchised dealer must sell a vehicle for more than its own purchase price to make a profit). Regardless, because there are "no certainties in science," courts do not require that expert opinions relay certainties— they must merely "present conclusions grounded in the methods and procedures of science." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010) (cleaned up). This is exactly what Dr. Scott Morton does. *See* Pl. Ex. 2, Scott Morton Dep. at 179:12-180:4 (opining that "it is very likely from the evidence that we have" that double marginalization will occur under a franchised model as compared to a vertically-integrated model).

### C. The Court Should Not Limit Dr. Scott Morton's Testimony on Her Opinion That Direct-Sales Manufacturers' Incentive to Serve Customers Well Is at Least as Strong as Those of Independent Dealers

The Court likewise should not limit Dr. Scott Morton's testimony concerning her opinion that a direct-sales-only manufacturer's incentives "to serve customers well and comply with consumer protection laws are at least as strong as those of independent dealers." Ex. A, at 4, § IV. TADA states that Dr. Scott Morton "does not explain … her qualifications to render such opinion," Mot. at 15, but her report includes a section laying out her credentials, Ex. A, § II, and also attaches her curriculum vitae, *id.*, Attachment 1.

TADA further incorrectly argues that Dr. Scott Morton "does not explain the basis of her opinion." Mot. at 15. Dr. Scott Morton's report explains that this opinion is based primarily on economic theory:

> As an economic matter, there is nothing inherent about vehicle manufacturers that makes them more likely than independent dealers to engage in unfair practices. Engaging in unfair practices harms a manufacturer's brand and can ruin its relationship with its consumers. Independent dealers also have an interest in avoiding unfair practices, but there is no evidence or theoretical reason for why a dealer's interest would be stronger than that of a manufacturer. If anything, a manufacturer has a greater incentive than independent dealers to ensure the long-term grown of its brand and relationship with consumers, because a manufacturer can keep a consumer even if the customer moves from one geographic location to another…. There is no plausible explanation for why a vertically integrated car manufacturer would be any more likely to engage in unfair practices than an independent dealer in light of these incentives.

Ex. A, at 5; *see also* Pl. Ex. 2, Scott Morton Dep. at 83:11-84:10 ("As far as the question about fraud and unfair practices and so on, my understanding as an economist is that there are state laws available to cover everybody, that it doesn't really matter whether you are vertically integrated or not, you would—the state law protect consumers."); *id.* at 85:16:86:8 ("Vertical integration isn't about product safety…"). Dr. Scott Morton's report then supplements this theoretical analysis with empirical reports of "consumer advocacy groups, public policy centers, leading academics, and the Federal Trade Commission," which "have opposed Texas's ban and similar bans in other states as anti-consumer and protectionist." Ex. A,. at 5 & n.11 (collecting sources).

TADA argues that Dr. Scott Morton "conducted no studies of Lucid consumers or customer complaints" and cites anecdotal evidence of customer complaints regarding Tesla. Mot. at 13–14. This misses the point of Dr. Scott Morton's opinion. Her opinion is not that *all* direct-sales-manufacturers are perfect or as good as or better than any franchised dealer; her opinion is that direct-sales manufacturers have at least as strong of an economic incentive as franchised dealers to serve their customers well. *See* Pl. Ex. 2, Scott Morton Dep. Tr. 102:25-105:6. And given these aligned economic incentives, there is no reason to believe that direct-sales-manufacturers as a group are any worse than franchised dealers as a group. In any event, there is no requirement that

an expert opinion be based on a case-specific study conducted by the expert, as opposed to a theoretical analysis or analysis of empirical data that is already available. *See* p. 12, *supra*.

TADA also argues that Dr. Scott Morton's opinion is wrong because there is "an inherent conflict between manufacturers and consumers." Mot. at 14. But TADA misrepresents Dr. Scott Morton's opinion, insofar as manufacturers clearly have an aligned interest with consumers to "mak[e] the car better, more innovative, [and] lower cost to produce." Pl. Ex. 2, Scott Morton Dep. at 103:16-104:3. Moreover, TADA's unsupported and self-serving argument does not even counter Dr. Scott Morton's opinion, which is that direct-sales-only manufacturers and franchised dealers have the same incentives with respect to serving customers well. For example, while TADA argues that manufacturers have an incentive to "put their own profit motives" ahead of the consumer, Mot. at 15, the exact same thing could and has been said of franchised dealers. More fundamentally, TADA's disagreement with Dr. Scott Morton's opinion provides no basis to exclude it. *See MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850 (5th Cir. 2015) ("Under *Daubert*, the proponent need not prove to the judge that the expert's testimony is correct." (cleaned up)).

### D. The Court Should Not Limit Dr. Scott Morton's Testimony Concerning Background Information on Lucid's Direct-Sales-Only Model

Lucid last asks that Dr. Scott Morton's "comments on manufacturing costs should be excluded." Mot. at 15. This argument concerns a two-paragraph *background* section (Ex. A, § III) in Dr. Scott Morton's report and not one of her expert opinions. That background section briefly summarizes what Lucid is, the types of vehicles Lucid produces, and the basics of Lucid's direct-sales-only business model. *Id.*

The background section contains no expert opinions; it merely recites publicly documented facts about Lucid. *Id.* As TADA acknowledges (Mot. at 16), Dr. Scott Morton made this point clear in her deposition. There is therefore no need to exclude any expert opinion of Dr. Scott Morton on manufacturing costs because it does not exist. And to the extent that TADA has an issue with Dr. Scott Morton citing and considering these public facts about Lucid as background material

for her actual expert opinions, TADA fails to identify any error in these background facts. Regardless, as noted above, TADA's quibbles regarding the materials considered by Dr. Scott Morton "affect the weight to be assigned that opinion rather than its admissibility." *14.38 Acres of Land*, 80 F.3d at 1077.

### E. TADA's Motion Provides No Basis to Exclude the Entirety of Dr. Scott Morton's Testimony

Finally, Lucid notes that, at a bare minimum, TADA's motion provides no basis to exclude the entirety of Dr. Scott Morton's testimony because it will include opinions not addressed in TADA's motion.

To start with, TADA's motion identifies no issue with respect to Dr. Scott Morton's opinion (Ex. A at 8, § VI.1) that prohibiting the direct-sales-only business model harms Texas consumers by reducing consumer choice. As Dr. Scott Morton explains in that section: "[i]t is important to emphasize that there is no risk of harm to competition from Lucid's direct sales model. If Lucid's direct-sales-model or its vehicles are not desired by consumers or if consumers judge Lucid's car prices to be too high, Lucid's cars will not be purchased. This is standard and expected in a competitive market." *Id.* By contrast, she explains that studies by both the FTC and DOJ establish that "bans on direct sales by vehicle manufacturers harm competition and consumers" by decreasing consumer choice. *Id.*; *see also id.* § IV and ¶ 2 ("More generally, Texas's direct sales ban stifles competition, harms consumers, and creates an artificial barrier to the entry of new companies and technologies into the automobile market. Allowing Lucid to own and operate sales Studios in Texas and to sell directly to Texas consumers would increase consumer choice.").

TADA's motion also identifies no issue with the opinions contained in Dr. Scott Morton's rebuttal expert report (Ex. B), apart from paragraphs 12 and 20 through 25 (addressed above). For example, her rebuttal report disputes the opinion of a defense expert that mandating the franchised model somehow results in a broader and larger retail capacity, *id.* at 3, § III.A, and increases incentives to support longer product cycles for new vehicles, *id.* at 5, § III.C; s*ee also id.* ¶ 9 ("I

conclude that Texas consumers would benefit if the state were to allow Lucid, an automaker with a direct sales model in operation across the U.S., to sell its vehicles direct to consumers in Texas.").

None of these opinions are addressed in TADA's motion, and thus, at the very least, TADA's motion provides no justification for excluding Dr. Scott Morton's testimony concerning them.

### Conclusion

Defendants' motion to exclude or limit the testimony of Dr. Scott Morton should be denied.


Dated: February 16, 2024    Respectfully submitted,

         /s/ Andrew M. Grossman
        Andrew M. Grossman (pro hac vice)
        agrossman@bakerlaw.com
        BAKER & HOSTETLER LLP
        1050 Connecticut Ave., N.W.
        Suite 1100
        Washington, D.C. 20036
        Telephone: (202) 816-1697
        Fax: (202) 861-1783

        Billy M. Donley
        Texas Bar No. 05977085
        bdonley@bakerlaw.com
        Rachel Palmer Hooper
        Texas Bar No. 24039102
        rhooper@bakerlaw.com
        BAKER & HOSTETLER LLP
        811 Main Street
        Suite 1100
        Houston, TX 77002
        Telephone: (713) 751-1600
        Fax: (713) 751-1717


        *Attorneys for Plaintiff*

**Certificate of Service**

I certify that on February 16, 2024, I electronically filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Andrew M. Grossman
Andrew M. Grossman