# Exhibit 2

1

2  IN THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF TEXAS
3  AUSTIN DIVISION
   Case No. 1:22-cv-01116-RP
4  ------------------------------------x
   LUCID GROUP USA, INC.,
5          Plaintiff,
6
        - against -
7
8  MONIQUE JOHNSTON, in her official
   Capacity as Director of the Motor Vehicle
9  Division of the Texas Department of Motor
   Vehicles, DANIEL AVITIA, in his official
10 Capacity as Executive Director of the Texas
   Department of Motor Vehicles; and
11 CORRIE THOMPSON, in her official
   Capacity as Director of the Enforcement
12 Division of the Texas Department of Motor
   Vehicles,
13          Defendants.
14 TEXAS AUTOMOBILE DEALERS
   ASSOCIATION,
15          Intervenor-Defendant.
   ------------------------------------x
16              January 23, 2024
                10:07 a.m.
17
18      Deposition of FIONA SCOTT MORTON,
19 Ph.D., taken by Intervenor-Defendant,
20 pursuant to Notice, held at the offices of
21 BakerHostetler, 45 Rockefeller Plaza, New
22 York, New York, before Todd DeSimone, a
23 Registered Professional Reporter and Notary
24 Public of the State of New York.
25

Fiona Scott Morton - January 23, 2024

```
 1
 2  A P P E A R A N C E S :
 3  BAKER HOSTETLER
    1050 Connecticut Avenue, NW
 4  Suite 1100
    Washington, D.C. 20036
 5          Attorneys for Plaintiff
    BY:     PAUL M. LEVINE, ESQ.
 6           pmlevine@bakerlaw.com
 7
 8
    LOCKE LORD LLP
 9  2200 Ross Avenue
    Suite 2800
10  Dallas, Texas 75201
            Attorneys for Intervenor-Defendant
11          Texas Automobile Dealers Association
    BY:     W. SCOTT HASTINGS, ESQ.
12           shastings@lockelord.com
            THOMAS G. YOXALL, ESQ. (Via Zoom)
13           tyoxall@lockelord.com
14
15
16  ATTORNEY GENERAL OF TEXAS
    P.O. Box 12548
17  Austin, Texas 78711
            Attorneys for Defendants
18  BY:     JOHNATHAN STONE, ESQ.
             johnathan.stone@oag.texas.gov
19          ZACHARY RHINES, ESQ. (Via Zoom)
             zachary.rhines@oag.texas.gov
20
21
22
23
24
25
```

1

2    A P P E A R A N C E S: (Continued)

3

4    ALSO PRESENT:

      DONALD R. HOUSE, JR., Ph.D, RRC, Inc.

5     (Via Zoom)

6     TERRY VANNOY, ESQ., Texas Department of

      Motor Vehicles (Via Zoom)

7

      KAREN PHILLIPS, ESQ., Texas Automobile

8      Dealers Association (Via Zoom)

9     ROBERT RUDIS, Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              MORTON, Ph.D.
 2  towards the bottom half of the page, there
 3  is a statement in here that says "General
 4  Motors and Ford are both manufacturers and
 5  should be similarly prohibited from
 6  entering the retail automobile market.
 7  Nothing in this case indicates that
 8  differing restrictions have been placed on
 9  these two companies."
10              Okay.  You see that language?
11      A.     I do.
12      Q.     Okay.  Are you aware of any
13  evidence of Lucid being treated any
14  different than any other manufacturer in
15  Texas?
16      A.     Yes.
17      Q.     What?
18      A.     Well, this language, because of
19  the existing franchise laws that mandate
20  the use of franchises, General Motors and
21  Ford are both manufacturers with franchise
22  dealers, as Ford is in the situation in
23  this case.  Lucid doesn't have franchise
24  dealers.  It is being treated differently
25  than everybody else because it doesn't have
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2    franchise dealers, and that is what this is
 3    all about.
 4              MR. HASTINGS:  I'm going to
 5         object as nonresponsive.
 6         Q.    So how is it that if Lucid
 7    under Texas restrictions is required to
 8    have dealers, how is that treating Lucid
 9    any different than any other manufacturer
10    in Texas?
11              MR. LEVINE:  I object to the
12         form.  He started out in his initial
13         colloquy on asking you questions about
14         the Ford case.  I remind you that you
15         are testifying as an economist and
16         you --
17              THE WITNESS:  Yup.
18              MR. LEVINE:  Very good.
19         A.    As an economist looking at this
20    Ford case it is about manufacturers who
21    have franchise dealers, therefore applying
22    a law about that to Lucid, who doesn't have
23    any franchise dealers, is treating Lucid
24    differently.
25              MR. HASTINGS:  I'm going to
```

Fiona Scott Morton - January 23, 2024

```
1                    MORTON, Ph.D.
2         object as nonresponsive.
3                    MR. STONE:  Objection,
4         nonresponsive.
5                    MR. LEVINE:  You are asking her
6         questions -- I just --
7         A.    The word for nonresponsive is I
8    don't agree with your theory of the case,
9    and that's going to happen all day.
10        Q.    We're not going to argue back
11   and forth.  I'm making my objection as
12   nonresponsive because you actually didn't
13   answer the question I asked, but that's
14   okay.
15                   Professor Morton, in this case
16   are you planning to offer any opinion
17   testimony on what is a legitimate state
18   interest for Texas to pursue through
19   regulations?
20        A.    Yes, in the sense that economic
21   analysis bears on questions like
22   competition, welfare, functioning of
23   markets, and, yeah, the functioning of the
24   automobile market, yeah.
25        Q.    If we will go to page 13 of the
```

```
 1              MORTON, Ph.D.
 2   Ford decision, and I have highlighted a
 3   paragraph on page 13 that we are going to.
 4   If you will read that paragraph, you will
 5   see that the Court discusses the interests
 6   that were found to be legitimate state
 7   interests to support the ultimate
 8   conclusion in the Ford decision.  Do you
 9   see that language?
10        A.    I see the language.
11        Q.    Do you believe that the
12   interests that are identified in this
13   highlighted page on page 13 are legitimate
14   state interests for a state to pursue
15   through legislation?
16        A.    That sounds like a legal
17   conclusion.  I'm not going to draw any
18   legal conclusions.  As we discussed
19   earlier, the issue of whether a
20   manufacturer could have its own stores that
21   are also competing with its own franchise
22   dealers is a complicated one, and I have
23   not spent the time to figure out what I
24   think the best policy response to that is,
25   which would be the economist's version of
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2    what's a good regulation.
3              As far as the question about
4    fraud and unfair practices and so on, my
5    understanding as an economist is that there
6    are state laws available to cover that that
7    cover everybody, that it doesn't really
8    matter whether you are vertically
9    integrated or not, you would -- the state
10   law would protect consumers.
11        Q.    So protecting against fraud,
12   unfair practices, discrimination, and
13   abuses of citizens, those would be
14   legitimate state purposes, right?
15        A.    There is a law for them.  I
16   don't think you need to get at them or
17   there is no reason to get at them through
18   instructing car companies on how to
19   organize themselves.  You have a law that
20   protects the people from malfunctioning and
21   bad products and business conduct.
22        Q.    My question is a little simpler
23   than that.  It is just you agree that those
24   are legitimate purposes, you think that
25   they can be served some other way, but you
```

Fiona Scott Morton - January 23, 2024

```
 1                MORTON, Ph.D.
 2   agree that those purposes, if they are
 3   being served, would be legitimate purposes
 4   for the state?
 5        A.    You are asking me that question
 6   in the context of this document and that
 7   quotation, and this is a legal document
 8   with legal implications, and it makes me
 9   very uncomfortable to agree with something
10   about it, because I don't fully understand
11   it, it's not my area of training.  If we
12   move away from this document and you ask me
13   just in the abstract should states be
14   protecting their citizens from unfair
15   practices and unsafe products, absolutely.
16        Q.    And I was trying to ask the
17   question in the abstract, so I'm sorry if I
18   didn't ask it clean enough.
19              In the abstract, if the
20   legislature believes that vertical
21   integration is harmful to consumers or
22   harmful to its citizens in the abstract
23   that would be a reasonable thing for the
24   state to want to regulate, right?
25        A.    The problem with that question
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2  is that there is no economic reason to
 3  imagine that that would be the case.
 4  Vertical integration isn't about product
 5  safety, so it's like saying if there were
 6  no gravity, then something would be true.
 7  Well, we have gravity, so that's just never
 8  going to be the case.
 9       Q.    So do you believe that there is
10  ever an appropriate circumstance under
11  which vertical integration should not be
12  allowed?
13       A.    I haven't -- I haven't thought
14  about that question.  Probably there is
15  one, but it would be -- it would take some
16  time to think through what it would be.
17  It's not here.
18              MR. HASTINGS:  I'll object to
19       that last statement as nonresponsive.
20              MR. STONE:  Join.
21       A.    I was finishing the question,
22  I'm sorry, I was completing the answer.
23              MR. LEVINE:  That's okay.  I
24       think they already know that is your
25       opinion anyway.
```

```
 1                    MORTON, Ph.D.
 2   customer is the main thing the manufacturer
 3   wants to do.
 4        Q.    Are you aware of instances in
 5   the automobile industry where a
 6   manufacturer has put its own profit motives
 7   ahead of what was in the best interest of
 8   consumers?
 9        A.    I'm aware of cases where
10   manufacturers have violated the law, like
11   the European diesel carmakers who engaged
12   in fraudulent activity to say that their
13   cars were clean when they weren't, that's,
14   I think, against consumer interest.
15        Q.    Are you aware of any other
16   instances?
17        A.    I haven't made a list, no.
18        Q.    What about the Ford Pinto
19   situation, do you recall that?
20        A.    I know as you refer to it, but
21   I don't know any details about what that
22   was.
23             MR. LEVINE:  Did you say the
24        Ford Pinto situation?
25             MR. HASTINGS:  Yes.
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2              MR. LEVINE:   I might not be old
3        enough to actually remember that.
4              THE WITNESS:   Exactly.
5        Q.    I mean, outside of the
6    automobile industry there are a lot of
7    examples of manufacturers putting its own
8    profit motives ahead of consumers, right,
9    the consumer best interest?
10       A.    I haven't studied that
11   question.
12       Q.    I mean, simple example, the
13   tobacco industry, I mean, they focused on
14   their profits for quite a long time at the
15   detriment to consumers; would you agree
16   with that?
17       A.    As a general matter, sure, from
18   reading the newspapers, but I have never
19   really studied that industry in any detail.
20       Q.    And have you seen any instance
21   or instances or evidence of EV
22   manufacturers putting their own interests
23   ahead of their consumers?
24       A.    No.
25       Q.    If you saw evidence of EV
```

```
 1              MORTON, Ph.D.
 2   manufacturers putting their own profit
 3   interests ahead of those of consumers,
 4   would that -- could that impact your
 5   opinion?
 6        A.    Of course, except that I just
 7   want to remind you of the framing here, the
 8   profit interest of a manufacturer involves
 9   getting consumers to want their car and to
10   want to buy their car, which means they're
11   incentivized to make a great car and make a
12   great-selling process.  That is something a
13   consumer wants.  So profit and consumer
14   interest are aligned to a great degree
15   here.
16        Q.    I mean, that is the theory that
17   profits and the consumer interest
18   ultimately are aligned, that is,
19   theoretically, that is the case, right?
20        A.    Not completely.  As I said, I
21   could sell my car for zero dollars and that
22   would not be aligning my profits with
23   consumer interest.  Consumers like that,
24   profits don't.  But making the car better,
25   more innovative, lower cost to produce,
```

Fiona Scott Morton - January 23, 2024

```
1                    MORTON, Ph.D.
2    that is aligning my profit with what the
3    consumer wants.
4         Q.    If you saw evidence of EV
5    manufacturers focused on increasing its
6    profits and selling more vehicles at the
7    expense of taking care of and repairing
8    vehicles for the people they have already
9    sold to, would that be a relevant
10   consideration for purposes of your opinions
11   of whether it is appropriate to have
12   restrictions on manufacturers selling
13   direct to consumers?
14                MR. LEVINE:  I object to the
15        form.
16        A.    I don't think it's relevant to
17   whether manufacturers should be allowed to
18   sell direct to consumers.
19        Q.    Why is it not relevant?
20        A.    Because that issue arises in
21   any form of distribution channel.
22        Q.    What do you mean by any -- what
23   do you mean it arises in any form of
24   distribution channel?
25        A.    Whether I have franchise
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2   dealers or have a different manufacturer
3   that have stores, they both have a problem
4   of trying to balance dedicating resources
5   to how much do I invest in, I don't know,
6   the old consumers versus new consumers.
7         Q.    Have you done any analysis of
8   Lucid to determine how it is balancing its
9   investments in selling vehicles and raising
10  a profit from new consumers versus having a
11  sufficient support infrastructure to take
12  care of its existing customers?
13        A.    No, because every manufacturer
14  varies on that front, and it has no
15  relationship to whether there is a reason
16  to block having this distribution channel.
17        Q.    Have you done an analysis of
18  that issue for any EV manufacturers about
19  how it is balancing their profit motives
20  versus having the infrastructure to take
21  care of their existing customers?
22        A.    No, again, because managerial
23  talent and how the strategy of the firm is
24  chosen is not relevant to whether there's a
25  good reason to block a certain distribution
```

1              MORTON, Ph.D.

2  channel from existing in the marketplace.

3      Q.     Let's go back to Exhibit 6 for

4  just a second and go to page 402.  There is

5  a sentence that I have highlighted here

6  that says "Economic theory tells us that

7  firms, individually and/or collectively,

8  will attempt to influence the regulator to

9  achieve outcomes that increase their

10 profit, such as establishing barriers to

11 new entrants or establishing an environment

12 with weak price competition."

13             Do you see that?

14     A.     I do.

15     Q.     And you certainly agree with

16 that statement because you wrote it?

17     A.     Yes.

18     Q.     Wouldn't you agree, and I know

19 you were saying this in the context of the

20 existing participants in the dealers and

21 other participants in the market, right,

22 when you wrote this?

23     A.     That's correct.

24     Q.     The same incentives, though,

25 would apply to any participants in the

```
 1                MORTON, Ph.D.
 2  market, right, that they would want to seek
 3  regulations that would help increase their
 4  profits, right?
 5       A.     That's correct, and that's why
 6  it doesn't matter whether somebody is
 7  distributing one way or another, they are
 8  all going to be firms that behave, if they
 9  are being fiduciarily responsible, to try
10  to maximize their profit, and that will
11  include trying to influence the government
12  favorably towards them.
13       Q.     And do you believe that all
14  market participants have the incentive to
15  encourage weak price competition?
16       A.     If you are a profit-maximizing
17  firm, you generally prefer to earn more
18  profit, and weaker competition lets you do
19  that.  So it is a very common desire on the
20  part of managers.
21       Q.     And Lucid in this case is
22  trying to have a distribution model under
23  which it has no intra-brand competition.
24  Do you agree with that?
25       A.     Did you say intra or inter?
```

Fiona Scott Morton - January 23, 2024

```
 1                    MORTON, Ph.D.
 2          Q.      Intra.
 3          A.      So because Lucid is going to
 4   have stores, that's not a well-defined
 5   question.  There isn't a layer of
 6   distribution that has independent entities
 7   trying to maximize profit where you would
 8   naturally have where competition becomes
 9   relevant.  That layer is gone because Lucid
10   owns stores.
11          Q.      Right.  So there is no
12   intra-brand competition, it is Lucid, Lucid
13   doesn't have -- would not have separate
14   dealerships that might offer customers
15   different prices or negotiate over prices?
16          A.      I don't agree with the setup of
17   your question because it implies that Lucid
18   has different stores that should be
19   competing with each other and aren't, but
20   those stores are not independent, they are
21   inside Lucid.  So it's not a well-defined
22   question.  Lucid is competing with BMW and
23   Ford and GM and Toyota and everybody else,
24   inter-brand competition.
25          Q.      So getting away from Lucid, I
```

Fiona Scott Morton - January 23, 2024

```
 1            MORTON, Ph.D.
 2  just want to talk the automobile industry,
 3  the traditional industry.  Have you studied
 4  the impact of inter-brand, I'm sorry,
 5  intra-brand competition on consumer
 6  pricing?
 7        A.    Yes.
 8        Q.    What conclusions did you find
 9  regarding the effect of intra-brand
10  competition on consumer prices?
11        A.    That consumers are surprisingly
12  unwilling to drive long distances to buy
13  new cars, that dealers therefore have
14  market power, that dealers mark up vehicles
15  more to women and minorities and
16  unsophisticated buyers, that having access
17  to the invoice price helps a person secure
18  a lower price, that access to the internet
19  and pricing on the internet helps a person
20  secure a lower price for the vehicle that
21  they have identified, and that consumers
22  don't really enjoy the process of buying a
23  new car because the haggling is so
24  unpleasant.
25        Q.    So one of the conclusions that
```

Fiona Scott Morton - January 23, 2024

```
1                 MORTON, Ph.D.
2    you found was that when there is
3    intra-brand competition and a consumer has
4    access to more or better information, they
5    tend to get lower pricing, are able to get
6    a lower price for a vehicle; would you
7    agree with that?
8         A.    Lower price relative to the
9    marked-up price that they are otherwise
10   facing.  I mean, yes, this is back to the
11   problem of double-marginalization and price
12   discrimination, which the regular sales
13   channel for automobiles features quite
14   heavily.
15        Q.    And on intra-brand competition
16   isn't it true that the conclusions you
17   found when studying -- I'm sorry, let me
18   start over.
19              Regarding intra-brand
20   competition, isn't it true that you found
21   that when a consumer was willing and able
22   to visit more dealerships, it was able to
23   negotiate better pricing?
24        A.    That's right.
25        Q.    When assessing whether it's
```

Fiona Scott Morton - January 23, 2024

```
1                MORTON, Ph.D.
2   reasonable for a state to require a
3   manufacturer to use a dealer as an
4   intermediary when interacting with
5   consumers, is it reasonable in your opinion
6   to assess how the manufacturer or EV
7   manufacturers have behaved with respect to
8   their consumers?
9                MR. LEVINE:  I object to the
10       form.
11       A.    Have behaved?  That's extremely
12   broad.  I don't think I can answer that as
13   phrased.
14       Q.    Okay.  So do you believe that
15   in assessing whether it's reasonable to
16   have restrictions on manufacturers owning
17   dealers, that it's appropriate to consider
18   the history of what has happened between
19   manufacturers and their consumers?
20                MR. LEVINE:  I object to the
21       form.
22                MR. STONE:  Objection, form.
23                MR. HASTINGS:  Sorry, I
24       butchered that one.
25                MR. STONE:  I don't think she
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2         has testified whether it is reasonable
3         or not.
4              MR. HASTINGS:  I'm going to
5         consider that and come back to it.
6         Q.     Professor Morton, if I'm
7    reading your opinions correctly, I
8    understand that you believe that a
9    consumer's right to choose, you know,
10   between different products is something
11   that is good, you were in favor of consumer
12   choice, right?
13        A.     Yes, I am.
14        Q.     But you agree that consumer
15   choice is, I mean, it cannot be unlimited,
16   there is some role to restrict some
17   consumer choices?
18        A.     Can you clarify what you mean,
19   some role to restrict some consumer
20   choices?
21        Q.     Do you believe that consumer
22   choice should be unlimited and consumers
23   should be able to always do whatever they
24   want to do?
25        A.     Well, we, for example, don't
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2  let consumers choose dangerous cars,
 3  because they are not allowed to be sold in
 4  the United States.  But do I think that the
 5  state should say we don't like the color
 6  green and we're going to eliminate that
 7  from the choice set of consumers buying
 8  cars?  No, clearly not.
 9              Look at the cereal aisle in a
10  supermarket, there is an awful lot of
11  choice.  Nobody is restricting that choice.
12  Is it necessary?  Probably not.  Perhaps in
13  the Soviet Union they only had two kinds of
14  breakfast cereal, but consumers like
15  choice, so we should let them have it.
16      Q.     But there are some
17  circumstances under which consumer choice
18  is not necessarily allowed, the dangerous
19  product example you just used, there are
20  limits to consumer choice?
21      A.     I would not use the phrase
22  "there are limits to consumer choice," no.
23  I would say it's an important role of the
24  state to ensure that products offered for
25  sale are safe.
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2       Q.      Have you done any analysis of
 3   the safety of Lucid's products?
 4       A.      No, I have not.
 5       Q.      What about EVs in general, have
 6   you done any analysis of the safety, the
 7   potential risks to consumers of EVs in
 8   general?
 9       A.      My understanding is that we
10   have a regulator in the United States who
11   carries out those -- who carries out the
12   safety regulations in our country, and an
13   economist does not have anything to add to
14   what that agency is doing, so there is no
15   role for me to make that -- do that study.
16       Q.      Are you aware of any risks
17   associated with fire for EV vehicles?
18       A.      I don't know anything about
19   that.
20       Q.      Would you agree that it is
21   appropriate for the state, when enacting
22   regulations, to consider the safety of
23   products that are being offered into the
24   state?
25       A.      I agree, and I think that
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2    therefore that shows you that the
3    distribution channel is not a safety issue,
4    it's the car that is the safety issue, and
5    indeed if there were a store in Texas for
6    Lucid, then Texas would have a way to
7    regulate the sale of the car in Texas,
8    whereas now people in Texas are driving
9    cars that are not sold in Texas and
10   therefore Texas has less ability to control
11   the safety of those vehicles, if that's
12   something the state wants to do, above and
13   beyond what the federal government is
14   already doing.
15              MR. HASTINGS:  Objection,
16        nonresponsive.
17              MR. STONE:  Objection,
18        nonresponsive.
19        Q.    Dr. Morton, in your report I
20   saw a reference, and I think I may have
21   even heard it today, of Lucid getting the
22   Motor Trend car of the year award in 2022.
23   Are you aware of that?
24        A.    Yes.
25        Q.    What relevance does that have
```

Fiona Scott Morton - January 23, 2024

1              MORTON, Ph.D.
2   to the opinions you are offering in this
3   case?
4        A.    It illustrates the fact that
5   more entrants into the automobile market
6   give consumers access to more product
7   attributes, more different choices,
8   possibly greater innovation, and more
9   variety than was there before, and so the
10  Motor Trend award just illustrates the fact
11  that somebody thinks this car is quite
12  good.
13       Q.    And do you have any knowledge
14  as to how that award was selected or what
15  went into that process?
16       A.    No.
17       Q.    Do you know if Lucid had even
18  sold a single vehicle at the time that that
19  award was issued?
20       A.    I don't.
21       Q.    Do you believe that there are,
22  in your opinion, any benefits that are
23  provided by automobile dealers?
24       A.    I mean, one has to go somewhere
25  to pick up the car, if it's not going to be

Fiona Scott Morton - January 23, 2024

1              MORTON, Ph.D.

2    delivered to your house.  One has to go

3    somewhere to test drive a car, if you want

4    to test drive a car, if the manufacturer

5    doesn't have a showroom at a shopping mall

6    or something like that.  I would say that

7    repairs and warranty work and so on are

8    often done through a dealership, but they

9    can be done through repair shops that are

10   not the dealership.

11              So there is a variety of ways

12   that buying a car and maintaining that car

13   can be organized, a franchise dealership is

14   certainly not the only one.

15        Q.    But you would agree that there

16   are some benefits to franchise dealers,

17   would you?

18        A.    No.  Let me clarify.  There are

19   some benefits that people need to buy and

20   maintain their car that can be provided by

21   franchise dealerships and often are, but

22   they can be provided by many other

23   organizational forums as well, so they are

24   not in any way unique to the fact that the

25   entity is franchised as opposed to, say,

Fiona Scott Morton - January 23, 2024

```
1                MORTON, Ph.D.
2    just a repair shop that doesn't belong to a
3    manufacturer or a showroom and test drive
4    center that does belong to a manufacturer.
5         Q.    I just heard you mention
6    warranty work just a second ago.  Do you
7    believe that -- do you believe that
8    manufacturers are allowed to perform
9    warranty work in Texas?
10        A.    I think I just -- no -- sorry,
11   say -- can you say the question again?
12        Q.    I'm not asking you for a legal
13   opinion, I'm asking for your personal
14   understanding.  Do you believe that
15   manufacturers in Texas are able to perform
16   warranty work?
17        A.    My understanding from my old
18   research is that no manufacturer is allowed
19   to do that in any state, under the
20   franchise dealer laws.
21        Q.    Okay.  So your understanding in
22   Texas is that the manufacturer does not
23   have the ability to do warranty work in
24   Texas, right?
25        A.    I understand that state law in
```

Fiona Scott Morton - January 23, 2024

1              MORTON, Ph.D.
2   Texas prohibits the manufacturer from doing
3   warranty work and requires it to pay the
4   dealer pretty high prices to carry out that
5   work.
6         Q.    As an economist, do you believe
7   that an innovative company that is
8   innovating and bringing new products to
9   market, that it needs to be able to charge
10  higher prices to justify the cost of the
11  innovation?
12        A.    I would not say it like that.
13  I would say that it is the prospect of
14  being able to freely set a price and decide
15  on the other ways of running your business
16  that induces entrepreneurs to engage in
17  innovation and have good ideas.
18        Q.    Innovation is risky, isn't it?
19        A.    Yes, it is.
20        Q.    And innovative entities would
21  expect to generate extra return or extra
22  profits to compensate for taking risk,
23  wouldn't it?
24        A.    It's not compensation ex post,
25  it is ex ante, the innovator says to him or

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2   herself is this worthwhile doing given the
 3   risk you just identified, and if there
 4   isn't a return they are going to be
 5   unlikely to move forward.  So the ability
 6   to earn a return is very important for an
 7   innovator.
 8        Q.    What is the concept of
 9   supracompetitive pricing?
10        A.     Prices that are above
11   competitive levels where competitive levels
12   is usually defined as either a marginal
13   cost or covering all the costs of
14   production, including the risk.
15        Q.    Have you done any analysis of
16   Lucid's pricing to determine whether it is
17   supracompetitive, competitive, or any other
18   description you want to fill in, did you do
19   any analysis of its pricing to determine if
20   it's competitive or supracompetitive?
21        A.     No, I didn't, because the price
22   of the car is something that should be
23   determined by consumers in the marketplace
24   and doesn't have any bearing on whether
25   competition is enhanced by the introduction
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2    of that manufacturer to the marketplace; it
3    will be when it offers new choices and new
4    ways of buying to consumers.
5         Q.    Have you done any analysis of
6    the pricing of Tesla or Rivian vehicles to
7    determine if their pricing is
8    supracompetitive?
9         A.    No.
10        Q.    Have you heard or seen any
11   reports of consumers accusing Tesla of
12   having supracompetitive pricing?
13        A.    No.
14        Q.    If you did see such a report or
15   public complaint that Tesla's pricing was
16   supracompetitive, is that something that
17   would be relevant to your opinions on
18   whether manufacturers should be allowed to
19   sell direct to consumers?
20        A.    No, it isn't, because high
21   prices should be disciplined by the market.
22   Consumers in Texas have lots of choices of
23   cars.  If Tesla's prices are too high, they
24   shouldn't buy a Tesla, they should buy
25   something else.  And the same thing of
```

Fiona Scott Morton - January 23, 2024

1                     MORTON, Ph.D.
2    Lucid, if it comes into Texas, Texas
3    consumers will decide if that price is
4    suitable for them or not.
5                     MR. HASTINGS:  Let's go ahead
6          and take a break.
7                     THE VIDEOGRAPHER:  Off the
8          record at 12:37 marking the end of
9          media unit number two.
10                    (Luncheon recess:  12:37 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1              MORTON, Ph.D.
 2         A F T E R N O O N   S E S S I O N
 3                 1:22 p.m.
 4  F I O N A   S C O T T   M O R T O N, Ph.D.,
 5  resumed.
 6              THE VIDEOGRAPHER:  On the
 7      record at 13:22, marking the beginning
 8      of media unit number three.
 9  CONTINUED EXAMINATION
10  BY MR. HASTINGS:
11      Q.    Professor Morton, is there any
12  information that you requested from Lucid
13  in this case that Lucid refused to provide
14  to you?
15      A.    No.
16      Q.    Sorry if I'm jumping around a
17  little bit.
18      A.    That's okay.
19      Q.    Do government subsidies for EVs
20  in your opinion have any relevance to the
21  issues and opinions you are offering in the
22  case?
23      A.    No.
24              MR. LEVINE:  The X's are good
25      things.
```

Fiona Scott Morton - January 23, 2024

1              MORTON, Ph.D.

2              MR. HASTINGS:  Huh?

3              MR. LEVINE:  The X's that you

4      are crossing off in your outline are

5      good things.

6              MR. HASTINGS:  It has gotten a

7      lot shorter.

8      Q.      So, Professor Morton, you are

9  aware that Lucid has not generated any

10  profits, right?

11     A.      I haven't looked at that

12  question, but young firms rarely do.

13     Q.      And you are aware that they

14  have had significant net losses over the

15  last few years, right?

16     A.      Again, I haven't looked at that

17  issue, but young firms usually do.

18     Q.      Have you done any analysis or

19  study to assess the likelihood that Lucid

20  will be able to be successful in the

21  market?

22     A.      No, I have not.

23     Q.      Have you heard that one of the

24  benefits franchise dealers provide to

25  consumers is additional protection and

Fiona Scott Morton - January 23, 2024

```
 1                    MORTON, Ph.D.
 2   support in cases where manufacturers go out
 3   of business, have you heard that rationale
 4   before?
 5        A.    I have heard it.  I don't know
 6   of any proof of it.
 7        Q.    Have you studied that issue to
 8   see how dealerships have fared and
 9   interacted with consumers after a
10   manufacturer has gone out of business?
11        A.    No.
12        Q.    I mean, you are aware that
13   there is a lot of automobile manufacturers
14   that have gone out of business over the
15   years, right?
16        A.    That's true.
17        Q.    I mean, fairly recently,
18   Saturn, Oldsmobile, they are examples of
19   companies that have gone out of business,
20   right?
21        A.    That is correct.
22        Q.    And have you done any study or
23   analysis as to how the franchise dealers
24   responded following the companies going out
25   of business?
```

Fiona Scott Morton - January 23, 2024

```
1                 MORTON, Ph.D.
2         A.     I only know that once the
3   manufacturer is gone, the franchise dealer
4   doesn't have any means of support, so
5   franchise dealers also close, and that's
6   eventually what happens.
7         Q.     What evidence are you aware of
8   to support that conclusion you just said?
9         A.     The general reading that I did
10  back in 2009 time period.
11        Q.     General reading.  Can you
12  identify specific companies where you have
13  evidence that that's the case?
14        A.     No.
15        Q.     And if TADA, for example, was
16  able to show that one of the benefits
17  dealers have provided to consumers is that
18  they have continued in operation for
19  periods of time servicing consumers after a
20  manufacturer went out of business, would
21  you have any basis to disagree with that?
22        A.     I would just disagree with the
23  necessity that it was a franchise dealer
24  organizational format to provide that.  I
25  think there are independent repair shops
```

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2   would be just as incentivized to repair
 3   cars that exist as any -- well, in fact,
 4   the franchise dealers of those
 5   manufacturers become independent repair
 6   shops at that time.  So I guess that proves
 7   my point, you don't have to be previously
 8   affiliated with a manufacturer.
 9              MR. HASTINGS:  I'm going to
10        object as nonresponsive.
11              MR. STONE:  Objection,
12        nonresponsive.
13        Q.    Are you aware that Fisker filed
14   for bankruptcy several years ago?
15        A.    No.
16        Q.    Now, as I understand it, one of
17   the opinions that you are prepared to offer
18   in this case is that a Lucid dealership,
19   independent dealership, would not be
20   economically viable; is that correct?
21        A.    That's right.
22        Q.    Why do you believe that a Lucid
23   dealership would not be economically
24   viable?
25        A.    Because the company will be
```

1              MORTON, Ph.D.

2     showroom or a store, whatever format the

3     manufacturer is using, but that the moment

4     where they hit go and press -- enter the

5     credit card number is not necessarily in

6     that store, it is after they have had a

7     chance to see the different features and

8     then they decide on the exact configuration

9     of their car at home.  So it is very often

10    not in the physical location belonging to

11    the manufacturer.

12        Q.    Assuming that scenario under

13    which the sale actually occurs through the

14    online connection, have you done any

15    analysis or investigation as to whether

16    it's possible to do a trade-in that way and

17    earn revenues off of a trade-in that way?

18        A.    I have not done an

19    investigation of whether Lucid is planning

20    to buy people's cars, but as a general

21    matter, anybody can buy a car and sell it

22    again and earn revenue that way.  It's not

23    a special thing reserved for just franchise

24    dealers.

25             MR. STONE:  Objection,

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2       nonresponsive.
 3       Q.      The fact that Lucid relies on
 4  the internet for parts of its transaction
 5  in selling a vehicle, that doesn't mean
 6  that it could not also try to engage in
 7  using the internet for purposes of the used
 8  vehicle transaction, right?
 9       A.      I don't understand the
10  question.
11       Q.      Maybe I asked a bad question.
12              What I'm getting at is you
13  opine that Lucid -- it would not be
14  economically viable for Lucid to have
15  independent dealers because there's no
16  margin you believe on new car sales, but
17  then when it comes to used car sales you've
18  done no analysis as to the amount of money
19  or revenues that could be generated from
20  used car sales even though that is
21  traditionally a significant part of what
22  dealerships generate their revenues doing,
23  right?
24       A.      Is the question have I done any
25  analysis of used car sales?
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2        Q.    Yeah.
3        A.    I told you, I've not done any
4   quantitative analysis of it, but of course,
5   first of all, you don't have to be a dealer
6   to do the used car sales, so the consumer
7   doesn't care if it's at the dealer or not,
8   and, secondly, in my work with Jorge
9   Padilla -- Jorge Silva-Risso and Florence
10  Zettelmeyer on dealership bargaining, what
11  you see is a substantial cross-subsidy
12  between the used car and the new car.
13              So the fact that the dealer is
14  making money on used cars is a feature --
15  is like a spill-over from the fact that
16  they are selling new cars.  In I think the
17  hypothetical world you're imagining, there
18  is no reason for this dealer to be selling
19  new cars in the first place, so then -- and
20  they don't control the price, so they can't
21  do the cross-subsidizing into the used car.
22  So I don't think you can just turn and look
23  at the used car revenue and say oh, that
24  would be what they could get in a world
25  with fixed new car prices.  I just don't
```

```
1                 MORTON, Ph.D.
2    think that carries over at all.  So I don't
3    think you have a basis for your assumption.
4         Q.    So are you saying that your
5    understanding as to how Lucid would work is
6    that Lucid would sell the new vehicle to a
7    consumer but then the consumer is left on
8    its own to find out whatever alternative
9    way it wants to resell its cars it is
10   trading in?
11        A.    It will be up to Lucid to
12   decide whether that's an important factor
13   and Lucid wants to offer some price, or
14   maybe go into a partnership with CarMax or
15   something like that, or whether they are
16   going to leave the consumer on their own.
17   I don't know.  But it's up to them because
18   that's just the business strategy.
19        Q.    And so you think it should be
20   up to Lucid to decide whether trade-in
21   services are provided, that's a decision
22   for Lucid to make?
23        A.    Absolutely, and then if
24   consumers in Texas don't like that, they
25   won't buy a Lucid car, they will buy a
```

1              MORTON, Ph.D.
2    different kind of car.  It is completely
3    fine for Lucid to make that decision and
4    for consumers to respond accordingly.
5         Q.     And do you believe that there
6    is -- that it would be reasonable for the
7    Texas legislature to believe otherwise that
8    the state wants, if they are going to -- if
9    someone is going to be selling new vehicles
10   in Texas, that they also want to make sure
11   that the Texas consumer has that option and
12   that ability to trade in its vehicles, do
13   you believe that's reasonable?
14        A.     I don't think so, because there
15   is a vibrant used car market, there is all
16   kinds of dealers and buyers and sellers of
17   used cars.  It's not -- it's not something
18   that we think of consumers being unable to
19   do by themselves.
20              Very often if I have a used car
21   I'm going to go and turn it in and buy a
22   different used car.  I mean, people do that
23   frequently.  So this is a well-functioning
24   market.  There are many entities who can
25   help the consumer do that.  There is no

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2    reason to force a new car manufacturer to
3    do it.
4         Q.    And are you saying that you
5    believe there is no role for the
6    legislature and the government to be
7    involved in regulating the need to have the
8    ability for trade-ins through dealerships
9    and from the manufacturer too?
10        A.    I don't see a market failure
11   there, I see a perfectly functioning market
12   in used cars.  I don't see why you would --
13   the legislature would say to a supermarket
14   you must offer three sizes of organic
15   mangos.  You let the supermarket decide
16   what they are going to offer and if
17   consumers don't like the range at that
18   supermarket they go to a different one.  It
19   is a bit the same here.
20        Q.    So you think that the
21   automobile industry is like the supermarket
22   situation?
23        A.    I think that markets, I believe
24   in capitalism and markets and free markets
25   and choices of businesses to run their
```

1            MORTON, Ph.D.

2        A.    Well, that's the sense in which

3   we care about reputable, that it's being

4   unbiased and not serving the interests of

5   the manufacturer, and if we're going to

6   evaluate cars, that's the sense of

7   reputable that we care about.

8        Q.    Do you believe that Consumer

9   Reports is a reputable source for

10  evaluating the reliability of products?

11       A.    I think so, in general.

12       Q.    And have you reviewed Consumer

13  Reports related to electric vehicles?

14       A.    I don't recall doing that.  But

15  I don't know, I can't remember everything

16  that's in my materials.

17       Q.    Dr. Morton, can you explain

18  what the concept of double-marginalization

19  is?

20            MR. LEVINE:  Before we jump to

21       that topic, can we take a short break?

22            MR. HASTINGS:  Sure.

23            MR. LEVINE:  Thanks.

24            THE VIDEOGRAPHER:  Off the

25       record at 14:12, marking the end of

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2         media unit number three.
 3              (Recess taken.)
 4              THE VIDEOGRAPHER:  On the
 5         record at 14:23, marking the beginning
 6         of media unit number four.
 7    BY MR. HASTINGS:
 8         Q.    Dr. Morton, did you review any
 9    customer complaints from Lucid customers
10    related to its vehicles?
11         A.    No, I did not.
12         Q.    And have you reviewed any
13    surveys or other data about consumer
14    satisfaction with Lucid vehicles?
15         A.    I don't recall off the top of
16    my head.  In the report I discuss a
17    vehicle, and there may be something there.
18              I don't see anything, so I
19    think I did not review such a report.
20         Q.    All right.  Getting back to
21    double-marginalization, could you explain
22    for us what double-marginalization is?
23         A.    Yes.  It's the increased price
24    that occurs when a firm with market power
25    sells an input to another firm with market
```

Fiona Scott Morton - January 23, 2024

1              MORTON, Ph.D.
2    power that then sets a price to end
3    consumers.
4         Q.    And so with
5    double-marginalization, both of those
6    entities with the market power would be
7    increasing price to generate a profit?
8         A.    They would be setting markups
9    over their own costs to generate a profit.
10        Q.    And in your rebuttal report,
11   and this is paragraph 21, you write that
12   "Mr. Stockton points out that the
13   illustration of double-marginalization in
14   my initial report shows the OEM and the
15   independent dealer with the same marginal
16   cost of retail sales," and then you
17   continue, you say "I agree with
18   Mr. Stockton that if one assumes instead
19   that the independent dealer's cost of
20   retail sales is less than that of the OEM,
21   the outcome becomes ambiguous."
22              What do you mean by that?
23        A.    I mean that if the independent
24   dealer's cost of retail sales is lower than
25   the OEM's cost of retail sales, then you

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2   can't immediately sign what the final price
3   comparison will be.
4        Q.    And does that mean that there
5   is a possibility, obviously not a
6   certainty, but a possibility if the cost of
7   retail sales is less for the independent
8   reseller, that there's a possibility that
9   having the independent reseller involved
10  could actually lower the price to the
11  consumer?
12       A.    That's a hypothetical that I
13  don't believe is supported by the evidence.
14  Theoretically what you said is true, but
15  it's not very relevant for this case
16  because that's not what the evidence
17  demonstrates in general.
18       Q.    Okay.  And what evidence are
19  you referring to regarding Lucid's sales of
20  vehicles?
21       A.    So Mr. Stockton talks about
22  evidence from 100 years ago, but I cite in
23  the report a Ford number, Ford's per
24  vehicle distribution costs are $2,000
25  higher than those of manufacturers with
```

1              MORTON, Ph.D.

2   direct sales.

3        Q.     Okay.  And so the Ford number

4   that you are referring to is from an

5   earnings call I believe?

6        A.     That's right.

7        Q.     And your understanding of the

8   statements in the earnings call is that

9   Ford's cost of resale is higher because it

10  is using dealers?

11       A.     Ford in this quotation from the

12  earnings call estimates that the per

13  vehicle costs are $2,000 higher in the

14  franchise channel than in the direct

15  channel.

16       Q.     And have you done any analysis

17  to see if that statement is correct?

18       A.     In the 2010 paper with Francine

19  Lafontaine we have some discussion of the

20  price of distribution, and I can't recall

21  exactly what the number is that we come up

22  with there.

23       Q.     Other than the Ford statement

24  in the earnings call, what other evidence

25  have you seen to support your belief that

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2   double-marginalization has resulted in
 3   higher retail costs of motor vehicles when
 4   franchise dealers are used?
 5        A.    The reduction in the dealer
 6   network when both GM and Chrysler declared
 7   bankruptcy and reorganized their dealers
 8   was an indication that the costs of those
 9   dealers were high, and they wanted fewer of
10   them, that's another element that fits
11   in -- it is indirect evidence, but it is
12   evidence of the inefficiency of the dealer
13   network.
14        Q.    Okay.  And regarding the
15   circumstance you were just describing, have
16   you seen anything analyzing -- any evidence
17   analyzing the cost of those General Motors
18   or Chrysler vehicles as a result of
19   reducing the number of dealerships, I mean,
20   the cost to consumers?
21        A.    I think what you're asking, is
22   there a study showing that distribution
23   costs went down after the number of dealers
24   declined.  I don't know of such a study.
25        Q.    And you have seen the reports,
```

Fiona Scott Morton - January 23, 2024

1              MORTON, Ph.D.
2    though, that have said that the profits for
3    the manufacturers, there being GM and
4    Chrysler, did go up as a result of reducing
5    the number of franchise dealers?
6         A.    So that would be consistent
7    with the cost of distribution going down.
8    So if that's a piece of evidence that you
9    want to put forward for my hypothesis, I'm
10   going to take it.
11              MR. HASTINGS:  I'm going to
12        object as nonresponsive.
13        Q.    You have seen the reports that
14   said the manufacturers' profits went up as
15   a result of reducing the GM and Chrysler
16   dealerships?
17        A.    I have not seen those reports,
18   but if they exist then that's consistent
19   with the cost of distribution going down,
20   which is exactly what I'm talking about.
21        Q.    But that would be the costs of
22   distribution going down, meaning the
23   manufacturer got to increase its profits
24   instead of sharing the profits with the
25   franchise dealers that it had?

Fiona Scott Morton - January 23, 2024

```
 1              MORTON, Ph.D.
 2      A.     It's not clear to me why the
 3  existing franchise dealer should get the
 4  profits that used to be going to a
 5  different franchise dealer engaged in
 6  entirely different activities.  I'm
 7  confused why that's a good idea.
 8      Q.     Have you ever testified or
 9  offered expert opinions on behalf of an
10  automobile dealership?
11      A.     No, I have not.
12      Q.     Have you ever testified or
13  offered opinions on behalf of a consumer of
14  automobiles against a manufacturer?
15      A.     No, I have not.
16      Q.     In paragraph 24 of your
17  rebuttal report you write "Dr. House simply
18  mischaracterizes my double-marginalization
19  analysis.  He states 'Professor Morton
20  claims that the independent dealership
21  model results in higher new vehicle
22  prices...'  My analysis identifies a
23  potential harm, not a certainty."
24              Do you see that?
25      A.     I do.
```

Fiona Scott Morton - January 23, 2024

```
1              MORTON, Ph.D.
2       Q.      Isn't it true, though, if you
3   take your statements here, that you agree
4   that the double-marginalization does not --
5   it's not a certainty that
6   double-marginalization will result in
7   higher new vehicle prices, that is what you
8   are saying here, isn't it?
9       A.      Higher compared to what?  I'm
10  sorry, I don't understand the question.
11      Q.      Okay.  Let me try that again.
12              I mean, I'm just reading
13  through your statements.  Your conclusion
14  here in paragraph 24 is agreeing that
15  double-marginalization is not certain to
16  result in higher prices of new automobiles.
17  Do you agree with that?
18      A.      Let me fix your question.  If
19  we took -- if we took Lucid's
20  vertically-integrated model and the
21  existing franchise model, one has
22  double-marginalization, the franchise
23  model, the other doesn't, is it for sure
24  known that the franchise model sets a
25  higher price than the vertically-integrated
```

Fiona Scott Morton - January 23, 2024

```
1                    MORTON, Ph.D.
2   model?  No.  It's probably -- it is very
3   likely from the evidence that we have, but
4   it's not a certainty, it is just probable.
5                    MR. HASTINGS:  I will pass the
6        witness.
7                    MR. STONE:  I'm going to pass
8        the witness as well.  I have no
9        questions.  I will reserve them until
10       trial.
11                   MR. LEVINE:  I just have one or
12       two follow-ups quickly.
13  EXAMINATION BY MR. LEVINE:
14       Q.    In paragraph 19 of your expert
15  report, which is Exhibit 3, it's on page 7.
16       A.    Yup, got it.
17       Q.    You talk about that -- you say
18  "Lucid's service and parts revenue will be
19  quite limited due to relatively small scale
20  of sales."
21                   Can you explain how that small
22  scale of sales impacts the revenue that
23  would be available to a hypothetical
24  independent dealer?
25       A.    Yes.  The hypothetical
```