# Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

**LUCID GROUP USA, INC.,**

*Plaintiff,*

Civil Action No. 22-cv-01116-RP

**MONIQUE JOHNSTON, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicle; DANIEL AVITIA, in his official capacity as Executive Director of the Texas Department of Motor Vehicles; and CORRIE THOMPSON, in her official capacity as Director of the Enforcement Division of the Texas Department of Motor Vehicles,**

*Defendants,*

## Expert Report of
## Edward M. Stockton, M.S.



3509 N. Campbell Avenue
Tucson, Arizona 85719
(520) 325-9800  Fax (520) 325-9847

**September 2023**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
TEXAS AUSTIN DIVISION


LUCID GROUP USA, INC.,

        Plaintiff,

vs.                    Case No. 1:22-cv-01116-RP

MONIQUE JOHNSTON, in her official
capacity as Director of the Department of
Motor Vehicles; DANIEL AVITIA, in his
official capacity as Executive Director of
the Texas Department of Motor Vehicles;
and CORRIE THOMPSON, in her official
capacity as the Director of Enforcement
Division of the Texas Department of Motor
Vehicles,

        Defendants.


**Expert Report of Edward M. Stockton**

# Table Of Contents

1. Introduction .......................................................................................................... 3

2. Assignment and Summary of Opinions ............................................................ 3

3. Qualifications ...................................................................................................... 5

4. Executive Summary ............................................................................................ 7

5. Bases For Opinions ........................................................................................... 12

   5.1. Nature of Independent Franchised Dealerships ....................................... 12

   5.2. Retail Automotive Distribution Network History ..................................... 13

   5.3. Expanded Access ......................................................................................... 19

   5.4. Diversified Service and Activities/Viability .............................................. 20

   5.5. Recall Campaigns ........................................................................................ 22

   5.6. Independent Dealership Support for Longer Product Cycles .................... 23

   5.7. Professor Morton's Double-Marginalization Discussion Is Oversimplified ............... 35

   5.8. Competitive Incentives ............................................................................... 35

6. Reliance Materials ............................................................................................ 38

7. Compensation .................................................................................................... 38

8. Need to Supplement .......................................................................................... 39

9. Limitations ........................................................................................................ 39

## 1. INTRODUCTION

1. I am the Chairman of the Board and the Vice President and Director of Economics Services of The Fontana Group, Inc. ("Fontana"). Fontana provides economic consulting services and expert testimony on the retail motor vehicle industry and other industries throughout the United States, Canada, and other countries.

2. This matter relates to Plaintiff, Lucid Group's ("Lucid") challenge of a Texas legal provision that I understand requires an original equipment manufacturer of new vehicles ("OEM") to sell those vehicles to end-using consumers through independent franchised dealerships, and therefore prohibits OEMs from selling those vehicles directly to end-using consumers. It is my understanding that Lucid is challenging this requirement/prohibition on the ground that it is not rationally related to the advancement of any legitimate governmental interest.

## 2. ASSIGNMENT AND SUMMARY OF OPINIONS

3. Intervenor, Texas Automobile Dealers Association, has engaged Fontana to address the following subject matter:

   - To evaluate the question of whether Texas' requirement to distribute new vehicles through independent franchised dealerships results in reasonably foreseeable economic benefits in which the state may have a reasoned economic interest.

   - To evaluate the expert reports of Lucid's proffered experts, Professor Fiona Scott Morton (the "Morton Report") and Mr. Herbert Walter (the "Walter Report"), and, if appropriate, provide analysis and opinions that will assist the trier of fact in assessing the subject matter contained therein.

3

4.  In connection with this assignment, I offer the following opinions:

(i) **The independent franchise distribution model emerged as the dominant distribution system for new automobile sales in the United States and did so from an environment that (a) pre-dated protective statutes and (b) included multiple other distribution models, including direct manufacturer sales. This emergence of independent franchise distribution as the superior model is reasonably and reliably attributed substantially to economic characteristics of the independent franchise dealer network that state governments may reasonably desire to protect.**

(ii) **Characteristics of the independent franchise distribution model are reasonably and reliably likely to result in systematic outcomes in which the state may hold a legitimate economic interest. In comparison to an OEM-operated retail distribution network, an independent franchise distribution network is likely to support broader and generally larger investment in retail capacity, increased investment in support of service and ancillary product sales, more rapid execution of large-scale recall campaigns, reduced exposure to principal-agent (incentive) problems, and increased incentives to support longer product cycles. The state may have a reasonable interest in ensuring that automotive distribution networks generally have these properties or are reasonably expected to promote these outcomes.**

(iii) **The Morton Report does not apply its finding concerning double marginalization in a reliable or helpful way. Its conclusions in this respect rely heavily upon the assumed occurrence of one specific cost outcome (relating to the marginal distribution costs of independent dealerships versus OEM distribution outlets) among many possible outcomes without any analysis that the assumed outcome is the one most likely to occur. However, if, in practice, different relative marginal distribution costs occurred, this could reverse the direction of Professor Morton's finding.**

**Additionally, the Morton Report's emphasis on double marginalization is oversimplified and imprecise. Retailers must hold some degree of market power in order to support elements of non-price competition and other specific investment in promotion of the brand and service of incumbent customers. Even accepting some impact from double marginalization, many important elements of independent dealership operations are not subject to double marginalization, and the potential magnitude of double marginalization is modest.**

(iv) **The Walter Report's inquiry is unhelpfully narrow and misplaced. Its findings regarding differences between the types of retail activities that Lucid would prefer and that dealerships typically undertake do not rule out or even address whether**

4

**independent dealerships could viably represent the Lucid brand. The Walter Report also ignores potential competitive advantages that independent dealerships may hold over an OEM in the development of an early-stage distribution of new automobiles. The Morton Report, similarly, fails to demonstrate that it would not be viable for an independent dealership to represent Lucid products.**

## 3. QUALIFICATIONS

5. I have studied and analyzed the economic and institutional elements and dynamics relevant to this matter. Examples include the study of durable goods markets, systems by which manufacturers distribute scarce vehicles among sales outlets, multi-stage distribution markets, dealership financial performance and evaluation, and many topics within the retail automotive industry. These topics include the study of concepts that I understand to be directly at issue or under discussion here, such as the double marginalization, differing economic incentives of independent franchised dealerships and OEMs (whether in the role of wholesale distributor or potential retailer), and the diversified operating characteristics of franchised dealerships. I testified before the Texas House of Representatives on issues related to Tesla's efforts to sell vehicles from retail locations in Texas.

6. My curriculum vitae is attached as **Tab 1** to this report. I have a bachelor's degree in economics from Western Michigan University. I have a master's degree from the Department of Agricultural and Resource Economics at the University of Arizona with a concentration in applied econometrics. I joined Fontana in the fall of 1998, and my prior positions with the company include analyst, senior analyst, senior financial analyst, and case manager. I serve on the Board of Directors for both Fontana and its parent company, Mathtech, Inc.

7. My professional experience includes 25 years of studying industries through which manufacturers sell durable goods through networks of authorized outlets including

automotive, motorcycle, heavy truck, agricultural equipment, construction equipment, and body manufacturing sales networks. I estimate that I have provided over 30,000 hours of professional services specifically to clients in the retail automotive industry. I have also provided consulting services to companies in other industries for products reaching consumers through authorized retail outlets. Examples include office equipment, restaurants, tax preparation, and financial services companies.

8.  Studies I have conducted include analysis of hundreds of franchised dealerships and dealer networks that sell or sold products of one or more of the following line-makes: Acura, Audi, Buell, BMW, Buick, Cadillac, Chevrolet, Chrysler, Case IH Deere, Dodge, Eagle, Freightliner, Ford, Ford Heavy Truck, GMC, Genesis, Harley-Davidson, Hitachi, Honda, Hyundai, Infiniti, International Truck, Isuzu, Jaguar, Jeep, Kawasaki, Kia, Lexus, Lincoln-Mercury, Link Belt, Mack, Mazda, Mercedes-Benz, Mitsubishi, Nissan, Oldsmobile, Peterbilt, Plymouth, Pontiac, Porsche, Ram, Saab, Saleen, Saturn, Sprinter, Sterling, Subaru, Suzuki, Toyota, Volkswagen, Volvo, Volvo Construction Equipment, Volvo Truck, Western Star, and others. I have performed these studies both on a consulting basis and in connection with litigation.

9.  These studies addressed, without limitation: a) the addition, location, relocation, or termination of dealerships/franchises; b) compensation for line-make discontinuation; c) franchise valuation; d) valuation of ongoing operation of businesses, e) the refusal of a manufacturer to approve the sale and transfer of a dealership to a new owner; f) systems for allocating new vehicles to dealerships; g) sales performance and customer satisfaction measurements; h) economic damages; i) line-make discontinuation; j) retail credit analysis; k) manufacturers' systems for administering volume-based incentive programs; l) public

policy analysis; m) economic market structure of multi-stage differentiated products; n) investment incentives for differentiated firms; o) elements of competition in differentiated markets; and p) claims of economic damages. I have performed these studies for clients and markets in forty-nine states and in several other countries.

10. I have been invited to speak before groups of motor vehicle dealers, CPAs, Chief Financial Officers of dealer groups, attorneys, and other industry professionals. A statistical study that I conducted on topics within the transportation industry was submitted to both houses of the United States Congress on behalf of a union representing railroad track inspectors. I have been accepted as an expert in three countries in proceedings before state and federal courts, administrative courts, and arbitration panels. I have been accepted as an expert on these topics: a) general and franchise economics; b) dealer network and market analysis; c) economic damages; d) allocation systems, including those used to allocate scarce/high demand product; e) statistics; f) econometrics; g) dealership operations; h) dealership finance; i) analysis of franchise markets; and j) and general knowledge of the automotive industry. I have provided testimony on at least 80 occasions at depositions, hearings, and trials. A list of my testimony in the last four years appears in **Tab 2**.

## 4. EXECUTIVE SUMMARY

11. The independent franchise dealership model of retail automotive distribution has been the dominant distribution method in the US for at least the last 100 years. The independent franchised dealership network emerged as the dominant model from an environment that included many different distribution models, including direct OEM sales. Coinciding with the emergence of the independent franchise dealership model, other distribution models, including direct OEM sales, receded or disappeared from the market.

12. The economic motivations/incentives of independent franchised dealerships and OEM direct retailers differ for systematic reasons. Of these differences, one important characteristic is the behavioral incentives of an owner-operator who is directly tied to the economic outcomes of an enterprise and an employee tasked with operating a retail outlet for the benefit of an employer. A second is the relatively expanded incentive of an independent dealership to engage in more diversified behavior with respect to older products and products and services beyond those of the OEM.

13. Economic literature on the subject substantially attributes the distinguishing historical success of the independent franchised dealership model to the effects of these characteristics--those that differentiate independent franchised dealerships from direct OEM sales outlets. Specifically, the higher relative incentive of independent dealerships to provide more diversified products and services to customers was responsive to customer needs, particularly in times of downturns in new vehicle sales. Additionally, the direct connection between independent dealer owners and the cost controls and activities of the dealerships led to more successful operations by independent dealerships than by OEM direct retail outlets.

14. Differences in the operating incentives and motivations of franchised dealerships versus OEM direct retail outlets leads to the reasoned expectation that franchised dealership networks will have different operating characteristics than would an OEM direct retail network. In general, and as discussed in more detail in the body of this report, it is reasonable to expect that an independent franchise dealer network would have a) higher overall investment in retail capacity, b) increased incentives to support a broader dealer network (more outlets and more capacity for viability in smaller markets), c) increased

overall capacity to provide service including recall campaign service, d) more diversified product and service offerings, e) and higher support for longer product cycles.

15. It is a reasonable and credible inference that the state holds a beneficial economic interest in the characteristics described in the previous paragraph. Under an independent franchised dealership distribution model, it is reasonable to expect (versus an OEM direct distribution model), (a) more investment in retail capacity, (b) broader product access through a larger viable dealer network, (c) increased access to service of owners of incumbent vehicles, including more rapid deployment of large-scale recall activities, (d) more diversified product and service options at retail locations, and (e) increased support for longer product cycles, which tends to protect and/or enhance the value of incumbent vehicles in the market. To be clear, the emergence of the independent franchised dealer network as the dominant distribution model was the emergence of a system that favored the characteristics and associated benefits discussed here.

16. The passage of dealer laws, like the one I understand to be at issue here, followed—not preceded—the emergence of the independent franchise dealer network as the dominant new vehicle distribution model. In light of systematic friction between the economic interests of independent franchised dealerships and manufacturers, dealer laws protected the incumbent distribution system from opportunistic behavior by OEMs who held superior bargaining positions over franchisees. In other words, dealer laws protected investment in a market-selected system of distribution.

17. Lucid's proffered experts offer two overarching opinions[1] regarding Lucid's desire to distribution vehicles directly to consumers from a Texas retail location. The first is that it would not be viable or suitable for an independent franchised dealership to adopt the characteristics of Lucid's desired retail distribution environment. The second is that Lucid's direct distribution, if allowed, would avoid harm to consumers by adopting a distribution model that avoids the mark-up by a second differentiated firm within the supply chain, which is known as double marginalization.

18. Neither of these opinions is reliable. A test of whether a dealership would choose to structure its retail distribution outlet exactly as Lucid would its own is overly narrow. As set forth above, independent franchised dealerships have different economic incentives than OEM direct distribution outlets. The question of whether it would be viable for an independent franchised dealership to meet Lucid's distribution objectives is not the same as whether an independent franchised dealership would distribute vehicles and structure its firm in the same way that a Lucid outlet would.

19. The differences between the economic incentives of an independent franchised dealership and an OEM direct retail outlet likely favor the viability of the independent dealership's investment over that of an OEM in two important ways. Independent dealerships who already have investments in retail automotive campuses potentially or likely have lower opportunity cost of investment in Lucid retail facilities than would an OEM. In other words, whereas some dealership investors likely could accommodate Lucid facilities only by way of modification of existing facilities, this possibility is less likely to exist for an entity

---

[1] This statement synthesizes the opinions of Lucid's proffered experts at a high level. It does not alter or disregard the specific content of either of their reports.

without existing real estate presence in the market. Second, the higher incentives of independent dealerships to engage in more diversified services, such as trading and servicing used vehicles of other makes, increases the potential benefits of investment in Lucid retail facilities, enhancing viability of that investment.

20. While double marginalization is a recognized economic concept, its implications are fact dependent. The Morton Report applies a very aggressive and untested assumption, which is that the marginal costs of distribution for an OEM direct retail outlet would be the same as for an independent franchised dealership. This is an unsupported assumption, for which there is potentially contradictory evidence historically. If the OEM's marginal costs of distribution are higher than those of an independent franchised dealership, the result the result of vertical integration can be higher retail prices to consumers, even in the presences of double marginalization.

21. In many respects, double marginalization is modest or non-existent in the franchised dealership model. Several profitable elements of retail activities at independent franchised dealerships are not subject to a second mark-up by a differentiated firm, e.g., service, most used vehicles, many types of finance and insurance, etc. Even among the sales of new vehicles, various competitive factors limit the margins that dealerships capture, with average gross profits on new vehicle sales only representing 3% of price in 2019.

22. While technically important, the limits on the materiality of double marginalization in practice should not distract from the larger point that price is not the only determinant of consumer welfare. Independent dealerships' incentives to invest in variable (transactional) and fixed resources (facilities, uncharged services, pre-sale services, etc.) depend upon the ability to recoup those investments at the transactional level by pricing products above

marginal cost. I know of no US OEM or distributor that does not require its dealerships to make specific investments that differentiate the brand and the dealerships, despite the fact that increased differentiation generally comes with increased market power and ability to price above marginal cost. In short, franchised dealerships and OEMs make investments that appear to affect consumers negatively within the static confines of a double marginalization exposition, but that the investors themselves perceive that consumers will value enough to justify the investments. Additionally, factors such as increased product access, more diversified product and service offerings, increased investments in retail facilities, and expanded service capacity are reasonably considered beneficial to consumers, irrespective of or external to any implications of double marginalization.

## 5. BASES FOR OPINIONS

### 5.1. Nature of Independent Franchised Dealerships

23. Independent franchised automobile dealerships are differentiated firms that share several common characteristics. Broadly, these characteristics include a) brand-specific investment, such as participation in promotion of the brand's products, engagement in pre-sale and uncharged services, and the development of long-term productive brand-oriented assets, b) sales of current OEM-specific products, c) sales of diverse ancillary products, d) service of incumbent customers, and e) leveraging investments and activities such as those identified above to reposition assets within the retail marketplace, through activities such as reconditioning vehicles, auction sales and purchases, segregating product offerings by price and product type, etc.[2]

---

[2] This list of characteristics is not exhaustive.

24. Independent franchised dealerships operate within a market structure known as the successive market structure or successive monopoly. Within this market structure a differentiated manufacturer (OEM), which holds some degree of market power, sells to differentiated retail dealerships, which also hold some degree of market power. Dealerships, in turn, sell to end-using consumers. In some cases, retail sellers with little differentiation of brand affiliation may sell many differentiated products. An example of this may be an unaffiliated convenience store that sells dozens or hundreds of differentiated drinks and snacks but holds little to no independent market power.

**(i) The independent franchise distribution model emerged as the dominant distribution system for new automobile sales in the United States and did so from an environment that (a) pre-dated protective statutes and (b) included multiple other distribution models, including direct manufacturer sales. This emergence is reasonably and reliably attributed substantially to economic characteristics of the independent franchise dealer network.**

**5.2.    Retail Automotive Distribution Network History**

25. I now turn to the discussion of the history of automobile distribution in the US and the emergence of the independent franchised dealer network.

26. The manufacturing of automobiles to sell to consumers began in earnest around the turn-of-the twentieth century. Franchising as a system of distributing vehicles dates to this time. "William E. Metzger is said to have been the first franchisee in automotive retailing; he obtained a franchise to sell steam automobiles from General Motors Corporation in 1898…"[3]

---

[3] Roger D. Blair and Francine Lafontaine, *The Economics of Franchising* (Cambridge: Cambridge University Press, 2005): 6 (footnote).

27. During the first decade of the twentieth century, manufacturers used many means of selling to consumers including direct sales.

> *Virtually all of the manufacturers sold their cars directly to the consumer. Many manufacturers solicited business by mail. Some manufacturers sold directly to the consumer only in localities where they had no 'agency' representation. Many cars were sold to 'agents' on a consignment basis, and some were sold to 'agents' both on credit and for cash in advance of delivery. Some cars were sold by traveling salesmen and some were sold through large department stores. The retail distribution outlets of a leading wagon manufacturer were utilized at one time. At least one manufacturer contracted to sell its entire output through a single distributor. It seems safe to conclude that virtually every type of distribution device was experimented with during this period.*[4]

28. During the 1910s and 1920s, as automobile production took off, most manufacturers used some combination of branches (OEM-owned and operated auto retail stores), third-party distributors (which sold primarily at wholesale, but also retail), and independent dealers. "In the 1910s and 1920s most companies utilized a combination of branches, distributors, and dealers to sell cars."[5] Of these systems, distribution through independent dealers was the most common.[6] The franchise system was common by the 1920s.[7]

---

[4] Charles Mason Hewitt, Jr., *Automobile Franchise Agreements* (Homewood, IL: Indiana University School of Business, 1956): 18-19.

[5] James M. Rubenstein, *Making and Selling Cars: Innovation and Change in the U.S. Automotive Industry* (London: The Johns Hopkins University Press, 2001): 266.

[6] Ralph C. Epstein, *The Automobile Industry – Its Economic and Commercial Development* (Chicago: A. W. Shaw Company, 1928): 132-133.

[7] Ibid., p. 267.

29. There are two important points to be made about the early emergence of the franchise system as the dominant means of retailing automobiles. First, franchise agreements, the nature of franchising, and how franchise agreements were treated by the courts evolve over time. This is true for the first half of the twentieth century and Hewitt's (1956) *Automobile Franchise Agreements* is an excellent source for discussion of these changes, especially as relates to the franchise agreements themselves and the *de facto* law, up to roughly the passage of the Automobile Dealer's Day in Court Act (ADDICA) of 1956. Second, franchising became the dominant system of automobile distribution by the 1920s, *far before the passage of ADDICA and pro-independent dealer state-level legislation*.

30. In the first two decades of the twentieth century as the volume of production and sales of automobiles grew rapidly[8], auto manufacturers concentrated primarily on production and leaned on third parties, especially independent dealers, to handle consumer sales. As the rapid growth of the market began to slow[9] and replacement sales began to constitute a large portion of the consumer market, exceeding half of total sales in 1924, manufacturers began to place relatively more attention on distribution and sales.[10] This structural change in the industry, with production capacity now able to far exceed consumer demand for new vehicles, led to conflicts between dealers and manufacturers and developments in franchised dealerships.

---

[8] "Auto production increased from about 4,000 vehicles in 1900 to over 1.9 million by 1920." – Thomas G. Marx, "The Development of the Franchise Distribution System in the U.S. Automobile Industry" in *Business History Review* 59, no. 3 (Autumn 1985): 469.

[9] "The phenomenal growth in demand did not continue after 1920, however; the output of passenger cars declined sharply in 1921, and then fluctuated throughout the remainder of the prewar period. Production of 3,179,385 passenger cars in 1940 was still below the output in 1925." – Ibid., pp. 469-470.

[10] Lawrence H. Seltzer, *A Financial History of the American Automobile Industry* (New York: Haughton Mifflin, 1928): 59-60.

*Production levels became a source of conflict, with manufacturers wanting to produce more cars than dealers believed they could profitably sell. Further, demand was rapidly changing from first-car to replacement-car demand. By 1929, dealers were handling more used than new cars, and as a result each sale became a unique trading proposition. Consumers also began demanding greater vehicle performance, comfort, and reliability as the automobile became the primary means of personal mobility rather than a recreational vehicle used mainly on weekends.*

*These changes in consumer demand greatly increased the importance of dealer service and warranty coverage.*[11]

31. The incentives of a manufacturer selling through franchised dealers and the incentives of those franchised dealers are not identical. Though they overlap in some ways, there are many ways in which the interests are directly opposed. The history of case law of automobile franchise agreements up to 1956 is a veritable tour of the ways in which the interests of the parties collide and lead to opportunistic, bad-faith behavior primarily by manufacturers because they generally were in much stronger bargaining positions than dealers.[12] This in turn is regarded as playing a large role in the rise of state and federal regulation of automobile franchising at mid-century. Professor Morton, and her co-author

---

[11] Marx (1985): 470-471.

[12] Hewitt, Jr. (1956).

Professor Francine Lafontaine summarize the discussion of this dynamic as it appears in the peer-reviewed literature:

> *The regulation of auto franchises arose as a response to car manufacturer opportunism early in the twentieth century. According to Surowiecki (2006), in 1920, Henry Ford took advantage of its established dealer network by forcing dealers to buy inventories of new cars that they were unlikely to sell. The reason that the company could 'force' dealers to take the cars was that they had all made important investments in their facilities and reputation. Thus they had sunk costs that could be expropriated. Ford and General Motors used the same strategy again during the Great Depression. These episodes demonstrated to policymakers that the franchisor, with its greater information and financial resources, might exploit investments made by the franchisees. Federal regulation followed these periods, likely driven partially by the experience of the dealers and their requests for protection. The starting point for auto franchise regulation is the 1956 federal act generally known as the Automobile Dealer's Day in Court Act (ADDICA), which provides that a car dealer may recover damages if its manufacturer fails to act in good faith in complying with the terms of the franchise agreement, including on issues of allocation of vehicles to dealers, or matters of termination, cancellation, or transfer of the franchise.[13]*

32. Though the ADDICA is often considered the starting point for regulation in this area, state laws had already been passed at that time. Since then, state laws regulating the auto

---

[13] Lafontaine and Morton (2010): 238-239.

franchise system have become universal in the U.S. and these are generally more restrictive than federal laws.

> *However, by the time ADDICA was enacted, 20 states had already passed auto franchise laws. Today, every state has a law governing car manufacturer/dealer relationships. These state laws tend to be more dealer-friendly than the federal law.*[14]

33. Summarizing the preceding section, it is contextually helpful to recognize that the emergence of the independent franchised dealer network pre-dated laws that may be considered protective or restrictive to the benefit of franchised dealerships. Irrespective of the timing of the development of double marginalization theory in the economic literature, the elements of double marginalization existed at the time that independent franchised dealer networks operated alongside factory direct distribution channels, but it did not deter the emergence of independent franchised dealer networks as the dominant distribution method. When market conditions changed within the retail automotive industry, independent dealerships responded through increased operational diversification to meet and address consumer demands for retail activities, such as facilitating trade-ins, servicing incumbent vehicles, etc. Finally, better-aligned incentives between retail owners and retail activities supported operational efficiencies and cost controls in favor of independent franchised dealerships. I discuss this last point in more detail in section (iii) of the report.

**(ii) Characteristics of the independent franchise distribution model are reasonably and reliably likely to result in systematic outcomes in which the state may hold a legitimate economic interest. In comparison to an OEM-operated retail distribution network, an independent franchise distribution network is likely to support broader and generally larger investment in retail capacity, increased investment in support of service and ancillary product sales, more rapid execution**

---

[14] Ibid., p. 239.

**of large-scale recall campaigns, reduced exposure to principal-agent (incentive) problems, and increased incentives to support longer product cycles.**

34. Currently, approximately 20,000 franchised dealerships representing approximately 38,000 franchises operate within the US.[15] The large-scale networks of franchised dealerships provide broad and varied access to consumers. Dealerships buy and sell both new vehicles and used vehicles. These dealerships also supply parts, service, and repair of vehicles, including work done under warranties and, in particular, under recall campaigns. As referenced earlier by way of modest gross profit margins, the existence of intra-brand and inter-brand competition amongst the large number of dealerships, as well as other margin-influencing activities by manufacturers,[16] act as a check on the ability of individual dealerships to charge prices for their products and services far in excess of their costs.[17]

## 5.3.    Expanded Access

35. Reasoned economic arguments suggest that the current system of automobile distribution through independent franchised dealerships gives rise to a larger number of dealerships and more total dealership capacity for service and used vehicle sales than would exist under a counterfactual automobile distribution system through OEM-owned and operated

---

[15] Automotive News currently reports (as of 2023) 18,271 dealerships and 31,366 franchises, e.g., a Ford/Mazda dealership is a single dealership with two franchises.

[16] These programs, to my understanding are contextual and not relevant to issues disputed in this case. For reference, examples of these programs include sales volume-based tiered pricing incentives and operational programs tied to the wholesale prices of vehicles.

[17] As stated in the introduction to this report, I understand the relevant questions (at least those posed to me) to be whether an independent franchised dealer network foreseeably facilitates benefits in which the state may have a reasoned economic interest, and also to include content related to Lucid's expert reports. In this section, I describe systematic benefits that arise from an independent franchised dealer network. The Morton Report and the Walter Report discuss whether the distribution of Lucid vehicles would be viable for independent dealerships, as well as issues of double marginalization. I am not aware of any assertion by Lucid regarding the general preferability of independent distribution versus OEM direct distribution or distribution by some other system.

dealerships. These economic arguments regard differing incentives of manufacturers under the two systems, different expected emphases on various parts of dealership business by independent franchised dealerships OEM-owned and operated dealerships, and the differential likelihood of dualing[18] under the two systems.

## 5.4.    Diversified Service and Activities/Viability

36. Under the current automobile distribution system of independent franchised dealerships, a manufacturer makes its revenue primarily from selling vehicles wholesale to its franchisees. Adding dealerships increases the number of independent buyers of the manufacturer's product. When a manufacturer adds additional independent dealerships, it may increase the demand for its vehicles at wholesale through the direct addition of demand from the new dealership, even if the demand for its goods at wholesale from extant dealerships decreases in response. Importantly, the impact on reduced retail sales of extant dealerships through any additional competition with the newly added dealership is borne primarily by the independent franchised dealerships, and only secondarily by the manufacturer through reduced wholesale orders of those dealerships. As long as the expected impact on the manufacturer's profits due to additional demand for vehicles wholesale from the new dealership exceeds any expected losses due to changes in demand from other franchised dealerships of that manufacturer, the profit-maximizing manufacturer would prefer to add that additional dealership[19]. Under a counterfactual system where dealerships are manufacturer-owned and operated, the manufacturer's

---

[18] Here, I refer to "dualing" as the representation of multiple brands by a single operator on a common campus. "Dualing" also refers to retail locations with non-exclusive brand presentation, e.g., Ford and Mazda operating from the same showroom.

[19] Assuming there is a potential franchisee.

incentives regarding the size of the dealership network are different. In this scenario, the primary source of revenue for the manufacturer comes not from selling vehicles wholesale, but rather selling them at retail to consumers. Here, the impact of adding a dealership on extant dealerships are internalized by the manufacturer directly, rather than being borne in part by independent franchised dealerships. Because the OEM directly experiences the impacts of the additional dealership on the retail sales of its other dealerships, it will find its optimal number of dealerships to be less under this system. Thus, the manufacturer will likely choose to have fewer total dealerships under a counterfactual system of OEM-owned and operated dealerships than under a system of independent franchised dealerships as exists at present.

37. A large portion of the business of independent franchised dealerships consists of trading in used vehicles and in parts, service, and repair work. Manufacturers who produce new vehicles may, under a counterfactual system of OEM-owned and operated stores, engage in less used vehicle trading (particularly of other makes' vehicles), independent finance activities, and less parts, service, and repair work than do dealerships under the current independent franchised dealerships system. As is consistent with the reports of Lucid's experts, ancillary activities make many dealerships viable today that would not be viable businesses in the markets they exist in if those dealerships were primarily or solely dedicated to new vehicle sales. That is, in some markets where we observe dealerships today, there does not exist enough new-vehicle demand in that market to support a dealership engaged primarily in new vehicle sales. To the extent that this is true and that under the counterfactual system OEM-owned and operated dealerships would not engage in as much used vehicle and parts, service, and repair work as is currently engaged in under

the present vehicle distribution system, we may expect that dealerships that exist in these thinner markets under the present system would not exist under the counterfactual system. Thus, there would be fewer total dealerships and reduced customer access, particularly markets with relatively low levels of new vehicle demand.

38. Dualing refers to the practice of a dealership engaged as a franchisee for multiple manufacturers. Dualing can rationalize the existence of dealerships in relatively thin markets which would not be able to support a non-dualing dealership. That is, there are cases in which the volume of demand is too low in the local market to make it profitable to run a non-dualing dealership. Under a counterfactual system of OEM-owned and operated dealerships, it is counter-intuitive that manufacturers themselves would choose to engage in dualing, selling both their own products and those of their competitors. In short, independent dealerships benefit from greater potential scope than would OEM direct retail outlets, supporting investment and operation in a broader array of markets and locations.

## 5.5.  Recall Campaigns

39. A specific beneficial characteristic of a large, franchised dealership network is the ability to supply repair work rapidly under a recall campaign. In cases in which the recall was issued due to public safety implications of the vehicles in question, the existence of a large number of dealerships with a large total capacity for repair work means there is the repair capacity to quickly perform that recall repair work and quickly mitigate or eliminate the public safety issues underlying the recall. The Takata Airbag recall and the GM Ignition switch recall are examples in which dealerships rapidly and effectively executed millions of recall repairs affecting diverse vehicles throughout the country.

40. All else equal, a larger dealership network with more total parts, service, repair capacity would be more capable of providing recall repair work in a short time frame. To the extent that the arguments under the prior section are true, specifically that there are more dealerships and more total capacity for repairs under a system of independent franchised dealerships than there would be under a counterfactual system of OEM-owned and operated dealerships, we can expect that the ability of the dealerships to adequately address a recall is greater under the current system.

## 5.6.    Independent Dealership Support for Longer Product Cycles

41. Another beneficial characteristic of the existence of the franchised dealer network is that franchised dealers' preferences regarding product cycles can differ from those of OEMs. Specifically, there are good reasons to believe that franchised dealers prefer longer product cycles for new vehicles than do OEMs. These differing preferences may lead to franchised dealerships' engaging in and promoting activities that support expanded vehicle ownership more so than would an OEM direct distribution network.

42. Franchised dealers earn revenue from sales of new vehicles, sales of used vehicles, and service on vehicles. While an OEM rationally prefers to introduce new models on a cycle that maintains perceived product differentiation, dealerships often earn higher margins on the sales of late model used vehicles than on new vehicle sales. In my experience, conflict often arises when manufacturers perceive that dealerships emphasize sales of used vehicles excessively versus the sales of late model used vehicles. For instance, imagine a case in which the volume of unsold vehicles held by dealers is large given the relatively low volume of retail sales to wholesale purchases of new vehicles in the prior time periods. OEMs make their revenue primarily from selling new vehicles. Under a franchise

distribution system as exists in the U.S. today, this is almost entirely selling at wholesale to franchised dealerships. If an OEM introduces a new model, it can sell the new model to its franchised dealerships at wholesale. In the process, the introduction of the new model is the introduction of a close substitute for the extant models. Its introduction to the market will likely lower the market demand and thus the retail prices of the unsold extant models of new vehicles already held by the dealerships. This lowers profit margins of franchised dealerships on those vehicles. From the standpoint of the dealerships here, the introduction of new models often has mixed effects on their profitability: additional expected profits on the newly introduced models are traded off against decreased expected profits on unsold new vehicles of older models they currently have in inventory. From the standpoint of the OEMs here, the introduction of the new model is more likely to be profitable: the negative impact on the retail sale price of new vehicles of older models is largely borne by the dealerships, the OEMs have already sold these vehicles to the franchised dealerships. For these reasons, we might expect that the franchised dealership network acts as a countervailing force to OEM's desires for shorter product cycles for new vehicles.[20]

43. Unlike OEMs, franchised dealerships systematically make large amounts of revenue from the buying and selling of used vehicles. Independent franchised dealerships typically make relatively lower portions of their profits on new vehicle sales. Dealerships actually make higher gross profit percentages (much higher) on used vehicle sales than on new vehicle sales. For these reasons, franchised dealerships may be more interested in used vehicles

---

[20] Note: This is *not* a statement about the net impact of a franchised dealership network versus a factory network on product cycles. The statements about the differing desires of an OEM and its franchised dealerships on product cycles *assume* the current system of franchised dealerships. Clearly the preferences of OEMs regarding product cycle length would differ in the case in which the OEM is selling the older models at retail rather than independent franchised dealerships. Further this is not a statement about the impact of the state laws in question in this suit.

maintaining higher resale prices than are OEMs, whose profits are less tied to the resale prices of their used vehicles.[21] Planned obsolescence would thus be counter to the interests of franchised dealerships and their existence may in some way push back against OEMs' possible desires for compressed product purchase cycles that relatively favor the introduction of new product releases over the maintenance of incumbent products. .

44. The above discussion demonstrates that the incentives of an independent dealer network favor a longer product cycle than would an OEM. In general a longer product cycle, all other things equal, creates greater retained value of incumbent vehicles in the market. Additionally, it reduces the effects of technical obsolescence/parts obsolescence, etc. These factors generally tend to benefit existing owners of motor vehicles, particularly, of older motor vehicles.

**(iii) The Morton Report does not reliably apply its finding concerning double marginalization in a reliable or helpful way. Its conclusions in this respect rely heavily upon the assumed occurrence of one specific cost outcome (relating to the marginal distribution costs of independent dealerships versus OEM distribution outlets) among many possible outcomes without any analysis that the assumed outcome is the one most likely to occur. However, if, in practice, different relative marginal distribution costs occurred, this could reverse the direction of Professor Morton's finding.**

**Additionally, the Morton Report's emphasis on double marginalization is oversimplified and imprecise. Retailers must hold some degree of market power in order to support elements of non-price competition and other specific investment in promotion of the brand and service of incumbent customers. Even accepting some impact from double marginalization, many important elements of independent dealership operations are not subject to double marginalization, and the potential magnitude of double marginalization is modest.**

---

[21] This is not to say that manufacturers have no interest in supporting resale prices of used vehicles. The ability to set competitive lease rates depends upon (in addition to factors relating to risk and repurchase options) the expected tendency of products to retail value in the market, as a lessor must account for expected disposal proceeds and associated risk at a future date.

45. An argument[22] in the Morton Report suggests that a potential impact of the state ban in question is harm to Texas consumers arising from double marginalization given the successive monopoly[23] structure of retailing vehicles through independent dealerships. The *potential* harm is in the form of higher prices of vehicles sold at retail given the highly stylized model of double marginalization presented by the Morton Report. As presented, this suggests that retailing vehicles through independent franchised dealerships is necessarily harmful to consumers as compared to retailing vehicles through vertically integrated firms, i.e. OEM-owned and operated dealerships.

46. As discussed in more detail below, this assumed outcome is unsupported and unreliable especially in light historical experience when independent dealerships and OEM direct distribution outlets operated contemporaneously. Not only was the stronger incentive of the independent operator/owner (than an OEM employee) to manage costs (by internalizing the benefits of cost controls) a factor in OEM's discontinuation of direct distribution, but other characteristics of independent dealership operations favored the viability of that model versus that of OEM, even absent the structural element of double marginalization.

47. Double marginalization arising from the successive monopoly structure of the supply side of the automobile market is a valid economic concern. However, it is only *one* of many aspects of relevant economic theory that bear on this matter. There are other important economic considerations, particular to this industry, which are notably absent from Professor Morton's simplistic illustrative model of double marginalization. Consideration

---

[22] Expert Report of Professor Fiona Scott Morton, July 25, 2023: ¶¶ 26-28.

[23] Monopoly is not required for double marginalization; a more apt and general term here would be "successive market power." Since "successive monopoly" is commonly used in the literature to refer to this supply structure, I use it here.

of these issues, for instance the differing incentives of owner-operators of dealerships and manufacturer's employee-managers and the related possibility of differing costs of retailing for manufacturers versus independent dealerships, shows that Professor Morton's highly stylized model of double marginalization is likely misleading as presented.

48. The stylized model of double marginalization presented by the Morton Report explicitly assumes that the marginal costs of retailing a vehicle would be the same in both the case of OEM-owned and operated dealerships as in the case of independent franchised dealerships. Professor Morton writes that, "Even if the manufacturer has the same costs to retail its vehicles as does an independent dealer, the final retail price is lower than it would be if the vehicle was marked up by both the manufacturer and the dealer…"[24] The model presented assumes that the costs are the same. If the costs are lower for the manufacturer than for an independent dealer, then the result will also hold. However, Professor Morton failed to mention that this result of higher prices to consumers *does not necessarily hold if independent dealers have lower costs of retailing than manufacturers*. If independent dealers have lower costs of retailing than manufacturers, then the result becomes ambiguous and whether prices are lower for consumers under a vertically integrated firm, or the successive monopoly structure depends on degrees of market power and differences in costs. If there are cost-savings in retailing associated with independent dealers, then it is possible that prices to consumers would be lower under a franchised structure than under a vertically integrated structure, *despite some amount of double marginalization*.

49. Does the above theoretical point matter in this case? In other words, are there reasons to believe that retailing costs may be lower for independent dealers than would be for

---

[24] Expert Report of Professor Fiona Scott Morton, July 25, 2023: ¶ 28.

manufacturers engaging in retailing? Is Professor Morton's highly stylized assumption of equal costs a bad assumption that is possibly misleading as to the matter at hand? The answer to that question is yes. The following paragraphs draw on the economic history of automobile distribution in the U.S. and franchise economics to show that retailing costs may be lower for independent dealerships. Given the above discussion, this in turn implies that working through independent dealers will not necessarily lead to higher prices for consumers and may actually reduce prices to consumers.

50. I return now to the discussion of the development of automotive distribution networks in the US. Early in the history of the automobile industry, manufacturers experimented with many different ways of distributing vehicles[25], including direct sales to consumers[26] and OEM-owned and operated dealerships, sometimes called "branches."[27] For instance, Ford early on used branches:

> *Ford opened branch stores in 1907 in six cities (Boston, Buffalo, Chicago, Kansas City, New York, and Philadelphia), in 1908 five more cities (Atlanta, Cincinnati, Dallas, Omaha, and Pittsburgh)-twenty-five altogether by 1910. The branches accounted for most of Ford's sales-62 percent in 1909, 79 percent*

---

[25] "There are thus three main channels through which cars may be distributed: factory to retail dealer, factory to distributor (wholesaler), factory to branch. Actually, no one of these three possible systems seems ever to have been employed as an exclusive method, except in one remarkable instance in which all the retail dealers had a direct contact with the factory. Most manufacturers have utilized both factory branches and wholesale distributors, or both wholesale distributors and retail dealers, some of whom may enjoy a direct contact with the factory, or other similar combinations of these three types of intermediary between factory and final buyer." Epstein (1928): 132-133.

[26] Gerald R. Bodisch, "Economic Effects of State Bans on Direct Manufacturer Sales to Car Buyers," *Economic Analysis Group Competition Advocacy Paper*, May 2009: 2.

[27] Rubenstein (2001): 266.

*in 1913-while independent dealers sold Ford cars in small towns beyond the*

*service area of any branch.[28]*

51. Ford was not alone in experimenting with direct-to-consumer sales. However, Ford chose to move away from the use of branch stores for reasons that bear on the discussion of differing costs of retailing.

> *But selling directly to the public proved impractical for Ford's expansion plans. Ford could not open branches fast enough to keep up with the enormous growth in demand for cars that it had created, nor could it find enough qualified people to staff branches. Ford officials believed that a manager had a much less strong incentive to work hard to maximize sales and minimize expenses than an independent dealer with a direct financial investment in the business.[29]*

52. The statement that Ford officials believed an (employee) manager of an OEM-owned and operated store was not as effective at minimizing expenses as an independent dealer is a statement that retailing costs were *higher* for the vertically integrated firm than for an independent dealer. Not only did those officials perceive this to be true, but they additionally turned to franchising more and more because they thought it was more effective than running OEM-owned and operated stores.

53. Other manufacturers also experimented with OEM-owned and operated stores early on; however, in general they moved away from it towards franchising. Dr. Epstein in his 1928, *The Automobile Industry: Its Economic and Commercial Development*, discussed this, including statements from the manufacturers in response to a survey specifying why they

---

[28] Ibid.

[29] Ibid.

made these changes. As in the case of Ford, discussed above, these statements imply that employee-managers or OEM-owned and operated stores were less effective in selling cars, *including in being less cost effective*.

> *Though a large number of factories today operate no branch houses whatever, or else operate but one or two such branches, most of them at one time or another have tried the branch system. A questionnaire which the writer circulated in 1926 in order to obtain information regarding marketing practices called for the checking of each year in the history of the company during which it had employed branches, distributors, direct dealers, and requested that in the event that branches had once been employed but later discontinued, the reasons for such action be stated, if the company cared to confide them.*

> *A number of firms complied with this request, and the reply which predominates is interesting. It is simply that it was extremely difficult to find branch managers who proved as competent as did the wholesale distributors who had their own funds invested in their establishments. One would naturally expect the manufacturing company to operate branches if it can; it is a more direct method; it maintains factory contacts with both local dealers and consumers. Further, the simultaneous operation of several branches ought presumably to reduce sales expense. Yet so great is the single obstacle just mentioned in the way of successful branch operation that comparatively few manufacturers have developed branches at all widely.*

*It is worthwhile to quote from several of the replies, just to indicate the unanimity of experience which prevails. The following excerpts are from separate answers received from executives of five different companies:*

*'The fact is that passenger cars sold by branches have not been generally a success. It is hard to get a manager… to handle the company's money, make trades, and so on … to compete with a dealer who has to work upon his own investment and protect it …'*

*'The retail motor car business has many leaks, and we find it extremely difficult to find managers who do not waste considerable money …'*

*'It is difficult to get good managers who have no money invested. … If a dealer has a financial interest in his own company, he is found to be much more satisfactory than a branch manager, who has practically no financial interest in the branch.'*

*'…We find in a general way that even a man who makes a 'fair to middling' dealer lies down and quits completely when put in charge of a factory branch-where the urge of actual, personal incentive is less strong.'* [30]

54. In summary, there is good reason based on the history of automobile distribution in the early U.S. to determine that the underlying assumption of equal costs of retailing in the Morton Report's simple model of double marginalization, which I discuss in more detail below, is false as applies to the auto industry: there are reasons to believe retailing costs would be higher for manufacturers than for independent dealers.

---

[30] Epstein (1928): 135-136.

55. This point is relevant to the Morton Report's conclusions regarding consumer harm from double marginalization. The prediction that retail prices paid by consumers will be lower with vertically integrated supply doesn't necessarily follow: the impact on retail prices through avoidance of double marginalization by vertical integration may be more than offset by less cost-effective retailing by the vertically integrated firm. This shouldn't be surprising given the history of auto distribution in the U.S.: franchising became the dominant system by which vehicles are distributed in the U.S. *prior to the enactment of state laws explicitly protecting the existence of the franchised dealer network*. If supplying vehicles through independent dealerships actually led to consistently higher prices than would have been the case under vertical integrated firms, then there is a question as to why some manufacturers didn't utilize that distribution method, and in the process, gain a price advantage over competing manufacturers at retail.

56. The above discussion relates to distribution costs among competing contemporaneous methods of automobile distribution. In addition, there are arguments made in the franchise economics literature that independent franchised dealers may be more effective than OEM-owned and operated dealerships. Notably, some of this literature was developed in order to help rationalize why vertical integration hasn't been more common in the past given the double marginalization argument and similar economic theory arguments in favor of vertically integrated firms.

57. Professor Morton's sometimes co-author[31] Francine Lafontaine co-authored a (separate) popular handbook/textbook, *The Economics of Franchising*.[32] Summarizing why so many

---

[31] See Francine Lafontaine and Fiona Scott Morton, "State Franchise Laws, Dealer Terminations, and the Auto Crisis" in *Journal of Economic Perspectives* 24, no. 3 (Summer 2010): 233-250.

[32] Blair and Lafontaine (2005).

chains (like automobile dealership networks) are organized as franchises rather than being vertically integrated, the authors write:

> *Why then do we see so many other chains organized as franchises? The answer apparently lies in the capacity of franchising to combine the chain's comparative advantages in creating brand recognition and capturing economies of scale with the local entrepreneur's local knowledge and drive. In other words, in the ideal franchise relationship, each party is able to specialize in what each does best and yet benefit from the efforts of the other. In fact, as we will see in more detail later, most franchise contracts are written such that both parties share in the sales revenues of the franchised outlet. The contract thus ensures that both parties have incentives to put forth effort to increase those revenues. Such joint incentives are more difficult to achieve in a corporate environment and therein lies the main long-term advantage of franchising over corporate organization.[33]*

58. The "local entrepreneur's local knowledge and drive" could of course result in lower retailing costs.

59. Two academics, Caves and Murphy, explored this topic in a paper titled, "Franchising Firms, Markets, and Intangible Assets." They write:

> *Internal control and supervision costs can be reduced by the use of a resident proprietor to supervise local production. The proprietor's motivation and outlay of effort may exceed those of hired employees. The supervisor of the local production unit often supplies much of the labor himself or through family*

---

[33] Ibid., pp. 1-2.

*workers, and the marginal opportunity cost of this labor may be below that of*

*hired workers…Dealings with customers may require a flexibility or discretion*

*in negotiation (sic) individual transactions that is relatively high to entrust to a*

*salaried individual-as in bargaining on the price of an automobile or renting*

*complex types of equipment.*[34]

60. In summary. both the history of automobile supply in the U.S. and the modern franchise economics literature provide good reasons to believe that the assumptions regarding retailing costs used by Professor Morton in her simple model illustrating double marginalization are false. The conclusion of Professor Morton that "Barring Lucid from Selling Direct to Consumers in Texas Harms Consumers by Introducing the Risk of Double Marginalization" was justified on the basis of that model delivering lower prices to consumers as a *necessary result*. Since that result does *not* necessarily follow when costs are lower for independent dealers and there are good reasons to believe that costs are lower for independent dealers, Professor Morton's opinion in this regard should be discounted. Rather, it simply is the application of one possible outcome regarding relative distribution costs, applied as a necessarily true outcome with no basis or analysis, no discussion of other outcomes or even the possibility of other outcomes.

61. For reference, I include as **Tab 3**, demonstration and discussion of the double marginalization problem without Professor Morton's assumption regarding equal marginal distribution costs. Under other cost outcomes, which seem to align with historical trends,

---

[34] Richard E. Caves and William F. Murphy II, "Franchising Firms, Markets, and Intangible Assets" in *Southern Economic Journal* 42, no. 4 (1976): 575.

consumers could pay lower costs under an independent franchise distribution network, even with double marginalization in place.

### 5.7. Professor Morton's Double-Marginalization Discussion Is Oversimplified

62. The Morton Report notes that dealerships earn, at least under normal historical circumstances, relatively small percentages of their net profits through their new vehicle departments. Ignoring recent pandemic-effected years in which dealerships and manufacturers captured historically high margins, I generally agree with Professor Morton's finding, particularly with respect to the sales of new vehicles. **Tab 4** shows reported gross profit margins (mark-up over invoice price charged by dealerships to new vehicle customers) between 2001 and 2019. Margins essentially followed a continuous downward trend, reaching only about 3% by 2019. While sales of new vehicles are subject to double marginalization, structurally, the magnitude of this mark-up is modest, at best.

63. In contrast, most dealership profit comes from other activities, many not subject to double marginalization. These activities include the sales of used vehicles,[35] many financing activities, and the provision service labor. Equating independent franchise dealer activity with double marginalization is imprecise and often incorrect.

### 5.8. Competitive Incentives

64. Dealerships engage in pre-sale forward-looking investment in the brand and in retail activities, in general. For example, dealerships invest in facilities, sacrificing liquidity of those investments by tailoring the investment to the design requirements of the brand. Furthermore, dealerships maintain inventories, invest in training, significant parts

---

[35] Certified Pre-Owned ("CPO") designation on some used vehicles is likely subject to two mark-ups.

inventories, etc. The expense of this investment does not occur at the transactional level and therefore is not generally reflected in the marginal cost of a sale.

65. As demonstrated in **Tab 5**, dealerships' incentives to invest both in experiential services and fixed (e.g., facility-related) activities is a function of the ability to capture higher margins. Simply put, a firm will invest if it expects the investment to increase customers' willingness to pay for the product or service and the firm making the investment expects to benefit from the higher prices.

66. These general concepts are not unfamiliar to dealerships or OEMs. For example, following its bankruptcy then-Chrysler sought to reduce the number of dealerships by cancellation of franchise rights in order to reduce intra-brand competition with the hope of strengthening dealerships' competitiveness with other brands' dealerships (increased inter-brand competition). In isolation, the simple demonstration of double marginalization would show reduced consumer benefit/increased consumer harm. However, the assertion at the time was that the reduction of intra-brand competition would provide increased competitiveness and strengthen Chrysler's offerings.

(iv) **The Walter Report's inquiry is unhelpfully narrow and misplaced. Its findings regarding differences between the types of retail activities that Lucid would prefer and that dealerships typically undertake do not rule out or even address whether independent dealerships could viably represent the Lucid brand. The Walter Report also ignores potential competitive advantages that independent dealerships may hold over an OEM in the development of an early-stage distribution of new automobiles. Professor Morton, similarly, fails to demonstrate that it would not be viable for an independent dealership to represent Lucid products.**

67. The Walter Report describes inconsistencies between typical and common operations of franchised dealerships and the type of retail operations desired by Lucid's management. While I agree that the average dealership or most dealerships do not or would not operate

successfully in the aspirational manner that Mr. Walter describes, I disagree that this is a helpful inquiry in general.

68. It is no more meaningful to conclude that most dealerships' activities would not fit Lucid's desired retail operational characteristics than it would be to conclude that few dealership operators would fit the characteristics of a very high-volume freeway dealership in Houston, a dealership that relies heavily upon sub-prime financing, a small luxury dealership or any other operation with uncommon characteristics.

69. Texas dealerships sold approximately 10,763 new electric vehicles in 2022. Texas dealerships selling luxury products sold relatively few units (well under 100 new vehicles). As Mr. Walter notes, many new vehicle dealerships have one-price practices. In other words, Texas dealerships already sell diverse products and operate under diverse circumstances.

70. While an independent dealership selling Lucid products would have few used Lucid vehicles to service, an independent franchised dealership would have relatively more incentive than Lucid itself to engage in sales of other brands' used vehicles. This would allow an independent dealership to benefit from its fixed investment in a more diverse and potentially broader manner than would Lucid.

71. While I have no opinions regarding specific locations or operators, it is my strong expectation that independent dealerships would generally have lower opportunity cost of investment in retail facilities than would an OEM. In my experience, it would be a conservative estimate that half of dealerships have related real estate entities that own properties outside of the dealership itself. In a practical sense, a dealership with a relatively large campus, the cost and opportunity cost of modifying the campus to accommodate the

sales of a relatively low volume make would likely be lower than it would be for an entity that had to seek out an entire location for the dealership.

72. Independent dealerships have made initial investments in many start-up entities in recent years, including Fiat, Mini, Genesis, Maybach, and others. In some cases, dealerships located these brands within or adjacent to existing buildings. In some cases, facilities were stand-alone.

73. Just as an independent dealership investment would need to justify an investment, so too would an OEM retailer. In many respects, the opportunity cost of that investment would be lower for a dealership already engaged in automotive retailing within a market. Systematically, it is reasonable to expect that dealerships would hold more incentives to engage in other activities that support the investment in Lucid.

74. Questions of whether an independent Lucid dealership would look exactly as Lucid would envision do not explore viability in general, nor do questions of whether representing Lucid is a viable fit for most or many dealerships. Neither Professor Morton nor Mr. Walter explains why investment by Lucid specifically would be more viable than investment by an independent dealer operator. Several systematic factors suggest otherwise.

## 6. RELIANCE MATERIALS

75. **Tab 6** identifies the materials I relied upon in preparing this report. If requested, I will provide underlying materials to retaining counsel.

## 7. COMPENSATION

76. For my time, TADA compensates my employer at the rate of $550 per hour, or one half of that rate for travel time and 133% of that rate for time spent testifying. My colleague, Dr. Max McDevitt, is the primary staff member who assisted me in this matter. Dr. McDevitt's

billing rate is $295 per hour. Hourly billing rates for other staff assisting me range from $65 to $195 per hour. None of my firm's compensation depends on any opinion offered or the outcome of any motion, hearing, or trial.

## 8.  NEED TO SUPPLEMENT

77. I understand that discovery is ongoing. I reserve the right to correct any errors, and to present additional that may become available or that may assist in presenting or explaining opinions developed and presented herein.

## 9.  LIMITATIONS

78.  This report is prepared only for use in the current matter and for the purposes expressed herein.

Executed this 15th day of September 2023.

*Edward M. Stockton*

# EDWARD M. STOCKTON

EDUCATION

University of Arizona, Tucson, AZ
M.S., Agriculture and Resource Economics (Applied Econometrics), 2010.
Western Michigan University, Kalamazoo, MI
B.A., Economics, 1998


POSITIONS

The Fontana Group, Inc., Tucson, Arizona
       *Vice President Economics Services: 2012 - present*
       *Director of Economics Services: 2011 - 2012*
       *Case Manager: 2005 - 2011*
       *Senior Analyst: 2000 - 2005*
       *Analyst: 1998 - 1999*
Old Ina Corporation Tucson, AZ
       *Supervisor, Analyst, Manager: 1995 - 1998*


RESEARCH AND CONSULTING EXPERIENCE

Mr. Stockton studies complex economic problems across multiple industries, including the retail automobile and other complex markets for durable goods. Additionally, he consults on matters involving conceptual foundations and calculation of economic harm. He has provided consultation for clients in numerous areas including:

• Retail automobile franchising, economics and marketing
• Economic impact of market malfunctions
• Allocation of new vehicles during shortages
• Franchise terminations and establishments
• Principles of customer satisfaction measurement
• Principles of sales performance measurement
• Financial forecasts and other analysis
• Applied econometrics
• Consumer credit markets
• Economic theory of competition and investment
• Competition in markets for durable, differentiated goods

Tab 1  Page 1

REPRESENTATIVE CLIENT ASSIGNMENTS

*Volkswagen Group Diesel Efficiency Foundation v. Volkswagen Aktiengesellschaft,* Utrecht, NL.

*Volkswagen Group Diesel Efficiency Stichting v. Volkswagen Aktiengesellschaft,* Groningen, NL.

*Aaron Gant, et al. v. Ford Motor Company,* Orlando, FL.
Provided deposition testimony 8/2023

*Ranbir Gujral and Danielle Emerson, on behalf of themselves and the Putative Class, v. BMW Of North America, LLC, and Bayerische Motoren Werke Aktiengesellschaft,* Cherry Hill, NJ.
Provided deposition testimony 8/2023

*Cowin Equipment Company, Inc., v. CNH Industrial America LLC and Scott Moore,* Birmingham, AL.
Provided deposition testimony 7/2023

*Hyundai Subaru of Nashville, Inc. d/b/a Downtown Hyundai v. Hyundai Motor America, Inc.,* Nashville, TN.
Provided hearing testimony 7/2023

*Rusnak/Pasadena, a California Corporation v. Jaguar Land Rover North America, LLC,* Las Angeles, CA.
Provided deposition testimony 5/2023

*Action Nissan, Inc. D/b/a Universal Hyundai for Itself and in the Name of the Department of Highway Safety and Motor Vehicle of the State of Florida, for its Use and Benefit v. Hyundai Motor America and Genesis Motor America, LLC,* Orlando, FL.
Provided deposition testimony 4/2023

*Al Piemonte Ford, Inc., at al v. Ford Motor Company,* Chicago, IL.
Provided deposition testimony 4/2023 and hearing testimony 7/2023

*Yandery Sanchez, Louise Knudson, Andrea Reiher-Odom, Derrick Smith, Amber Witt, and Mark Treston, on behalf of themselves and all others similarly situated, v. Kia Motors America, Inc.,* Central District of CA.
Provided deposition testimony 03/2023

*Larson Motors, Inc. v. General Motors LLC, et al.* Seattle, WA.
Provided deposition testimony 02/2023

Revised 9/14/2023

Tab 1  Page 2

*Estate of William D. Pilgrim, et al., on behalf of themselves and all others similarly situated v. General Motors, LLC,* Detroit, MI.
Provided deposition testimony 02/2023

*Hyundai Motor America Corporation v. EFN West Palm Motor Sales, LLC (Defendant/Counterclaim Plaintiff/Third-Party Plaintiff ) Gene Khaytin; Ernesto Revuelta; Edward W. Napleton; Geovanny Pelayo, Jorge Ruiz (Defendants), EFN West Palm Motor Sales, LLC; For Itself and in the Name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its Use and Benefit (Counterclaim-Plaintiff/Third-Party Plaintiff) v. Hyundai Motor America Corporation (Counterclaim-defendant) And Hyundai Motor Company (Third-party Defendant),* West Palm Beach, FL, 2021-.
Provided deposition and trial testimony.

*Sloan/Siqueiros, et al. v. General Motors LLC,* San Francisco, CA, 2019-
Provided deposition and trial testimony.

*Spitzer Autoworld Akron, LLC, v. Fred Martin Motor Company,* Akron, OH, 2022-.
Provided deposition and trial testimony.

*Hyundai Motor American Corporation v. North American Automotive Services, Inc. Et al,* West Palm Beach, FL, 2021-

*Jason Nuwer, Mark Minkowitz, Amarillis Gineris, Christina Vigoa, and Kevin Van Allen v. FCA US LLC f/k/a Chrysler Group LLC*, Miami, FL, 2021-
Provided deposition testimony.

*Chapman, et al, v. General Motors, LLC.*, Detroit, MI, 2021-.
Provided deposition testimony.

*James Bledsoe, et al, v. FCA US LLC, and Cummins Inc.*, Detroit, MI, 2021-.
Provided deposition testimony.

*In Re: Duramax Diesel Litigation, Relating to: Nancy Anderton, et al., v. General Motors LLC, et al.*, Detroit, MI, 2020-.
Provided deposition testimony.

*Fox Hills Auto, Inc. D/b/a Airport Marina Ford v. Ford Motor Company, Central Ford Automotive, Inc., dba Central Ford v. Ford Motor Company and Los Feliz Ford, Inc., dba Star Ford Lincoln v. Ford Motor Company*, Los Angeles, CA, 2021-.
Provided deposition testimony.

Revised 9/14/2023

Tab 1  Page 3

*West Palm Beach Acquisitions, Inc. d/b/a Greenway Kia West Palm Beach and Florida Department of Highway Safety & Motor Vehicles, v. Kia Motors America, Inc.*, West Palm Beach, FL, 2020-.
Provided deposition testimony.

*Kenneth John Williams and Another Applicants v. Toyota Motor Corporation Australia Limited*, New South Wales, Australia, 2020-.
Provided trial testimony.

*Gabriel Patlan, Ryan Cornell, and La Della Levy, on behalf of themselves and all others similarly situated v. BMW of North America LLC; Wendy Vazquez, on behalf of herself and all individuals similarly situated v. BMW of North America, LLC; Vikkie Wilkinson, on Behalf of Herself and the Putative Class, v. BMW of North America, LLC and Bayersiche Motoren Werke Aktiengesellschaft*, Trenton, NJ. 2020-.
Provided deposition testimony.

*Peterson Motorcars, LLC et al v. BMW of North America, LLC*, Louisville, KY, 2019-.
Provided deposition testimony.

*James Bledsoe, Paul Chouffet, Martin Rivas, Jeremy Perdue, Michael Erben, Martin Witberg, Marty Ward, Alan Strange, James Forshaw, Matt Langworthy, Natalie Beight, Jordan Hougo, Dawn Roberts, and Marc Ganz, on Behalf of Themselves and All Others Similarly Situated, v FCA US LLC, a Delaware Corporation, and Cummins Inc., an Indiana Corporation*, Detroit, MI, 2021-
Provided deposition testimony.

*Ricardo R. Garcia, et al. v. Volkswagen Group of America, Inc., et al.*, Alexandria, VA, 2020-.
Provided deposition testimony.
*Paul Weidman, et al., v Ford Motor Company*, Detroit, MI, 2020-.
Provided deposition testimony.

*Milind Desai v. Geico Casualty Company*, Cleveland, OH, 2020-.
Provided deposition testimony.

*Eric Stevens, Christopher L. Rodriguez, Michael S. Frakes, Terry Pennell, Ray Moore, Kent Larry Bakken, Lynn E. Kirkpatrick, and Michael E. Stone v. Ford Motor Company*. Corpus Christi, TX, 2021-.
Provided deposition testimony.

*In the matter of Luxury Cars of Bayside, Inc., v. BMW of North America, LLC,* Long Island, NY, 2019-.
Provided hearing testimony.

Revised 9/14/2023

Tab 1  Page 4

*Clarence Simmons, Franklin Navas, Jorge Arroyave, Joseph Dabbs, Jennifer DeWitt, Anne Erdman, Mark James, Shand Jackson, Mike Tierney, Mark Van Bus Kirk, John Buczynski, Ilja Lopatik, Brian Yarborough, William MacSaveny, Ryan Marshall, Allyson Rogers, Peter Tulenko, and Greg Licktenberg, on behalf of themselves and all others similarly situated v. Ford Motor Company*, Miami, FL, 2021-.
Provided deposition testimony.

*Kimberley Carter and Keith Halliday v. Ford Motor Company of Canada, Ltd., Ford Credit Canada Limited and Ford Motor Company,* Toronto, Canada, 2020-.
Provided cross-examination testimony.

*Braman Motors, Inc., d/b/a Braman BMW, for Itself and in the Name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its Use and Benefit, and Palm Beach Imports, Inc., d/b/a Braman Motorcars, for Itself and in the Name of the Department of Highway Safety and Motor Vehicles of The State of Florida, for its Use and Benefit, and The Department of Highway Safety and Motor Vehicles of the State of Florida, for the Use and Benefit of Braman Motors, Inc. and Palm Beach Imports, Inc. v. BMW of North America, LLC.* Miami, FL, 2019-.
Provided deposition testimony.

*Gina Signor, Individually and on Behalf of All Those Similarly Situated v. Safeco Insurance Company of Illinois*, Ft. Lauderdale, FL, 2020-.
Provided deposition testimony.

*Between Barry Rebuck and Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited Proceeding under the Class Proceedings Act, 1992*, Toronto, Ontario, Canada, 2018-.
Provided cross-examination testimony.

*In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation Nemet v. Volkswagen Group of America, Inc.*, San Francisco, CA, 2019-.
Provided deposition testimony.

*William South, Individually and on Behalf of All Those Similarly Situated v. Progressive Select Insurance Company,* Tampa, FL, 2020-.
Provided deposition testimony.

*Biljana Capic v. Ford Motor Company of Australia Limited*, New South Wales, Australia, 2019-.
Provided trial testimony.

*Jason Counts, Donald Klein, Oscar Zamora, Derek Long, Bassam Hirmiz, Jason Silveus, John Miskelly, Thomas Hayduk, Christopher Hemberger, Individually and on Behalf of All Others*

5

Tab 1  Page 5

*Similarly Situated, v. General Motors, LLC, Robert Bosch GMBH, and Robert Bosch, LLC,* Detroit, MI, 2019-.
Provided deposition testimony.

*Alfredo's Foreign Cars, Inc., d/b/a Larchmont Chrysler Jeep Dodge v. FCA US LLC,* NY, NY 2019-
Provided hearing testimony.

*George Tershakovec, et al. v. Ford Motor Company,* Miami, FL, 2019-
Provided deposition testimony.

*Continental Imports Inc. d/b/a Mercedes Benz of Austin v Swickard Austin, LLC d/b/a Mercedes Benz of South Austin,* Austin, TX, 2019-
Provided deposition and hearing testimony.

*Vista Ford Oxnard, LLC., d/b/a Vista Ford Lincoln of Oxnard v. Ford Motor Company and Ford of Ventura, Inc., d/b/a Ford of Ventura, Intervenor,* Oxnard, CA, 2019-.
Provided deposition and hearing testimony.

*Colonial Chevrolet Co., Inc., et al.; Alley's of Kingsport, Inc., et al.; and Union Dodge, Inc., et al. v. The United States*, Washington, DC, 2011-.
Provided deposition and trial testimony.

*Barber Group, Inc., d/b/a Barber Honda v. American Honda Motor Co., Inc., Galpinsfield Automotive, LLC, Intervenor.* Bakersfield, CA, 2018-.
Provided deposition and hearing testimony.

*Association of Equipment Manufacturers, AGCO Corporation, CNH Industrial America LLC, Deere & Company, and Kubota Tractor Corporation, v. the Hon. Doug Burgum, Governor of the State of North Dakota, in His Official Capacity, and the Hon. Wayne Stenehjem, Attorney General of the State of North Dakota, in His Official Capacity, and North Dakota Implement Dealers Association, Intervenor-Defendant*, Bismarck, ND, 2018-.
Provided deposition testimony.

*Napleton's Arlington Heights Motors, Inc. f/k/a Napleton's Palatine Motors, Inc. d/b/a Napleton's Arlington Heights Chrysler Dodge Jeep RAM, an Illinois Corporation; et. al, v FCA US LLC*, Chicago, IL, 2017-.
Provided deposition and hearing testimony.

*Star Houston, Inc. d/b/a Star Motor Cars v. Volvo Cars of North America, LLC,* Houston, TX, 2017-.
Provided deposition and hearing testimony.

*Sioux City Truck Sales, Inc. v. Peterbilt Motors Company*, Sioux City, IA, 2017-.
Provided deposition and hearing testimony.

*Capitol Buick GMC, LLC v. General Motors LLC,* Baltimore, MD, 2017-.
Provided deposition and hearing testimony.

*Crown Chrysler Jeep, Inc. d/b/a Crown Kia v. Kia Motors America*, Columbus, OH, 2017-
Provided deposition and hearing testimony.

*Folsom Chevrolet, Inc. dba Folsom Chevrolet v. General Motors, LLC*, Folsom, CA, 2017-.
Provided deposition and hearing testimony.

*Sunnyvale Automotive Inc., dba Sunnyvale Ford Lincoln v. Ford Motor Company*, Sunnyvale, CA, 2017-.
Provided deposition testimony.

*Omar Vargas, Robert Bertone, Michelle Harris, and Sharon Heberling, individually and on behalf of a class of similarly situated individuals v. Ford Motor Company*, Los Angeles, CA, 2017-.*Charles Johnson, et al. individually and on behalf of all others similarly situated v. Ford Motor Company,* Huntington, WV, 2017-.
Provided deposition testimony.

*Shawn Panacci v. Volkswagen Aktiengesellschaft, Volkswagen Group Canada, Inc., Audi Aktiengesellschaft, VW Credit Canada, Inc. and Audi Canada,* Toronto, Ontario, Canada, 2017-.

*Rebecca Romeo and Joe Romeo v. Ford Motor Company and Ford Motor Company Canada, Limited,* Toronto, Ontario, Canada, 2017-.
Provided cross-examination testimony.

*Duncan McDonald v. Samsung Electronics Canada, Inc.* Toronto, Ontario, Canada, 2017-.
Provided cross-examination testimony.

*The Estate of Richard C. Poe, Richard C. Poe II v. Paul O Sergent, Jr., et al.,* El Paso, TX, 2017-
Provided deposition testimony.

*Star Houston, Inc. d/b/a Star Motor Cars v. VCWH. LLC d/b/a Volvo Cars West Houston and Volvo Cars of North America, LLC,* Houston, TX, 2017-.
Provided deposition testimony.

*Option Consommateurs et Francois GrondinPersonne Désignée C. Volkswagen Group Canada Inc. et al.(2L),* Montreal, Quebec, 2017-.

Revised 9/14/2023

Tab 1  Page 7

*Option Consommateurs et Francois GrondinPersonne Désignée C. Volkswagen Group Canada Inc. et al. (3L),* Montreal, Quebec, 2017-.

*John M. McIntosh v. Takata Corporation, TK Holdings, Toyota Motor Corporation, Toyota Motor Manufacturing, Canada Inc., and Toyota Motor Manufacturing Indiana, Inc.,* Toronto, Ontario Canada, 2017-

*Rick A. Des-Rosiers and Stephen Kominar v. Takata Corporation, TK Holdings, Honda Motor Co., LTD, Honda of America Manufacturing, Inc., and Honda Canada, Toronto,* Ontario, Canada 2017-.

*Yogesh Kalra v. Mercedes-Benz Canada Inc., Daimler AG, Mercedes-Benz USA LLC and Mercedes-Benz Financial Services Canada Corporation*, Toronto, ON, Canada, 2017-.
Provided cross-examination (deposition) testimony.

*Lake Forest Sports Cars, LTD v. Aston Martin Lagonda of North America, Inc.,* Chicago, IL, 2017.
Provided deposition testimony.

*Shahriar Jabbari and Kaylee Heffelfinger on behalf of themselves and all others similarly situated v. Fargo Company and Wells Fargo Bank, N.A.* San Francisco, CA, 2016-.

*Matthew Robert Quenneville et al. v. Volkswagen Group Canada, Inc.,Volkswagen Aktiengesellschaft, Volkswagen Group of America, Inc., Audi Canada, Audi Aktiengesellschaft, Audi of America, Inc., Inc., and VW Credit Canada, Inc. (2L),* Ontario, Canada, 2016-.

*Matthew Robert Quenneville et al. v. Volkswagen Group Canada, Inc.,Volkswagen Aktiengesellschaft, Volkswagen Group of America, Inc., Audi Canada, Audi Aktiengesellschaft, Audi of America, Inc., Inc., and VW Credit Canada, Inc. (3L),* Ontario, Canada, 2016-.

*Fort Collins Nissan, Inc. d/b/a Tynan's Kia, v. Kia Motors America, Inc.*, Ft. Collins, CO, 2015-.
Provided deposition testimony.

*In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation, Napleton et al v. Volkswagen Group of America et al., No. 16-02086*, 2015-.

Above including *J. Bertolet, Inc. et al v. Robert Bosch, LLC and Robert Bosch GmbH.*, MDL No. 02672-CRB (JSC), 2016-.
Provided deposition testimony 8/2019.

*Northwest Hills Chrysler Jeep, LLC; Gengras Chrysler Dodge Jeep, LLC; Crowley Jeep Dodge, Inc.; Papa's Dodge, Inc. v. FCA US, LLC and Mitchell Dodge, Inc.,* Canton, CT, 2015-2017.
Provided deposition and hearing testimony.

Revised 9/14/2023

Tab 1  Page 8

*VMDT Partnership, LP, v. Thornbury Township,* Delaware County, Pennsylvania, 2015-.
Provided hearing testimony.

*John Deere Construction & Forestry Company v. Rudd Equipment Company, Inc.*, Houston, TX, 2015-2017.
Provided hearing testimony.

*Ball Automotive Group d/b/a Ball Kia, v. Kia Motors America, Inc.*, San Diego, CA, 2015-2017.
Provided deposition testimony.

*GB Auto Corporation d/b/a Frisco Kia, v. Corinth Automotive Plano, d/b/a Central Kia of Plano, Kia Motors America, Inc. Intervenor*, Dallas, TX, 2015-2017.
Provided deposition testimony.

*Walter Enterprises, Inc., d/b/a Timmons Subaru v. Subaru of America, Inc.*, Long Beach, CA, 2016-2017.
Provided deposition testimony.

*Motor Werks Partners, LP, v. General Motors, LLC*, Chicago, IL, 2015-2017.
Provided deposition testimony.

*Jeff Looper et al., v. FCA US LLC, f/k/a Chrysler Group, LLC, et al.,* California and Texas, 2015-2016.
Provided deposition testimony.

*In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation,* San Francisco, CA, *2015-2017.*

*Dependable Dodge, Inc. v. Fiat Chrysler Automobiles, Inc.*, Canoga Park, CA, 2015-2017.
Provided deposition and hearing testimony.

*Wayzata Nissan, LLC v. Nissan North America, Inc., et al.,* Wayzata, MN, 2015-2017.
Provided pre-filed trial testimony.

*Glick Nissan, Inc. v. Nissan North America, Inc.,* Westborough, MA, 2015-2016.

*Volvo Construction Equipment North America, LLC v. Clyde/West, Inc.,* Spokane, WA, 2015.

*General Motors, LLC v. Hall Chevrolet LLC dba Hall Chevrolet,* Virginia Beach, VA, 2015-2016.

*Long Beach Motors, Inc. dba Long Beach Honda v American Honda Motor Co., Inc.,* Long Beach, CA, 2015.

Revised 9/14/2023

Tab 1  Page 9

*Tom Matson Dodge Inc. v. FCA US LLC.,* Seattle, WA, 2015.

*Ferrari of Atlanta*, Atlanta, GA 2015.

*Grossinger Autoplex, Inc. v. General Motors, LLC*, Chicago, IL, 2015-2016.
Provided deposition and hearing testimony.

*Mathew Enterprise, Inc. v. Chrysler Group LLC*, San Jose, CA, 2015-2016.
Provided deposition and trial testimony.

*Navistar v. New Baltimore Garage*, Warrenton, VA, 2015-2016.
Provided hearing testimony.

*Mathew Enterprise, Inc., a California Corporation, and Mathew Zaheri, an individual v. Chrysler Group, LLC, a Delaware Liability Company; Chrysler Group Realty Company, LLC, a Delaware Limited Liability Company, and DOES 1-40,* San Jose, CA 2014-2015.
Provided trial and deposition testimony.

*CNH America, LLC n/k/a CNH Industrial America, LLC v. Quinlan's Equipment, Inc.,* Racine, WI, 2014-2015.
Provided deposition testimony.

*Grayson Hyundai, LLC and Twin City Hyundai, Inc., v. Hyundai Motor America*, Knoxville, TN, 2014-2015.
Provided deposition testimony.

*TrueCar, Inc. v. Sonic Automotive, Inc., and Sonic Divisional Operations, LLC, Los Angeles, CA*, 2015-2016.
Provided deposition testimony.

*TECC, Complaintant v. GM Respondent before the California New Motor Vehicle Board,* Oakland, CA, 2014-15.

*US District Court Southern District of NY in re General Motors LLC Ignition Switch Litigation,* NY, NY, 2014-.

*Feldten, LLC, d/b/a Tennyson Chevrolet v. Keith Lang, Lang Auto Sales, Inc.,Gordon Chevrolet, Inc.,Stewart Management Group, Inc., Scott Rama, Susan Ianni, and Mike Meszaros, and Gordon Chevrolet, Inc.& Stewart Management Group, Inc.* Detroit, MI, 2014-2016.

*Canadian Toyota Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation,* 2014-.

Revised 9/14/2023

Tab 1  Page 10

*Jim Hardman, Buick GMC*, Gainesville, GA, 2014-2016.

*Bates Nissan, Inc., v. Nissan North America Inc.,* Killeen, TX, October 2014-2017.
Provided deposition and hearing testimony.

*Recovery Racing, LLC d/b/a Maserati of Fort Lauderdale v. Maserati North America, Inc., and Rick Case Weston, LLC, d/b/a Rick Case Maserati*, Ft. Lauderdale, FL, 2014-.
Provided hearing testimony.

*Sweeten Truck Center, L.C. v. Volvo Trucks North America, a Division of Volvo Group North America, LLC*, Before the Texas Department of Motor Vehicles Motor Vehicle Division, Austin, TX, 2014-.
Provided deposition and hearing testimony.

Beck Chevrolet Co, Inc. v. General Motors LLC, New York, NY 2014-2016.
Provided trial testimony.

*BSAG Inc., and Bob Stallings Nissan of Baytown, Inc. v. Baytown Nissan, Inc., Burklein Family Limited Partnership, Nissan North America, Inc., and Frederick W. Burklein*, Harris County, TX 2014-.
Provided deposition testimony.

*Richard C.B. Juca v. Larry H. Miller Corporation*, Peoria, AZ, 2014.

*General Motors, LLC v. Leep Chev, LLC, d/b/a Lujack's Chevrolet,* Scott County, IA. 2014-2015
Provided deposition testimony.

*Century Motors Corporation v. Chrysler Group, LLC et al.*, Wentzville, MO 2014-2015.
Provided deposition and trial testimony.

*Keyes European, LLC v. Encino Mercedes, LLC, Steve Zubieta, David Floodquist, Shimon Broshinsky and Does 1-20*, Los Angeles, CA, 2014.

*Ohio Auto Dealers Association*, 2014.

*Transteck, Inc. d/b/a Freightliner of Harrisburg v. Daimler Trucks North America, LLC (Freightliner Trucks Division)*, Harrisburg, PA, 2014-2015.

*Butler Toyota et al v. Toyota Motor Sales*, Indianapolis, IN, 2014.

*Wayzata Nissan, LLC v. Nissan North America, Inc., et al.,* Wayzata, MN, 2013-2017.

Tab 1  Page 11

*Santa Cruz Nissan, Inc., dba Santa Cruz Nissan v. Nissan North America, Inc.*, Santa Cruz, CA 2013-2015.
Provided deposition and hearing testimony.

*Majid Salim v. Henry Khachaturian aka Hank Torian, Torian Holdings, Fremont Automobile Dealership, LLC., and Does 1-20,* Alameda County, CA, 2013-2014.
Provided deposition and trial testimony.

*GMAC v. Lloyd Belt, Lloyd Belt GM Center, Inc., and Lloyd Belt Chrysler, Inc.,* Eldon, MO 2013-2014.
Provided deposition testimony.

*General Motors v. Englewood Auto Group, LLC,* Englewood, NJ, 2012-2014.

*Bob Wade Autoworld v. Ford Motor Company*, Harrisonburg, VA, 2011-2012.
Provided hearing testimony.

*Van Wie Chevrolet, Inc. d/b/a Evans Chevrolet v. General Motors LLC and Sharon Chevrolet, Inc.,* Baldwinsville, NY, 2012-2017.
Provided deposition testimony.

*Midcon Compression L.L.C. v. Loving County Appraisal District,* Loving County, TX, 2013.
Provided deposition testimony.

*Texas Automobile Dealers Association,* Austin, TX, 2013.
Provided hearing testimony before Business and Industry Committee in Texas H.O.R.

*Tyler Automotive,* Niles, MI, 2013.

*Sutton Suzuki,* Matteson, IL 2013.

*Carson Toyota/Scion, Cabe Toyota/Scion, Norwalk Toyota/Scion and South Bay Toyota/Scion v. Toyota Motor Sales, U.S.A., Inc.,* Long Beach, CA, 2012-2013.
Provided deposition and hearing testimony.

*James T. Stone, individually, and on Behalf of JDJS Auto Center, Inc. v. Jacob A. DeKoker, Pro Financial, Inc., and JDJS Auto Center, Inc.,* Tyler, TX, 2012.

*New Country Automotive Group,* Saratoga Springs, NY, 2013-.

*Goold Patterson*, Las Vegas, NV, 2012.

*James Rist v. Denise Mueting and the Dominican Sisters of Peace*, Littleton, CO, 2012-2013.

Revised 9/14/2023

Tab 1  Page 12

*Law Office of Gary E. Veazey*, Memphis, TN, 2012.

*Randy Reed Nissan,* 2012.

*Arent Fox, LLP,* 2012.

*Chrysler Group, LLC v. Sowell Automotive, Inc. et al.*, 2012-2013.

*Morrie's European Car Sales, Inc. dba Morrie's Cadillac-Saab v. General Motors, LLC*, Minneapolis, MN, 2012-.
Provided deposition testimony.

*Dulles Motorcars, Inc. d/b/a Dulles Subaru v. Subaru of America,* Leesburg, VA, 2012-.
Provided hearing testimony.

*Bowser Cadillac, LLC v. General Motors, LLC v. Rohrich Cadillac, Inc.,* McMurray, PA, 2012-.
Provided hearing testimony.

*In Re: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Expert Report of Products Liability Litigation,* Santa Ana, CA, 2010-.

*Bob Wade Autoworld*, 2012.

*Planet Subaru, John P Morrill, and Jeffrey R. Morrill v. Subaru of New England,* Hanover, MA, 2011-2012.

*Hill Nissan v. Jenkins Nissan*, Winterhaven, FL, 2011-2012.

*Burns & Levinson,* Boston, MA 2011-.

*Brydon, Sweringen & England*, 2011.

*Napleton Automotive Group,* Chicago, IL, 2011.

*Orloff Imports,* Chicago, IL, 2011.

*Boas International Motors, dba San Francisco Honda,* San Francisco, CA, 2011-.

*Carson CJ, LLC and Kenneth Phillips v. Sonic Automotive, Inc., Sonic-Carson F, Inc, Avalon Ford, Inc. dba Don Kott Chrysler Jeep, and Does 1 - 100,* Los Angeles, CA, 2010-2012.
Provided deposition and hearing testimony.

*First United, Inc. A California Corporation dba De La Fuente Cadillac v. General Motors, Greiner Poway, Inc. and Does 1-50*, San Diego, CA, 2012.

Tab 1  Page 13

*Ionia Automotive Management, LLC and Beverly Kelly v. Berger Motor Sales, Ned Berger, Jr, LC and Ned Berger Jr.*, Mason, MI, 2012-2013.

*Riverside Motorcycle, Inc. dba Skip Fordyce Harley-Davidson v. Harley-Davidson Motor Company,* Riverside, CA, 2011- 2012.
Provided deposition and hearing testimony.

*Leep Hyu, LLC, an Iowa Corporation also known as Lujack Hyundai v. Hyundai Motors America, Green Family Hyundai Inc., and Green Family Holdings LLC*, Davenport, Iowa, 2011.
Provided trial testimony.

*Royal Motor Sales,* San Francisco, CA, 2011-2012.

*Miller Barondess,* Los Angeles, CA, 2011.

*Brotherhood of Maintenance of Way Employee Division/IBT*, Washington, DC, 2011-.

*Star Houston, Inc., d/b/a Star Motor Cars v. Mercedes-Benz USA, LLC*, Houston, TX, 2010-2013.
Provided deposition testimony and hearing testimony.

*Chapman's Las Vegas Dodge, LLC and Prestige Chrysler Jeep Dodge, LLC v. Chrysler Group LLC,* Las Vegas, NV, 2011- 2012.
Provided deposition and hearing testimony.

*Laidlaw's Harley-Davidson Sales, Inc. dba Laidlaw's Harley-Davidson v. Harley-Davidson Motor Company,* Sacramento, CA, 2011- 2012.
Provided deposition and hearing testimony.

*Agrillo v. Martinez,* Tucson, AZ, 2011.

*Hyundai of Milford, LLC, d/b/a Key Hyundai v. Hyundai Motor America*, Milford, CT, 2011.

*Houston Mack Sales & Service d/b/a Houston Isuzu Truck, Inc. v. Hayes Leasing Company, Inc. d/b/a Hayes UD Trucks-Houston*, Houston, TX, 2011-2012.

*Bo Beuckmann Ford*, Ellisville, MO, 2011-.

*Boas International Motors dba San Francisco Honda v. American Honda Motor Co.*, San Francisco, CA, 2011.
*Life Quality BMW*, Brooklyn, NY, 2011-2012.

Revised 9/14/2023

Tab 1  Page 14

*Forrester Lincoln Mercury v. Ford Motor Company*, Chambersburg, PA, 2011-.
Provided hearing testimony.

*North Palm Motors, LLC d/b/a Napleton's North Palm Lincoln Mercury v. Ford Motor Company*, West Palm Beach, FL, 2011.

*Mega RV Corp. v. Mike Thompson Recreational Vehicles*, Irvine, CA, 2010-.
Provided deposition testimony.

*Harry W. Zanville, Esq.,* San Diego, CA, 2010-.

*Pond, Athey, Athey & Pond,* Front Royal, VA, 2010-2013.

*Daphne Automotive, LLC dba Eastern Shore Toyota and Shawn Esfahani v. Pensacola Motor Sales d/b/a Bob Tyler Toyota and Fred Keener,* Mobile, AL, 2010-2011.
*Gebhardt v. PCNA*, Boulder, CO, 2011.

*Fields Automotive Group,* Glencoe, IL, 2011.

*Laura Buick-GMC*, Collinsville, IL, 2011.

*Bredemann Family of Dealerships*, Park Ridge, IL, 2011.

*Transteck, Inc. d/b/a Freightliner of Harrisburg,* 2004-

*Bass Sox Mercer,* Tallahassee, FL, 2011-.

*The Collection*, Coral Gables, FL, 2011-2012.

*Manning, Leaver, Bruder & Berberich,* Los Angeles, CA, 2010-2012.

*Magic City Ford v. Ford Motor Company*, Roanoke, VA, 2010-2011.

*Bob Wade AutoWorld v. Ford Motor Company*, Harrisonburg, VA, 2010-2011.

*East West Lincoln Mercury*, Landover Hills, MD, 2010-2011.

*Stevens Love,* Longview, TX, 2010-2014.

*JP Chevrolet*, Peru, IL, 2010-2011.

*Bellavia & Gentile*, Mineola, NY, 2010-2011.

*Hayes Leasing v. Wiesner Commercial Truck Center*, Houston, TX, 2010.

Tab 1  Page 15

*Link-Belt Construction Equipment Company v. Road Machinery & Supplies Co.*, Minneapolis, MN, 2010-2011.
Provided deposition testimony.

*Elliott Equipment Co., Inc. v. Navistar, Inc.*, Easton, Maryland, 2010.
Provided deposition testimony.

*Rally Auto Group, Inc. v. General Motors, LLC,* Palmdale, CA, 2010.
Provided hearing testimony.

*Ron Westphal Chevrolet v. General Motors, LLC,* Aurora, CO, 2010.

*Edmark Auto, Inc., v. General Motors, LLC,* Nampa, ID, 2010.

*Gurley-Leep Dodge, Inc. n/k/a Gurley Leep Dodge, LLC v. Chrysler Group, LLC,* Mishawaka, IN, 2010.

*Gurley-Leep Buick v. General Motors, LLC,* Mishawaka, IN, 2010.

*Leep Chev, LLC, v. General Motors, LLC,* South Bend, IN, 2010.

*Mike Finnin Motors, Inc., v. Chrysler Group LLC*, Dubuque, IA, 2010.
Provided hearing testimony.

*Sedars Motor Co., Inc. and Community Motors of Mason City, Inc. v. General Motors LLC,* Cedar Falls, IA, 2010.

*Burke, Warren, MacKay & Serritella, P.C.,* Chicago, IL, 2010-.

*First Family, Inc. d/b/a Bredemann Chevrolet v. General Motors, LLC,* Park Ridge, IL, 2010.

*Lou Bachrodt Chevrolet Co. d/b/a Lou Bachrodt Jeep v. Chrysler Group, LLC,* Rockford, IL, 2010.
Provided hearing testimony.

*Cape County Auto Park I, Inc. v. Chrysler Group, LLC,* Cape Girardeau, MO, 2010.
Provided hearing testimony.

*Fury Dodge, LLC v. Chrysler Group, LLC,* Lake Elmo, MN, 2010.
Provided hearing testimony.

*Midtown Motors, Inc., d/b/a John Howard Motors v. Chrysler Group LLC,* Morgantown, WV, 2010.
Provided hearing testimony.

Tab 1  Page 16

*Deur Speet Motors, Inc. v. General Motors, LLC,* Fremont, MI, 2010.

*Village Chevrolet-Buick-Oldsmobile, Inc. v. General Motors LLC,* Carthage, MO, 2010.

*Arenson & Maas,* Cedar Rapids, IA, 2010-.

*Nyemaster, Goode, West, Hansell & O'Brien, PC,* Des Moines, IA, 2010

*C. Basil Ford, Inc. v. Ford Motor Company*, Buffalo, NY, 2010.

*Leonard, Street & Deinard,* Minneapolis, MN, 2010-2015.

*Dady & Gardner,* Minneapolis, MN, 2010.

*Star Houston, Inc., d/b/a Star Motor Cars v. Mercedes-Benz USA, LLC*, Houston, TX, 2009 - 2015.

*Mente Chevrolet Oldsmobile, Inc., F/K/A Mente Chevrolet, Inc. T/A Mente Chevrolet and Mente Chrysler Dodge, Inc. and Donald M. Mente v. GMAC,* Kutztown, PA, 2009-2011.

*Long-Lewis, Inc. v. Sterling Truck Corporation*, Besemer, AL, 2009-2011.

*Gossett Motor Cars, LLC v. Hyundai Motor America and Homer Skelton Auto Sales, LLC,* Memphis, TN, 2009-2010.

*Star Houston, Inc., d/b/a Star Motor Cars v. Mercedes-Benz USA, LLC*, Houston, TX, 2009-.
*In re: CHRYSLER LLC, et al. v. Debtors, Chapter 11,* New York, NY, 2009.

*Cooper and Walinski, LPA,* 2009.

*Jennings Motor Company, Inc., d/b/a Springfield Toyota v. Toyota Motor Sales USA, Inc.,* Springfield, VA, 2008-2010.

*General Motors v. Harry Brown's and (counterclaim) Harry Brown's and Faribault v. General Motors*, Faribault, MN, 2008.
Provided declaration.

*Nick Alexander Imports v. BMW of North America*, Beverly Hills, CA, 2008.

*Monroeville Chrysler v. DaimlerChrysler Motors Company*, Pittsburgh, PA, 2008.

*Bowser Cadillac, LLC v. General Motors Corporation and Saab Cars USA, Inc.,* Pittsburgh, PA, 2008-2009.

Tab 1  Page 17

*Carlsen Subaru v. Subaru of America, Inc.,* San Francisco, CA, 2008.
Provided deposition and hearing testimony.

*Suburban Dodge of Berwyn, Inc., and Lepetomane XXII, Inc., v. DaimlerChrysler Motors Company, LLC and DaimlerChrysler Financial Services Americas LLC,* Chicago, IL, 2007-2008.
Provided deposition testimony.

*Wiggin & Nourie, P.A.,* Manchester, NH, 2007-2008.

*McCall-T LTD., a Texas limited partnership d/b/a Sterling McCall Toyota & Sterling McCall Scion, et al. v. Gulf States Toyota, Inc., McCall- T LTD., et al. v. Madison Lee Oden et al.,* Houston, TX, 2007-2009.

*Volkswagen of America, Inc., and Aristocrat Volkswagen East, Inc. v. Royal Automotive, Inc., d/b/a Royal Volkswagen,* Orlando, FL, 2007-.

*Myers & Fuller, P.A.,* Tallahassee, FL, 2007-2009.

*Ed Schmidt Pontiac-GMC Truck, Inc. v. DaimlerChrysler Motors Company, LLC*, Perrysburg, OH, 2006-2009.

*Fowler Motors, Inc. v. BMW of North America, LLC,* Conway, SC, 2006-2008.

*Serpa Automotive Group, Inc. v. Volkswagen of America, Inc.,* Visalia, CA, 2006.
Provided deposition and hearing testimony.

*Serra Chevrolet, Inc. d/b/a Serra Kia v. Kia Motors America, Inc., et al.,* Birmingham, AL, 2006-2009.

*Cardenas Enterprises, Inc., d/b/a Cardenas Toyota BMW v. Gulf States Toyota, Inc. and Toyota Motor Sales, USA, Inc.*, Harlingen, TX, 2006.

*North Avenue Auto, Inc., d/b/a Grand Honda v. American Honda Motor Co., Inc. a California Corporation,* Chicago, IL, 2006-2009.

*Saleen, Inc.,* Irvine, CA, 2006-2009.

*Golden Ears Chrysler Dodge Jeep,* Maple Ridge, BC, 2006-2007.

*Action Nissan, Inc. v. Nissan North America, Inc.,* Nyack, NY, 2005-2007.

*Harbor Truck Sales and Services, Inc. d/b/a Baltimore Freightliner v. DaimlerChrysler Motors Company, LLC,* Baltimore, MD, 2005-2007.

Tab 1  Page 18

*PH Automotive Holding Corporation, d/b/a Pacific Honda, Cush Automotive Group, d/b/a Cush Honda San Diego, Tipton Enterprises, Inc., d/b/a Tipton Honda, Ball Automotive Group, d/b/a Ball Honda v. American Honda Motor Co., Inc.,* San Diego, CA, 2005-2007.
*Rusing & Lopez,* Tucson, AZ, 2005.

*Sonic Automotive, Inc. v. Rene R. Isip, Jr.; RRIJR Auto Group, Ltd., d/b/a Rene Isip Toyota of Lewisville, and John Eagle,* Lewisville, TX, 2005.

*Competitive Engineering, Inc. v. Honeywell International, Inc.,* Tucson, AZ, 2005.

*Century Motors Corporation v. DaimlerChrysler Motors Company, LLC.,* St. Louis, MO, 2005.

*Lone Star Truck Group,* Albuquerque, NM, 2005-2006.

*Thomas Bus Gulf Coast, Inc.*, Houston, TX, 2005.

*Stoops Freightliner*, Indianapolis, IN, 2005-2006.

*Cameron, Worley, Forham, P.C.,* Nashville, TN, 2004-2005.

*Transteck, Inc. d/b/a Freightliner of Harrisburg v. DaimlerChrysler Vans, LLC,* Harrisburg, PA, 2004.

*Around The Clock Freightliner Group, Inc.,* Oklahoma City, OK, 2004-2006.

*Alamo Freightliner,* San Antonio, TX, 2004-2005.

*GKG Motors, Inc. d/b/a Suzuki of San Antonio v. Cantwell Fielder, Ltd. d/b/a Quality Suzuki and American Suzuki Motor Corporation,* San Antonio, TX, 2004-2007.

*Maple Shade Motor Corporation v. Kia Motors America, Inc.,* Turnersville, NJ, 2004-2006.

*Star Houston, Inc. d/b/a Star Motor Cars, Inc. v. Mercedes-Benz-USA, LLC*, Austin, TX, 2004-2006.

*Perez Investments, Inc. d/b/a Rick Perez Autonet v. DaimlerChrysler Financial, L.L.C. d/b/a Chrysler Financial, L.L.C.; DaimlerChrysler Motors Corporation*, Austin, TX, 2004.

*Mazda Motors of America v. Maple Shade Motor Corporation, d/b/a Maple Shade Mazda et al.,* Maple Shade, NJ, 2004.

*Wickstrom Chevrolet-Pontiac-Buick-GMC. v. General Motors Corporation, Chevrolet Division*, Austin, TX, 2004.

Tab 1  Page 19

*Sea Coast Chevrolet - Oldsmobile, Inc.* Belmar, NJ, 2004.

*Steve Taub, Inc. d/b/a Taub Audi v. Audi Of America, Inc.,* Santa Monica, CA, 2003.
*Toledo Mack Sales and Service, Inc. v. Mack Truck, Inc.,* Columbus, OH, 2003.

*Cooper & Elliot,* Columbus, OH, 2003.

*Bayshore Ford Truck Sales, Inc., et al. v. Ford Motor Company,* New Castle, DE, 2003-2013.

*Maritime Ventures, LLC; Maritime Motors, Inc. v. City of Norwalk; Norwalk Redevelopment Agency*, Norwalk, CT, 2003.

*Cox Nuclear Pharmacy, Inc. and Accuscan, LLC v. CTI Molecular Imaging, Inc.*, Mobile, AL, 2002-.

*Mazda Motor of America, Inc. v. David J. Phillips Buick-Pontiac, Inc.,* Orange County, CA, 2002- 2003.

*Kimnach Ford*, Norfolk, VA, 2002-.

*Brown & Brown Chevrolet v. General Motors,* Phoenix, AZ, 2002.

*New Country Toyota,* Durango, CO, 2002-2003.

*ALCO Cadillac-Pontiac Sales, Inc. v. General Motors Corp. et al,* Englewood Cliffs, NJ, 2001-2003.

*Al Serra Chevrolet, Inc. v. General Motors Corp.,* Flint, MI, 2001.

*Bayou Ford Truck Sales, Inc. d/b/a Bayou City Ford-Sterling v. Sterling Truck Corp.,* Houston, TX, 2001-2002.

*Fred Lavery Company et al. v. Nissan North America, Inc., et al.,* Birmingham, MI, 2000-2002.

*Tamaroff Buick and Sunshine Automotive, Inc. v. American Honda,* Detroit, MI, 2000-2006.

*Applegate Chevrolet, Inc. v. General Motors Corporation* Flint, MI, 2000-2001.

*Anchorage Chrysler Center, Inc. v. DaimlerChrysler Motors Corporation,* Anchorage, AK, 2000-2003.

*Ford Motor Company v. Pollock Motor Co., Inc. f/k/a Pollock Ford Co., Inc., v. Ford Motor Credit,* Gadsden, AL, 1999-2001.

Tab 1  Page 20

*Suzuki Motor Corporation Japan v. Consumers Union of United States, Inc.,* Orange County, CA, 1999.

*Arata Motor Sales v. American Honda Motor Co., et al.,* Burlingame, CA, 1999.

*Star Motor Cars v. Mercedes-Benz of North America, Inc.,* Houston, TX, 1999.

*Dispatch Management Services Corp., in Aero Special Delivery, Inc. v. United States of America,* San Francisco, CA, 1999-2003 (est).

*Arnold Lincoln Mercury v. Ford Motor Co.,* Detroit, MI, 1999-2000.

*Landmark Chevrolet Corporation v. General Motors Corporation et al,* Houston, TX, 1998-2002.

*Ford Dealers of Greater Toronto,* Toronto, ONT, Canada 1998-2003.

*Volkswagen of America, Inc., et al. v. Pompano Imports, Inc., d.b.a. Vista Motor Company,* Pompano Beach, FL, 1998-1999.


PUBLICATIONS

Mark M. Leitner, Joseph S. Goode, and Ted Stockton, "Franchise and Dealership Litigation Damages" in *The Comprehensive Guide to Economic Damages*, ed. Nancy Fannon and Jonathan Dunnitz, 6th Edition, Business Valuation Resources, 2020.

Joseph S. Goode, Mark M. Leitner, and Ted Stockton, "Franchise and Dealership Litigation Damages" in *The Comprehensive Guide to Economic Damages*, ed. Jonathan Dunnitz and Nancy Fannon, 5th Edition, Business Valuation Resources, 2018.

"Understanding Sales Performance Measurements: How Average Became the New Minimum," *Dealer Law Review*, Issue 14.3, Winter 2014, pp. 1-2.

*White Paper: Customer Satisfaction Measurement,* co-authored with Dr. Ernest H. Manuel, Jr., 2012.

*White Paper: Generalized Retail Sales Effectiveness* [restricted distribution]*,* co-authored with Dr. Ernest H. Manuel, Jr., 2012.

Tab 1  Page 21

*Time Inspection Study Report of the Brotherhood of Maintenance of Way Employee Division/IBT (BMWED)*, Submitted to The Committee on Transportation and Infrastructure of the House of Representatives and The Committee on Commerce, Science, and Transportation of the Senate, 2011.

*White Paper: Customer Satisfaction,* co-authored with Dr. Ernest H. Manuel, Jr., 2010.

*White Paper: Sales Effectiveness (RSI and MSR): Flaws in Manufacturers' Measurement of Dealers' Sales Performance,* co-authored with Dr. Ernest H. Manuel, Jr., 2010.


OTHER

*Developments in Sales Metrics*, presentation to AutoCPA Group, Sun Valley, Idaho, October 1, 2018.

*Conditional Margin, Tiered Margins, Market Stratification, and Project Pinnacle*, presentation to National Association of Dealer Counsel, with Harry Zanville, April 25, 2017.

*Business Cycles and Fraud,* presentation to AutoCPA Group, September 23, 2016.

*Trends in Franchise Economics and a Theory of Dealer Investment,* presented to CPA group, Oklahoma City, OK, 2014.

"sales expectations vs Sales Expectations," presentation to AutoCPA Group, 2013.

Testimony before the Texas House of Representatives on behalf of the Texas Automobile Dealers Association regarding public policy issue related to franchise law, April 9, 2013.

"Navigating the Post-Slump Environment," presentation to Chief Financial Officers Group, Palm Springs, CA, April 2012.

"How Dealers Can Protect Themselves" presentation to AutoCPA Group, 2011.

Minnesota Auto Dealers, issues related to General Motors and Chrysler bankruptcies and dealer arbitrations, 2010.

Arizona Electric Power Cooperative, hourly load forecasting using econometric estimation, 2006.

Revised 9/14/2023

Tab 1  Page 22

**Cases in which Mr. Stockton gave deposition, hearing**
**or trial testimony during the past four years**

*Aaron Gant, et al. v. Ford Motor Company,* (United States District Court Eastern District of Michigan Southern Division)
Provided deposition testimony 8/2023

*Ranbir Gujral and Danielle Emerson, on behalf of themselves and the Putative Class, v. BMW Of North America, LLC, and Bayerische Motoren Werke Aktiengesellschaft,* (United States District Court For The District of New Jersey)
Provided deposition testimony 8/2023

*Cowin Equipment Company, Inc., v. CNH Industrial America LLC and Scott Moore,* (In the Circuit Court For Jefferson County, Alabama)
Provided deposition testimony 7/2023

*Hyundai Subaru of Nashville, Inc. d/b/a Downtown Hyundai v. Hyundai Motor America, Inc.,* (Before the Tennessee Motor Vehicle Commission)
Provided hearing testimony 7/2023

*Rusnak/Pasadena, a California Corporation v. Jaguar Land Rover North America, LLC,* (United States District Court Central District of California)
Provided deposition testimony 5/2023

*Action Nissan, Inc. d/b/a Universal Hyundai for Itself and in the Name of the Department of Highway Safety and Motor Vehicle of the State of Florida, for its Use and Benefit v. Hyundai Motor America and Genesis Motor America, LLC,* (United States District Court Middle District of Florida Orlando Division)
Provided deposition testimony 4/2023

*Al Piemonte Ford, Inc., et al. v. Ford Motor Company,* (State of Illinois Motor Vehicle Review Board)
Provided deposition testimony 4/2023 and hearing testimony 7/2023

*Yandery Sanchez, Louise Knudson, Andrea Reiher-Odom, Derrick Smith, Amber Witt, and Mark Treston, on behalf of themselves and all others similarly situated, v. Kia Motors America, Inc.,* (United States District Court Central District of California)
Provided deposition testimony 3/2023

*Larson Motors, Inc v. General Motors LLC, et al.* (United States District Court Western District of Washington at Seattle)
Provided deposition testimony 2/2023

*Estate of William D. Pilgrim, et al., on behalf of themselves and all others similarly situated v.*

Tab 2  Page 1

*General Motors, LLC,* (United States District Court Eastern District of Michigan)
Provided deposition testimony 2/2023

*Hyundai Motor America Corporation v. EFN West Palm Motor Sales, LLC (Defendant/Counterclaim Plaintiff/Third-Party Plaintiff ) Gene Khaytin; Ernesto Revuelta; Edward W. Napleton; Geovanny Pelayo, Jorge Ruiz (Defendants), EFN West Palm Motor Sales, LLC; For Itself and in the Name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its Use and Benefit (Counterclaim-Plaintiff/Third-Party Plaintiff) v. Hyundai Motor America Corporation (Counterclaim-defendant) And Hyundai Motor Company (Third-party Defendant)* (United States District Court for the Southern District of Florida West Palm Beach Division)
Provided deposition testimony 10/2022 and trial testimony 1/2023.

*Sloan/Siqueiros, et al. v. General Motors LLC,* (United States District Court Northern District of California San Francisco Division)
Provided deposition testimony 10/2019 and trial testimony 9/2022.

*EFN West Palm Motor Sales, LLC d/b/a Napleton's West Palm Beach Hyundai, North Palm Hyundai, LLC d/b/a Napleton's North Palm Hyundai, and the Florida Department of Highway Safety and Motor Vehicles v. Hyundai Motor America Corporation,* (United States District Court for the Southern District of Florida West Palm Beach Division)
Provided deposition testimony 8/2022.

*Spitzer Autoworld Akron, LLC, v. Fred Martin Motor Company,* (Court of Common Pleas, Summit County, OH)
Provided deposition testimony 7/2022 and trial testimony 8/2022..

*Vivian Arevalo and Micah Simon v. USAA Casualty Insurance Company and Garrison Property & Casualty Insurance Company,* (District Court of Bexar County, TX)
Provided deposition testimony 6/2022.

*Jason Nuwer, Mark Minkowitz, Amarillis Gineris, Christina Vigoa, and Kevin Van Allen v. FCA US LLC f/k/a Chrysler Group LLC,* (United States District Court, Southern District of Florida)
Provided deposition testimony 5/2022.

*Chapman, et al, v. General Motors, LLC.,* (United States District Court for the Eastern District of Michigan)
Provided deposition testimony. 4/2022.

*James Bledsoe, et al, v. FCA US LLC, and Cummins Inc.,* (United States District Court for the Eastern District of Michigan)
Provided deposition testimony 1/2022.

Revised 9/14/2023

Tab 2  Page 2

*In Re: Duramax Diesel Litigation, Relating to: Nancy Anderton, et al., v. General Motors LLC, et al.*, (United States District Court for the Eastern District of Michigan)
Provided deposition testimony 1/2022.

*Fox Hills Auto, Inc. D/b/a Airport Marina Ford v. Ford Motor Company, Central Ford Automotive, Inc., dba Central Ford v. Ford Motor Company and Los Feliz Ford, Inc., dba Star Ford Lincoln  v. Ford Motor Company*, (State of California New Motor Vehicle Board)
Provided deposition testimony 12/2021.

*West Palm Beach Acquisitions, Inc. d/b/a Greenway Kia West Palm Beach and Florida Department of Highway Safety & Motor Vehicles, v. Kia Motors America, Inc.*, (United States District Court Southern District of Florida West Palm Beach Division)
Provided deposition testimony 12/2021.

*Kenneth John Williams and Another Applicants v. Toyota Motor Corporation Australia Limited*, (Federal Court of Australia District Registry: New South Wales Division: General)
Provided trial testimony 12/2021.

*Gabriel Patlan, Ryan Cornell, and La Della Levy, on behalf of themselves and all others similarly situated v. BMW of North America LLC; Wendy Vazquez, on behalf of herself and all individuals similarly situated v. BMW of North America, LLC; Vikkie Wilkinson, on Behalf of Herself and the Putative Class, v. BMW of North America, LLC and Bayersiche Motoren Werke Aktiengesellschaft*, (United States District Court for the District of New Jersey)
Provided deposition testimony 11/2021.

*Peterson Motorcars, LLC et al v. BMW of North America, LLC*, (United States District Court Western District of Kentucky Louisville Division)
Provided deposition testimony 9/2021.

*James Bledsoe, Paul Chouffet, Martin Rivas, Jeremy Perdue, Michael Erben, Martin Witberg, Marty Ward, Alan Strange, James Forshaw, Matt Langworthy, Natalie Beight, Jordan Hougo, Dawn Roberts, and Marc Ganz, on behalf of Themselves and All Others Similarly Situated, v FCA US LLC, a Delaware Corporation, and Cummins Inc., an Indiana Corporation*, (U.S. District Court for the Eastern District of Michigan )
Provided deposition testimony 9/2021.

*Ricardo R. Garcia, et al. v. Volkswagen Group of America, Inc., et al.*, (United States District Court for the Eastern District of Virginia Alexandria Division)
Provided deposition testimony 9/2021.

*Paul Weidman, et al., v Ford Motor Company*, (U. S. District Court Eastern District of Michigan Southern Division)
Provided deposition testimony 5/2021.

Tab 2  Page 3

*Milind Desai v. Geico Casualty Company*, (U.S. District Court Northern District of Ohio Eastern Division)
Provided deposition testimony 5/2021.

*Eric Stevens, Christopher L. Rodriguez, Michael S. Frakes, Terry Pennell, Ray Moore, Kent Larry Bakken, Lynn E. Kirkpatrick, and Michael E. Stone v. Ford Motor Company.* (United States District Court Southern District of Texas, Corpus Christi Division)
Provided deposition testimony 4/2021.

*In the matter of  Luxury Cars of Bayside, Inc., v. BMW of North America, LLC*  (State of New York Department of Motor Vehicles Safety and Business Hearing Bureau)
Provided hearing testimony 4/2021.

*Clarence Simmons, Franklin Navas, Jorge Arroyave, Joseph Dabbs, Jennifer DeWitt, Anne Erdman, Mark James, Shand Jackson, Mike Tierney, Mark Van Bus Kirk, John Buczynski, Ilja Lopatik, Brian Yarborough, William MacSaveny, Ryan Marshall, Allyson Rogers, Peter Tulenko, and Greg Licktenberg, on behalf of themselves and all others similarly situated v. Ford Motor Company* (United States District Court Southern District of Florida)
Provided deposition testimony 3/2021.

*Kimberley Carter and Keith Halliday v. Ford Motor Company of Canada, Ltd., Ford Credit Canada Limited and Ford Motor Company* (Ontario Superior Court Justice)
Provided cross-examination testimony 3/2021.

*Braman Motors, Inc., d/b/a Braman BMW, for Itself and in the Name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its Use and Benefit, and Palm Beach Imports, Inc., d/b/a Braman Motorcars, for Itself and in the Name of the Department of Highway Safety and Motor Vehicles of The State of Florida, for its Use and Benefit, and The Department of Highway Safety and Motor Vehicles of the State of Florida, for the Use and Benefit of Braman Motors, Inc. and Palm Beach Imports, Inc. v. BMW of North America, LLC.* (United States District Court Southern District of Florida Miami Division)
Provided deposition testimony 2/2021.

*Gina Signor, Individually and on Behalf of All Those Similarly Situated v. Safeco Insurance Company of Illinois*, (U.S. District Court, Southern District of Florida, Fort Lauderdale Division)
Provided deposition testimony 11/2020 and 1/2021.

*Between Barry Rebuck and Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited Proceeding under the Class Proceedings Act, 1992*, (Ontario Superior Court of Justice)
Provided cross-examination testimony 10/2020.

Revised 9/14/2023

Tab 2  Page 4

*In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation Nemet v. Volkswagen Group of America, Inc.*, (U.S. District Court, Northern District of California)
Provided deposition testimony 8/2020.

*William South, Individually and on Behalf of All Those Similarly Situated v. Progressive Select Insurance Company,* (United States District Court Southern District of Florida Tampa Division)
Provided deposition testimony 7/2020.

*Biljana Capic v. Ford Motor Company of Australia Limited* (Federal Court of Australia, New South Wales)
Provided trial testimony 7/2020.

*Jason Counts, Donald Klein, Oscar Zamora, Derek Long, Bassam Hirmiz, Jason Silveus, John Miskelly, Thomas Hayduk, Christopher Hemberger, Individually And on Behalf of All Others Similarly Situated, v. General Motors, LLC, Robert Bosch GMBH, and Robert Bosch, LLC,* (United States District Court Eastern District of Michigan)
Provided deposition testimony 2/2020

*Barber Group, Inc., d/b/a Barber Honda v. American Honda Motor Co., Inc., Galpinsfield Automotive, LLC, Intervenor.* (State of California New Motor Vehicle Board)
Provided deposition testimony 1/2019.  Provided  hearing testimony 12/2019 and 1/2020.

*Continental Imports Inc.  d/b/a Mercedes Benz of Austin v Swickard Austin, LLC d/b/a Mercedes Benz of South Austin* (Before the Texas State Office of Administrative Hearings)
Provided deposition testimony 9/2019 and hearing testimony 11/2019

*Alfredo's Foreign Cars, Inc., d/b/a Larchmont Chrysler Jeep Dodge v. FCA US LLC,* (State of New York Department of Motor Vehicles Safety and Business Hearing Bureau)
Provided hearing testimony 10/2019.

*George Tershakovec, et al. v Ford Motor Company,* (United States District Court Southern District of Florida)
Provided deposition testimony 9/2019.

*Vista Ford Oxnard, LLC., d/b/a Vista Ford Lincoln of Oxnard v. Ford Motor Company and Ford of Ventura, Inc., d/b/a Ford of Ventura, Intervenor*, (State of California New Motor Vehicle Board)
Provided deposition testimony 8/2019 and hearing testimony 9/2019.

Tab 2  Page 5

**Illustration of Double Marginalization with Differential Retailing Costs
Case: Marginal Cost OEM > Marginal Cost Independent Dealer**

F:\LUCI\DOUBLEMARGEX.PDF:30:TENTIN

SOURCE:  The Fontana Group, Inc.

Tab 3  Page 1

**Discussion of Double Marginalization with Differential Retailing Costs (Graph):**

The graph illustrates that *in spite of the presence of double marginalization* if the marginal cost of a vertically integrated OEM is larger than the marginal cost of an independent dealer under a successive monopoly structure, then retail prices to consumers are *lower* under the successive monopoly structure than under the vertically integrated OEM. More specifically, this result follows in this model whenever the difference in marginal costs of retailing exceed the wholesale markup. In plain English: consumers are better off under the successive monopoly structure here in spite of double marginalization.

The model is the same as that of Professor Morton[1] but for the assumption of differing retail costs for OEM and an independent dealer.

In the diagram:

-*a* is the marginal cost of retailing for an independent dealer;

-*b* is the marginal cost of retailing for a vertically integrated OEM;

-*c* is the marginal cost of manufacturing the automobile;

-*d* is the wholesale price of the vehicle at which the OEM sells to the independent dealer under a successive monopoly structure;

-*a* + *d* is the (total) marginal cost for an independent dealer under successive monopoly. Note that the marginal cost for an independent dealer is the sum of the marginal cost of retailing for the independent dealer and the wholesale price they pay for the vehicle;

-*b* + *c* is the (total) marginal cost for a vertically integrated OEM. Note that the marginal cost for a vertically integrated OEM is the sum of the marginal cost of retailing for the OEM and the marginal cost of manufacturing the automobile;

-*b* − *a* is the difference in marginal costs of retailing. This is the amount by which marginal costs of retailing are higher for the OEM than for an independent dealer;

-*d* − *c* is the wholesale markup. This is the amount by which the wholesale price of an automobile exceeds the marginal cost of the automobile;

-*P* is the retail price of autos under the successive monopoly structure;

-*Q* is the quantity of autos sold at retail under the successive monopoly structure;

-*P′* is the retail price of autos under the vertically integrated OEM structure;

-*Q′* is the quantity of autos sold under the vertically integrated OEM structure;

The diagram shows the case where the marginal cost for the vertically integrated OEM, *b* + *c*, exceeds the marginal cost for the independent dealer under successive monopoly, *a* + *d*. That is, this is the case *b*

---

[1] Chart 1 "Illustration of Double Marginalization" in "Expert Report of Professor Fiona Scott Morton", in Civil Action No. 1:22-cv-01116-RP, p. 10.

Tab 3  Page 2

$+ c > a + d$. Rearranging the inequality yields $b - a > d - c$. That is, this is the case where the difference in marginal costs of retailing exceeds the wholesale markup.

In this case, the retail price under successive monopoly, $P$, is lower than the price under vertical integration, $P'$. In other words, consumers are worse-off under vertical integration in this case. This is true *in spite of the presence of double marginalization*.

Tab 3  Page 3

# New Retail Vehicle Gross Profit as a Percentage of Sales Price
## Average U.S. Dealer
## 1998 - 2020

| Year | Percentage |
|------|------------|
| 1998 | 6.52% |
| 1999 | 6.36% |
| 2000 | 6.13% |
| 2001 | 5.98% |
| 2002 | 5.85% |
| 2003 | 5.40% |
| 2004 | 5.15% |
| 2005 | 5.10% |
| 2006 | 5.21% |
| 2007 | 5.01% |
| 2008 | 4.43% |
| 2009 | 4.49% |
| 2010 | 4.49% |
| 2011 | 4.57% |
| 2012 | 4.15% |
| 2013 | 3.78% |
| 2014 | 3.63% |
| 2015 | 3.6% |
| 2016 | 3.2% |
| 2017 | 2.8% |
| 2018 | 2.6% |
| 2019 | 2.5% |
| 2020* | 3.1% |

\* 2020 is a COVID pandemic year.

Note: Starting in 2015, percent values are reported to one place beyond the decimal.

SOURCE: The Fontana Group, Inc.
DATA: AutoExec Average Dealership Profile, 3/2000 - 3/2009.
NADA Internet Site, 2009 - 2020.
F:\RESOURCE\R&D: GP%SLSNEW.XLSX:SDAT:21:TOIDIN

Tab 4  Page 1



**New Retail Vehicle Gross Profit as a Percentage of Sales Price**
**Average U.S. Dealer**
**1998 - 2020**

| Year | Value |
|------|-------|
| 1998 | 6.52% |
| 1999 | 6.36% |
| 2000 | 6.13% |
| 2001 | 5.98% |
| 2002 | 5.85% |
| 2003 | 5.40% |
| 2004 | 5.15% |
| 2005 | 5.10% |
| 2006 | 5.21% |
| 2007 | 5.01% |
| 2008 | 4.43% |
| 2009 | 4.49% |
| 2010 | 4.49% |
| 2011 | 4.57% |
| 2012 | 4.15% |
| 2013 | 3.78% |
| 2014 | 3.63% |
| 2015 | 3.6% |
| 2016 | 3.2% |
| 2017 | 2.8% |
| 2018 | 2.6% |
| 2019 | 2.5% |
| 2020* | 3.1% |

* 2020 is a COVID pandemic year.
Note: Starting in 2015, percent values are reported to one place beyond the decimal.

SOURCE: The Fontana Group, Inc.
DATA:    AutoExec Average Dealership Profile, 3/2000 - 3/2009.
             NADA Internet Site, 2009 - 2020.

F:\RESOURCE\R&D.GP%\SLSNEW.XLS\XSDAT2\:TOIDIN

Tab 4  Page 2

**Retailer Incentives to Invest in Facilities**

Retailers have incentives to improve their facilities to the extent that such investments increase retail demand for the products they sell.  The manufacturer also benefits from facility investments in that the wholesale demand for products is ultimately derived from retail demand.  However, we show below that implementing policies that reduce retailer market power also reduce retailer incentives to invest in facilities.

First, we specify retail demand for products as $Q = q(P, F)$ where $P$ is the retail price of the products and $F$ is expenditures on retailer facilities.  Note that $\partial Q / \partial F > 0$ (i.e., increased expenditures on facilities increases retail demand).  Next, we write the retailer's profit function as

$$\textstyle\prod^{d} = q(P,F)[P - (w + s)] - F \tag{1}$$

Differentiating (1) with respect to F yields the following first-order condition for profit maximization

$$\frac{\partial \prod^{d}}{\partial F} = \frac{\partial Q}{\partial F}[P - (w + s)] - 1 = 0 \tag{2}$$

Adding one to both sides of (2) and multiplying through by F yields

$$\frac{\partial Q}{\partial F} F[P - (w + s)] = F \tag{3}$$

Tab 5  Page 1

Next, multiply left-hand side of (3) by Q/Q = 1 and get

$$\frac{\partial Q}{\partial F} \frac{F}{Q} [P - (w + s)]Q = F \qquad (4)$$

We define the facility expenditure elasticity of demand, $\varepsilon_F$ as[2]

$$\varepsilon_F = \frac{\partial Q}{\partial F} \frac{F}{Q} \qquad (5)$$

Substituting for $\varepsilon_F$ and dividing both sides of (4) by Q gives us

$$\varepsilon_F [P - (w + s)] = F/Q \qquad (6)$$

Equation (6) says that the profit-maximizing expenditure on facilities (per products sale) is positively related to $\varepsilon_F$ and the spread between retail price (P) and the retailer's marginal cost (w+s). There is an intuitive explanation for the relationship between P – (w+s) and F. The larger the retailer mark-up over marginal costs, the greater the incentive the retailer has to increase demand (sales) by investing in facility improvements. Thus, policies that reduce retailer market power also reduce retailer incentives to invest in facilities.

We can also show that reducing retailer market power reduces retailers' incentives to advertise. If we replace F in (1) with A=advertising expenditures, we can show that the ratio of the profit-maximizing level of advertising expenditures to sales is positively related to the advertising elasticity of demand and the spread between price and the retailer's marginal cost. The explanation for this result is similar to the one we offered above for investments in facilities.

---

[2] $\varepsilon_F$ measures the effect on retail demand (Q) of a one percent increase in facilities expenditures.

Tab 5  Page 2

The larger the retailer's mark-up over marginal costs, the greater the retailer's incentive to expand sales through advertising.[3]

**Variable Service Quality**

Facility improvements are just one type of retailer service quality. Investments in facilities are fixed in the sense that costs do not change with marginal changes in products sales. However, the costs of some types of services do vary with sales. Examples include free oil changes, car washes, and providing loaner cars. Below, we show that retailer incentives to provide these variable services also depend on the spread between retail product prices and retailers' marginal costs.

Let V be an index of service quality, and write the retailer's demand function as $Q = q(P,V)$. Since V is increasing in service quality, we have $\partial Q / \partial V > 0$. Next, write the retailer's profit function as

$$\prod{}^d = q(P,V)[P - (w + s)] - V_c VQ \qquad (7)$$

where $V_c$ is the cost of a unit of service quality (i.e., a unit of V) and all else is as previously defined. Note that in this specification of the profit function, service quality enters directly as a cost, but affects revenues indirectly through its impact on the demand for products.

Differentiating (7) with respect to V yields the following first-order conditions for profit maximization:

$$\frac{\partial \prod{}^d}{\partial V} = \frac{\partial Q}{\partial V}[P - (w + s)] - V_c(Q + V\frac{\partial Q}{\partial V}) = 0 \qquad (8)$$

Solving for V gives

$$V = [P - (w + s)]/V_c - \frac{\partial V}{\partial Q}Q \qquad (9)$$

---

[3] See Dorfman, Robert and Peter O. Steiner, "Optimal Advertising and Optimal Quality," *American Economic Review*, Vol. 44 (December 1954), 826-836 for a proof of this result.

Tab 5  Page 3

Next, multiply the last term on the right-hand-side of (9) by V/V=1 and get

$$V = [P - (w + s)]/V_c - V/\varepsilon_v \qquad (10)$$

where

$$\varepsilon_v = \frac{\partial Q}{\partial V} \frac{V}{Q} \qquad (11)$$

Note that $\varepsilon_v$ is the service quality elasticity of demand (i.e., it measures the percentage change in demand for a one percent change in service quality).

Finally, solving for V*, the profit maximizing level of service quality, we get

$$V^* = [P - (w + s)]/V_c(1 + 1/\varepsilon_v) \qquad (12)$$

Equation (12) shows that the profit maximizing level of service quality is positively related to the retailer market power (i.e., the spread between the retail price of the products (P) and the retailer's marginal costs (w+s)). In short, implementing policies that reduce retailer market power in the retail market for products also reduces retailers' incentives to provide types of service quality whose costs vary with output (sales).[4]

---

[4] Equation (12) also shows, as we would expect, that incentives to provide service quality are positively related to the service quality elasticity of demand and negatively related to service quality costs.

Tab 5  Page 4

# Data/Documents Relied Upon

Roger D. Blair and Francine Lafontaine, *The Economics of Franchising* (Cambridge: Cambridge University Press, 2005).

Charles Mason Hewitt, Jr., *Automobile Franchise Agreements* (Homewood, IL: Indiana University School of Business, 1956).

James M. Rubenstein, *Making and Selling Cars: Innovation and Change in the U.S. Automotive Industry* (London: The Johns Hopkins University Press, 2001).

Ralph C. Epstein, *The Automobile Industry – Its Economic and Commercial Development* (Chicago: A. W. Shaw Company, 1928).

Thomas G. Marx, "The Development of the Franchise Distribution System in the U.S. Automobile Industry" in *Business History Review* 59, no. 3 (Autumn 1985).

Lawrence H. Seltzer, *A Financial History of the American Automobile Industry* (New York: Haughton Mifflin, 1928).

Expert Report of Professor Fiona Scott Morton, July 25, 2023.

Gerald R. Bodisch, "Economic Effects of State Bans on Direct Manufacturer Sales to Car Buyers," *Economic Analysis Group Competition Advocacy Paper*, May 2009.

Francine Lafontaine and Fiona Scott Morton, "State Franchise Laws, Dealer Terminations, and the Auto Crisis" in *Journal of Economic Perspectives* 24, no. 3 (Summer 2010): 233-250.

Richard E. Caves and William F. Murphy II, "Franchising Firms, Markets, and Intangible Assets" in *Southern Economic Journal* 42, no. 4 (1976): 575.

Automotive News Dealer Census, January 1, 2023.

Expert Report of Herbert E. Walter, July 26, 2023.

Tab 6  Page 1

# New Electric Vehicle Retail Car + Light Truck* Registrations
## Texas
## 2022

| Sold by Texas Dealers** | % Electric Vehicles | Lucid, Polestar, Rivian, and Tesla | % Electric Vehicles | Sold by Out-of-State Dealers | % Electric Vehicles | Sold by Unknown | % Electric Vehicles | Electric Vehicles |
|---|---|---|---|---|---|---|---|---|
| 10,741 | 24.5% | 32,208 | 73.4% | 502 | 1.1% | 406 | 0.9% | 43,857 |

* Car + Light Truck includes GVWs U, 1, and 2.

** Includes Electric Vehicle Registrations sold by Texas Dealers less Lucid, Polestar, Rivian, and Tesla.

Note: Excludes GEM.

SOURCE: The Fontana Group, Inc.

  DATA: S&P Global Mobility New Summary Registration by Dealer Data File, 2022 (6/2023 Update).

  F:\LUCI\ EVSLS.XLSX\SEV\00\TLTDIN\RTLHKIN.89

# New Select Line Make* Retail Car + Light Truck** Registrations
# Sold by Texas Dealers
# Texas
# 2022

| Line Make | Dealer Name | Dealer Town | Registrations |
|---|---|---|---|
| ASTON MARTIN | BENTLEY DALLAS | DALLAS | 55 |
| ASTON MARTIN | SHIPOPO AUTOS | HOUSTON | 39 |
| ASTON MARTIN | RICKYS AUTO SALES | HOUSTON | 21 |
| FERRARI | FERRARI OF HOUSTON | HOUSTON | 80 |
| FERRARI | BOARDWALK MASERATI | PLANO | 51 |
| FERRARI | BARRETT MOTORS | SAN ANTONIO | 32 |
| FERRARI | FERRARI OF AUSTIN | AUSTIN | 32 |
| FERRARI | AUDI PLANO | PLANO | 1 |
| FERRARI | TOM PEACOCK NISSAN INC | HOUSTON | 1 |
| FIAT | NORTHSIDE ALFA ROMEO FIAT | SPRING | 15 |
| FIAT | NYLE MAXWELL FIAT ALFA ROMEO | AUSTIN | 12 |
| FIAT | LITHIA CHRYSLER DODGE JEEP RAM FIAT OF B | BRYAN | 10 |
| FIAT | ED PAYNE MOTORS LLC | WESLACO | 7 |
| FIAT | HELFMAN DODGE CHRYSLER JEEP RAM FIAT | HOUSTON | 6 |
| FIAT | NORTH STAR DCJRF | SAN ANTONIO | 6 |
| FIAT | ALFA ROMEO FIAT OF CORPUS CHRISTI | CORPUS CHRISTI | 4 |
| FIAT | ALLEN SAMUELS DODGE CHRYSLER JEEP | WOODWAY | 3 |
| FIAT | BONHAM CHRYSLER DODGE JEEP RAM FIAT | BONHAM | 3 |
| FIAT | GLENN POLK AUTOPLEX | GAINESVILLE | 2 |
| FIAT | WILLIAMS CHRYSLER DODGE JEEP | WEATHERFORD | 2 |
| FIAT | ALL AMERICAN CHRYSLER DODGE JEEP RAM FIA | SAN ANGELO | 1 |
| FIAT | BIG STAR CHRYSLER JEEP DODGE RAM FIAT | WEBSTER | 1 |
| FIAT | BRUNER MOTORS INC | STEPHENVILLE | 1 |
| FIAT | FRONTIER DODGE CHRYSLER JEEP RAM FIAT | LUBBOCK | 1 |
| FIAT | PORT LAVACA DODGE CHRYSLER JEEP RAM FIAT | PORT LAVACA | 1 |
| FIAT | SUNLAND PARK CHRYSLER DODGE JEEP RAM | EL PASO | 1 |
| MCLAREN | FOUNDATION 45 MITSUBISHI | HOUSTON | 25 |
| MCLAREN | BENTLEY DALLAS | DALLAS | 23 |
| ROLLS ROYCE | DRIVER SOURCE | HOUSTON | 42 |
| ROLLS ROYCE | BENTLEY DALLAS | DALLAS | 32 |
| ROLLS ROYCE | LAMBORGHINI HOUSTON | HOUSTON | 2 |
| ROLLS ROYCE | CARBIZ SOLUTIONS INC | STAFFORD | 1 |

\* Includes Line Makes for which no Dealer has greater than 100 Sales.

\*\* Car + Light Truck includes GVWs U, 1, and 2.

Note: Excludes GEM and Karma.

SOURCE: The Fontana Group, Inc.
DATA: S&P Global Mobility New Summary Registration by Dealer Data File, 2022 (6/2023 Update).
F:\LUCI: TXREGS.XLSX:SREG:00:TLTDIN:RTLHKIN:89